IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

CASE NO.     23-cr-00419-RMR

UNITED STATES OF AMERICA,

       Plaintiff,

v.

CHRISTOPHER CARL MEIER,

       Defendant.

---

**RESPONSE/OBJECTIONS TO PRESENTENCE REPORT**

---

Christopher Carl Meier, by and through undersigned counsel, respectfully submits the following response to the United States Probation Office's Presentence Investigation Report ("PSR"), filed at ECF No. 30.

### **Objections Impacting the Guideline Calculation**

Mr. Meier is before the Court having pled guilty to one count of conspiracy to distribute child pornography, in violation of 18 U.S.C. §§ 2252A(a)(2) and (b)(1), and five substantive counts of distribution of child pornography in violation of 18 U.S.C. §§ 2252A(a)(2) and (b)(1). Distribution offenses are, as the Probation Office notes, generally governed by U.S.S.G. § 2G2.2. *See, e.g.,* PSR ¶ 93. That guideline contains a cross-reference provision, § 2G2.2(c)(1), which states that U.S.S.G. § 2G2.1 should apply, if it yields a higher offense level, in certain factual circumstances. In the Presentence Investigation Report, the Probation Office applied the § 2G2.1 cross-reference to four counts (Counts 2, 4, 5 and 6; PSR ¶¶ 104-138), and declined to apply it to two counts (Counts 1 and 3; PSR ¶¶ 93-103).

With respect to the counts that the Probation Office determined should be governed by

§ 2G2.2, without the application of the cross-reference to § 2G2.1, Mr. Meier has no complaint with the guideline calculation contained in the PSR.[1] He agrees that the various enhancements applied by the Probation Office in PSR ¶¶ 93-103 are appropriate, and acknowledges that his adjusted offense level, as calculated under § 2G2.2, and before acceptance of responsibility, is 39. PSR ¶103. Because offenses covered by § 2G2.2 group under U.S.S.G. § 3D1.2(d); this would mean that, if the § 2G2.2 guideline is applied to all, rather than just to some, of the counts of the indictment, Mr. Meier would have an overall adjusted offense level, after acceptance of responsibility, of 36. When combined with his criminal history category of II, this would yield a final guideline range of 210-262 months.

But here, Probation found that § 2G2.2 governed only Counts 1 and 3, applied the cross-reference to § 2G2.1 that is found at § 2G2.2(c)(1) to the remaining four counts, and then grouped the counts pursuant to U.S.S.G. § 3D1.4 (counts governed by § 2G2.1 do not group pursuant to § 3D1.2(d). *See generally* PSR ¶¶ 104-146. This added five levels (four for grouping, and one for the higher offense level under § 2G2.1) to Mr. Meier's total offense level and increased his guideline range to 360-480 months. PSR ¶¶ 139-141;190. Mr. Meier respectfully submits that the Probation Office erred, at least in part, when it made these determinations.

### The Cross-Reference to § 2G2.1

As an initial matter, it is Mr. Meier's position that the Probation Office correctly grouped Counts 1 and 3, and also correctly declined, with respect to Count 3, to apply the cross-reference

---

[1] *See also* Defendant's Plea of Guilty and Statement of Facts Relevant to Sentencing (Without Plea Agreement), ECF No. 25 at pp.7-8

to § 2G2.1 "based on a lack of evidence that the defendant produced the images/videos noted in Count 3". PSR at *n*.2.

The government did not charge Mr. Meier with a production offense in this case. This website existed so that people could exchange, share, and download child pornography materials that originated from a variety of places. And, while Mr. Meier did hold himself out as a "capper" (PSR ¶ 32), the evidence that he actually created the specific videos that are charged in Counts 2, 4, 5, and 6, comes primarily from statements that he made, either in the captions of the posts themselves and/or in private messages to other users of this website.

Many of these statements, while accurately reproduced by the government at length in the additional information they provided to the Probation Office (PSR ¶¶ 12-81), could (and should) be fairly construed as being puffery, braggadocio, and/or exaggeration—statements that Mr. Meier made to enhance his own status with other users of this website, rather than necessarily being statements of literal truth. But the Probation Office relies on the literal truth of these statements to support not only the application of the cross-reference to § 2G2.1 but also as a basis to apply various enhancements within that guideline.[2] Because doing so results in an advisory guideline range of 360-480 months (PSR ¶ 190), a massive increase from the 210-262 month range that would otherwise apply, the Court must carefully consider whether those determinations are actually warranted.

