## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Criminal Case No. 23-cr-00419-RMR

UNITED STATES OF AMERICA,

        Plaintiff,

v.

1.     CHRISTOPHER CARL MEIER,

        Defendant.

---

## GOVERNMENT'S SENTENCING STATEMENT

---

The United States of America ("the government"), by and through Matthew T. Kirsch, Acting United States Attorney for the District of Colorado, Alecia L. Riewerts, Assistant United States Attorney, and Kyle Reynolds, Acting Deputy Chief of the Department of Justice's Child Exploitation and Obscenity Section, hereby submits this Sentencing Statement.

The defendant is a registered sex offender who, by his own admission, is "addicted" to child pornography and has been viewing it for approximately 25 years. He was not deterred when federal law enforcement searched his home for child pornography offenses in 2006. Nor was he deterred when local authorities searched his home and arrested him in 2012, which led to his 2013 conviction for sexual exploitation of children and his requirement to register as a sex offender. Nor was he deterred when the FBI executed yet a third search warrant at his home in 2021. After all this, he still continued to access child pornography websites online.

In fact, after his first encounter with law enforcement, the defendant's criminal sexual activity toward children *escalated*. Passively consuming child pornography was no longer

enough for him.  He began posing as a young girl to talk to minor boys online and encouraging and enticing them to disrobe and masturbate for the camera.  Once they did so, he would create videos of the boys without their knowledge and advertise and distribute them on websites dedicated to the sexual exploitation of children.  The presentence report ("PSR") refers to *more than sixty* minor victims of the defendant's conduct.

The defendant is a sexual predator, a recidivist, and a clear danger to children.  He had every opportunity to cease his sexually exploitative conduct and simply did not.  The government therefore recommends that the Court sentence him to 40 years in prison, which is a fair and just sentence given the egregious facts, the sheer number of victims, the advisory sentencing guidelines, and the other factors set forth in 18 U.S.C. § 3553(a).

## I.    THE UNITED STATES SENTENCING GUIDELINES

The United States Sentencing Guidelines are advisory, but they remain "the starting point and the initial benchmark" in sentencing.  *Gall v. United States,* 552 U.S. 38, 49-50 (2007).  The guidelines must be properly calculated and considered, but ultimately the Court must craft a sentence that sufficiently accounts for the sentencing factors and objectives outlined in 18 U.S.C. § 3553(a).  *Id*. at 49-50.  "A sentence is substantively reasonable when the length of the sentence reflects the gravity of the crime and the § 3553(a) factors as applied to the case." *United States v. Martinez-Barragan*, 545 F.3d 894, 905 (10th Cir. 2008).

The draft PSR [ECF #37] filed on October 9, 2024, calculates the defendant's final offense level at 41, accounting for his acceptance of responsibility.  The government agrees with portions of the PSR's analysis but objects to other portions, and it has filed objections [ECF #32] establishing that the defendant's final offense level should be 42, which combined with a

Criminal History Category of II leads to a guidelines range of 360 months to the statutory maximum sentence of 240 years, equivalent to 2,880 months.

Because the guidelines are advisory and only one factor to be considered by the Court in determining a sentence under 18 U.S.C. § 3553(a), the government will frame its argument within the factors set forth in 18 U.S.C. § 3553(a) and proceed through those factors in the order in which they appear in the statute.

## II.    DISCUSSION OF THE 18 U.S.C § 3553(a) FACTORS

### A.  *Nature and Circumstances of the Offense*

The facts of the defendant's crime of conviction are well documented in the PSR.  The defendant pleaded guilty to multiple counts involving the distribution of child pornography.  PSR at ¶¶ 1-2.

But this defendant is no mere distributor.  Instead, as the unobjected-to facts in the PSR make clear, the images and videos he shared over the website at issue—referred to here as "Website A"—consisted of branded content the defendant produced himself.  He did so by targeting minor boys online, enticing them to perform sexually, recording them as they did so, and then sharing the resulting videos with like-minded pedophiles on Website A.  The defendant was so notorious and prolific that his online activity attracted the attention of four different law enforcement agencies in three separate countries.  PSR at ¶ 29.

