IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No. 23-cr-00419-RMR

UNITED STATES OF AMERICA,

    Plaintiff,

v.

1.  CHRISTOPHER CARL MEIER,

    Defendant.

---

### UNITED STATES' RESPONSE TO DEFENDANT'S OBJECTIONS TO PRESENTENCE INVESTIGATION REPORT [ECF #31]

The United States of America, by and through Acting United States Attorney Matthew T. Kirsch, Assistant United States Attorney Alecia L. Riewerts, and Acting Deputy Chief of the Department of Justice's Child Exploitation and Obscenity Section Kyle Reynolds, respectfully responds to the defendant's objections to the Presentence Investigation Report [ECF #31 ("Objections")] as follows:

<u>Response to Objections Impacting the Guideline Calculation</u>

*The USSG § 2G2.1 Cross-Reference Applies to All Counts Other than Count One*

Section 2G2.2 of the guidelines typically applies to offenses involving the distribution of child pornography. That section contains a cross-reference, however, which generally provides that if the defendant produced the child pornography he distributed, his guidelines should be calculated under Section 2G2.1 and not 2G2.2. *See* U.S.S.G. § 2G2.2(c)(1).

The draft Presentence Investigation Report ("PSR") [ECF #30] correctly determines that the § 2G2.2(c)(1) cross-reference applies to Counts 2, 4, 5, and 6.[1] PSR ¶¶ 104, 113, 122, 130.  In its objections to the draft PSR, the United States has already explained why the cross-reference should apply to Count 3 as well.  [ECF #32.]

The defendant's objection that the cross-reference should not apply to any count in the Indictment should be overruled.  He concedes, as he must, that his own statements provide "circumstantial evidence tending to show that he was involved in the production of some videos at various points in time."  Objections at 4.  But he claims that his statements are mere exaggeration and not evidence of production.

This argument fails, principally because it disregards numerous factors in the draft PSR that lend reliability, credibility, and corroboration to the defendant's online admissions that he produced the child pornography that he shared over Website A.

*First,* the defendant's admissions that he produced the content on Website A were extensive.  They were not stray, coy, cryptic, or infrequent comments.  He straightforwardly held himself out to be a "capper" who maintained a "productions index" of the material that he produced.  PSR at ¶¶ 32, 34.  This "index" formed the basis for Count 3 of the Indictment.  *Id.* ¶ 38.  The defendant also repeatedly admitted on Website A that he produced the content that he posted, both in public and private messages.  *See, e.g., id.* at ¶¶ 41-42, 45, 58, 61, 64, 73.

With regard to the specific posts underlying counts 2, 4, 5, and 6 of the Indictment, the defendant stated in each one that he was offering "original content," and

---

[1] The Probation Office has since filed a final PSR and addendum.  [ECF #35.]

the file title for each offered video included an abbreviation for his username's "productions," a boy's name and age, a specific date, and a country.  PSR at ¶¶ 40-41, 45-46, 50-51, 60, 64.  Each file title also contained the name of an online video-chatting platform that presumably corresponds to where the defendant encountered the child victim.  *Id.*  Each victim underlying Counts 2, 4, 5, and 6 of the Indictment actually lived in the United States, as their file titles indicated.  *Id.* at ¶¶ 43, 48, 53, 65; *compare id.* at ¶¶ 34-35 (video titles referring to other countries).  For the victims underlying Counts 5 and 6, the boy's name in the file title that the defendant distributed was the real name of the victim, and for the victim underlying count 2, the first initial in the defendant's file title was the real first initial of the victim.  *Id.* at ¶¶ 40, 43, 51, 53, 64-65.

