IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Criminal Action No. 23-cr-00419-RMR

UNITED STATES OF AMERICA,

Plaintiff,

vs.

CHRISTOPHER CARL MEIER,

Defendant.

------------------------------------------------------------------

REPORTER'S TRANSCRIPT

Sentence

------------------------------------------------------------------

Proceedings before the HONORABLE REGINA M. RODRIGUEZ, District Judge, United States District Court for the District of Colorado, commencing on the 13th day of November, 2024, in Courtroom A901, United States Courthouse, Denver, Colorado.

APPEARANCES

For the Government:
ALECIA RIEWERTS and KYLE REYNOLDS, United States Attorney's Office, 1801 California Street, Suite 1600, Denver, CO 80202

For the Defendant:
STEPHANIE SNYDER, Office of the Federal Public Defender, 633 17th Street, Suite 1000, Denver, CO  80202

Reported by SADIE L. HERBERT, RPR, RCR, 901 19th Street, Denver, CO 80294, (303)335-2105

PROCEEDINGS

(Proceedings commenced at 3:06 p.m.)

(In open court)

THE COURT:  Good afternoon, everyone.  Please be seated.

We're here for sentencing in case number 23-cr-00419, United States v. Christopher Carl Meier.

Could I have appearances of counsel, please.

MR. REYNOLDS:  Yes.  Good afternoon, your Honor, Kyle Reynolds and Alecia Riewerts both present on behalf of the United States.

MS. SNYDER:  Good afternoon, your Honor.  Stephanie Snyder with Mr. Meier, who is at counsel table.

THE COURT:  We have probation.

PROBATION OFFICER:  Good afternoon, your Honor. Michelle Sinaka, US Probation.

THE COURT:  Good afternoon.

Ms. Myhaver, will you go ahead and administer the oath to Mr. Meier.

(Defendant sworn)

THE COURT:  So Mr. Meier, as I have indicated, we are here for sentencing in your case today.  Similar to when you appeared before me before for the change of plea, it is important you understand what's happening.  So if at any point in time you have a question, you don't hear something, you

don't understand something, just let me know, we'll stop.  I'll give you a chance, if you need to speak to your attorney, we'll do that as well.

So the record reflects, on October 24th, 2023, the defendant was charged by indictment with Count One, conspiracy to distribute child pornography 18, USC, Section 2252(a), (a)(2) and (b)(1) and Counts Two through Six, distribution of child pornography, 18, USC, Section 2252(a), (a)(2) and (b)(1). On June 10th of 2024, the defendant filed a notice of disposition and pursuant to that notice of disposition, Mr. Meier pled guilty to Counts One through Six of the indictment.  The Court would note that the plea was without a plea agreement.

So we're here for sentencing today.  In preparation for sentencing, I have reviewed the record as a whole, including the presentence investigation report and the addendum thereto.  I have also reviewed the defendant's objections to the PSIR and the defendant's motion for a variant sentence.  I have reviewed the government's response and objections to the PSIR, the government's response to the defendant's objections and the government's sentencing statement, the government's motion for a one level reduction and the government's response to the defendant's motion for a variant sentence.

Now, Ms. Snyder, I take it you have received the presentence report and have had an opportunity to review it

with Mr. Meier.

MS. SNYDER:  I have, your Honor.

THE COURT:  And Mr. Meier, did you in fact get a chance to go over that with Ms. Snyder?

THE DEFENDANT:  Yes, your Honor, I have.

THE COURT:  And did you get all your questions answered?

THE DEFENDANT:  Yes, your Honor, I have.

THE COURT:  Counsel, is there anything that I have missed?  We have a number of filings here, so I just want to make sure I got it all.

MR. REYNOLDS:  Not from the government, your Honor.

MS. SNYDER:  Not from the defense, your Honor.

THE COURT:  So with this, why don't we go ahead and address the objections to the report.  Both the government and the defendant have filed objections.

First, I note that the PSIR has been revised and several of the objections have been addressed through revision, so I will not address those objections.

The remaining objections appear to relate to which counts the Section 2G2.1 cross-reference should be applied to and how those counts should be grouped, whether an enhancement on Count Six should be applied and an objection to the condition of supervised release related to polygraph and visual response testing.

So I have reviewed the filings by the parties, but I will say, I am thrown back to my college math days and the formulas and such, and I recall why I went to law school.  So I have reviewed it, but it is somewhat complicated, so to the extent either counsel wishes to make a record here today or further expound on their filings, I will hear from counsel on that.

Let's first take up the issue about the 2G2.1 cross-reference and whether or not that should apply and how the parties believe that the counts should be grouped and what they believe the resulting guideline calculation is.  I will say that it does seem, in some ways, a little like the exercise of take two steps forward, stand on your head, twirl around three times and add three, but I think I have followed each of your analyses.  And at the end of the day, I don't know how much substantial difference it makes in terms of the guideline range, so I would urge you to also think about really focusing on where there really is an impact on the actual guideline range and the Court's application of it.

Since the government is arguing that the cross-reference should apply, the defendant is arguing that it should not, but it is the defendant's objection, so I'll let the defendant go first and ultimately have the last word, I suppose, on this issue.

MS. SNYDER:  Very well, your Honor.  I think, with

6

23-cr-00419-RMR      Sentence    November 13, 2024

respect to where I think it's most important for the Court to focus in with regard to our objection, obviously, the government has filed an objection saying that the cross-reference should be applied to Count Three, which is the index count.  I believe probation correctly calculated the guideline and found that that did not or should not be applied to that count.  I think it probably makes sense for the government to address those arguments first, and if the Court would give me an opportunity to respond at the end of that, I have some points.

I'm not going to belabor the point with regard to whether or not the cross-reference applies to Count Two.  I think that's probably straightforward for the Court as well and probably does apply, a fair reading of it is that it does.  So I think that where that brings us is, should the Court find that the cross-reference applies, and I would start with Count Five.  And I think there's an argument about the guideline calculation, what is higher, what's lower.  But I think the real question is just on the merits, that's the first one.

Your Honor asked me to focus on what matters the most. If the Court only finds that the cross-reference does not apply to Count Five, I agree that does not change the ultimate offense level of 41, criminal history category of II, the guidelines will be the same, 360 to life.  But I do think, if the Court is going through and doing the deep dive that I think

it needs to and not just relying on inferences and generalizations about how people create this stuff and what cappers generally do and where we are and looks at the specifics of each count, Count Two, Count Four, Count Five and Count Six, that Count Five is the weakest.

If the Court looks at the section of the PSR that details the sort of conversations around that count. There are posts made by Mr. Meier and there are posts made by someone else. And a fair reading of that back and forth and the two people's names being on it and Mr. Meier thanking the other person for the hours of work that they did, I think it is just as fair to say that the other individual was the creator of the content and Mr. Meier posted it. He pled guilty to posting it, he's responsible for that, certainly, that's the distribution, but not necessarily that he created that specific video. And for that reason, your Honor, I would suggest that it's maybe a close call, but that the Court should find that the cross-reference does not apply to Count Five.

If the Court agrees with that, I think Counts Five, Three and One group under 2G2.2. The Court would be applying the cross-reference 2G2.1 to Count Two. And then you are looking at Counts Four and Six.

Again, I'm not going to belabor the point extensively, but I think the Court has to look at the facts that were marshaled in the presentence report to determine whether or not

the Court can conclusively say or can determine that Mr. Meier was the one who created that material.

The Court was given, in the presentence report or portions of the presentence report that the government drafted, a lot of information and generalities about what screen cappers do, what people do in these communities, what people do in these online forums. And I don't disagree that those statements are correct, but I do think that, while you could infer that Mr. Meier was the creator of this content, that you could also infer that he was not.

And I think when the government implicitly acknowledges in their pleadings that they did not have enough information to charge Mr. Meier with production, that's why we're not here on a straight production count, that you are saying that there are reasonable inferences the other way that could be drawn. They didn't have sufficient basis to charge it because they couldn't prove it beyond a reasonable doubt. And I get that that's not the standard for a sentencing or a guideline enhancement. But when you are talking about enhancements that do change the guideline range from 210 to 262 all the way to 360 to life, the Court needs to exclude all reasonable possible alternative inferences.

And I would submit that with reference to Count Four and Six, while they are closer calls that will probably weigh in the government's favor on a pure balancing, that there are

as ways to construe the comments that sort of surround the posts of being indicative of Mr. Meier's ownership of posting, but not necessarily his ownership of producing.

So for those reasons, your Honor, my position ultimately is that the Court should follow the probation officer's guidance with regard to Count Three, which I think is the undisputed count that the government -- and should also decline on the merits to apply the cross-reference to Count Five.

I would also suggest, if the Court is inclined to not apply it to Counts Four and Six, that that would actually change the guideline calculation and that would lower it to some degree. The probation officer in the addendum, I believe, on the third page indicates what the reference ranges would be if the Court were to apply it to some, but not all. They basically range from 292 to 365 months to 324 to 405, depending on which of those counts to which it's applied.