For example, while counsel acknowledges that there are a number of statements with respect to Count 2 in particular that could lead the Court to infer that it was Mr. Meier who

---

[2] *See, e.g.*, the discussion below about what can be fairly said about the age of the individual in count 6.

produced this video (*see generally* PSR ¶¶ 40-44), with respect to Count 5 (*see generally* PSR ¶¶ 50-54), the evidence for such a conclusion is much weaker. The PSR's argument that the cross-reference should apply to Count 5 appears to ultimately turn on the words "original content" being in a post header that also specifically referenced another user; Mr. Meier then went on to thank that other user for the "countless time" he had put "into this work". PSR ¶ 52. A fair and plausible reading of all of this could be that Mr. Meier simply posted/distributed a video that this other person made. Similarly, the PSR's application of the cross-reference to Count 6, and to the § 2G2.1(b)(6)(B) enhancement within that guideline, appears to turn, at least in part, on the word "my", modifying "girl", in a line of text in the video (PSR ¶ 134). Even Count 4, where the post Mr. Meier made included the words "I" and "my" (PSR ¶¶ 45-49), when describing certain actions, is not necessarily definitive in terms of identifying who actually created the specific video in question, as opposed to merely revealing the identity of the individual who was posting the caption and video. Ultimately, these are relatively thin reeds upon which to rest such significant sentencing enhancements; it would not be unreasonable to conclude that the § 2G2.1 cross-reference should not apply to some or all of the counts where the PSR utilized it.

      Mr. Meier has admitted to posting videos and distributing child pornography. Nor could anyone deny that his own posts and messages provide circumstantial evidence tending to show that he was involved in the production of some videos at various points in time. But the much narrower question here is whether the Court can be sure that he, and not some other individual, made the specific videos that he was charged with, and that he has admitted to posting, in this case. Mr. Meier acknowledges that the guidelines counsel that the cross-reference to § 2G2.1 should be "construed broadly". *See* U.S.S.G. § 2G2.2, comment. (n.7(A)). But counsel

respectfully submits that, with regard to Counts 4, 5, and 6, in particular, the Court should hesitate to find a sufficient basis from which to find that the § 2G2.1 cross-reference applies. If the cross-reference does not apply to any of these three counts, they, along with Counts 1 and 3, would comprise a single group with an adjusted offense level of 39. The application of U.S.S.G. § 3D1.4 would then add two levels (instead of four) to the offense level of the highest group— here 40—creating an offense level of 42. *Compare with* PSR ¶¶ 139-141. After acceptance of responsibility, the final offense level would be 39 which, when combined with Mr. Meier's criminal history category of II, would yield an advisory range of 292-365 months.

Similarly, were the Court to find that the § 2G2.1 cross-reference applied with respect to Counts 2 and 4, but not to Counts 5 and 6, there would be three groups[3] which would mean that three levels (instead of four) would be added pursuant to U.S.S.G. § 3D1.4. *Compare with* PSR ¶¶ 139-141. After the deduction for acceptance of responsibility, this would leave a total offense level of 40 which, when combined with Mr. Meier's criminal history category of II, would yield an advisory range of 324-405 months.[4]

### Additional Guideline Considerations

But even if the Court finds, as Probation did, that the weight of the evidence supports the application of the cross-reference to § 2G2.1 with respect to Counts 2, 4, 5, and 6 (PSR ¶¶ 104-138), there are additional issues presented by Counts 5 and 6 that implicate the applicability of

---

[3] Group 1: Counts 1, 3, 5, and 6, with an offense level of 39; Group 2: Count 2 with an offense level of 40; Group 3: Count 4 with an offense level of 40.

[4] If the Court declined to apply the § 2G2.1 cross-reference only to Count 5, the guideline range found by Probation would not change based on the application of § 3D1.4, despite there being four, not five, groups.

the cross-reference and grouping under § 3D1.4, and suggest that a lower advisory guideline range would apply in this case.