Specifically, Website A was website dedicated to child pornography and the sexual exploitation of minor boys.  PSR at ¶ 26.  The defendant was active on the website for more than 18 months, and during this time he made more than 600 posts and received several "awards."  *Id.* at ¶¶ 26, 30-31.  On Website A, he used a particular username that identified him to other users and which he used to brand his content.  *See, e.g., id.* at ¶¶ 34-37.

The defendant held himself out on Website A as a "capper," which refers to someone who takes videos or screen captures—sometimes called "caps"—of minors engaging in sex acts on web camera. PSR at ¶ 32. He maintained a "productions index" within a Website A subforum dedicated to cappers. *Id.* at ¶¶ 27, 34. This "productions index" consisted of a post on Website that included numerous depictions of boys between the ages of approximately 12 and 15 disrobing and masturbating in front of a camera. *Id.* at ¶¶ 34-35. Each depiction consisted of a collage of screenshots from a video, and each included a title that included a boy's name, a location like "USA" or "CANADA," a date, and often a sexually explicit description such as "12yo shows dick in bath," "13yo cums 2x," or "15yo poses, anal fun, cums." *Id.* ¶ 34. (The abbreviation "yo" stands for "years old.")

One set of images in the defendant's "production index" depicts two boys, identified as being 14 and 12 years old, engaging in oral and anal sex with one another. PSR at ¶¶ 34-35. All told, this "production index" post appears to include depictions of at least *thirty-five* minor boys who showed their genitals and/or masturbated on camera. *Id.* at ¶ 36. This includes nine boys who were identified by the FBI, as well as eight additional boys who were preliminarily identified. *Id.* at ¶¶ 34-36.

The defendant made other posts on Website A as well. As detailed in the PSR, the FBI captured at least six other posts he made on Website A that included images or videos of minor boys masturbating. PSR at ¶¶ 40-66. In these posts, the defendant often included nauseatingly specific descriptions of the depicted conduct. For example, he described one 12-year-old child as "hot and horny" and "too young to cum," but whose genitals "are begging for a thorough sucking and licking." *Id.* at ¶ 41. In a comment to this post, the defendant admitted that his session with the boy lasted approximately two and a half hours, and that he had been interacting

with the minor for more than a year before he went through puberty. *Id.* at ¶ 42. These other posts that the defendant made on Website A depicted at least eight identified or preliminarily identified minor boys, not including the 35 minor boys depicted in the "production index" post. *Id.* at ¶¶ 48, 65, 67.

Some of the defendant's posts constituted entries in perverse "competitions" with other members of Website A about the sexual abuse of children. *See, e.g.,* PSR ¶¶ 40, 45, 55, 60. In these posts, the defendant distributed and advertised child pornography he previously produced in order to gain favor and appreciation from other like-minded pedophiles. *Id.* The defendant specifically stated in one such instance, "I'm trying to get more votes from the pedos…" *Id.* at ¶ 42. Other Website A users responded to the defendant's posts to thank and praise him and comment on the videos he posted. *See, e.g., id.* at ¶¶ 41-42, 46-47, 51-52, 57, 62-63.

In these posts, the defendant encouraged his audience of Website A users to masturbate to the minor boys in the videos he posted. *See, e.g.,* PSR at ¶¶ 46, 61. He and other users discussed and praised the minor boys' sexual attractiveness and performance in explicit detail. *See, e.g., id.* at ¶¶ 41-42, 45, 47, 58. These comments—made both by the defendant and the audience to which he catered—made clear that they viewed these boys as mere sexual objects to be ogled and masturbated to and not vulnerable minor victims of sexual exploitation and gross invasions of privacy.

All of the defendant's conduct made clear that he was the original producer of the content that he posted on Website A. For example, as noted above, he expressly held himself out as a capper who maintained an index of his "productions." PSR at ¶¶ 32, 34. He also made detailed statements about his interactions with the victims. He said, for example, that one of his videos omitted certain scenes depicting the victim getting distracted and nervous, and these are details

only the producer of the video would know. *Id.* at ¶ 42. He also implied that he interacted with this same victim over the course of several years and observed his sexual development, and specifically his ability to ejaculate. *Id.* He also sent another user a detailed transcript between him and a 13-year-old boy in which he asked the boy to be his "slave," he instructed the boy to "slap ur ass" and to "cum," and that he might ask the boy to "use a hairbrush in your ass like a dildo…" *Id.* at ¶ 73. He told another user that he has "been directing boys in solo action and duo hardcore action since 2012." *Id.*