The defendant made other comments in each of these posts indicating that he produced the videos available through them.  For example, in three of these four posts, he referred directly to using his "girl" to entice the child victims to disrobe, masturbate, and ejaculate.  *See, e.g.,* PSR at ¶ 40, 42, 45, 64.  As further described below, this refers to the defendant streaming a video of a girl the same age as his victim in order to induce the victim to disrobe and masturbate.  *Id.* at ¶ 33.  In the remaining post, he referred to "how much countless time went into this work," which is consistent with his other statements that capping minors is time-consuming.  *Id.* at ¶¶ 52, 73.  He also described one of his videos as a "cap entry" provided by a "capper."  *Id.* at ¶¶ 60-61.

The defendant also provided details about off-screen interactions with one of the victims that only the producer of the video would know.  He said, for example, that the video omitted certain scenes depicting the victim getting distracted and nervous.  *Id.* at

3

¶ 42. He also implied that he interacted with this same victim over the course of several years and observed his sexual development, and specifically his ability to ejaculate. *Id.*

Contrary to the defendant's arguments, these statements cannot plausibly be interpreted as the defendant simply posting videos that some other person created. Instead, he plainly held himself out as the creator of this "original content."

*Second*, the defendant's admissions contained significant details about his methods of targeting minors, tricking them into performing sexually on webcam, and editing the results. He specifically admitted that he used a "girl" to induce his victims to engage in sexual conduct. He mentioned that one victim viewed "my girl stripping for him," another wanted to spend time with "my girl," another ejaculated only after the defendant used "my girl," yet another victim wanted to "cum for a girl," and even yet another had "cam sex with my girl." *Id.* at ¶¶ 40, 42, 45, 58. He also refers to "girls" employed by other cappers. *Id.* at ¶ 73.

Once again, the defendant's efforts to explain these statements away fall flat. He asserts that sentencing enhancements should not rest on words such as "I" or "my," when talking about his girl. Objections at 4. But this argument misreads and minimizes the defendant's own words. As set forth above, the defendant announced online that he used a "girl" to entice minor boys to masturbate and ejaculate. These statements are direct confessions to conduct that satisfies the sentencing enhancement, and they cannot be wished away by simply dismissing them, as the defendant does. *Id.* Also, no girls appear in <u>any</u> of the videos the defendant shared over Website A. It is therefore unclear what else the defendant's repeated references to his "girl" could possibly mean.

4

Many of the defendant's other statements also contain minute details about his conduct that cannot be so casually waved away as "puffery." For example:

- He previously targeted boys in three specific countries in Eastern Europe, and he focused on boys in one particular country "from 2012 to 2018" until he was prevented from doing so by specific political events. *Id.* at ¶ 73. He has 230 videos of them "that will never see the light of day…" *Id.*

- He capped one boy over a 2-year period and has "43 vids/cams of him." *Id.*

- He mentioned on one occasion that he has "capped since 2007" and on another occasion that he has "been capping since 2007, and ben directing boys in solo action and duo hardcore action since 2012." *Id.* The FBI recovered at least one of the defendant's branded videos that depicted "duo hardcore action"—*i.e.*, two boys engaging in oral and anal sex. *Id.* at ¶ 35.

The defendant also made statements online that focused on the drudgery and labor of being a capper, which is inconsistent with attempts to impress other pedophiles on Website A. For example, he complained about the "hours" needed "to search, befriend, groom, the capping itself, editing, and encoding." PSR at ¶ 73. He also lamented his low success rate in targeting minors and the fact that many of them changed their minds before agreeing to masturbate on camera. *Id.* He also grumbled about sharing his caps with other users who did not share back to his satisfaction. *Id.*

These statements contain the kind of detail known only to someone actively engaged in capping with children. They are plainly not the sort of statements of someone peddling idle falsehoods to impress people on the internet.

*Third*, the defendant's admissions were internally consistent. At all times, he represented himself to be a "capper" who targeted boys in a very specific age range. *See, e.g.,* PSR at ¶ 73. Throughout his extensive admissions on Website A, he never deviated from this self-description. If the defendant were right—*i.e.*, if he was just making stuff up to impress other pedophiles—there would have been no reason to hew so closely to such a narrow sexual interest and self-description.