So with that being said, I would ask if the Court is inclined to give the government an opportunity to expound on why it believes it should apply to Count Three, an opportunity to respond to that. But other than that, I rest on the pleadings.

THE COURT: Very well. Thank you.

MR. REYNOLDS: Thank you, your Honor.

It is our position that the cross-reference applies to

every count in the indictment, except that Count One essentially merges into the remainder of the counts, so there would only be pseudocounts calculated for Counts Two through Six.

I want to start by addressing what Ms. Snyder referred to as generalities. I think what she's referring to is evidence set forth in the PSR that's not directly said, not directly within the post that is the basis for a particular count in the indictment. And we would certainly dispute that these are, quote, "generalities."

What the PSR lays out over dozens and dozens of paragraphs is abundant evidence that Mr. Meier is the producer of all this content that he posted to this website. And the defendant does not appear to dispute that there's some evidence that he produced this content and certainly will acknowledge that a lot of this consists of his own statements. But I think statements are not all created equal.

What we have in the PSR is essentially 18 months of continuous statements by Mr. Meier made to other people in private messages, made to the audience of the website as a whole, virtually all of which is consistent, he is consistent all throughout all of his statements in public and in private, he is detailed, he provides significant information about how he particularly produced this content, how he targeted these minors, how he groomed them, how he edited the videos, that

sort of thing.

At all times, he holds himself to be a capper.  He holds himself out to be a producer of this child pornography.  And he provides significant information.  I would say that this is corroborated by the victims' accounts.  He makes comments about how he uses a quote, unquote, girl to entice the victims into engaging in sexual content.  That's exactly what many of the victims told law enforcement, that the only sexual encounter they have had on a webcam is with a girl.  And several of them specifically raised kind of very suspicious facts that there was a girl who either never spoke or never showed her face.  Now, we can't say with certainty that that was Mr. Meier.  But certainly, none of the victims claimed that they were having any interaction with an adult man.  They are consistent they were talking to a girl.

I also want to be clear about the nature of this website.  I think we put in -- looking at Paragraph 27 of the PSR, of the revised PSR -- this was a website with lots and lots of different subforums, different rooms dedicated to different kinds of child pornography.  And all of Mr. Meier's activity was in a specific subroom or subforum dedicated to this kind of activity, to people who produce child pornography over webcam.

So that's what we would -- I think that's the evidence that my colleague here, on the other side of the room, is

describing as generalities.  We would encourage the Court to look at this evidence as a whole and not just sort of put blinders on and look specifically at the specific posts.  But even if the Court is going to take that approach, there are specific indications underlying every single post that Mr. Meier in fact produced this material.  He offers all of it as, quote, original content.  He offers all of it under his brand name, Chokehold Buyer Productions.  And then with every single count, other than Count Five, which I'll address in a minute, he provides information that only the producer would know, such as repeated interactions with the minor, such as his use of the quote, unquote, girl.

The other thing that I would note, your Honor, is that he has a very standardized method of putting together a file name for the child pornography he distributed over the website.  Very frequently, this consists of a boy's first name.  And it might not be a hundred percent clear on the face of the PSR, but in most of the cases, the name of the person in the file was the victim's real first name, which indicates that Mr. Meier had personal interactions with his victim.

And I'm looking at paragraph 35 of the PSR.  We have anonymized some of the victims' names to protect their privacy.  But the Court can see that the name of the file is the first initial of the victim throughout.

Now, addressing Count Five of the indictment,

Ms. Snyder is certainly correct that, compared to every other count in the indictment, there is less information on the face of this count that Mr. Meier produced it.  I would say, again, he describes it as original content, he says it's from CFP, which is his brand, Cold Fire Productions.  Production, obviously, refers to somebody who has created something.  He also made comments about how much countless time went into this work.

Also, the Court may notice, in Paragraph 53, once again, the name of the child in the file title was Aaron, and that's the victim's real name.

Let me address just one more thing, which is the fact that Mr. Meier was not charged with production of child pornography.  That's true.  But the guidelines don't require that.  In fact, the whole idea behind there being a cross-reference within 2G2.2 contemplates the idea that there are people who produce child pornography who will not be charged with production, they will be charged with some kind of distribution or receipt or possession offense, that's why the cross-reference is there.

Of course, we're dealing with different standards here.  Had we charged him with production of child pornography, which there was some debate about whether we should, we would have had to meet the beyond a reasonable doubt standard.  And here, we're obviously dealing with a preponderance standard.

Ms. Snyder made a comment during her argument, and I don't know if I have accurately written it down, but it was something along the lines of the Court must exclude all reasonable alternative inferences.  That's a description of the beyond a reasonable doubt standard.  We're dealing with a preponderance standard here, is it more likely than not Mr. Meier produced this child pornography.  I would say the many, many paragraphs of evidence in the PSR make it more amply more likely than not, it exceeds the preponderance standard.

Thank you, your Honor.

THE COURT:  Thank you.

Ms. Snyder.

MS. SNYDER:  Thank you.  It is an odd case where the government is like, hey, we wrote nine pages of the PSR and now we're marshaling what we wrote to get the Court to try to come to the inference that we want the Court to do or to make, and that's really what the government is saying; you should infer this, you should infer that, you should draw this conclusion.  But what Mr. Reynolds just said, we can't say with certainty whether Mr. Meier made or didn't make this or whether he was interacting with this person or not.

He referenced Paragraph 53.  He is thanking -- this is with regard to Count Five -- he's thanking the other individual for the countless hours that they spend.  That's a fair reading of that quote.

What the government is saying and what I believe to be sort of the thrust of this overall sentencing today is, though we can't necessarily prove it to the substantiation that we would need to if we charged it, he didn't plead to it and he didn't admit to it, but we want to punish him for it anyway, and the Court -- this is federal court, this is different.  He is right that it is a lower standard, but I do think that the Court needs to be firmly and fairly convinced that it is appropriate to apply a cross-reference when you are talking about a 10-year difference between what the guideline range could be and where the probation officer has found it.

It's also not limitless.  The Court can't draw the wide array of inferences that I think the government is asking you to do.  There are four specific videos where probation applied the cross-reference.  But to say that because a username or a file had a victim's name in it means that Mr. Meier himself necessarily interacted with that person, I think, overstates it.  It may mean that he got a video from someone who interacted with that person or knew that person's name, but it doesn't necessarily mean that he was the actual content creator.

THE COURT:  What, if anything, is the Court to make of the pattern and practice?

MS. SNYDER:  I think if there was real specific evidence of MO, right, that was Mr. Meier did it in this way

all the time, this was the pattern, maybe that would be convincing.  But the pattern and practice that the government pointed to is he uses social media.  And as probation appropriately responds to, so does everybody else, particularly on this subforum or group of people who are talking about this, right.

The government says, oh, there's a bait girl.  Well, in their sort of overarching description of cappers and how cappers get people to do this, right, how people induce young boys to masturbate on video, the use of a bait girl is commonly known.  It's not unique to Mr. Meier, he's the only person in the history of the world who would ever do this.

When the government was going through in their response or their -- I guess it was their original objections to the PSR saying that the Court should apply the cross-reference to Count Three, the government at one point said, there's a black screen that was in use in some of these, and a black screen is indicative of something that Mr. Meier has done or would have known about.  In other counts, they said there's a bait girl.  And A bait girl and black screen seem somewhat in tension with one another and certainly not something that would be, here's the standard practice, here is the standard pattern.  My point, your Honor, is yes, there is evidence of an MO or pattern and whatever, but it's so broad that it actually proves too much.

23-cr-00419-RMR     Sentence     November 13, 2024

The government acknowledges that we are talking about a subpart of a website that is sort of geared towards people who do this, have this interest, whatever, and that he's not the only participant, that there are lots of other folks.  And people go on these sites, these posts are made, the distribution itself is about swapping material, sharing materials, giving people materials, et cetera.  That's what lots of people on that site were doing.  And so my point, your Honor, is that posting something is not a one-to-one correlation with creating it.

The government at one point in one of their pleadings said, well, no one complained that he misappropriated someone else's work, so obviously the Court should conclude that Mr. Meier produced it.  I mean, while that's perhaps some -- a reasonable inference or an inference you can draw, to the extent that we're basing hundred-month sentencing enhancements on the lack of human pride in the direct messages on a child porn website, I think proves too much.  What if the person who made it had been arrested, what if they were in treatment, what if they had given it to him with permission.  What if, instead of being the actual, original producer he was doing some post production editing, branding it, taking files made by someone else and doing something with it.