### Count 5

With respect to Count 5, U.S.S.G. § 2G2.2(c) specifically provides that the cross-reference provision only applies, "if the resulting offense level is greater than that determined above". *See* § 2G2.2(c)(1). Here, using the cross-reference provision of § 2G2.1 yields an adjusted offense level of 38. PSR ¶ 129. Because this number is *lower* than the offense level that would apply using § 2G2.2 (i.e. an adjusted offense level of 39; PSR ¶ 103), the higher guideline controls. Thus, because Count 5 should be calculated using § 2G2.2, it would group with Counts 1 and 3, pursuant to § 3D1.2(d). *See also* n.4 *supra*.

### Count 6

With respect to Count 6, Probation found that the § 2G2.1 cross reference applied and, in so doing, also added a 2-level enhancement based on the victim's age pursuant to U.S.S.G. § 2G2.1(b)(1)(B), concluding that the victim, W.R., was 13 years old when the video was made. PSR ¶ 131. It is true that the video file at issue was entitled "SkypeHD-William 13yo—USA-2020-04-08". PSR ¶ 61. And because counsel received redacted discovery, she does not know W.R.'s precise birth date. But, from the materials that were provided, her understanding is that W.R. was born in 2005 and turned 18 in 2023.

Underscoring the general problem with relying on the titles or the captions of videos as being definitive proof of the actual truth of the statements made therein—W.R., born in 2005, could not have been 13 in a video made in 2020 (if, indeed, that is when the video was made). And while, without knowing his exact birthdate, it is impossible to know if W.R. could have

theoretically attained his 16th birthday by March 27, 2021 (the date the post was made), there is at least a question as to his age on the relevant dates based on the factual record to which counsel currently has access.

If the Court ultimately determines that there is insufficient proof of age in order to support the application of the § 2G2.1(b)(1)(B) enhancement and declines to do so, this would mean that the adjusted offense level for Count 6 would be 38, not 40. *Compare with* PSR ¶ 138. As with Count 5, because this number is *lower* than the offense level that would apply using § 2G2.2 (i.e. an adjusted offense level of 39; PSR ¶ 103), the higher guideline controls. Thus, the guidelines for Count 6 would be calculated using § 2G2.2, and Count 6 would group with Counts 1, 3, and 5.

For these additional reasons, even if the Court determines that it would otherwise apply the § 2G2.1 cross-reference to Counts 5 and 6, these counts should nonetheless group with Counts 1 and 3 pursuant to § 3D1.2(d), and three levels (for three groups) should be added to the highest adjusted offense level of 40 (for Groups 2 and 3) pursuant to § 3D1.4. *Compare with* PSR ¶¶ 139-141 (adding four levels, for five groups). After acceptance of responsibility, this would leave a total offense level of 40 which, when combined with a criminal history category of II, would yield an advisory guideline range of 324-405 months.

## Objections to Conditions of Supervised Release

Mr. Meier does not object to the condition that he participate in sex offender treatment generally.[5] But he does object to both the imposition of polygraph testing and to visual response

---

[5] While Mr. Meier has no opposition to the Court ordering him to comply with a mental health treatment condition, he believes that it may benefit him if his mental health and sex offender treatments were offered together, instead of being siloed into separate conditions of his

testing.

A district court has discretion in imposing special conditions of supervised release. In exercising this discretion, however, a court is bound by both statutory and constitutional concerns. The imposition of conditions of supervised release is governed by 18 U.S.C. § 3583(d). That Section provides that the Court may order a special condition of supervised release, provided such condition:

(1) is reasonably related to the factors set forth in section 3553(a)(1), (a)(2)(B), (a)(2)(C), and (a)(2)(D);

(2) involves *no greater deprivation of liberty than is reasonably necessary* for the purposes set forth in section 3553(a)(2)(B), (a)(2)(C), and (a)(2)(D); and

(3) is consistent with any pertinent policy statements issued by the Sentencing Commission pursuant to 28 U.S.C. § 994(a).

18 U.S.C. § 3583(d) (emphasis added). Interpreting this Section, the Tenth Circuit has required "conditions of supervised release to be linked to the offense and be no broader than necessary to rehabilitate the defendant and protect the public." *See United States v. Smith*, 606 F.3d 1270, 1282 (10th Cir. 2010). Any restriction affecting a defendant's liberty must be especially "fine-tuned to achieve the goals set forth in section 3553(a)(2)(B), (C), and (D)." *United States v. Edgin*, 92 F.3d 1044, 1049 (10th Cir. 1996).