The defendant also spoke in detail in his private messages about being a capper and the process of capping. For example, he stated that he has been capping since 2007, that he worked with another person to recruit and target boys in three specific foreign countries, that he capped one particular boy 43 times over a two-year period, that he capped eight separate boys in one particular day, that capping is a difficult and "time consuming" process that takes "hours," that certain online platforms are better for capping than others, that only about 10% of his efforts result in successful caps. PSR at ¶ 73. He also provided detailed instructions to other users about best practices for targeting children online and producing child pornography of them. *Id.*

In addition, the defendant made statements disclosing his *modus operandi* of enticing young boys to perform sexually on camera. As noted in the PSR, cappers who target boys often pose as girls the same age as their victims, in the hopes that their victims will be more likely to engage in sexual conduct if they think they are interacting with a girl their own age. PSR at ¶ 33. The defendant made numerous statements on Website A admitting that he used a "girl" to induce his victims to engage in sexual conduct. For example, he mentioned that one victim viewed "my girl stripping for him," another wanted to spend time with "my girl," another ejaculated only after the defendant used "my girl," yet another victim wanted to "cum for a girl," and even yet

another had "cam sex with my girl." *Id.* at ¶¶ 40, 42, 45, 58. The defendant, of course, is a childless middle-aged male sex offender, so these statements make no sense in any context other than a disclosure of his capping methods. He also told another user in a private message that he uses a "bait girl" in his capping. *Id.* at ¶ 73.

The defendant's online admissions are corroborated by the statements of several of his victims. A number of the defendant's victims told law enforcement that they chatted over various platforms with a "girl" who directed them to disrobe and/or send nude images, and this "girl" either never spoke or never appeared on camera. *See, e.g.,* PSR at ¶¶ 35, 48, 68. Other victims also confirmed more generally that they engaged in sexual interactions with girls online. *Id.* at 35, 36, 53, 67, 68. These victims, of course, would have no reason to know about the admissions the defendant made on Website A regarding his capping methods. And none of them reported having an online sexual interaction with an adult man.

In addition, the defendant went to great lengths to brand his videos and market them as his own produced content. For example, his username appears frequently in his videos, either in full or in abbreviated form, and he included a personalized banner in his posts. *See, e.g.,* PSR at ¶¶ 35, 37, 40-41, 45-46, 50-51, 55-58, 60-62, 64. This username was personal to the defendant, and he has been using it since he was a child. *Id.* at ¶ 77. Some of his videos also included a stylized logo that appeared to be a play on his username. *Id.* at ¶¶ 36, 58, 64.

The defendant's sexually predatory conduct was not limited to Website A, either. He engaged in essentially the same conduct on at least three other websites dedicated to child exploitation—that is, he screen-captured boys masturbating on camera and then uploaded them to a child pornography website—and FBI identified or preliminarily identified approximately 23 additional child victims whose content appeared on websites other than Website A. PSR at ¶ 68.

All told, the PSR alone refers to more than 65 separate victims of the defendant, and whose depictions he advertised or distributed over Website A and other websites. This excludes numerous as-of-yet unidentified victims, including victims in foreign countries and victims whose videos the defendant did not share with others. *See, e.g.,* PSR at ¶¶ 59, 69, 73. As the Supreme Court first noted approximately 40 years ago, the abuse and memorialization of the abuse "are a permanent record of the children's participation." *New York v. Ferber*, 458 U.S. 747, 759 (1982). The harm that the defendant inflicted on his victims will likely be lifelong. And by distributing the videos memorializing his abuse, he has inflicted an entirely different kind of harm on them. The internet is forever. His victims necessarily know that their videos will be in the hands of pedophiles and circulating on the internet for their whole lives.

Also, these figures necessarily understate the number of minors the defendant *tried* to target online. As noted above, he stated that only about 10% of his efforts resulted in successful caps. PSR at ¶ 73. By his own math, the defendant must have targeted more at least 650 minors online to achieve the caps depicting 65 minors that are referred to in the PSR.