There are, sadly, many ways to produce child pornography. Many offenders do so by sexually assaulting children on camera. Other offenders take surreptitious videos of children in private while they are bathing, using the bathroom, or otherwise disrobing.

There are even many ways to "cap" minors online. Some offenders—commonly referred to as "sextortionists"—will blackmail minors into creating sexualized images of themselves or performing sexually on webcam. Other cappers will use their own identity and images when targeting, grooming, and exploiting children online. They thus have no need for a "bait girl" or similar misrepresentation. *See* PSR at ¶ 73.

But the defendant never claimed on Website A to have produced child pornography in any of these other ways, even though doing so almost certainly would have "enhance[d] his own status with other users of this website…" Objections at 3. He always described himself as a capper who targeted boys between 11 and 16.

The defendant maintained this consistency even in private, one-to-one messages with other users, where he would have had much less incentive to exaggerate or fabricate details than in his public posts. *See, e.g.,* PSR at ¶ 73.

*Fourth*, the defendant's admissions were corroborated by the accounts of several of his victims. A number of the defendant's victims told law enforcement that they chatted over various platforms with a "girl" who directed them to disrobe and/or send nude images, and this "girl" either never spoke or never appeared on camera. *See, e.g.,* PSR at ¶¶ 35, 48, 68. Other victims also confirmed more generally that they engaged in sexual interactions with girls online. *Id.* at ¶¶ 35, 36, 53, 67, 68. None of them reported having an online sexual interaction with an adult man. And these victims, of course, would have no reason to know about the admissions the defendant made on Website A regarding his methods of producing child pornography.

*Fifth*, the defendant went to great lengths to personalize and brand the content he shared over Website A and to market them as his own produced content. For example, his username appears frequently in his videos, either in full or in abbreviated form, and he included a personalized banner in his posts. *See, e.g.,* PSR at ¶¶ 35, 37, 40-41, 45-46, 50-51, 55-58, 60-62, 64. This username was personal to the defendant, and he has been using it since he was a child. *Id.* at ¶ 77. Some of his videos also included a stylized logo that appeared to be a play on his username. *Id.* at ¶¶ 36, 58, 64. These acts are, of course, efforts to claim credit and ownership.

*Sixth*, the record is entirely bereft of <u>anyone else</u> claiming credit for producing the videos that the defendant shared over Website A. This is notable because Website A had hundreds of thousands of users and a subforum exclusively dedicated to cappers. If the defendant was fraudulently passing off another capper's work as his own, it stands to reason that one of these hundreds of thousands of users would have said something.

*Finally*, the defendant made numerous other statements about himself and his past on Website A that were entirely true.  For example, he told other users about his birthday, the birthdays of other people in his family, his job and paycheck, an injury he sustained, his prior criminal history and incarceration, and his requirement to register as a sex offender.  PSR at ¶ 72.  All of these statements corresponded exactly with the defendant's own life, and he displayed no tendency to exaggerate or embellish details.  He also said more than once online that he discovered child pornography when he was around 15 years old, or in the late 90s when he was starting high school.  PSR at ¶ 73.  This is exactly what he told law enforcement back in 2013.  *Id.* at ¶ 149.

These factors provide more than enough to establish that the defendant was the original producer of the content he shared over Website A.  Guidelines enhancements, of course, need to be proven only by a preponderance of the evidence.  *See United States v. Montano*, 109 F.4th 1275, 1280 (10th Cir. 2024).  And the guidelines commentary makes clear that the cross-reference in Section 2G2.2(c)(1) should be "construed broadly…"  U.S.S.G. § 2G2.2, App. Note 7(A).

The defendant's arguments to the contrary are unavailing.  In an effort to escape the plain consequences of his own statements, he reads them in a tortured and unreasonable manner to mean something different than what they mean on their face.  He also broadly minimizes his own statements in nearly 70 paragraphs of the draft PSR as "puffery" or "exaggeration," *id.* at 3, but he does not identify a single statement that is false or overstated.  This objection should be overruled.