Ultimately, your Hoonor, I think the government's argument proves too much.  I think that probation's response

was measured and reasonable, which is, we can get him for the things that we are firmly convinced, fairly convinced that he did, if you are going to enhance the sentence, that's why I am saying, I can't make a good faith argument to you about Count Two, it applies there. But I think if you are looking at this 35 post index forum with regard to Count Three, when I think you are looking at Count Five, I think there are other very reasonable inferences that can be drawn from that evidence.

Obviously, Mr. Meier's own statements are problematic, they are the best evidence that the government has, it's the evidence the government has. But I think the one gospel truth of the internet is that what people say online is not necessarily gospel truth. Anybody who has been on a dating website or read the comments to a news article or a Facebook post knows that people say and do all kinds of things that may not correlate with who they are in real life, the persona that they adopt in real life, what they actually do or believe. People portray themselves.

And even the government has provided the date of birth for the victim in Count Six. I don't dispute that. But the file name, the file date of birth, the label on it was wrong. Presumably, it's wrong because whoever -- or that young man represented himself as being a different age than he actually was. People say and do things that aren't real online.

And I also think that, while the government correctly

points to some of the statements that Mr. Meier made, I'm sure the Court was deeply troubled by them, you have to read them in context. And the context here was that Mr. Meier -- it gets more into the sort of sentencing, the meat of the sentencing itself -- but he's somebody who is desperate and has been desperate for approval and acceptance and community.

I think, ultimately, the way that probation handled Count Three is appropriate. There's not no evidence to say that he made this, but there's not sufficient evidence for the Court to determine that the cross-reference applies. And so particularly, with regards to Count Three and to Count Five, I would urge the Court not to apply the cross-reference. If your Honor started out with, you're spinning around on your head and not getting anywhere, Ms. Snyder, that's fair, because whether you grant the government's objection or grant my objection or grant neither or both, right, you are really coming out the same way with the range. But with that said, I do believe that when you take and contextualize the entirety of the body of work, the body of evidence that the government has produced here, it is fair to apply it when there's sufficient proof of it, that's Count Two. It's unfair to apply it when there is less than that.

I would suggest, your Honor, that the Court should, in a close call, apply the rule, the Court should give Mr. Meier the benefit of the doubt on this, the Court should find that

probation chose correctly not to apply the cross-reference to Count Three, and the Court should consider not applying the cross-reference to the remaining counts.

Thank you.

THE COURT:  Thank you.

As both counsel have acknowledged, probation applied the cross-reference to Counts Two, Four and Six.  The government argues that the cross-reference should apply to all counts, other than Count One and that the cross-reference should apply to Count Three because the government has shown by a preponderance of the evidence that Mr. Meier produced the images or videos related to Count Three.  And therefore, the resulting offense level is greater under 2G2.1 than 2G2.2.

Defendant argues that the cross-reference should not apply to any of the counts, but in particular, Counts Four, Five and Six because the evidence that he produced the images and videos related to the counts were based primarily on statements he made, and many of them could fairly be construed as puffery, braggadocio and/or exaggeration.

I certainly hear Ms. Snyder's argument with regard to the cross-reference.  And the Court is mindful and trying to be careful and thoughtful when applying the cross-reference.  And I have taken that approach, to the best of my ability, in this case as well.

It is important to note that the standard here is

23-cr-00419-RMR    Sentence    November 13, 2024

preponderance of the evidence, rather than beyond a reasonable doubt.  And while the cross-reference is certainly permissible and appropriate under the guidelines, in this instance and other instances in the guidelines, the Court does look at those pretty carefully because of the difference in the standard.

In this case, all parties agree that the starting point for the guideline calculation is USSG Section 2G2.2 and pursuant to Section 2G2.2(c)(1).  If the offense involved causing, transporting, permitting or offering or seeking by notice or advertisement a minor to engage in sexually explicit content for the purpose of producing a visual depiction of such conduct or for the purpose of transmitting a live visual depiction of such conduct, apply Section 2G2.1, if the resulting offense level is greater than that determined under 2G2.2.  Thus, if the cross-reference here is applicable, the base offense level would be 32.

Now, the application notes to 2G2.2(c)(1) provide that the cross-reference in subsection (c)(1) is to be construed broadly and includes all instances where the offense involved employing, using, persuading, inducing, enticing, coercing, transporting, permitting, offering or seeking by notice or advertisement a minor to engage in sexually explicit conduct for the purpose of producing any visual depiction of such conduct or for the purpose of transmitting live any visual depiction of such conduct.

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294   (303)335-2105

23-cr-00419-RMR     Sentence     November 13, 2024

I first find that the PSIR properly applied the cross-reference to Counts Two, Four and Six.  Mr. Meier held himself out as a capper, which the PSR explains is a person who takes screen captures of videos depicting minors engaging in sexual activity and creates or preserves those screen captures for later distribution.  That appears to be precisely what Mr. Meier did in this case.  Additionally, the probation officer notes that cappers frequently entice these minors to engage in sexual activity for this purpose, for example, by impersonating a minor of the same or similar age as the intended victim.

Mr. Meier held the content supporting Counts Two, Four and Six out as original content.  Each title contained the abbreviation for his user's name -- for his usernames productions, a boy's name and age, a specific date and a country.  Each final title also contained the name of an online video chatting platform.  Mr. Meier made comments in each of the posts indicating that he produced the videos and used fake, quote, girls to entice the victims to engage in acts online.  His content was branded with his username and included personalized banners and occasionally stylized logos.  He also spoke online about how much time went into his work and that capping is time consuming.  He gave specific details about his method of targeting minors and how he ultimately obtained the content.  Many of these statements contained details that match

up with the victims' statements and align with the content he posted online.

I understand Ms. Snyder's argument that, in many ways, the government's evidence proves too much, in as much as Mr. Meier has admitted that he is a capper and this is the process or procedure which a capper uses to entice his victims. However, it is important here that, in many instances, many of the statements obtained from the victims contain details that match with what Mr. Meier is representing.  So there is more than just a casual or general statement about what a capper does.  In Mr. Meier's particular case, many of the statements, again, are detailed and they align with the independent statements of the victims themselves.

Now, additionally, Mr. Meier attempts to explain all of this evidence away as mere puffery, braggadocio and/or exaggeration, but concedes that no one could deny that his own posts and messages provide circumstantial evidence tending to show that he was involved in the production of some videos at various points in time.

The Court has reviewed the evidence specifically as it relates to each of these counts, as well as generally, and finds that both support a finding by a preponderance of the evidence that the cross-reference to Section 2G2.1 applies to Counts Two, Four and Six because those offenses involve Mr. Meier producing the child pornography he distributed.

As to Count Five, the Court also finds that the cross-reference should apply.  The cross-reference applies if the offense level, under 2G2.1, is greater than that calculated under Section 2G2.2.  Under 2G2.2, the base offense level is 22, plus 5 for distributing in exchange for nonpecuniary consideration, plus 5 for pattern of activity involving the sexual abuse or exploitation of a minor, plus 2 for use of a computer or interactive computer service for receipt of child pornography, plus 2 for an offense involving at least 10, but fewer than 150, images, which results in a total offense level of 36.

Under Section 2G2.1, the base offense level is 32, plus 2 for involving a minor between the age of 12 and 16, plus 2 for involving the commission of a sexual act or sexual contact, plus 2 for knowing distribution, plus 2 for use of a computer, which results in a total offense level of 38.

Because the total offense level is higher under 2G2.1 the Court finds that the cross-reference should apply.

As to Count Three, the Court finds that the cross-reference should apply as well.

I should say that, with regard to Count Five, for the same reasons as discussed by the government, both in its argument today and in the briefing, the Court agrees that there is sufficient evidence to find by a preponderance of the evidence that the cross-reference does apply.

As to Count Three, I do find that the cross-reference should apply. The basis for Count Three is the content associated with the defendant's production index. Again, Mr. Meier held himself out as a capper. In Mr. Meier's production index, he listed videos posted and purportedly produced by his username, which included name, age and geographic location of the victims. Many of these videos contained indicia that Mr. Meier created them, including his username, logo and imagery. The victim interviews support that Mr. Meier produced the content underlying Count Three. Many of the victims told law enforcement they met a, quote, girl online who directed them to disrobe and/or masturbate on camera, but she never spoke or appeared on camera. These victim accounts are consistent with one another and consistent with Mr. Meier's online representation that he enticed minor boys to perform sexually using images or video of a girl.

Mr. Meier's online admissions show a consistent method of obtaining these videos. For example, he responded to a Boystown user who thanked him for capping, and he responded that it takes many hours, quote, to get a bait girl and make the clips for minicam. The time it takes to search, befriend, groom, the capping itself, editing and encoding takes many hours. Mr. Meier also talks about using -- is it Omegle, did I say that right? Is that Omegle?

MR. REYNOLDS: Omegle.

THE COURT: And Skype to get his caps, and indeed it appears that is exactly what he did. The victims' statements related to the content underlying Count Three all discuss that they spoke with these, quote, girls on Omegle and Skype.