Importantly, it is the district court and not a probation officer that must engage in the Section 3583(d) analysis. It is true that probation officers are granted broad authority to "advise and supervise probationers." *United States v. Mike*, 632 F.3d 686, 695 (10th Cir. 2011) (citing *United States v. Pruden*, 398 F.3d 241, 250 (3rd Cir. 2005)). But, there are limits to this

---

supervision. He, appropriately, believes that his treatment needs in both areas are intertwined and overlapping.

8

authority. For example, "Article III prohibits a judge from delegating the duty of imposing the defendant's punishment to the probation officer." *Mike*, 632 F.3d at 695. As the Tenth Circuit has explained:

> In determining whether a particular delegation violates this restriction, courts distinguish between those delegations that merely task the probation officer with performing ministerial acts or support services related to the punishment imposed and those that allow the officer to decide the nature or extent of the defendant's punishment. Delegations that do the former are permissible, while those that do the latter are not.

*Id.* (internal citations omitted).

Allowing a probation officer, or a third-party treatment agency, to impose a condition that affects a significant liberty interest is "tantamount to allowing him to decide the nature or extent of the defendant's punishment." *Id.* at 696. The Tenth Circuit has recognized several specific conditions that affect a significant liberty interest. These include requiring participation in residential treatment, requiring penile plethysmographic testing, polygraph testing and the forced administration of psychotropic medication. *Id.*; *see also United States v. Fivaz*, 521 Fed. Appx. 696, 701-02 (10th Cir. April 15, 2013) (unpublished); *United States v. Von Behren,* 822 F.3d 1139 (10th Cir. 2016).

Constitutional issues also arise with respect to conditions of supervised release. These include First Amendment violations and Fifth Amendment violations. The Fifth Amendment provides, in relevant part, that no person "shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property without due process of law." U.S. Const. amend. V. The Supreme Court held that the general obligation of a probationer to appear and answer questions truthfully does not convert voluntary statements into compelled ones. *Minnesota v. Murphy,* 465 U.S. 420 (1984). But, while a state may require a probationer to

9

appear and discuss matters that affect his probationary status without giving rise to a self-executing privilege:

> The result may be different if the questions put to the probationer, however relevant to his probationary status call for answers that would incriminate him in a pending or later criminal prosecution. There is thus a substantial basis in our cases for concluding that if the state, either expressly or by implication, asserts that invocation of the privilege would lead to revocation of probation, it would have created the classic penalty situation, the failure to assert the privilege would be excused, and the probationer's answers would be deemed compelled and inadmissible in a criminal prosecution.

*Id.* at 435.  Conditions that require a probationer to "choose between making incriminating statements and jeopardizing his conditional liberty by remaining silent" are impermissible. *Id.* at 436.

In *United States v. Von Behren,* the Tenth Circuit addressed the question of whether polygraph testing poses a risk of compelled self-incrimination where an invocation of privilege *might* lead to the revocation of Supervised Release.  The Court held that "a witness is compelled under the Fifth Amendment *as soon as the government threatens him* with a substantial penalty—it makes no difference whether he proceeds with answering or stands on his right." *Von Behren,* 822 F.3d 1139, 1150 (10th Cir. 2016).  In other words, a condition of Supervised Release requiring polygraph testing without the grant of immunity will necessarily violate the Fifth Amendment.   If there is no immunity grant, and the defendant, based on his Fifth Amendment privilege, refuses to provide information – be it to a treatment provider, a polygraph examiner, a plethysmographic (or visual response) technician, or to his probation officer – he cannot be sanctioned because of this refusal.  *See Murphy*, 465 U.S. at 438. ("Our decisions have made clear that the State could not constitutionally carry out a threat to revoke probation for a legitimate exercise of the Fifth Amendment privilege.").  This is true despite any legitimate

therapeutic or rehabilitative purpose the disclosure might serve: "The irreconcilable constitutional problem . . . is that even though the disclosures sought here may serve a valid rehabilitative purpose, they also may be starkly incriminating, and there is no disputing that the government may seek to use such disclosures for prosecutorial purposes." *United States v. Antelope*, 395 F.3d 1128, 1137 (9th Cir. 2005).