The defendant's conduct with regard to these victims was outrageous on its own, but it was all the worse because he uploaded videos of the victims to a community dedicated to child pornography and child exploitation. The U.S. Sentencing Commission has specifically identified this as an aggravating factor not currently accounted for in the Sentencing Guidelines for child pornography trafficking.[1] The Commission concluded that the existence of such communities "increases the likelihood that *other* community members may engage in sex offending to create

---

[1]    United States Sentencing Commission, *2012 Report to the Congress: Federal Child Pornography Offenses*, at xvii-xviii (December 2012) ("2012 Report"), available at https://www.ussc.gov/sites/default/files/pdf/news/congressional-testimony-and-reports/sex-offense-topics/201212-federal-child-pornography-offenses/Full_Report_to_Congress.pdf.

new child pornography images for trading online." 2012 Report at 94. The Commission found that such communities are also dangerous because they normalize the sexual exploitation of children, help offenders look at their deviant sexual desires in a positive light, and may lead offenders to progressing from viewing CSAM to committing other sex offenses. *Id.* at 97.

Another aggravating factor is the defendant's level of sophistication—not just in exploiting minors online, but in avoiding detection by law enforcement. The defendant was so knowledgeable about law enforcement methods and matters that he invoked by name a particular anti-child-exploitation task force operated by a foreign government. PSR at ¶ 73. In an effort to evade law enforcement, he used sophisticated anonymizing tools—such as the dark web and virtual private networks—to obscure his true identity while committing crimes online. *See, e.g., id.* at ¶¶ 19-26, 68, 72, 74. He also used encryption software on his devices. In fact, expert forensic examiners from the FBI and the Department of Justice were unable to decrypt and access almost all of the digital devices seized from his home during a search warrant in 2021. *Id.* at ¶ 74. The FBI still does not know what is on these devices. And not only did the defendant use these technological methods to avoid law enforcement detection, but he also specifically counseled other criminals on Website A to do the same. *See, e.g., id.* at ¶ 72.

The defendant also used online tradecraft to evade detection and arrest. By his own admission, he would delay distributing videos he created because then the victim would look different and be harder to identify. PSR ¶ 73. This tactic was successful, as the victims were in fact more difficult to identify and had less recollection of their interactions of the defendant. *Id.* at ¶ 70. In addition, the defendant left few online remnants of his online interactions with his victims. By the time the FBI identified the victims and served process on social-media companies, the evidence was no longer available, and the FBI was not able to identify what

online accounts he used to target and exploit children. *Id.* ¶ 80. This, combined with the defendant's successful use of encryption software on the devices in his home, is the reason for the absence of charges under 18 U.S.C. § 2251(a) in the indictment.

Finally, the defendant did not stop his criminal conduct even after the FBI executed a search warrant at his home and seized his devices. As noted further below, this was the *third time* law enforcement searched his home for evidence of child-exploitation crimes. Approximately six to seven months after the FBI searched his home, the defendant was back on a child pornography website, telling a confederate that law enforcement had searched his home. PSR ¶ 78. The FBI also obtained evidence that after the 2021 search warrant at his home, the defendant began accessing at least one child pornography website from an internet account belonging to the Jefferson County Public Library system. *Id.* at ¶ 79. (The defendant's place of employment in this time period was located in Jefferson County. *Id.* at ¶ 177.)

Overall, the defendant's criminal conduct is shocking. He specifically targeted dozens of child victims over the course of many years, he created video evidence of them at their most vulnerable and exposed moments, and he gleefully shared that content with other pedophiles on multiple websites. This offense conduct fully supports a sentence of 40 years in prison.

### B. History and Characteristics of the Defendant

The defendant's history and characteristics likewise warrant a substantial sentence. He is, by his own admission, "addicted" to child pornography. PSR at ¶¶ 17, 76, 81, 149. He stated on numerous occasions that he first started viewing child pornography approximately 25 years ago and he was "hooked ever since." *Id.* at ¶¶ 17, 72, 81. He told the FBI that he has tried to stop his behavior, but he cannot be fixed. *Id.* at ¶ 81. He stated online that he knew his actions were wrong and he asked God for assistance, without success. *Id.* at ¶ 73. He stated "I have

always had constant battles within myself over this. It gets exhausting so I stopped fighting and gave in for now. I came to acceptance, knowing that I cannot help what I like." *Id.*

      True to his own admissions, the defendant's criminal conduct appears to be the product of a deep and uncontrollable sexual attraction to children—particularly boys who are in early puberty. He stated online that his preferred age of boys is 11 through 16, with a particular preference for 12-15 year olds. PSR at ¶ 73. He expressly describes himself as a hebephile, which is a scientific term for sexual attraction to minors in early puberty or early adolescence. *Id.* And needless to say, he described his sexual desires online in great detail. For example, he told one user of Website A that "We seem to have similar taste in boys age and body types (i like 11y-16y as long as they CUM!, must have cum, LOL). What ages do you like?"