*The Guideline Calculation for Count 5*

Count 5 of the Indictment charges the defendant with making a post on Website A on January 1, 2021. PSR at ¶ 8 & n.1. The draft PSR correctly determines that the adjusted offense level for this count is 38. PSR at ¶ 129. In reaching this calculation, the draft PSR applies the cross-reference in U.S.S.G. § 2G2.2(c)(1). *Id.* at ¶¶ 122.

In his Objections, the defendant argues that the guidelines for Count 5 should be calculated under U.S.S.G. § 2G2.2 and not 2G2.1 because the former leads to a higher offense level. He is right that 2G2.2(c)(1) provides for a cross-reference to 2G2.1 only when "the resulting offense level is great than that determined" under 2G2.2.

But he is not right that calculating the offense level for Count 5 under 2G2.2 would lead to a higher offense level than calculating it under 2G2.1. The defendant claims that the adjusted offense level for Count 5 would be 39 if calculated under 2G2.2, and in support, he cites to paragraph 103 of the draft PSR. Objections at 6. But paragraph 103 of the draft PSR is not based on the single post on Website A that gave rise to Count 5 of the Indictment. Instead, it includes the guidelines calculation for Count 1, which is the <u>entire conspiracy underlying Website A</u>. PSR at ¶¶ 1, 7-10, 38.

One critical distinction is that paragraph 103 of the draft PSR provides for a five-level enhancement under U.S.S.G. § 2G2.2(b)(7)(D) because the offense involved 600 or more images. It reached this calculating by accounting for <u>all</u> the defendant's conduct on Website A. PSR ¶ 103.

Count 5, in contrast, is limited to the one post the defendant made on Website A on January 1, 2021. As described in the draft PSR, that post included four images of

9

minors, plus one video.  PSR ¶¶ 50-54.  This results in a total of 79 images for Count 5.  *See* U.S.S.G. § 2G2.2, App. Note 6(B)(ii).

The accurate guidelines analysis for Count 5 under § 2G2.2 thus looks like this:

| Guideline | Offense Level |
|---|---|
| Base Offense Level (U.S.S.G. § 2G2.2(a)(2)); | 22 |
| Enhancement for distributing in exchange for non-pecuniary consideration (*id.* § 2G2.2(b)(3)(B)); | +5 |
| Enhancement for pattern of activity involving the sexual abuse or exploitation of a minor (*id.* § 2G2.2(b)(5)); | +5 |
| Enhancement for use of a computer or interactive computer service for receipt of child pornography (*id.* § 2G2.2(b)(6)); | +2 |
| Enhancement for an offense involving at least 10 but fewer than 150 images (*id.* § 2G2.2(b)(7)(A)); | +2 |
| **TOTAL:** | **36** |

Accordingly, calculating Count 5 under Section 2G2.2 leads to a lower offense level than calculating it under 2G2.1.  The cross-reference in Section 2G2.2(c)(1) applies, and the defendant's objection should be overruled.

*The Guideline Calculation for Count 6*

The draft PSR correctly determines that the adjusted offense level for Count 6 is 40.  PSR at ¶ 138.  This includes a two-level enhancement under U.S.S.G. § 2G2.1(b)(1)(B) because the offense involved a minor who had attained the age of 12 years old but had not attained the age of 16 years.  *Id.* at ¶ 121.

The Objections raise the possibility that the victim underlying Count 6 may have been 16 years old and not 15 at the time of the relevant criminal conduct.  Objections at 6.  The United States, however, has since provided the defendant and the Probation

Office with information establishing that the victim underlying Count 6 was 15 years old on March 27, 2021, which is the date on which the defendant posted relevant video to Website A. This victim also would have been 14 years old on April 4, 2020, which is the date listed in the video title that the defendant posted to Website A, and which presumably corresponds with the date on which the defendant created the video.

The victim was under the age of 16 on both dates. The two-level enhancement under U.S.S.G. 2G2.1(b)(1)(B) was therefore appropriate.