Thus, the Court finds that, by a preponderance of the evidence, the cross-reference to Section 2G2.1 applies to Count Three because Mr. Meier produced the child pornography distributed in the index. The Court will also incorporate in its findings the factual statements as set forth in the presentence investigation report and in the government's briefing on this issue.

Count Six, 2 level enhancement pursuant to Section 2G2.1(b)(1)(B), Mr. Meier disputes the 2 level enhancement based on the victim's age pursuant to Section 2G2.1(b)(1)(B). He argues that it is impossible to know the victim WR's age when the video was made because counsel did not receive the victim's precise birthdate. The government indicated that WR's date of birth is July 6th of 2005. WR would have been 15 as of March 27th, 2021. Therefore, Section 2G2.1(b)(1)(B) would still be applicable. Accordingly, the Court overrules the objection and applies the 2 level enhancement pursuant to Section 2G2.1(b)(1)(B).

I don't know that we heard argument on the Count Three pseudo count specifically. If there is some further record somebody needs to make, let me know, otherwise, I'm prepared to

rule.

MR. REYNOLDS:  Not from the government, your Honor.

MS. SNYDER:  No, your Honor.

THE COURT:  The government argues that a pseudo count should be calculated for each of the seven victims whose interviews support the inference that the defendant was the producer of the content underlying Count Three.  The government assigned seven victims as pseudo counts to Count Three.  Because, as found above, the Section 2G2.1 cross-reference applies to Count Three, then pursuant to Section 2G2.1(d)(1) if the offense involved the exploitation of more than minor, Chapter 3, Part D, multiple counts, shall be applied as if the exploitation of each minor had been contained in a separate count of conviction.  Based on the seven identified victims, there are seven units associated with Count Three of the indictment pursuant to Section 3D1.4.

With regard to those rulings, the final units and guidelines range calculations come out as follows -- carefully follow along with me, make sure I have not made a mistake here -- I have, as to Count One, adjusted offense level is 39 and one unit; Count Two, adjusted offense level would be 40, one unit; Count Three, adjusted offense level 40, seven units; Count Four, adjusted offense level 40, one unit; Count Five, adjusted offense level 38, one unit; Count Six, adjusted offense level 40, one unit.  Thus, the greatest offense level

is 40.

Under Section 3D1.4, I then add 5 levels because there are more than 5 units.  So the total offense level is 45.

I do have the motions I haven't ruled on, but with acceptance of responsibility, the total offense level would then be 42, and the criminal history category is II, which results in a total guideline range of 360 months to life.

Any corrections to anything that -- I understand you disagree, Ms. Snyder.  That's not my question.  Given my rulings, any further record that we need to make on that?

MR. REYNOLDS:  Not from the government, your Honor.

MS. SNYDER:  No, your Honor.  Thank you.

THE COURT:  Then next we'll deal with the defendant's objections to supervised release conditions.  Again, I have the filings and papers prepared by both sides, as well as the probation department.  If there's any further argument or record that either side would like to make, now would be the opportunity.

MR. REYNOLDS:  Not from the government, your Honor.

MS. SNYDER:  Your Honor, I'll rely largely on the pleadings.  I would simply suggest, one, no matter what sentence the Court ultimately imposes, we are guessing what treatment providers are going to do decades from now.  What I would suggest is appropriate in terms of balancing Mr. Meier's liberty interests with the Court's concern with supervision and

ensuring the safety of the community is this:

As Mr. Meier is closer to his release date, as he has completed treatment within the Bureau of Prisons, as he is approaching any sort of presumptive release date, I would suggest that it would be appropriate for the Court to revisit this issue at that time, with the benefit of the record that has been created in the Bureau of Prisons.  If he gets out without there having been any sort of treatment applied, the appropriate thing for the Court to do would be to order an initial assessment and then to consider whether it would be appropriate to authorize polygraph testing, visual response testing based on an actual assessment of Mr. Meier, as opposed to our sort of projections of what may happen.  I think that is an appropriate way of balancing the government, the Court, community's interests with Mr. Meier's constitutionally protected liberty interests.  I don't think that is unreasonable given, particularly with the visual response testing and the polygraph, this is not norm -I mean, they're not Daubert passed, these are not things that come into court typically, but yet they are things that involve a very deep intrusion into Mr. Meier's liberty interests.  So for that reason, your Honor, I would suggest that it would be appropriate for the Court to sort of punt those specifics down the road to such a time and place as the Court has a little bit more information.

THE COURT:  Thank you.

I presume that when you refer to the Court, you are referring to the Court generally, as I have no intention of being around decades into the future, and so it would not be this court.  But I hear your argument.  I think that it makes some sense.

What I would say is this, my experience with our probation officers and probation department in this court, in this district is that they work very carefully with their clients upon their release to formulate and tailor the supervised release conditions to the specific needs of their client at the time of their release.  And therefore, I have no reason to believe that even if it is decades in the future that that policy and procedure will have changed at that point in time.  And certainly, it is within the purview -- and it happens not infrequently here -- that the probation officers will ask the Court to amend, add, subtract, et cetera, the supervised release conditions to be consistent with the current condition and state of their client.  And they do refer to these individuals, as they are reentering society, as clients.  And it's my experience that the probation department does take its obligation seriously to reintegrate their clients into society.  And so while I hear your argument, I will indicate here that the Court certainly leaves open the possibility that the probation officer, in consultation with the professionals

who have evaluated Mr. Meier, upon his release, and in conversations with Mr. Meier on his needs, may certainly petition the Court at the time of Mr. Meier's release for any modifications necessary for his supervision upon his release. And that may include modifications that would be consistent with the current state of technology at that time.  Things are moving fast, and I have no idea and I don't dare to try and predict what will be available at that time.  And so I will leave it to the professionals at that time to make that determination.

So while Mr. Meier does not object to sex offender treatment as a condition, he does object to the portion that requires the polygraph and visual response testing as part of the required participation and argues that these conditions implicate his constitutional liberty interests.  Under 18, USC, Section 3583(d), the Court may order special conditions of supervised release, provided such condition is:  One, reasonably related to the 3553(a) factors; two, involves no greater deprivation of liberty than is reasonably necessary for the purposes set forth in Section 3553(a); and three, is consistent with any pertinent policy statements issued by the sentencing commission pursuant to 28, USC, Section 994(a).  The Tenth Circuit requires that conditions of supervision be linked to the offense and be no broader than necessary to rehabilitate the defendant and protect the public.  Any restrictions

affecting a defendant's liberty must be especially fine-tuned to achieve the goals set forth in Section 3553(a)(2)(B), (C) and (D).  Although there have been questions surrounding the reliability of polygraph testing, the Tenth Circuit, at least as of the state of the law today, has generally upheld that testing as a condition of supervised release.  That being said, as I have previously indicated, I don't know what the sentencing commission's position will be decades in the future, when Mr. Meier is released.  I don't know what his condition will be, what treatment he will have received, and what he will need upon his release.  And therefore, I am specifically indicating here that these conditions -- although the Court is imposing polygraph and visual response testing as part of the supervised release, I am ordering that the probation office should re-evaluate these upon Mr. Meier's release, to request any modification necessary to be consistent with the current state of the law, the recommendations of the sentencing commission and the current state of technology, as well as Mr. Meier's specific condition upon his release from incarceration.

It appears that the remaining objections have been addressed, either through the revisions to the PSIR -- so I don't think I need to address any of those here, but if there's anything that you think specifically the Court believes -- needs a ruling, let me know.

I do note that the government, although the guideline range is capped at 480 months for one count of conviction, the government's position is that a life guideline in this case is the maximum number of years to which the defendant can be sentenced if he is sentenced on all six counts consecutively. The guideline of life in this case is therefore 40 years, 480 months for each of the six counts of conviction, totaling 240 years or 2,880 months. The probation officer here, Ms. Sinaka, has agreed with the government and has revised the PSIR accordingly. So it would appear to me that no ruling is necessary on this issue. But again, if you disagree, speak now.

Hearing nothing, I will then deal with the objection to the special assessments.

Mr. Meier objects to probation's recommendation that the Court impose $30,000 in special assessments pursuant to the JVTA in this case and asks the Court to make a finding that he is indigent and is relieved of this obligation. Probation has agreed and has removed this requirement from the final PSIR. Again, I don't believe any further ruling is necessary.

Similarly, with the AVAA, the government indicates the defendant is subject to the AVAA special assessment for each of his six counts of conviction. I agree and probation agrees, and therefore, the PSIR has also been revised accordingly.

The remaining objections do not impact the guideline

range.

So any further record that needs to be made on any of this?

MR. REYNOLDS:  No, your Honor.

THE COURT:  Yes.

MS. SNYDER:  No, your Honor.  Thank you.

THE COURT:  Okay.  I do have the government's motion pursuant to Section 3E1.1(b), the government moves for an additional one level decrease, and it does appear that that is appropriate.  And this has been included in the presentence report, and therefore, the Court grants that motion.