Finally, due process requires that conditions of supervised release be sufficiently clear to inform a released prisoner of what conduct will result in his return to prison. *See United States v. Simmons*, 343 F.3d 72, 81 (10th Cir. 2003). Conditions of supervised release may be infirm if they are overly vague or unclear. *Mike*, 632 F.3d at 694. As a result, the scope of all supervised release conditions needs to be clearly defined. *Id*.

## Polygraphs and Visual Response Testing

Courts have paid particular attention to areas of sex offender treatment that implicate significant liberty interests, specifically polygraph testing and plethysmograph testing. For example, in order for the Court to impose plethysmograph testing, there must be a strong nexus to the defendant's history and characteristics before it can be imposed. *United States v. Bennett*, 823 F.3d 1316 (10th Cir. 2016), citing *United States v. Dougan*, 684 F.3d 1030, 1034 (10th Cir. 2012).

Polygraph testing to ensure compliance with terms of supervision involves a greater deprivation of liberty than necessary, and is not reasonably related to Mr. Meier's conduct or to his history and characteristics. Polygraph testing for the sole purpose of ensuring "compliance with requirements of supervision," is not recommended in non-sex offense cases, and cannot therefore be necessary to ensure compliance with supervision generally. Nothing about Mr.

Meier specifically suggests a propensity to lie or to lie about his compliance with treatment. Moreover, as even Probation acknowledges (PSR at R-6), the reliability of polygraphs, for any purpose, has frequently and deservedly come under scrutiny. *See, e.g., United States v. Scheffer*, 523 U.S. 303, 309-310 (1998); *United States v. Begay*, 631 F.3d 1168 (10th Cir. 2011). And there is real concern for the potential for a polygraph condition to result in the violation of Mr. Meier's Fifth Amendment Right against compelled self-incrimination. *See Von Behren,* 822 F.3d at 1150. Given all of the forgoing, the Court should decline—or should carefully limit—this requested condition.

Imposing a visual response condition of supervised release implicates a significant liberty interest, and the Court should not do so absent a strong need for this type of "treatment". As an initial matter, Probation offers limited insight into the exact nature of the "visual response testing" that it requests. Without further information, the Court cannot possibly determine the liberty interests at stake, or whether the condition is reasonably related to the 18 U.S.C. § 3553(a) factors as they apply to Mr. Meier. That being said, this test certainly involves a mental intrusion, through "probing of [Mr. Meier's] most innermost thoughts. Such an intrusion is unwarranted absent a specific finding of necessity." *United States v. Weber,* 451 F.3d 552, 562 (9th Cir. 2006). Additionally, these types of tests, like the Abel Assessment or penile plethysmograph, are not scientifically validated and are widely regarded as junk science. *See, e.g.,* The Sex Offender Test, *The Atlantic,* available at https://www.theatlantic.com/politics/archive/2015/07/the-sex-offender-test/397850 (psychology professor Robert Enright notes, for example, that "there are just not enough studies to give me confidence that the scale has strong and enduring psychometric properties for use in predicting a

particular person's sexual interest."). Moreover, general sexual interest does not necessarily, or even often, correlate with offense conduct. In other words, the fact that a test may determine sexual interest, does not make it more likely that Mr. Meier will re-offend, and the Court should therefore decline to authorize an intrusion of this magnitude here.

For the foregoing reasons, these two conditions should either not be imposed at all, or should be modified to conform with the statutory and constitutional mandates governing conditions of Supervised Release.

## Objection to the JVTA Special Assessments

The Probation Office recommended that the Court impose $30,000 in special assessments pursuant to the JVTA in this case. PSR ¶ 199. Mr. Meier requests that the Court make a finding that he is indigent such that he is relieved of this obligation. *See* PSR, Justification at R6-R7.

Mr. Meier is not a wealthy man. Prior to his arrest he was earning $27.44/hour. PSR ¶ 177. He has a bank account with less than $11,000 in it, and he has saved approximately $65,000 for his retirement over the entirety of his working life. PSR ¶ 182. That is the extent of his liquid assets. Mr. Meier does own a modest home which has appreciated in value since he purchased it. But, as the Court knows all too well, the ability of individuals on the sex offender registry to find appropriate housing is staggeringly difficult, and Mr. Meier is very much hoping to be able to use his relatively modest savings to ensure that he is able to keep his house while he serves this sentence. PSR ¶ 163.