      There is also little in the defendant's background that would explain—much less justify—his destructive, decades-long criminal behavior. He appears to have had a good relationship with his family, including during his childhood. PSR at ¶¶ 155-58. There is no question that the defendant has suffered hardship, including severe bullying and a sexual assault as an adolescent. *Id.* at ¶¶ 159-60. As awful as these incidents were, however, it is a sad truth that many other people undergo similar or more traumatic abuse, and yet they do not go on to sexually exploit dozens of minors online and then upload videos of that exploitation to child pornography websites. In addition, many victims of sexual exploitation naturally feel deep sympathy and empathy for others in the same position; for the defendant, it appears to have had the opposite effect.

      It is also clear that the defendant is intelligent and resourceful. He has a bachelor's degree in computer information systems, and he was a reliable employee at his places of employment. PSR ¶¶ 176-81. Unfortunately, the defendant chose to devote his talents to

malevolent ends.  After all, he targeted dozens of children online, persuaded them to disrobe and masturbate, recorded, edited, and branded the fruits of his labor, posted them on online communities dedicated to child sexual exploitation, and used sophisticated technological methods to evade serious punishment for two-and-a-half decades.

### C.   *A sentence that reflects the seriousness of the offense, promotes respect for the law, provides just punishment, affords adequate deterrence to criminal conduct, and protects the public from further crimes of the defendant*

The offense of production of child pornography is one of the most serious that this office prosecutes and warrants the most serious of sentences.  Federal District Judge John R. Adams, in *United States v. Cunningham*, 680 F. Supp. 2d 844, 847 (N.D. Ohio 2010), used a quote attributed to Nelson Mandela: "There can be no keener revelation of a society's soul than the way in which it treats its children."  He continued: "Given the recent statistics surrounding child pornography, we are living in a country that is losing its soul."  *Id.*

The criminal conduct at issue is the sexual exploitation and abuse of dozens of minor boys.  Deterrence and protection of the public are critical.  A sentence of 40 years will afford such deterrence, particularly as to this defendant, as he cannot reoffend while incarcerated. Additionally, a sentence of 480 months would deter the defendant and others from future criminal behavior.  As for other offenders who might consider engaging in similar behavior, "[g]eneral deterrence is crucial in the child pornography context."  *United States v. Bistline*, 665 F.3d 758, 767 (6th Cir. 2012).

There is a manifest risk that the defendant will reoffend without a substantial sentence. As noted above, he admitted that he is "addicted" to child pornography and has tried to stop his criminal behavior, but he cannot.

The defendant specifically needs to be deterred and incapacitated because his criminal activity escalated throughout his life, and there is no reason to believe that he will stop upon his

release from federal prison. As noted above, he repeatedly stated that he first became involved with child pornography when he was 15, approximately 25 years ago. This would have been approximately in the late 1990s. And his first encounter with law enforcement for child pornography crimes was in 2006, when agents from Homeland Security Investigations executed a search warrant at his home and seized his devices. PSR at ¶ 13. The defendant was ultimately charged in Colorado state court, but the charges were dropped. *Id.* at ¶ 14.

But even after this, the defendant's conduct escalated to exploiting children in real time. He also stated on Website A on more than one occasion that he began capping minors in 2007, *after* the 2006 search warrant at his home. PSR ¶ 73.

The defendant's next encounter with law enforcement was more serious. In 2012, the Adams County Sheriff's office executed a search warrant at his home to search for child pornography offenses. PSR at ¶ 17. This time, the defendant was convicted of sexual exploitation of a child in Colorado state court, which required him to register as a sex offender. *Id.* at ¶¶ 18, 149.

But a criminal conviction and sex-offender registration did not dissuade the defendant from continuing his criminal activity. Indeed, this conduct persisted for an additional decade, during which time he began accessing child-exploitation communities on the dark web and cultivating his heavily branded and curated online reputation as a capper.