Response to Objections to Conditions of Supervised Release

The defendant's objections to the special conditions of supervised release should be overruled. "District courts have broad discretion to impose conditions of supervised release," as long as those supervised release conditions are consistent with the statutory requirements of 18 U.S.C. § 3583(d) and "comport with the relevant constitutional provisions." *United States v. Mike*, 632 F.3d 686, 692 (10th Cir. 2011) (citation omitted). A supervised release condition "must satisfy both § 3583(d)(1) (requiring reasonable relationship to the [enumerated] § 3553 factors) and § 3583(d)(2) (involve no greater deprivation of liberty than necessary)"; however, each condition "does not need to be reasonably related to *all* of the [enumerated] factors in § 3553." *United States v. Hahn*, 551 F.3d 977, 983 (10th Cir. 2008) (citation omitted) (emphasis added). Further, the conditions must be "consistent with any pertinent policy statements issued by the Sentencing Commission. 18 U.S.C. § 3583(d)(3). As the supervised release conditions recommended by U.S. Probation meet both statutory and

constitutional requirements and do not conflict with any pertinent policy statements, the government respectfully requests that they be imposed.

The draft PSR recommends sex-offender treatment, which "may include polygraph and visual response testing as part of the required participation."  PSR, Sentencing Recommendation, Special Condition 2.  This is a standard condition for sex offenders in this district.  (Neither the Probation Office nor the United States are recommending penile plethysmograph testing, so it is not addressed herein.)

The defendant objects to these conditions on the grounds that they implicate constitutional and liberty interests.  Objections at 7-13.  He argues that the polygraph and visual-response testing conditions should either not be imposed at all, or should be modified to conform with statutory and constitutional mandates.  *Id.* at 13.

As an initial matter, the defendant has not provided anything to suggest that the imposition of these conditions *would* infringe on anyone's constitutional rights; he just suggests that they *could*.  The United States does not anticipate any such violations.

In general, imposition of polygraph testing as a special condition of supervised release has been upheld in the Tenth Circuit.  *United States v. Begay*, 631 F.3d 1168, 1175-76 (10th Cir. 2011).  There is particular reason for this condition here, as the defendant previously entered into a conspiracy to distribute child pornography while still on parole for a previous child pornography offense.  PSR at ¶¶ 30, 149, 151.  In addition, under Tenth Circuit law, government may not threaten a defendant with a substantial penalty for refusing to answer a question during a polygraph.  *United States v. Von Behren*, 822 F.3d 1139, 1150-51 (10th Cir. 2016).

Visual response testing, otherwise known as a visual reaction time test, is a physically non-invasive test that gauges an individual's sexual interests.  The nature of the defendant's offenses justifies such testing.  *See United States v. Traufield,* 768 Fed.Appx. 802, 810 (10th Cir. 2019) (unpublished).  As does the defendant's repeated admissions that he is sexually interested in boys between the ages of 11 and 16 (particularly aged 12-15), that he is "addicted" to child pornography, that his attempts to seek therapy have failed, that he cannot be fixed, and that he has "stopped fighting" his sexual urges toward children.  PSR at ¶¶ 17, 73, 76, 81, 149.

In *Mike*, one of the conditions of supervised release was that the defendant "immediately undergo a psychosexual evaluation upon release and begin participating in sex offender treatment, consistent with the recommendations of the psychosexual evaluation, and furthermore, the defendant shall submit to clinical polygraph testing and any other specific sex offender testing, as directed by the probation officer."  632 F.3d at 690.  The defendant's objections should be overruled.

<u>Response to Objection to the JVTA Special Assessments</u>

Under 18 U.S.C. § 3014(a)(3), the court "shall" assess a special assessment of $5,000 per count for a person convicted of distributing distribution of child pornography.  The statutory word "shall," of course, carries a "mandatory intent."  *Jewell v. United States*, 749 F.3d 1295, 1298 (10th Cir. 2014).  The assessments under this provision fund programs relating to human trafficking and child protection.  18 U.S.C. § 3014(3).