So the Court finds that the total offense level is 42, defendant's criminal history category is II.  This results in a guideline range of 360 months to life, a supervised release range of 5 years to life, and a fine range of 50,000 to $500,000.

So at this point, having identified the guideline range, I now have to take a step back to try to determine what is the appropriate sentence in my estimation and whether there are any areas where I disagree with the guidelines.  I consider the factors set forth in 18, USC, Section 3553.  I have reviewed the motion for a variant sentence.  I have reviewed the sentencing statements and each party's positions.

Mr. Meier has requested a variant sentence of 240 months or 20 years.  As mitigating factors, Mr. Meier

identifies that he was subject to bullying growing up and was ultimately sexually assaulted when he was in seventh grade. He was introduced to adult pornography by neighborhood boys. He has not had an adult relationship and has lived his life largely alone. Mr. Meier does not excuse his actions by this, but feels like that assault that he suffered early in his life froze something inside of him, and so that he is really stuck and really dealing with issues that would be more consistent with a man of about 14 years, in terms of that portion of his maturation.

He has prayed for help to overcome this. He recognizes he has a sickness and addiction and has taken responsibility by pleading guilty to each of the counts.

He argues that a 20-year imprisonment period followed by 10 years of supervised release would account for the scope of the indictment, punishment for the harm he has caused and sufficiently protect the community by keeping him in prison until he is 60 years old, and then under the Court's supervision for a decade beyond that.

The government recommends a sentence of 40 years, which is the statutory maximum. There, the government argues that he -- Mr. Meier is a registered sex offender by admission, who is addicted to child pornography and has been viewing it for approximately 20 years. It is clear from the record that Mr. Meier has not been deterred by prior investigations and by

his prior conviction, but rather his conduct appears to have escalated.  The defendant is, according to the government, a sexual predator, a recidivist and is a clear danger to children.  He spent a great deal of time and sophistication in this case -- or as evidenced by this case to exploit minors online and to avoid detection by law enforcement.  His conduct appears to be the product of a deep and uncontrollable sexual attraction to children, particularly boys in early puberty.

The criminal conduct at issue is the exploitation and abuse of dozens of minor boys.  Deterrence and protection of the public are paramount here, according to the government's argument.

So with that, I will turn it over to counsel.  I will let the government go first, in terms of any further record it wishes to make with regard to its sentencing recommendations.

MR. REYNOLDS:  Thank you, your Honor.

As the Court correctly notes, we're recommending a sentence of 40 years in this case, followed by lifetime of supervised release.  That is a within guideline sentence.  And it's a sentence that is fully supported and justified by the 3553(a) factors.

I just want to touch on the offense conduct.  I know your Honor has read extensive briefing and the lengthy PSR, so I won't belabor any of the points.  But the offense conduct is outrageous.  Outrageous may not be a strong enough word for it.

As the Court noted, the defendant targeted, groomed and sexually exploited minor boys online, not just once, not just twice, but continuously for years and years on end.  And as set forth in the PSR, the FBI is aware of more than 60 victims of his criminal conduct captured online.

I want to just say something about why this conduct is so dangerous.  I mean, I think it's obviously dangerous on its face.  But I think it's also important to remember that children and adolescents who are growing up today were raised on Facebook and Instagram.  Their whole lives are online.  And when adolescents children experiment sexually, as they naturally do, they tend to do so online.  In this day and age, conduct that, at a prior time, might have taken place in the backseat of a car or something like that, now takes place on webcam.  And this defendant's modus operandi was to exploit that, to make young boys think they were talking to someone of their same age and to engage in, perform in sexual conduct.  Unbeknownst to them, Mr. Meier was capturing their most intimate moments online and sharing them with people.

And I think it raises the question, how are parents supposed to protect their children from people like Mr. Meier.  They certainly cannot monitor their children's internet activity around the clock.  Not even the best parent can possibly do that.  They can't really disconnect their children from the internet, because that would be sort of a death

sentence for their children's social lives.  So what is to be done?

Frankly, I don't have an answer here.  Parents can lock their doors and windows to keep people from getting in, but there's very, very little they can do to prevent people like Mr. Meier from making contact with their children online.

And Mr. Meier appears to be somewhat callous to this dilemma.  In Paragraph 73 of the PSR, he said online that he's been confronted by three different parents or confronted by parents on three different occasions, and his response was to laugh at them and taunt them and to make crude comments about the fathers who are trying to protect their children.  And that level of callousness towards victims is really truly shocking.

I do want to make clear, much of the evidence in this case consisted of young boys performing by themselves, masturbating for the camera, but that was not all Mr. Meier did or admitted to doing.  Again, Paragraph 73 states that he has been, quote, directing boys in duo hardcore action since 2012.  And the PSR does describe a video that Mr. Meier posted online and claimed credit for that depicted two young boys performing sexual acts on each other.  And what this means is Mr. Meier's conduct included, quote, directing -- his own words -- minors to sexually assault one another.

And obviously, little needs to be said about what he did with his content.  He didn't just hold it himself.  He

shared it online with this community of pedophiles.  And this imposes a new burden on these victims who are already burdened by his offense conduct.

I think we all know in this room that the internet, it's forever.  And these victims will have to spend their whole lives knowing that these videos and these screen captures of them engaging in this activity is circulating online and being shared by people who are sexually interested in that sort of thing.

Again, this was not a simple mistake, it was not a momentary lapse in judgment.  It lasted for years.  It was sustained, deliberate criminal activity.  It took a lot of time and a lot of planning.  And it was so egregious that law enforcement agencies all around the world were investigating the profile that Mr. Meier controlled, not just here in Colorado, not just in the United States, but in Australia and the United Kingdom as well.

So the offense conduct, your Honor, makes clear that this defendant is a serial and high volume sexual predator of children.  And that on its own would be enough to justify a very substantial sentence.  But when the Court moves down the line of 3553(a) factors to his history and characteristics, it really gets worse.  We have spilled a lot of ink on his criminal history, and I don't mean to belabor that, but he's had three search warrants executed at his house by three

different law enforcement agencies conducting three different independent investigations. And not even that stopped him from accessing these websites online. And in fact, it seemed to have only caused him to become more technologically sophisticated in an effort to evade law enforcement. He began using the Tor network, using virtual private networks, he began using encryption. And even today, at his sentencing hearing, some of these tactics were successful, because the FBI was not able to get into some of his devices. We don't know what's on there.

We certainly don't think that the Court should presume that those devices contain incriminating content, but he shouldn't get the benefit of the doubt either. Very often we can say with defendants that the FBI has examined all of their devices and is fully aware of the outer boundaries of that defendant's criminal conduct. That's just not true for Mr. Meier. And again, for the record, this was the reason why Mr. Meier, who the government sees as a very clear and obvious producer of child pornography, was charged only with distribution, because we did not have the corresponding evidence that is almost always found on a producer's devices.

We mention in our papers that his criminal conduct got more serious over time. It had a plain and upward trajectory. We would assert, your Honor, that there's very little reason to believe that the defendant will stop doing this.

He admits that he's addicted.  He's claimed he has tried to stop doing this before without success, claims he can't be fixed.  I think it's worth mentioning that he has already received sex offender treatment that was unsuccessful.  The record is devoid of any kind of psychological examination finding that he is not going to be a recidivist in the future.

And for these reasons, your Honor, the egregious offense conduct, the lifetime of law breaking and the increasingly serious conduct, we would submit that a 40-year sentence is appropriate under the guidelines and the 3553(a) factors, and there's no justification for the very substantial downward departure that the defendant seeks.

I just want to make one more point, your Honor, and then I will conclude.  The government strenuously recommends that Mr. Meier receive a supervised release term of life, given his history, given his efforts to evade law enforcement, given his admissions that he can't stop, he appears to be exactly the kind of offender that lifetime supervised release is for.

Thank you.

THE COURT:  I have a question for you.

MR. REYNOLDS:  Yes.

THE COURT:  Don't run away so fast.

I understand that the government believes that a 40-year sentence is appropriate.  I guess the question that I am left with is, given that I am required by law to impose a

sentence which is sufficient, but not greater than necessary, to achieve the purposes of sentencing as described in the statute, it's my understanding that Mr. Meier is 41 years old now, the variant sentence that the defendant is the requesting would have him released at age 60, 61 -- I told you, my math is not so great, double check me at every turn -- the sentence that probation is recommending would have him released at age 71, and the government's recommendation would have him released at age 81.  Talk to me about why release at 81 is sufficient, but not greater than necessary, to achieve the purposes of sentencing.

MR. REYNOLDS:  Our view is that release at 81 is the appropriate sentence, given all of the factors.  We have very, very serious concerns about Mr. Meier's recidivism.  He is already a recidivist.  We have very, very serious concerns about whether he's going to get released and immediately go back to his criminal conduct.