Mr. Meier will serve a prison sentence measured in decades. When he gets out, a man who has done physical labor his entire life, will be in his 60s. Even setting aside how difficult it is for people on the registry to obtain employment, Mr. Meier's ability to perform warehouse

work is likely to be greatly diminished by that time, and his ability to support himself is likely to be tenuous at best.  Mr. Meier understands that he is responsible for any requested restitution.  He understands that he will face an AVAA assessment.  But, looking at the full financial picture here, the Court can, and should, relieve him of the $30,000 JVTA assessment.

### Objections That Do Not Impact the Guideline Range

Mr. Meier makes the following further objections and clarifications to the draft Presentence Report, none of which impact the calculation of the advisory guideline sentencing range:

- **Paragraph 4**:  Mr. Meier notes that he was never served with any disciplinary paperwork by the Washington County Jail in connection with any of these infractions.  He has been rehired into the inmate worker program at Washington County twice—first in January of 2024 and then again in August of 2024.  He currently serves as a laundry porter.

- **Additional Information; PSR ¶¶ 11-85**:  Mr. Meier does not dispute the general accuracy of the information provided by the government in this section, but he adamantly denies ever blackmailing or trying to extort anyone (*see, e.g.*, PSR ¶35), although he is aware that "cappers" do engage in this behavior on occasion.  Mr. Meier also notes that many of the statements he made in his private messages on the charged website, while accurately reproduced by the government at length in this section, were made in the vein of puffery, braggadocio, and/or exaggeration and so as to enhance his own status with other users, rather than being statements of literal truth.  Finally, while it is true that Mr. Meier made one post (which he later deleted) on "The Resistance" website (PSR ¶ 68), he notes that his involvement with that site was otherwise extremely limited and did not include posting.

- **Paragraph 148**:  Mr. Meier clarifies that he was not arrested in connection with this traffic

offense but was rather simply given a citation.

- **Paragraphs 165-166**:  Mr. Meier reports that he also has a history of sleep apnea and was working with Rocky Mountain Sleep Diagnostics in Brighton to obtain appropriate care for this condition prior to his arrest in this case.

- **Paragraph 172**:  Mr. Meier clarifies that he was unable, not unwilling, to participate in treatment while in the CDOC.  Given the scarcity of those services, people who are serving determinate (as opposed to indeterminate) sentences are generally not able to access treatment.

- **Paragraph 180**:  Mr. Meier worked at Nature Composites after (not before) working at Anderson Carpets in Torrington.

- **Justification at R-5, ¶2**:  Mr. Meier clarifies that he was mocked for his *perceived* sexuality; he does not identify as being gay.  Additionally, even when not incarcerated, he has had several periods over the last fifteen years where he was able to abstain from engaging in the conduct at issue in this case. *See also* PSR ¶¶ 76, 81.

WHEREFORE Mr. Meier respectfully objects as detailed above to the Presentence Investigation Report.

    Respectfully submitted,

    VIRGINIA L. GRADY
    Federal Public Defender

    s/ *Stephanie Snyder*
    STEPHANIE SNYDER
    Assistant Federal Public Defender
    633 17th Street, Suite 1000
    Denver, CO  80202
    Telephone: (303) 294-7002
    FAX: (303) 294-1192
    Stephanie_Snyder@fd.org
    Attorney for Christopher Meier

# CERTIFICATE OF SERVICE

I hereby certify that on October 23, 2024, I electronically filed the foregoing ***Response/Objections to Presentence Report*** with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following e-mail addresses:

Alecia Riewerts, Assistant United States Attorney
Email:  Alecia.Riewerts@usdoj.gov

Kyle P. Reynolds, Trial Attorney
Email:  Kyle.Reynolds@usdoj.gov

I hereby certify that I have mailed or served the document or paper to the following non-CM/ECF participant in the manner (mail, hand-delivery, etc.) indicated by the non-participant's name:

Christopher Meier (via hand-delivery)

s/ *Stephanie Snyder*
STEPHANIE SNYDER
Assistant Federal Public Defender
633 17th Street, Suite 1000
Denver, CO  80202
Telephone: (303) 294-7002
FAX: (303) 294-1192
Stephanie_Snyder@fd.org
Attorney for Christopher Meier