In fact, the defendant was still on parole from this conviction at the time he began accessing Website A in September 2019. PSR at ¶¶ 30, 149. This is not factored into his Criminal History Category due to recent changes to Section 4A1.1(e) of the Sentencing Guidelines. *Id.* at ¶ 151.

The defendant could have stopped his conduct at any time. He could have stopped in 2006, after the first search warrant at his home. But he did not. He could have stopped in 2013, after his conviction and his sex offender registration. But he did not. And he could have stopped in 2021, when the FBI executed a search warrant at his home. But again, he did not. In fact, he did not stop until he was arrested and detained on the current charges. There is every reason to believe that the defendant cannot and will not stop engaging in this criminal conduct.

And his claims that he will stop his conduct should fall on deaf ears. After all, that is what he said in an "autobiography" discovered in his home, which appears to have been written around the time of his 2013 conviction. There, he expressed optimism that his involvement with child pornography was over. PSR ¶ 76. But it was not—it persisted for another ten years. Based on all the available evidence in the record, the defendant's involvement with child pornography and minors is likely to continue after he is released from federal prison.

The risk of recidivism is one factor to be taken into account with regard to protecting the public from the defendant's further crimes. The difficulty in assessing recidivism is critical to consider in regard to protecting the public from further crimes of the defendant under 18 U.S.C. § 3553(a). Unfortunately, valid risk assessment instruments to predict sexual recidivism by child pornography offenders currently do not exist.[2] Many of these risk assessments provide a series

---

[2] On the issue of recidivism and child pornography offenses, Dr. Gene Abel testified before the Sentencing Commission at a public hearing on February 15, 2012, addressing federal child pornography offenses. Dr. Abel is a well-known psychiatrist and widely respected leader in the field of diagnosing and treating sexual problems. He is considered by many to be the leading psychophysiology researcher in studies of sexual behavior problems in the United States. Dr. Abel was also presented with a series of questions by the Sentencing Commission. One of the questions he was asked was "[a]re there valid risk assessment instruments to predict sexual recidivism by child pornography offenders." His response: "We don't have that—I don't have that, at present." The transcript can be found online at https://www.ussc.gov/sites/default/files/Transcript_4.pdf, p. 107. The government's understanding is that this statement still reflects the current state of affairs.

of questions to determine whether a defendant is likely to recidivate.  But those assessments are not necessary here, where the defendant has *already* demonstrated his willingness to recidivate, even after a conviction, sex offender registration, jail time, and numerous encounters with law enforcement.

### III.    CONCLUSION

The defendant has participated in one of the most vile and heinous crimes in our society—that which exploits our society's children.  The defendant engaged in the repeated sexual exploitation of dozens of children and posted the videos online.  A sentence of 40 years of imprisonment fairly reflects the factors to be considered under 18 U.S.C. § 3553(a), including the nature and circumstances of the offense, the history and characteristics of the defendant, the need for the sentence to reflect the seriousness of the offense, promote respect for the law, afford adequate deterrence to criminal conduct, and protect the public from future crimes of the defendant.

Respectfully submitted,

MATTHEW T. KIRSCH                              STEVEN J. GROCKI
Acting United States Attorney                    Chief

By: *s/ Alecia L. Riewerts*                 By: *s/ Kyle P. Reynolds*
Alecia L. Riewerts                               Kyle P. Reynolds
Assistant U.S. Attorney                          Acting Deputy Chief
U.S. Attorney's Office                           U.S. Dept. of Justice, Criminal Division
1801 California Street, Suite 1600               Child Exploitation and Obscenity Section
Denver, CO 80202                                 1301 New York Avenue, NW
Telephone: 303-454-0100                          Washington, DC 20005
E-mail:  Alecia.Riewerts@usdoj.gov               Telephone: 202-616-2842
Attorney for Government                          E-mail:  Kyle.Reynolds@usdoj.gov
                                                 Attorney for Government

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 30th day of October, 2024, I electronically filed the foregoing **SENTENCING STATEMENT** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

**Stephanie Maureen Snyder**
**Email:  Stephanie_Snyder@fd.org**


By:  *<u>s/ Kyle P. Reynolds</u>*
     Kyle P. Reynolds
     Acting Deputy Chief
     U.S. Dept. of Justice, Criminal Division
     Child Exploitation and Obscenity Section