The only exception to this assessment is for defendants who are "indigent." 18 U.S.C. § 3014(a). The defendant bears the burden of proving indigency. *See, e.g., United States v. Janatsch*, 722 F. Appx. 806, 811 (10th Cir. 2018) (unpublished).

The defendant has not met his burden, principally because he is not indigent. He has a positive net worth of nearly $290,000. PSR at ¶ 183. This includes approximately $12,000 in savings and checking accounts, $58,000 in retirement savings accounts, and a house worth $375,000, subject to a mortgage of $90,000. *Id.* He has a college degree in computer information systems and a history of stable and satisfactory employment, all of which indicate that he has future earning power. *Id.* at ¶¶ 176-81.

The defendant is much better off than other individuals who were properly found not to be indigent within the meaning of § 3014. In *United States v. Wesely*, the Eighth Circuit reversed a finding of indigency for a defendant with a net worth of $120,000, $90,000 of which was in illiquid home equity, and a restitution judgment of $48,000. 96 F.4th 1045, 1048 (8th Cir. 2024). The court found that a positive net worth of $70,000, most of which is tied up in home equity, is "hardly a fortune" but "does not make someone indigent either." *Id.*; *see also United States v. Graves*, 908 F.3d 137, 139, 143-44 (5th Cir. 2018) (affirming finding of non-indigency for defendant with $245 in monthly discretionary income, given that he had a GED and some college, had vocational skills and a long history of employment, and was able bodied).

The defendant's arguments to the contrary are unavailing. He points to the difficulties that sex offenders often face when seeking employment. Objections at 13. A large portion of the individuals subject to § 3014, however, will be required to register as

14

sex offenders, and courts have held that sex-offender status neither renders a defendant indigent nor "shield[s] him from paying the assessment." *United States v. Rosario*, 7 F.4th 65, 73 (2d Cir. 2021) (quoting *United States v. Shepherd*, 922 F.3d 753, 760 (6th Cir. 2019)).  He also claims that he "is very much hoping to use his relatively modest savings to ensure that he is able to keep his house" while incarcerated.  Objections at 13.  But his desire to use his assets for a purpose other than the mandatory statutory assessment hardly makes him "indigent."  This objection should be overruled.

### Response to Objections Not Impacting the Guideline Calculation

The United States takes no position on these objections.

Dated this 6th day of November, 2024.

Respectfully submitted,

| | |
|---|---|
| MATTHEW T. KIRSCH<br>Acting United States Attorney | STEVEN J. GROCKI<br>Chief |
| By: *s/ Alecia L. Riewerts*<br>Alecia L. Riewerts<br>Assistant U.S. Attorney<br>U.S. Attorney's Office<br>1801 California Street<br>Suite 1600<br>Denver, CO 80202<br>Telephone: 303-454-0100<br>Alecia.Riewerts@usdoj.gov<br>Attorney for Government | By: *s/ Kyle P. Reynolds*<br>Kyle P. Reynolds<br>Acting Deputy Chief<br>U.S. Dept. of Justice, Criminal Division<br>Child Exploitation and Obscenity Section<br>1301 New York Avenue, NW<br>Washington, DC 20005<br>Telephone: 202-616-2842<br>Kyle.Reynolds@usdoj.gov<br>Attorney for Government |

## CERTIFICATE OF SERVICE

  I hereby certify that on this 6th day of November, 2024, I electronically filed the foregoing **UNITED STATES' RESPONSE TO DEFENDANT'S OBJECTIONS TO PRESENTENCE INVESTIGATION REPORT** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following email address:

Stephanie Snyder
Email: Stephanie_Snyder@fd.org

          By: <u>s/ Kyle P. Reynolds</u>
             Kyle P. Reynolds
             Acting Deputy Chief
             U.S. Dept. of Justice, Criminal Division
             Child Exploitation and Obscenity Section