And so the idea that Mr. Meier would be released in his lifetime gives the government grave concerns.  On the other hand, we have an obligation not just to seek the highest sentence we possibly can, but to balance the 3553(a) factors and take into account the whole picture of Mr. Meier.  And really the only significant mitigating factor in this case that we see was his very, very prompt and full acceptance of responsibility.  And given his very prompt and full acceptance

of responsibility, we are uncomfortable recommending a sentence that is essentially a life sentence on him.

We think that 40 years is the appropriate sentence. That will incapacitate him, it will protect the public. But given the fact, as I'm sure Ms. Snyder will point out, he quickly owned up to his conduct, it will give him the possibility of living a life outside prison.

What we would say is that release at age 60 --

THE COURT: Let me ask you this, does he pose less of a danger to the public at age 81 than 71?

MR. REYNOLDS: I think someone taking a 40-year break from the, as your Honor pointed out, relentless progress of technology would certainly make him less of a danger. He's still able to do it. Someone being in prison for 40 years coming out, trying to replicate what he was doing before has a much greater challenge ahead of him. I think it would be more difficult for him to resume this conduct at that age than it would be for a shorter sentence.

THE COURT: Thank you.

MR. REYNOLDS: Thank you, your Honor.

THE COURT: Ms. Snyder.

MS. SNYDER: I think the question your Honor asked is the ultimate question here. And let's be clear about what the government is asking for. I mean, they may say it's 40 years, but we are really arguing about essentially a de facto life

sentence.  If you impose a 40-year sentence, given how difficult it is to survive in prison, particularly as a sex offender, it is overwhelmingly likely that Chris Meier is going to die in federal prison.  If he gets out, he may be out for a modicum of years, but not much.

So I think the ultimate question for the Court and what's at stake for Mr. Meier is does this man deserve a chance at spending the last years of his life monitored, supervised, closely watched -- I don't know what the technology is going to be in 30 years.  I'm sure -- I mean, now, camera phone, can't -- I'm sure there will be new things that you can and cannot do, but does he deserve a chance and enough sentencing consideration to have a shot at having a bit of a meaningful life outside of prison walls, after he spends decades in atoning for all of the things that the government pointed to.

And I would submit that the answer to that question is yes.  Of course, he does.

I was rereading all of the paper in preparation for this.  And if I had one critique of both the government and myself; they talk only about the crime, the crime, the crime, and I talk only about other things, about Mr. Meier, about case comparisons, et cetera.  And your Honor is in the unenviable position, I think, of trying to marry those two things, because both matter, both warrant consideration.

And I think when you look at who Mr. Meier is -- and I

certainly dispute the government's characterization that the only mitigating thing about Mr. Meier is that he took responsibility -- I think there's a lot more about him and about his life and about his struggles that are mitigating.

I think when you think about that and you weigh the offense conduct -- and I mean, it's bad, I'm not saying it's not -- but when you do that, you will find that this is not a life case, that Mr. Meier is worthy of a chance. That's all that we are asking for is a sentence that gives him a chance at spending some period of time outside of prison.

Of course, child pornography is horrible. The violation of these men's privacy and their dignity, that's very real. And I can't -- I cannot say anything other than that.

THE COURT: Well, isn't that fundamentally the issue here?

MS. SNYDER: Yeah.

THE COURT: Is Mr. Meier entitled to some portion of his life, dignity and life outside prison, yet I have heard no one argue to me today -- and I appreciate that, because it would be a difficult argument to make -- that he is unlikely to recidivate. Mr. Meier candidly -- and the Court appreciates that candor -- acknowledges that he has a sickness and an addiction. And I don't think -- it's not my practice to incarcerate somebody solely for that. However, I have to balance the risk of his harm to even yet another young person,

just one.

MS. SNYDER:  Sure.

THE COURT:  So I have to balance the risk of harm to even just one more young boy or young person, or old person, against, as you say, the ability for Mr. Meier to at some point leave prison.  And even under supervision, while I recognize that it is important and it is effective in many situations, it is not a hundred percent and we still run the risk --

MS. SNYDER:  Sure.

THE COURT:  -- of injury to yet another person, where we acknowledge that the injuries are deep, long lasting and profound.

MS. SNYDER:  Yes.  Absolutely, your Honor.  I mean, I think that's the crux of the issue, and that's why this case is not easy, why it's not -- I had a sentencing in front of your Honor yesterday, if it was spitting the numbers into a machine, and we just looked at the result, that's one thing.  That's not what we do.  And those are deep and weighty considerations.

But I think a couple of things.  I think it matters to the Court or should matter to the Court, I submit that it should matter to the Court, that Mr. Meier has been fighting this for a long time.  The government uses that as a club, his autobiography, the things he says, the hope he has, the fact that it didn't work out, that's aggravating.  But it's also mitigating.

Because what we know about state supervision, the services there, is that it's not what you are going to get under federal supervision.  What we know is he's never had, for lack of a better word, residential or intensive or 24/7 kind of treatment like he will get in the BOP, assuming the Court recommends he participate in all the treatment programs there.

It is true that 20 years or 30 years or 40 years will, I suppose, protect the public in some way.  But ultimately, your Honor, no one is a zero risk person, no one that the Court sentences, no matter what the crime, no matter what the offense is.  There is always a risk.  And the question is, when are you balancing that, you know Mr. Meier is going to get treatment inside and he is going to get treatment when he is outside and he is going to be under the strictest of scrutinies, which is what sex offender federal supervised release is, I think the balance is to impose a sentence that punishes what he does. The sentence we're asking for, I assume it does that, certainly, the sentence probation recommends does that.  It protects the public until he's in his 60s, 70s.

But the check, the counterbalance, if the Court feels, impose lifetime supervised release, if 10 years isn't enough, 20, whatever the Court does, but I think there has to be a way to ensure that Mr. Meier gets the benefit of real and meaningful treatment, gets the benefit of being able to, in a sustained way, try to rehabilitate himself.  And that also

provides supervision that minimizes or mitigates the risk.

I can't tell you that there is zero chance that he will ever recidivate again.  But I can't tell you that in any case; a gun case, a robbery case, a drug case.

And it is absolutely true that what Mr. Meier did was bad.  But I would submit to your Honor that he is not -- he and his crime are not so bad that he deserves no chance ever of proving himself and his ability to be in the community.

I think it matters that he himself has never laid hands on a child, that this is not a contact offense, that these are not forcible offenses.  Did he participate in a system of exploitation?  Absolutely.  And that demands punishment, and the Court is going to impose it.  But two decades in prison is a profoundly long time; 25 years in prison is a profoundly long time.

Indeed, the last federal murder case I did, the gentleman who strangled another individual for 7 and a half minutes, got a sentence that was less than 20 years.

You are not sentencing Chris Meier for the harm that child pornography has done at large to the soul of the country or whatever the government's quotation was in their pleadings. You are not sentencing the social ill.  You are sentencing him, a profoundly sad individual, who is facing literally the worst day of his life.  And if the Court looks around, he's doing it alone.

He is going to spend decades in a prison system where he, I expect, he knows, that he'll be targeted relentlessly because of what he did, who he is, all of that.  And what we are asking for is the Court to give him a release date, something to work towards, something where he can meaningfully say there is a chance at real life on the other side of this.

There are good things about Mr. Meier.  He's always held a job.  He's always worked.  He's reliable.  He's generous with his family.  He's funny.  He's a man of faith.  And he did terrible things.  But what I would submit to the Court is that he's not someone who needs to die in prison or for whom there is no sentence that would be sufficient but for a sentence that is tantamount to having him die in prison.

I would respectfully submit, your Honor, that 20 years, with additional supervision to follow, is sufficient.  I would submit that it is consistent with what similarly situated people have received.  It's 20 times longer than he's ever spent in a jail before.  It will keep him under the supervision of the Court at large for a long time; decades.  It punishes, it deters, it sends a strong message to the community, but it also fairly accounts for a man who doesn't want to be here, who doesn't want to be doing this.

He wants treatment.  He will do treatment.  He will do everything he can so that he has a chance at being able to live a life he can live with.

Your Honor, the national average sentence -- and this is in my motion, my sentencing motion, Page 11 -- the national average sentence for people who have a prior, people who are recidivists, people who have done this before, who are escalating, on a straight distribution offense, is 236 months. In 2023, the national average sentence for a person with a prior who committed a production offense was 304 months. That is a long time, a very, very long sentence.

What we are asking the Court to do today is to impose a sentence that is sufficient, but not greater than necessary, and would respectfully submit to the Court that those two benchmarks provide the Court with side posts for what is reasonable, what is often imposed in these cases, what is often imposed in cases much like the one that -- or most analogous to the ones that Mr. Meier has been convicted of, we have submitted all of that in our papers. Your Honor, what we're asking for is that you give this man a chance at life outside. I think there is enough redeeming about him and about who he is that gets him at least that.

So for those reasons, your Honor, I would ask the Court to impose a variant sentence in this case. If the Court is not inclined to do that, I would strongly ask the Court not to impose a sentence that is going to mean that he walks out of prison, if at all, in his 80s.

It's bad. The conduct is bad. But he doesn't need to

die.

If the Court has further questions, I'm happy to answer them.  Otherwise, I'll rest on my pleadings.

THE COURT:  I think you answered my questions.  Thank you.

Are there any further record by either counsel?

MR. REYNOLDS:  Not from the government.

THE COURT:  Mr. Meier, as I told you at your change of plea hearing, you would have the opportunity to speak to me directly today if you wish to do so.  You are under no obligation to do that, and I absolutely won't hold that against you.  But if you do want to speak, I will listen carefully and will be interested in anything you care to say.  And you are not limited in any way as to what you can say, anything you want me to have to think about as I have to make this difficult decision of what sentence to impose in your case I am happy to hear.  So if you would like to speak, I just ask that you go to the podium.

THE DEFENDANT:  Thank you, your Honor.

Can you hear me?

THE COURT:  Yes.

THE DEFENDANT:  This is really difficult, so please be patient.

I'm not denying that what I did was absolutely horrible.  I'm deeply ashamed that I yet again have failed in

this addiction and let it get the best of me.

When COVID hit, I spiraled out of control. I'm not going to lie. It was something that I chose to stop using my tools, and I chose to get in that behavior again. And I am sick by it. I am ashamed by it. And I acknowledge that I have hurt deeply a lot of people. I have hurt the young men. I have hurt my family, the investigators, everybody in this court that has to investigate this stuff and look at it.

I can't understand or explain why. It's a very powerful addiction. And yes, I -- it's a lifelong thing to work towards. Everybody that has an addiction problem, like alcohol, drugs, it's something they deal with the rest of their lives. You have people with 40-year badges of sobriety and then relapse, you know, we're not perfect, your Honor. And I have made mistakes time and time again. I am not denying it. I am not trying to minimize. I really screwed this up.

And I have yet again brought more shame on my family. I mean, they did want to be here today, your Honor, but it's very difficult for them. They couldn't do it. Just the fact that they don't think that they'll ever see me again even outside of prison kills them. Just to never even see them kills me too. But they still have my back. Of all the stuff that I have put them through, and they still have my back, and that is still driving me forward, your Honor. And I do seek change, and I do want to be able to redeem myself through this

and prove through my actions that I can do this and will do this in prison and demonstrate that I can do this and succeed.

And I have been compliant before, I have been in treatment before and successfully completed treatment before, and I know I can do it again.  I just look at it as it's a nonstop opportunity to work on myself.  You know, it's like getting a doctorate degree on myself, in this case, if I had to look at it that way.  But I am determined to continue to grow and learn and do what I need to do to just be a better man, better person, better human being.

And you know, if I can see a life outside at the end of this, that would be awesome.  I mean, I just would really run with that the best I can run with it.  And I just hope that you would allow me to prove that in actions.

And again, I apologize to everybody.  I apologize to the prosecutors, the law enforcement agencies, everybody that -- the harm that I put everybody through.  I apologize.  I sincerely apologize.  Words can't describe or say how sorry I am.  I mean, I know it's just words and probably doesn't mean anything to you guys, but I just want you to know that I really am humbly, truly sorry for what I put you all through.

Thank you.

THE COURT:  Thank you, sir.

In determining the sentence here today, I have considered the presentence report and all documents related to

that report.  I have considered the arguments made in briefing and on the record made today, as well as the statements by Mr. Meier himself here.

I am mindful of the fact that I am required by law to impose a sentence which is sufficient, but not greater than necessary, to achieve the purposes of sentencing as described in 18, USC, Section 3553.  In fashioning that sentence, I have considered both individually and as a whole all of the 3553(a) factors which must be considered in determining the sentence, specifically including those that have been discussed by counsel here today.

Mr. Meier, I am going to tell you in plain English what sentence I am going to impose.  And then I do have to pronounce the sentence verbatim, and it does contain a lot of legal language that can sometimes be confusing, so I am going to tell you what I'm going to do here.

First of all, with regard to the request for a sentence that varies downward from the bottom end of the guideline range, what the Court has determined the guideline, I do not believe that that is appropriate.  And therefore, I will deny that request for a variance.

In this case, it does appear to me that a sentence within the guideline range is an appropriate one.  The real question then becomes, what is the appropriate sentence to balance the various needs of the community; for protection, for

deterrence, as well as the specifics with regard to this particular defendant and the history and characteristics of this defendant, as well as the characteristics of this particular offense or set of offenses that's pled guilty to here.

It is a difficult thing to determine what sentence is sufficient, but not greater than necessary, to accomplish those goals. But in this case, I do conclude that a sentence of 420 months, or 35 years, is sufficient, but not greater than necessary to accomplish the goals of sentencing. I will impose the 420 months on each of the Counts One through Six to be served concurrently. This will be followed by lifetime of supervised release. I will not impose the fine, but I must impose a $600 special assessment. I will also impose the AVAA's fine as required -- or as recommended by probation.

This sentence takes into account the nature and circumstances of this offense, as well as the history and characteristics of the defendant, while taking into consideration the seriousness of the offense, deterrence to criminal conduct and protection of the public.

In particular, the Court notes that the sentence reflects that Mr. Meier is before the Court after pleading guilty to an offense that involved the exploitation of several minors between 2019 and 2021. The defendant admits to being a user of a site called Boystown, a Tor hidden service dedicated

to child pornography and specifically the sexual exploitation of young boys.

The defendant has a prior felony conviction for exploitation of a child, video, and more items from 2012 in which he was originally sentenced to probation, but was ultimately sentenced to the Department of Corrections in Colorado for 3 years due to violations of that probation.

In 2006, he was investigated for possession of child pornography, but the prosecutors ultimately declined the case.

None of that deterred the defendant.  The defendant has been involved in the conduct noted in the instant offense for over 15 years, with the exception of when he was incarcerated.

In the instant offense, not only did the defendant distribute child pornography, but he was specifically engaged in enticing minors to engage in sexual activity in order to get content to distribute.  This is a significant crime.  And at the outset, I do wish to make clear that I would have reached this sentence regardless of the guideline calculations.

Although this conviction stems from his behavior over a period of two years, it is clear to this court that Mr. Meier has been exploiting minors for a significant period of time, as represented by his 2013 conviction for sexual exploitation of children, and hasn't admitted to his addiction to child pornography and the viewing of this content for many, many

years.

Even if the Court would have adopted the guideline calculation by the defendant, I would have varied upward to reach this same sentence, as I believe it is necessary, indeed essential, in order to protect against future victims of this pernicious conduct.

Defendant's conduct with regard to these victims was certainly outrageous, and the defendant does not attempt to sidestep that.  And that acceptance of responsibility is important here, and he was credited with that in the guideline calculations.  But I also took that into consideration in not imposing the maximum sentence as requested by the government.

Nonetheless, there are significant aggravating factors here that are not currently accounted for in the sentencing guidelines for child pornography trafficking.  The commission concluded that the existence of the communities like the one that Mr. Meier involved himself with on the network increases the likelihood that other community members may engage in sex offending to create new child pornography images for trading online.

Another aggravating factor here is the defendant's level of sophistication displayed here, not just in exploiting minors online, which that level of sophistication was demonstrated, but by avoiding detection by law enforcement.  In an effort to evade law enforcement, he used sophisticated and

anonymizing tools, such as the dark web and virtual private networks, to obscure his true identity while committing crimes online.  He also used encryption software on his devices, which law enforcement was unable to unencrypt.  The Court does not make any presumption of what would have been demonstrated or what was on devices that were not unencrypted, but looks to that as an aggravating factor, as the level of sophistication utilized by Mr. Meier in committing the instant offense.

I also find that it is aggravating that Mr. Meier was quite notorious and prolific online in his activity.  And this attracted the attention of at least four different law enforcement agencies in three separate countries.  So this conduct appears not to have been limited to the conduct in the United States.  Again, the Court does not specifically rely upon those other investigations for what they found, but certainly that Mr. Meier's conduct was significant enough that it attracted the attention of other law enforcement agencies in other countries, the Court does find this aggravating.

Ultimately, this sentence is necessary to punish Mr. Meier for his serious offenses, promote deterrence, protect the most vulnerable members of our public, and to get him the help and treatment he needs to address this harmful addiction.

Is there any further record that either counsel wishes to make before the Court pronounces the sentence verbatim?

MR. REYNOLDS:  Not from the government, your Honor.

MS. SNYDER:  No, your Honor.  Thank you.

THE COURT:  The Court makes the following findings concerning the objections to the presentence report:  I find that, number one, pseudo counts should be added for the 7 victims in Count Three; two, the cross-reference to Section 2G2.2 shall be applied to Count Two; number three, the cross-reference to Section 2G2.2 should be applied to Count Three; the cross-reference to Section 2G2.2 should be applied to Count Four; number five, the cross-reference to Section 2G2.1 should be applied to Count Five; number six, the cross-reference to Section 2G2.2 should be applied to Count Six; seven, the 2 level enhancement pursuant to Section 2G2.2(b)(1)(B) is applicable; number eight, polygraph testing shall be imposed as part of sex offense specific treatment; nine, visual response testing shall be imposed as part of sex offense specific treatment.  The Court determines that no finding is necessary concerning the remaining objections to the presentence report, because the controverted matters will not be taken into account in imposing sentence or will not affect the sentence.

Neither the government nor the defendant has challenged any other aspect of the presentence report; therefore, the remaining factual statements and guideline applications are adopted without objection as the Court's finding of fact concerning sentencing.

The Court finds that the total offense level is 42 and the defendant's criminal history category is II.  This results in an imprisonment term of 360 months to life and a fine range of $50,000 to $500,000.  The supervised release range is 5 years to life as to each count.

The Court will not vary downward, as requested by the defendant, from the guideline range for the reasons stated on the record.

Pursuant to the Sentencing Reform Act of 1984, it is the judgment of the Court that the defendant, Mr. Meier, is hereby committed to the custody of the Bureau of Prisons to be imprisoned for a total term of 420 months as to each count, One though Six, to be served concurrently.  Upon release from imprisonment, the defendant shall be placed on supervised release for a term of life.  As to each count, One through Six, all such terms to run concurrently.

Within 72 hours of release from the custody of the Bureau of Prisons, the defendant shall report to the probation office in the district to which the defendant is released. While on supervision, Mr. Meier, you must not commit another federal, state or local crime and must not unlawfully possess a controlled substance.  You must refrain from any unlawful use of a controlled substance.  You must submit to one drug test within 15 days of release from imprisonment and a maximum of 20 tests per year of supervision thereafter.  You must cooperate

in the collection of DNA as directed by the probation officer. You must comply with the standard conditions adopted by this court in General Order 2020-20.

I find that the following special conditions of supervision are determined to be reasonably related to the factors enumerated in 18, USC, Section 3553(a) and 18, USC, Section 3583(d). Further, based on the nature and circumstances of the offense and the history and characteristics of this particular defendant, the following conditions do not constitute a greater deprivation of liberty than reasonably necessary to accomplish the goals of sentencing:

Number one, you must participate in a program of mental health treatment approved by the probation officer and follow the rules and regulations of such program. The probation officer, in consultation with the treatment provider, will supervise your participation in the program as to modality, duration and intensity. You must pay for the cost of treatment based on your ability to pay.

Number two, you must participate in a sex offense specific evaluation and/or treatment program approved by the probation officer. This will include polygraph and visual response testing as part of the required participation. The probation officer, in consultation with the treatment provider, will supervise your participation in and compliance with the

treatment program.  You must comply with all rules and regulations of the treatment program that are specified by the treatment agency and the probation officer.  You must pay for the cost of treatment based on your ability to pay.

Number three, your use of computers and internet capable devices will be limited to those requests to use and which the probation officer authorizes.  The probation officer may not prohibit lawful internet use, except to impose restrictions on the types of computers or internet capable devices that you may use to provide necessary restrictions to facilitate correctional treatment and rehabilitation and to protect the public from any further crimes.  Authorization for use of any computer or internet capable devices shall be based on the ability of the computer device to be effectively monitored by monitoring software used by the probation office. You must disclose any username or identifications and passwords for all computers or internet capable devices to the probation officer.

Number four, you must allow the probation officer to install software or hardware designed to monitor activities on any computer or internet capable device you are authorized by the probation officer to use.  This monitoring may record any and all activity on the device, including the capture of keystrokes, application information, internet use history, email correspondence and chat information, internet use history

and chat conversations.  You must not attempt to remove, tamper with, reverse engineer or in any way circumvent the software and/or hardware.

You must submit your person and property -- excuse me -- you must submit your person and any property, house, residence, vehicle, papers, computer, internet capable device or other electronic communications or data storage devices or media and effects to search at any time or with or without a warrant by any law enforcement or probation officer with reasonable suspicion concerning a violation of a condition of supervised release or unlawful conduct and by any probation officer in the lawful discharge of the officer's supervision functions.

Number six, you must not incur new credit charges or open additional lines of credit without the approval of the probation officer, unless you are in compliance with the periodic payment obligations imposed pursuant to the Court's judgment and sentence.

Number seven, you must provide the probation officer access to any requested financial information and author the release of any financial information until all financial obligations imposed by the Court are paid in full.

Number eight, you must apply any monies received from income tax refunds, lottery winnings, inheritances, judgments and any unanticipated or unexpected financial gains to the

outstanding court ordered financial obligation in this case. If the judgment imposes a financial penalty and/or restitution, you must pay the financial penalty and/or restitution in accordance with the schedule of payments sheet of this judgment.  You must also notify the Court of any changes in economic circumstances that might affect your ability to pay the financial penalty and/or restitution.

Number ten, if you have an outstanding financial obligation, the probation office may share any financial or employment documentation relevant to you with the asset recovery division of the United States Attorney's Office to assist in the collection of the obligation.

Although the provisions of the Mandatory Victim's Restitution Act of 1996 apply to this Title 18 offense, the Court finds that there is no restitution to be ordered.

The special assessment of $600 and a $12,000 AVAA assessment are due and payable immediately.

The Court finds the defendant does not have the ability to pay a fine, so I will waive the fine in this case.

I find that the defendant does not have the ability to pay the JVTA assessment, so I will waive the JVTA assessment in this case.

It is ordered that the payment of the monetary obligation shall be due as follows:  The special assessment and AVAA assessment are due immediately.  Any unpaid monetary

obligations upon release from incarceration shall be paid in monthly installment payments during the term of supervised release.  The monthly installment payments will be calculated as at least 10 percent of the defendant's gross monthly income.

Pursuant to Rule 32.2, the Federal Rules of Criminal Procedure, and the defendant's admission of the forfeiture allegation contained in the indictment, the defendant must forfeit to the United States any and all property, real or personal, derived from the proceeds of the instant offense.

Mr. Meier, you are advised of your right to appeal the sentence.  If you wish to appeal, a notice of appeal must be filed with the clerk of the court within 14 days after entry of judgment or the right to appeal will be lost.  If you are unable to afford an attorney for an appeal, the Court will appoint one to represent you.  If you so request, the clerk of the court must immediately prepare and file a notice of appeal on behalf of the defendant.

With that, is there anything else that the parties wish to raise or any further issue the Court needs to address?

MR. REYNOLDS:  Not from the government, your Honor. Thank you.

MS. SNYDER:  Your Honor, just one point of clarification and one request.

With regard to the AVAA assessment, I think the government pointed out and the Court agreed with that it was

supposed to be assessed per count.  I'm assuming that the $12,000 is $2,000 per count, I just ask that the judgment reflect that.

THE COURT:  Fair enough.  And that is correct.  The judgment should reflect that is $2,000 per count.

MS. SNYDER:  Your Honor, the final thing, we had asked in our briefing for a recommendation to FCI Englewood, assuming that the BOP determines that is commensurate with Mr. Meier's ultimate security classification, I would ask the Court to consider doing that to allow him to be closer to his family.

THE COURT:  The Court does note that Mr. Meier is from this area.  It's my understanding that the parents live in Wyoming.

MS. SNYDER:  Yes, your Honor.  They live in Torrington, about two hours from here.

THE COURT:  Mr. Meier's family does live close to this jurisdiction, and therefore, the Court will recommend that, based upon the Bureau of Prisons' analysis with regard to security, rehabilitation needs, mental health needs, et cetera, if it is a fit that he be housed here Colorado.

Mr. Meier, it is important that you understand that the Court does not make the designation of which facility you will ultimately be incarcerated in.  That decision is ultimately up to the Bureau of Prisons and is based on a number of factors, as I know your counsel has advised you.

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

Nonetheless, one of the factors that the BOP will consider is the recommendation of the Court, and I do find that it is appropriate in this particular case to make that recommendation, and so I do make that recommendation.

MS. SNYDER:  Thank you.

THE COURT:  Is there anything further?

MR. REYNOLDS:  No, your Honor.

MS. SNYDER:  No, your Honor.  Thank you.

THE COURT:  With that, Mr. Meier, I am ordering that you are remanded to the custody of the United States.  I know this is a difficult one, and I do wish you well.  With that, we are adjourned.

(Adjourned)

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

23-cr-00419-RMR     Sentence     November 13, 2024

I hereby certify that the foregoing is a true and accurate transcript, to the best of my skill and ability, from my stenographic notes.


*Sadie L. Herbert*
Official Court Reporter
U.S. District Court


SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294   (303)335-2105