APPEAL,TERMED

# U.S. District Court – District of Colorado
## District of Colorado (Denver)
## CRIMINAL DOCKET FOR CASE #: <u>1:23–cr–00419–RMR</u>–1

Case title: USA v. Meier

Date Filed: 10/04/2023

Date Terminated: 11/25/2024

Assigned to: Judge Regina M. Rodriguez

Appeals court case number: 24–1480 USCA 10th CIRCUIT

**<u>Defendant (1)</u>**

**Christopher Carl Meier**
*TERMINATED: 11/25/2024*

represented by **Matthew Kyle Belcher**
Office of the Federal Public Defender
633 Seventeenth Street
Suite 1000
Denver, CO 80202
303–294–7002
Fax: 303–294–1192
Email: Matthew_Belcher@fd.org
*ATTORNEY TO BE NOTICED*
*Designation: Public Defender or Community Defender Appointment*

**Stephanie Maureen Snyder**
Federal Public Defender's Office
Districts of Colorado and Wyoming
633 17th Street
Suite 1000
Denver, CO 80202
303–294–7002
Fax: 303–294–1192
Email: stephanie_snyder@fd.org
*ATTORNEY TO BE NOTICED*
*Designation: Public Defender or Community Defender Appointment*

| <u>Pending Counts</u> | <u>Disposition</u> |
| --- | --- |
| 18 U.S.C. § 2252A(a)(2) and (b)(1) – (Conspiracy to Distribute Child Pornography) (1) | Imprisonment for a term of four hundred twenty (420) months as to counts 1, 2, 3, 4, 5, and 6; to be served concurrently. Supervised release for a term of life as to counts 1, 2, 3, 4, 5, and 6; to be served concurrently. $600 Special Assessment. $12,000.00 AVAA Assessment. |

1

| | |
|---|---|
| 18 U.S.C. § 2252A(a)(2) and (b)(1) – (Distribution of Child Pornography) (2–6) | Imprisonment for a term of four hundred twenty (420) months as to counts 1, 2, 3, 4, 5, and 6; to be served concurrently. Supervised release for a term of life as to counts 1, 2, 3, 4, 5, and 6; to be served concurrently. $600 Special Assessment. $12,000.00 AVAA Assessment. |

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
|---|---|
| None | |

**Highest Offense Level (Terminated)**

None

| **Complaints** | **Disposition** |
|---|---|
| None | |

**Plaintiff**

| **USA** | represented by | **Alecia Lynne Riewerts** |
|---|---|---|
| | | U.S. Attorney's Office |
| | | District of Colorado |
| | | 1801 California Street |
| | | Suite 1600 |
| | | Denver, CO 80202 |
| | | 303–454–0100 |
| | | Fax: 303–454–0406 |
| | | Email: Alecia.Riewerts@usdoj.gov |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |
| | | *Designation: Federal Agency Attorney* |
| | | |
| | | **Kyle Patrick Reynolds** |
| | | U.S. Department of Justice |
| | | Criminal Division |
| | | 1301 New York Avenue NW |
| | | Washington, DC 20530 |
| | | 202–616–2842 |
| | | Email: kyle.reynolds@usdoj.gov |
| | | *ATTORNEY TO BE NOTICED* |

| Date Filed | # | Docket Text |
|---|---|---|
| | | |

| 10/04/2023 | 1 | INDICTMENT as to Christopher Carl Meier (1) count(s) 1, 2−6. (Attachments: # 1 Criminal Information Sheet) (angar, ) (Entered: 10/05/2023) |
| 06/10/2024 | 22 | NOTICE of Disposition by Christopher Carl Meier (Snyder, Stephanie) (Entered: 06/10/2024) |
| 07/09/2024 | 24 | COURTROOM MINUTES for Change of Plea Hearing as to Christopher Carl Meier held before Judge Regina M. Rodriguez on 7/9/2024. Plea entered by Christopher Carl Meier (1) Guilty Count 1,2−6. Sentencing set for 10/15/2024 02:00 PM in Courtroom A 901 before Judge Regina M. Rodriguez. Court Reporter: Sadie Herbert. (kmyha) (Entered: 07/09/2024) |
| 07/09/2024 | 25 | Plea of Guilty and Statement of Facts Relevant to Sentencing (WithoutPlea Agreement) as to Christopher Carl Meier (kmyha) (Entered: 07/09/2024) |
| 07/09/2024 | 26 | STATEMENT IN ADVANCE OF PLEA OF GUILTY by Defendant Christopher Carl Meier (kmyha) (Entered: 07/09/2024) |
| 10/23/2024 | 31 | OBJECTION/RESPONSE to Presentence Report 30 by Christopher Carl Meier (Snyder, Stephanie) (Entered: 10/23/2024) |
| 10/24/2024 | 32 | OBJECTION/RESPONSE to Presentence Report by USA as to Christopher Carl Meier (Riewerts, Alecia) (Entered: 10/24/2024) |
| 10/30/2024 | 33 | MOTION for Non−Guideline Sentence by Christopher Carl Meier. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K)(Snyder, Stephanie) (Entered: 10/30/2024) |
| 10/30/2024 | 34 | SENTENCING STATEMENT by USA as to Christopher Carl Meier (Reynolds, Kyle) (Entered: 10/30/2024) |
| 11/06/2024 | 37 | RESPONSE by USA as to Christopher Carl Meier re: 31 Objection/Response to Presentence Report filed by Christopher Carl Meier (Reynolds, Kyle) (Entered: 11/06/2024) |
| 11/07/2024 | 39 | RESPONSE to Motion by USA as to Christopher Carl Meier re 33 MOTION for Non−Guideline Sentence (Riewerts, Alecia) (Entered: 11/07/2024) |
| 11/13/2024 | 40 | COURTROOM MINUTES for Sentencing as to Christopher Carl Meier held before Judge Regina M. Rodriguez on 11/13/2024. Denying 33 Motion for Non−Guideline Sentence as to Christopher Carl Meier (1); Granting 38 Motion for Decrease for Acceptance of Responsibility as to Christopher Carl Meier (1). Defendant sentenced as reflected on the record. Court Reporter: Sadie Herbert. (kmyha) (Entered: 11/14/2024) |
| 11/25/2024 | 42 | JUDGMENT as to defendant Christopher Carl Meier (1). Counts 1−6: Imprisonment for a term of four hundred twenty (420) months as to counts 1, 2, 3, 4, 5, and 6; to be served concurrently. Supervised release for a term of life as to counts 1, 2, 3, 4, 5, and 6; to be served concurrently. $600 Special Assessment. $12,000.00 AVAA Assessment. Entered by Judge Regina M. Rodriguez on 11/25/2024. (kmyha) (Entered: 11/25/2024) |
| 12/03/2024 | 44 | NOTICE OF APPEAL as to 42 Judgment, by Christopher Carl Meier. (Snyder, Stephanie) (Entered: 12/03/2024) |

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No.  **23-cr-419-RMR**

UNITED STATES OF AMERICA,

      Plaintiff,

v.

CHRISTOPHER CARL MEIER,

      Defendant.

---

### INDICTMENT

---

The Grand Jury charges:

### <u>COUNT 1</u>

Between in or about September 2019 and in or about April 2021, in the State and District of Colorado and elsewhere, CHRISTOPHER CARL MEIER, defendant herein, a person with a prior conviction under the laws of any state relating to the possession, receipt, mailing, sale, distribution, shipment, and transportation of child pornography, did knowingly conspire with others unknown to the Grand Jury to knowingly distribute child pornography, as defined in Title 18, United States Code, Section 2256(8)(A), using any means and facility of interstate and foreign commerce and that has been mailed, and has been shipped and transported in and affecting interstate and foreign commerce by any means, including by computer.

All in violation of Title 18, United States Code, Section 2252A(a)(2) and (b)(1).

## COUNTS 2-6

On or about the dates set forth below, in the State and District of Colorado and elsewhere, CHRISTOPHER CARL MEIER, defendant herein, a person with a prior conviction under the laws of any state relating to the possession, receipt, mailing, sale, distribution, shipment, and transportation of child pornography, knowingly distributed and attempted to distribute child pornography, as defined in Title 18, United States Code, Section 2256(8)(A), using any means and facility of interstate and foreign commerce and that has been mailed, and has been shipped and transported in and affecting interstate and foreign commerce by any means, including by computer, each date constituting a separate incident and count of this indictment, to wit:

| Count | Date |
|-------|------|
| 2 | May 3, 2020 |
| 3 | May 23, 2020 |
| 4 | October 8, 2020 |
| 5 | January 1, 2021 |
| 6 | March 27, 2021 |

All in violation of Title 18, United States Code, Section 2252A(a)(2) and (b)(1).

## FORFEITURE ALLEGATION

1.      The allegations contained in Counts 1-6 of this Indictment are hereby re-alleged and incorporated by reference for the purpose of alleging forfeiture pursuant to the provisions of Title 18, United States Code Section 2253.

2.      Upon conviction of any of the violations alleged in Counts 1-6 of this Indictment involving violations of Title 18, United States Code, Section 2252A, the

2

defendant, CHRISTOPHER CARL MEIER, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 2253, any and all of the defendant's right, title and interest in:

    a.    any visual depiction described in section 2251, 2251A, or 2252, 2252A, 2252B, or 2260 of Title 18, or any book, magazine, periodical, film or videotape, or other matter which contains any such visual depiction, which was produced, transported, mailed, shipped, or received;

    b.    any property, real or personal, constituting or traceable to gross profits or other proceeds obtained from such offense; and

    c.    any property, real or personal, used or intended to be used to commit or to promote the commission of such offense or any property traceable to such property.

3.    If any of the property described in paragraph 2 above, as a result of any act or omission of the defendant:

    a.    cannot be located upon the exercise of due diligence;

    b.    has been transferred or sold to, or deposited with, a third party;

    c.    has been placed beyond the jurisdiction of the Court;

    d.    has been substantially diminished in value; or

    e.    has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section

3

853(p) as incorporated by Title 18, United States Code, Section 2253(b), to seek

forfeiture of any other property of said defendant up to the value of the forfeitable

property.

A TRUE BILL:

Ink signature on file in the Clerk's Office
FOREPERSON

COLE FINEGAN
United States Attorney

By: *s/ Alecia L. Riewerts*
Alecia L. Riewerts
Assistant U.S. Attorney
U.S. Attorney's Office
1801 California St., Ste. 1600
Denver, CO 80202
Telephone: 303-454-0100
Fax:  303-454-0401
E-mail:  Alecia.Riewerts@usdoj.gov
Attorney for Government

By: *s/ Kyle P. Reynolds*
Kyle P. Reynolds
Trial Attorney
U.S. Department of Justice, Criminal Division
Child Exploitation and Obscenity Section
1301 New York Avenue, NW
Washington, DC 20005
Telephone: 202-616-2842
Fax: 202-514-1793
E-mail:  Kyle.Reynolds@usdoj.gov
Attorney for Government

DEFENDANT:      CHRISTOPHER CARL MEIER

YOB:      1983

COMPLAINT
FILED?      _____ Yes    \_\_X\_\_\_ No

OFFENSE(S):    **Count 1:**
18 U.S.C. § 2252A(a)(2) and (b)(1) (Conspiracy to Distribute Child Pornography)

**Counts 2-6:**
18 U.S.C. § 2252A(a)(2) and (b)(1) (Distribution of Child Pornography)

LOCATION OF
OFFENSE:    Denver County, Colorado, and Elsewhere

PENALTY:    **Counts 1-6:**  If it is determined that the defendant has no prior sex-related convictions, NLT 5 years, NMT 20 years; NMT $250,000 fine, or both; supervised release of NLT 5 years, NMT life; $100 Special Assessment.  However, if defendant has a prior conviction under Chapters 110, 71, 109A, 117, Title 18 section 1591, or under section 920 of title 10 (article 120 of the Uniform Code of Military Justice), or under the laws of any State relating to aggravated sexual abuse, sexual abuse, or abusive sexual conduct involving a minor or ward, or the production, possession, receipt, mailing, sale, distribution, shipment, or transportation of child pornography, or sex trafficking of children, NLT 15 years, NMT 40 years; NMT $250,000 fine, or both, supervised release of NLT 5 years, NMT life; $100 Special Assessment.  For offenses under Chapters 77, 109A, 110, 117 committed on or after May 29, 2015, $5,000 Special Assessment if the defendant is a non-indigent person.  For offenses committed on or after December 7, 2018, a Special Assessment of no more than $35,000 if convicted of any trafficking in child pornography offense as defined by 18 U.S.C. Section 2259(c)(3), which includes offenses under 18 U.S.C. Sections 2251(d), 2252(a)(1) through (3), 2252A(a)(1) through (4), 2252(g) (in cases in which the series of felony violations exclusively involves violations of sections 2251(d), 2252, 2252A(a)(1) through (5), or 2260(b)), or 2260(b).

**Forfeiture Allegation**

AGENTS:    Special Agent Vanitha Pandi
Special Agent Christopher Scrabis
Special Agent Tory Smith
FBI

AUTHORIZED        Alecia L. Riewerts
BY:               Assistant U.S. Attorney

                  Kyle P. Reynolds
                  Trial Attorney
                  U.S. Department of Justice
                  Criminal Division, Child Exploitation and Obscenity Section


ESTIMATED TIME OF TRIAL:

 X  five days

THE GOVERNMENT

X    will seek detention in this case based on 18 U.S.C. § 3142(f)(1)(A)

The statutory presumption of detention is applicable to this defendant.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

CASE NO.     23-cr-00419-RMR

UNITED STATES OF AMERICA,

       Plaintiff,

v.

CHRISTOPHER CARL MEIER,

       Defendant.

---

## NOTICE OF DISPOSITION

---

       Defendant, Christopher Carl Meier, by and through counsel, Stephanie Snyder, Assistant Federal Public Defender, hereby notifies this Honorable Court that he intends to plead guilty to all counts in the indictment, without an agreement with the government. Defendant notes that a change of plea hearing is set for July 9, 2024, at 3:00 p.m.

                          Respectfully submitted,

                          VIRGINIA L. GRADY
                          Federal Public Defender

                          *s/ Stephanie Snyder*
                          STEPHANIE SNYDER
                          Assistant Federal Public Defender
                          633 17th Street, Suite 1000
                          Denver, CO  80202
                          Telephone: (303) 294-7002
                          FAX: (303) 294-1192
                          Stephanie_Snyder@fd.org
                          Attorney for Mr. Meier

## **CERTIFICATE OF SERVICE**

I hereby certify that on June 10, 2024, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following e-mail addresses:

Alecia Riewarts, Assistant United States Attorney
Email: Alecia.Riewarts@usdoj.gov

Kyle P. Reynolds, Trial Attorney
Email: Kyle.Reynolds@usdoj.gov

and I hereby certify that I have mailed or served the document or paper to the following non-CM/ECF participant in the manner (mail, hand-delivery, etc.) indicated by the non-participant's name:

Christopher Carl Meier (via hand-delivery)

s/ *Stephanie Snyder*
STEPHANIE SNYDER
Assistant Federal Public Defender
633 17th Street, Suite 1000
Denver, CO 80202
Telephone: (303) 294-7002
FAX: (303) 294-1192
Stephanie_Snyder@fd.org
Attorney for Mr. Meier

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Regina M. Rodriguez**

| | |
|---|---|
| Criminal Action No.: 23-cr-00419-RMR-1 | Date: July 9, 2024 |
| Courtroom Deputy: Kally Myhaver | Court Reporter: Sadie Herbert |

_Parties:_                                                         _Counsel:_

UNITED STATES OF AMERICA,                      Alecia Lynne Riewerts


    Plaintiff,

v.

1. CHRISTOPHER CARL MEIER,                   Stephanie Maureen Snyder

    Defendant.

---

## COURTROOM MINUTES

---

**CHANGE OF PLEA HEARING**

**3:03 p.m.      Court in session.**

Court calls case. Appearances of counsel.  Defendant present in custody.

Defendant sworn.

Defendant's Plea of Guilty and Statement of Facts Relevant to Sentencing (Without Plea Agreement) (Court Exhibit 1), and Statement by Defendant in Advance of Plea of Guilty (Without Plea Agreement) (Court Exhibit 2), are tendered to the court.

Defendant advised of appellate rights, penalties, sentencing guidelines, trial rights, and other constitutional rights.

Defendant enters a plea of guilty to Counts 1-6 of the Indictment and admits to the forfeiture allegation.

Court states its findings of fact and conclusions of law.

**ORDERED:**  Court Exhibits 1 and 2 are admitted.

**ORDERED:** Defendant's plea of guilty is accepted.

**ORDERED:** The Probation Department shall conduct a presentence investigation and file a presentence report.

**ORDERED:** Sentencing is set for October 15, 2024, at 2:00 p.m. in Courtroom A901 before Judge Regina M. Rodriguez.

**ORDERED:** Counsel shall file their sentencing positions and all motions at least 14 days before the sentencing date. Responses or objections shall be filed no later than 7 days before the sentencing date.

**ORDERED:** Trial set for July 15, 2024 in Courtroom A901 before Judge Regina M. Rodriguez, and all dates other than the Sentencing date are VACATED.

**ORDERED:** Any pending pretrial motions on behalf of the Defendant are deemed MOOT.

**ORDERED:** Defendant is remanded to the custody of the U. S. Marshal.

**3:37 p.m.**   **Court in recess.**

Hearing concluded.
Total time in court:   00:34

2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 23-cr-419-RMR

UNITED STATES OF AMERICA,

       Plaintiff,

v.

**Christopher Carl Meier,**

       Defendant.

---

## DEFENDANT'S PLEA OF GUILTY AND STATEMENT OF FACTS RELEVANT TO SENTENCING (WITHOUT PLEA AGREEMENT)

---

Defendant, Christopher Carl Meier, personally and by his counsel, Stephanie Snyder, submits this Plea of Guilty and Statement of Facts Relevant to Sentencing (Without Plea Agreement):

## I. PLEA OF GUILTY

Mr. Meier intends to plead guilty to the Indictment which charges him with one count of conspiracy to distribute child pornography, and five substantive counts of distribution of child pornography, all in violation of 18 U.S.C. § 2252A(a)(2) and (b)(1), **without a plea agreement**. Mr. Meier also intends to admit to the forfeiture allegation contained in the Indictment.

## II. ELEMENTS OF THE OFFENSES

Mr. Meier submits that the elements of Count One, conspiracy to distribute child pornography in violation of 18 U.S.C. §2252A(a)(2) and (b)(1), are as follows:

COURT EXHIBIT
1

*First*:  The defendant agreed with at least one other person to violate the laws as alleged in the Indictment, namely, distribution of child pornography as defined in 18 U.S.C. 2256(8)(A), in violation of 18 U.S.C. §2252A(a)(2) and (b)(1);

*Second*:  the defendant knew the essential objective of the conspiracy;

*Third*: the defendant knowingly and voluntarily participated in the conspiracy; and

*Fourth*: there was interdependence among the members of the conspiracy; that is, the members, in some way or manner, intended to act together for their shared mutual benefit within the scope of the conspiracy charged.[1]

Mr. Meier submits that the elements of Counts Two through Six, distribution of child pornography in violation of 18 U.S.C. §2252A(a)(2) and (b)(1), are as follows:

*First*:  The defendant knowingly distributed child pornography as defined in 18 U.S.C. §2256(8)(A);

*Second*:  the defendant distributed the child pornography using any means or facility of interstate or foreign commerce, or the child pornography has been mailed, or shipped or transported in or affecting interstate or foreign commerce by any means, including by computer; and

*Third*:  when the defendant distributed the child pornography, he knew it was child pornography.

To "distribute" something means to deliver, transfer, disperse or dispense to others,

---

[1] *See* 10th Cir. Pattern Jury Instructions, §2.19, Conspiracy as defined in 18 U.S.C. §371, modified (2021); *see also* 18 U.S.C. § 2252A(b)(1) (contains no overt-act requirement); *United States v. Heatherly*, 985 F.3d 254, 262 (3d Cir. 2021) (no overt act required for conspiracy under analogous statute, 18 U.S.C. § 2252(b)(1)).

2

with or without any money involved in the transaction.

As to the Second element above, the United States need not prove that the defendant knew that the child pornography was distributed using any means or facility of interstate or foreign commerce, or had been mailed, or that it was shipped or transported in or affecting interstate or foreign commerce by any means, including by computer.

**The United States advises that it agrees (x), disagrees ( ), or takes no position ( ).**


## III. STATUTORY PENALTIES

Because the parties agree, as charged in the Indictment, that Mr. Meier has a prior qualifying conviction, the maximum statutory penalty for a violation of 18 U.S.C. §2252A(a)(2) and (b)(1) is not less than 15 years and not more than 40 years of imprisonment; not more than a $250,000 fine, or both; not less than five years nor more than lifetime supervised release pursuant to 18 U.S.C. §3583(k); a special assessment fee of $100 under 18 U.S.C. § 3013, $5,000 under 18 U.S.C. § 3014 if he is found to be non-indigent, and no more than $35,000 pursuant to 18 U.S.C. §2259A; and restitution pursuant to 18 U.S.C. § 2259(a).

Mr. Meier understands that pursuant to 18 U.S.C. § 2259(a), the Court must order restitution for the full amount of the victims' compensable losses, which will not be less than $3,000 per victim under § 2259(b)(2)(B).

Mr. Meier also understands that a violation of the conditions of probation or supervised release may result in a separate prison sentence and additional supervision.

**The United States advises that it agrees (x), disagrees ( ), or takes no position ( ).**

## IV. **COLLATERAL CONSEQUENCES**

The conviction may cause the loss of civil rights, including but not limited to the rights to possess firearms, vote, hold elected office, and sit on a jury.

Mr. Meier has also been advised and understands that, under the Sex Offender Registration and Notification Act, a federal law, and pursuant to 18 U.S.C. § 3583(d), upon his release from prison and as a condition of his supervised release, if any, he will be subject to federal and state sex offender registration requirements, and that those requirements may apply throughout his life. He understands he must register as a sex offender and must keep the registration current with the state sex offender registration agency in each of the following jurisdictions: where he was convicted, where he resides, where he is employed, and where he is a student. Mr. Meier understands that the requirements for registration include providing his name, residence address, the names and addresses of any places where he is or will be an employee or a student, and information relating to intended travel outside the United States, among other information. He further understands that the requirement to keep the registration current includes informing at least one jurisdiction in which he resides, is an employee, or is a student not later than three business days after any change of name or residence, and that he shall comply with requirements to periodically verify in person his sex offender registration information. Mr. Meier has been advised, and understands, that failure to comply with these obligations subjects him to prosecution for violations of applicable state law or 18 U.S.C. § 2250, a federal law, which is punishable by a fine or imprisonment, or both. Finally, Mr. Meier understands that, under 18 U.S.C. § 4042(c), notice will be provided to certain law enforcement agencies upon his release from confinement following his conviction.

4

## V. **FACTUAL BASIS TO SUPPORT THE PLEA OF GUILTY**

Mr. Meier admits to the following:

Utilizing a username known to Mr. Meier and the government, on five separate dates in 2020 and 2021 as charged in the Indictment,[2] Mr. Meier posted images depicting child pornography, as defined in 18 U.S.C. §2256(8)(A), and links to videos containing child pornography, as defined in 18 U.S.C. §2256(8)(A), on a then-existing Internet site that was dedicated to facilitating the discussion and distribution of child pornography. Mr. Meier accessed the website by using a computer and posted the child pornography images and relevant links with the intention that other users of the site would view the linked videos. Mr. Meier admits that he did so knowing that he was distributing child pornography by posting child pornography images and links to videos containing child pornography for other individuals who were accessing the website to view, discuss, share, and download.

The website where Mr. Meier posted this material operated on the Tor network, which is a "dark web" computer network that was designed to facilitate anonymity on the Internet. The site, which has since been taken down and seized by international law enforcement authorities, was password-protected and required potential users to register and create accounts in order to gain access to its contents. The website contained a directory of links to other sites featuring child pornography as well as a variety of indexed user forums where the site's users could post

---

[2] Specifically, Mr. Meier admits that he knowingly distributed images depicting child pornography, as defined in 18 U.S.C. §2256(8)(A), on an Internet website, with the intention that other users of the site would access them, on May 3, 2020 (Count Two); May 23, 2020 (Count Three); October 8, 2020 (Count Four); January 1, 2021 (Count Five); and March 27, 2021 (Count Six). On each of these dates, Mr. Meier posted at least one image depicting a minor boy masturbating and displaying his naked, erect genitals to the camera.

5

messages and links to images or videos, publicly comment on posts, and exchange private

messages.  The site was used by hundreds of thousands of individuals around the world for the

express purpose of discussing, sharing, trading, and otherwise distributing child pornography of

varying types and kinds.  Mr. Meier knew that, when he knowingly and voluntarily accessed this

website and posted links to videos containing child pornography, that they would be seen and

shared by other users of the site, and thus knew that he was engaging in the distribution of child

pornography.  He further admits that, by posting links to videos containing child pornography on

the dates specified in the Indictment, he engaged in acts designed to facilitate the distribution of

child pornography to other registered users of the website who had gained access to it for this

purpose.  When Mr. Meier posted images depicting child pornography on the site, he distributed

child pornography using any means or facility of interstate or foreign commerce and the child

pornography had been shipped or transported in or affecting interstate or foreign commerce by

any means, including by computer.  When the acts described above took place, Mr. Meier was

located in the District of Colorado.

**The United States advises that it agrees (x)[3], disagrees ( ), or takes no position ( ).**

## VI. <u>SENTENCING COMPUTATION</u>

Mr. Meier understands that sentencing is determined pursuant to 18 U.S.C. § 3553(a).  In

determining the particular sentence to be imposed, the Court is required to consider seven

factors.  One of those factors is the sentencing range computed by the Court under advisory

---

[3] The United States agrees to the extent that this factual basis includes those facts necessary to support Mr. Meier's plea of guilty in this case.  It does not include every fact known to the United States.

guidelines issued by the United States Sentencing Commission. In order to aid the Court in this

regard, Mr. Meier sets forth below his estimate of the advisory guideline range called for by the

United States Sentencing Guidelines.

Mr. Meier estimates the advisory guidelines apply as follows:

A. The applicable guideline is U.S.S.G. §2G2.2, with a base offense level of 22 pursuant
   to §2G2.2(a)(2).

B. Because the defendant distributed this material in exchange for valuable
   consideration, but not for pecuniary gain, a 5-level increase under §2G2.2(b)(3)(B)
   applies;

C. Because the defendant engaged in a pattern of activity involving the sexual abuse or
   exploitation of a minor, a 5-level increase under §2G2.2(b)(5) applies;

D. Because the offense involved the use of a computer or an interactive computer service
   for the possession, transmission, receipt, or distribution of the material, or for
   accessing with intent to review the material, a 2-level increase under §2G2.2(b)(6)
   applies;

E. Because the offense involved 600 or more images, a 5-level increase applies.[4]

---

[4] Mr. Meier anticipates that the government will assert that the cross-reference to U.S.S.G.
§2G2.1 applies pursuant to §2G2.2(c)(1). If the Court finds that the cross-reference applies, Mr.
Meier estimates his guidelines under §2G2.1 as follows:
- Base offense level of 32;
- Plus 2-levels for the involvement of a minor who had attained the age of twelve years,
  but had not attained the age of sixteen, pursuant to §2G2.1(b)(1);
- Plus 2-levels because the offense involved the commission of a sexual act or sexual
  contact pursuant to §2G2.1(b)(2);
- Plus 2-levels because the defendant knowingly engaged in distribution pursuant to
  §2G2.1(b)(3);
- Plus 2-levels because the offense involved the use of a computer to solicit the
  participation of a minor pursuant to §2G2.1(b)(6);
- Plus 5-levels pursuant to §3D1.4 for multiple victims;

F.  The career offender (§4B1.1) and repeat and dangerous sex offender (§4B1.5)
    adjustments do not apply;

G.  Mr. Meier should receive a 2-level decrease based upon his acceptance of
    responsibility under §3E1.1(a); and an additional 1-level decrease for timely notifying
    the government of his intent to plead guilty pursuant to §3E1.1(b);

H.  The adjusted offense level would be 36;

I.  Mr. Meier's criminal history category is estimated as Category II.

J.  The advisory guideline range of imprisonment resulting from an offense level of **36**
    and a criminal history category of **II** is **210-262** months.  In order to be as accurate as
    possible, with the criminal history category undetermined at this time, the range could
    conceivably extend from as low as 188 months (bottom of Category I) to as high as
    405 months (top of Category VI).

K.  Pursuant to guideline §5E1.2, assuming the estimated offense level is correct, the fine
    range would be $40,000 to $ 400,000, plus applicable interest and penalties.

L.  Pursuant to guideline §5D1.2 and 18 U.S.C. § 3583(k), if the Court imposes a term of
    supervised release, that term will be at least 5 years and could be up to life.

**The United States advises that it agrees ( ), disagrees ( ), or takes no position (x).**


    Mr. Meier understands that although the Court will consider the above estimate, the
Court must make its own determination of the guideline range.  In doing so, the Court is not

---

- Minus 3-levels pursuant to §3E1.1 for prompt acceptance of responsibility;
- This results in an estimated final adjusted offense level of **42**, which yields an advisory
  imprisonment range of **360 months to life** for Criminal History Categories I-VI, and a
  fine range of $50,000 to $500,000 pursuant to §5E1.2. The government has indicated that
  it takes no position as to the Criminal History Category at this time.

8

bound by any estimate calculated herein, regardless of whether agreed to by the government.

No estimate regarding the guideline range precludes either the defendant or the government from asking the Court, within the overall context of the guidelines, to depart from the guideline range at sentencing if the defendant or the government believes a departure is specifically authorized by the guidelines or that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the United States Sentencing Commission in formulating the advisory guidelines. Similarly, no estimate regarding the guideline range precludes either Mr. Meier or the government from asking the Court to vary from the advisory guidelines and to impose a non-guideline sentence based on other 18 U.S.C. § 3553 factors.

Mr. Meier understands that the Court is free, upon consideration and proper application of all 18 U.S.C. § 3553 factors, to impose a sentence which it deems appropriate in the exercise of its discretion and that such sentence may be less than that called for by the advisory guidelines (in length or form), within the advisory guideline range, or above the advisory guideline range - up to and including imprisonment for the statutory maximum term, regardless of any computation or position of any party.

Date: 6-28-24

Christopher Carl Meier
Defendant

Date: 6/28/24

Stephanie Snyder
Attorney for Christopher Meier

9

**As to matters agreed to by the United States:**

Date:  _July 9, 2024_       _Alecia Riewerts_
_____

Alecia Riewerts
Assistant U.S. Attorney
District of Colorado

Date:  _July 9, 2024_       _Alecia Riewerts for_
_____

Kyle Reynolds
Trial Attorney
U.S. Department of Justice, Criminal Division
Child Exploitation and Obscenity Section

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

CASE NO. 23-cr-00419-RMR

UNITED STATES OF AMERICA,

        Plaintiff,

v.

CHRISTOPHER CARL MEIER,

        Defendant.

---

## STATEMENT BY DEFENDANT IN ADVANCE OF PLEA OF GUILTY (WITHOUT PLEA AGREEMENT)

---

I acknowledge and certify that I have been advised of and understand the following facts and rights, that all representations contained in this document are true and correct, and that my attorney has assisted me as I have reviewed and completed this document.

1.    The nature of the charges against me have been explained to me by my attorney. I have had an opportunity to discuss with my attorney both the nature of the charges and the elements which the government is required to prove.

2.    I know that when the Court sentences me, the Court will consider many factors. These factors are listed in 18 U.S.C. § 3553 and include (a) the nature and circumstances of the offense and my personal history and characteristics, (b) the need for a sentence to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford deterrence, protect the public, and provide me with needed training, care or correctional treatment in the most effective manner, (c) the

COURT EXHIBIT
2

kinds of sentences available to the court, (d) the advisory sentencing guidelines established by the U.S. Sentencing Commission, (e) the pertinent policy statements of the U.S. Sentencing Commission, (f) the need to avoid unwarranted sentence disparity among defendants with similar records who have been found guilty of similar conduct, and (g) the need to provide restitution. No single factor is controlling or determinative. I recognize that it is possible that the Court could, after considering these factors, impose any sentence in my case, including one which is as severe as the maximum term of imprisonment, the maximum fine, full restitution (if applicable), the maximum term of supervised release, and a special assessment, all as set out in paragraph 3 below.

3.      I know that the following penalties may be imposed as a result of my guilty pleas:

**For each of the following counts: Count One, Conspiracy to Distribute Child Pornography; and Counts Two through Six, Distribution of Child Pornography, all in violation of 18 U.S.C. § 2252A(a)(2) and (b)(1):**

   a.   Imprisonment for a term of not less than 15 years and not more than 40 years;

   b.   A term of supervised release of not less than five years and not more than a lifetime, pursuant to 18 U.S.C. § 3583(k);

   c.   A fine of not more than $250,000.00, pursuant to the statute that I admit I violated and/or the alternative fine schedule set out at 18 U.S.C. § 3571;

   d.   Restitution to the victims of my crimes in an amount to be determined, pursuant to 18 U.S.C. §§ 2259(a), 3663, 3663A, and 3664, which will not be less than $3,000 per victim;

   e.   A special assessment of $100.00, pursuant to 18 U.S.C. § 3013; $5,000 pursuant to 18 U.S.C. § 3014 if I am found to be non-indigent; and not more than $35,000 pursuant to 18 U.S.C. § 2259A;

2

4.      I know that if I am convicted of more than one count, the sentences imposed may be either concurrent (served at the same time) or consecutive (served separately or back-to-back) unless the statutory penalty for an offense of conviction expressly requires that a sentence be imposed to run consecutively.

5.      I know that in addition to any punishment that the Court may impose, there are collateral consequences to pleading guilty to a crime.  These consequences are neither imposed nor controlled by the Court.  For example, pleading guilty may result in a loss of civil rights, including but not limited to the rights to possess firearms, vote, hold elected office, and sit on a jury.  And, if I am not a citizen of the United States, these consequences may include deportation from the United States or indefinite confinement if there is no country to which I may be deported, denial of the right to enter the United States in the future, and denial of citizenship.

6.      I know that if I am given a term of supervised release as a part of my sentence, that supervised release will only begin to run upon my release from custody on all terms of imprisonment imposed by this and any other courts. I understand that any violation of the conditions of that supervised release during its term may lead to an additional prison sentence and additional supervised release being imposed.

7.      I know that there is no parole in the federal system and that I will be required to serve the entire sentence of imprisonment which may be imposed in my case, reduced only by such good time and/or program allowances as may be set by Congress and applied by the Bureau of Prisons.

8.      I know that if a fine or restitution is imposed as a part of my sentence, I will be required to pay interest on any amount in excess of $2,500, unless the fine or

3

restitution is paid in full before the fifteenth day after the date of the judgment or unless interest is waived by the Court.

9.      I know that if a fine or restitution is imposed as a part of my sentence, I will be required to pay it in a timely manner. Failure to do so may trigger monetary penalties, collection efforts by the government, potential revocation of any probation or supervised release, and/or exposure to prosecution for "Criminal Default" under 18 U.S.C. § 3615.

10.      I know that I can be represented by an attorney at every stage of the proceedings in this matter, and I know that, if I cannot afford an attorney, one will be appointed to represent me at no cost or expense to me.

11.      I know that I have a right to plead "not guilty;" and I know that if I do plead "not guilty," I can persist in that plea and demand a trial.

12.      I know that I have a right to and can demand a trial by jury, and I know that if I choose to stand trial:

     a.      I have a right to the assistance of an attorney at every stage of the proceeding;

     b.      I have a right to see and observe the witnesses who testify against me;

     c.      My attorney can cross-examine all witnesses who testify against me;

     d.      I can call and present such relevant witnesses and evidence as I desire, and I can obtain subpoenas to require the attendance and testimony of those witnesses;

     e.      If I cannot afford to pay witness fees and expenses, the government will pay those fees and expenses, including mileage and travel expenses, and including reasonable fees charged by expert witnesses;

f.      I cannot be forced to incriminate myself and I do not have to testify at any trial;

g.      However, I can testify at my trial if I choose to, and I do not have to decide whether or not to testify until after I have heard the government's evidence against me;

h.      If I decide that I do not want to testify at trial, the jury will be told that no inference adverse to me may be drawn from my decision not to testify;

i.      In order for me to be convicted, the government must prove each and every element of the offenses with which I am charged, beyond a reasonable doubt;

j.      In order for me to be convicted, the jury must reach a unanimous verdict of guilty, meaning all jurors must agree that I am guilty; and

k.      If I were to be convicted, I could appeal both my conviction and whatever sentence the Court later imposed, and if I could not afford an appeal, the government would pay the cost of the appeal, including the cost of an appointed attorney.

13.     I know that if I plead guilty, there will not be a trial of any kind.

14.     I know that if I plead guilty, there will be no appellate review of the question of whether or not I am guilty of the offenses to which I have pled guilty.

15.     No agreements have been reached and no representations have been made to me as to what the sentence in this case will be, except those which are explicitly detailed in the document entitled "Defendant's Plea of Guilty and Statement of Facts Relevant to Sentencing (Without Plea Agreement)" which I and the government have signed. I further understand that any sentencing agreements and stipulations in the aforementioned document are not binding on the Court.

16.     I understand that the Court will make no decision as to what my sentence will be until a Presentence Report has been prepared by the Probation Department and received and reviewed by the Court.

5

17. I know that when I enter my pleas of guilty, the Court may ask me questions under oath about the offenses to which I have pled guilty. Such questions, if asked of me on the record and in the presence of my attorney, must be answered by me, and if I give false answers, I can be prosecuted for perjury.

18. I know that I have the right to ask the Court any questions that I have concerning my rights, these proceedings, and my plea to the charges.

19. I am ___41___ years of age. My education consists of _BS. degree in 2007._ I [can] [cannot] understand the English language. (Circle either "can" or "cannot.") I am not taking any medications which interfere with my ability to understand the proceedings in this matter or which impact or affect my ability to choose whether to plead guilty.

20. No promises and no threats of any sort have been made to me by anyone to induce me or to persuade me to enter my pleas in this case.

21. No one has promised me that I will receive probation, home confinement or any other specific sentence desired by me because of my plea of guilty.

22. I have had sufficient opportunity to discuss this case and my intended pleas of guilty with my attorney. I do not wish to consult with my attorney any further before I enter my pleas of guilty.

23. I am satisfied with my attorney. I believe that I have been represented effectively and competently in this case.

24. My decision to enter pleas of guilty is made after full and careful thought, with the advice of my attorney, and with full understanding of my rights, the facts and circumstances of the case, and the potential consequences of my pleas of guilty. I was not under the influence of any drugs, medication, or intoxicants which affect my

6

decision-making ability when I made the decision to enter my guilty pleas. I am not now under the influence of any such drugs, medication or intoxicants.

25.     I want to plead guilty and have no mental reservations about my decision.

26.     Insofar as it shows my conduct, the summary of facts set out in the document entitled "Defendant's Plea of Guilty and Statement of Facts Relevant to Sentencing (Without Plea Agreement)" is true and correct, except as I have indicated in that document.

27.     I know that I am free to change or delete anything contained in this document and that I am free to list my objections and my disagreements with anything contained in the document entitled "Defendant's Plea of Guilty and Statement of Facts Relevant to Sentencing (Without Plea Agreement)." I accept both documents as they are currently drafted.

28.     I wish to plead guilty to the following charges: **Count One, Conspiracy to Distribute Child Pornography; and Counts Two through Six, each charging Distribution of Child Pornography, all in violation of 18 U.S.C. § 2252A(a)(2) and (b)(1), without a plea agreement.**

Dated this 28th day of June, 2024.

_____
CHRISTOPHER CARL MEIER
Defendant

7

I certify that I have discussed this statement and the document entitled "Defendant's Plea of Guilty and Statement of Facts Relevant to Sentencing (Without Plea Agreement)" with the defendant. I certify that I have fully explained the defendant's rights to him or her and have assisted him completing this form. I believe that the defendant understands his rights and these statements.

Dated this _28th_ day of _June_____, 2024.

_____
STEPHANIE SNYDER
Attorney for Christopher Meier

8

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

CASE NO.     23-cr-00419-RMR

UNITED STATES OF AMERICA,

      Plaintiff,

v.

CHRISTOPHER CARL MEIER,

      Defendant.

---

## RESPONSE/OBJECTIONS TO PRESENTENCE REPORT

---

Christopher Carl Meier, by and through undersigned counsel, respectfully submits the following response to the United States Probation Office's Presentence Investigation Report ("PSR"), filed at ECF No. 30.

### Objections Impacting the Guideline Calculation

Mr. Meier is before the Court having pled guilty to one count of conspiracy to distribute child pornography, in violation of 18 U.S.C. §§ 2252A(a)(2) and (b)(1), and five substantive counts of distribution of child pornography in violation of 18 U.S.C. §§ 2252A(a)(2) and (b)(1). Distribution offenses are, as the Probation Office notes, generally governed by U.S.S.G. § 2G2.2. *See, e.g.,* PSR ¶ 93. That guideline contains a cross-reference provision, § 2G2.2(c)(1), which states that U.S.S.G. § 2G2.1 should apply, if it yields a higher offense level, in certain factual circumstances. In the Presentence Investigation Report, the Probation Office applied the § 2G2.1 cross-reference to four counts (Counts 2, 4, 5 and 6; PSR ¶¶ 104-138), and declined to apply it to two counts (Counts 1 and 3; PSR ¶¶ 93-103).

With respect to the counts that the Probation Office determined should be governed by

§ 2G2.2, without the application of the cross-reference to § 2G2.1, Mr. Meier has no complaint with the guideline calculation contained in the PSR.[1]  He agrees that the various enhancements applied by the Probation Office in PSR ¶¶ 93-103 are appropriate, and acknowledges that his adjusted offense level, as calculated under § 2G2.2, and before acceptance of responsibility, is 39.  PSR ¶103.  Because offenses covered by § 2G2.2 group under U.S.S.G. § 3D1.2(d); this would mean that, if the § 2G2.2 guideline is applied to all, rather than just to some, of the counts of the indictment, Mr. Meier would have an overall adjusted offense level, after acceptance of responsibility, of 36.  When combined with his criminal history category of II, this would yield a final guideline range of 210-262 months.

But here, Probation found that § 2G2.2 governed only Counts 1 and 3, applied the cross-reference to § 2G2.1 that is found at § 2G2.2(c)(1) to the remaining four counts, and then grouped the counts pursuant to U.S.S.G. § 3D1.4 (counts governed by § 2G2.1 do not group pursuant to § 3D1.2(d).  *See generally* PSR ¶¶ 104-146.  This added five levels (four for grouping, and one for the higher offense level under § 2G2.1) to Mr. Meier's total offense level and increased his guideline range to 360-480 months.  PSR ¶¶ 139-141;190.  Mr. Meier respectfully submits that the Probation Office erred, at least in part, when it made these determinations.

### The Cross-Reference to § 2G2.1

As an initial matter, it is Mr. Meier's position that the Probation Office correctly grouped Counts 1 and 3, and also correctly declined, with respect to Count 3, to apply the cross-reference

---

[1] *See also* Defendant's Plea of Guilty and Statement of Facts Relevant to Sentencing (Without Plea Agreement), ECF No. 25 at pp.7-8

to § 2G2.1 "based on a lack of evidence that the defendant produced the images/videos noted in Count 3".  PSR at *n*.2.

The government did not charge Mr. Meier with a production offense in this case.  This website existed so that people could exchange, share, and download child pornography materials that originated from a variety of places.  And, while Mr. Meier did hold himself out as a "capper" (PSR ¶ 32), the evidence that he actually created the specific videos that are charged in Counts 2, 4, 5, and 6, comes primarily from statements that he made, either in the captions of the posts themselves and/or in private messages to other users of this website.

Many of these statements, while accurately reproduced by the government at length in the additional information they provided to the Probation Office (PSR ¶¶ 12-81), could (and should) be fairly construed as being puffery, braggadocio, and/or exaggeration—statements that Mr. Meier made to enhance his own status with other users of this website, rather than necessarily being statements of literal truth.  But the Probation Office relies on the literal truth of these statements to support not only the application of the cross-reference to § 2G2.1 but also as a basis to apply various enhancements within that guideline.[2]  Because doing so results in an advisory guideline range of 360-480 months (PSR ¶ 190), a massive increase from the 210-262 month range that would otherwise apply, the Court must carefully consider whether those determinations are actually warranted.

For example, while counsel acknowledges that there are a number of statements with respect to Count 2 in particular that could lead the Court to infer that it was Mr. Meier who

---

[2] *See, e.g.*, the discussion below about what can be fairly said about the age of the individual in count 6.

produced this video (*see generally* PSR ¶¶ 40-44), with respect to Count 5 (*see generally* PSR ¶¶
50-54), the evidence for such a conclusion is much weaker.  The PSR's argument that the cross-
reference should apply to Count 5 appears to ultimately turn on the words "original content"
being in a post header that also specifically referenced another user; Mr. Meier then went on to
thank that other user for the "countless time" he had put "into this work".  PSR ¶ 52.  A fair and
plausible reading of all of this could be that Mr. Meier simply posted/distributed a video that this
other person made.  Similarly, the PSR's application of the cross-reference to Count 6, and to the
§ 2G2.1(b)(6)(B) enhancement within that guideline, appears to turn, at least in part, on the word
"my", modifying "girl", in a line of text in the video (PSR ¶ 134).  Even Count 4, where the post
Mr. Meier made included the words "I" and "my" (PSR ¶¶ 45-49), when describing certain
actions, is not necessarily definitive in terms of identifying who actually created the specific
video in question, as opposed to merely revealing the identity of the individual who was posting
the caption and video.  Ultimately, these are relatively thin reeds upon which to rest such
significant sentencing enhancements; it would not be unreasonable to conclude that the § 2G2.1
cross-reference should not apply to some or all of the counts where the PSR utilized it.

Mr. Meier has admitted to posting videos and distributing child pornography.  Nor could
anyone deny that his own posts and messages provide circumstantial evidence tending to show
that he was involved in the production of some videos at various points in time.  But the much
narrower question here is whether the Court can be sure that he, and not some other individual,
made the specific videos that he was charged with, and that he has admitted to posting, in this
case.  Mr. Meier acknowledges that the guidelines counsel that the cross-reference to § 2G2.1
should be "construed broadly".  *See* U.S.S.G. § 2G2.2, comment. (n.7(A)).   But counsel

4

respectfully submits that, with regard to Counts 4, 5, and 6, in particular, the Court should

hesitate to find a sufficient basis from which to find that the § 2G2.1 cross-reference applies.   If

the cross-reference does not apply to any of these three counts, they, along with Counts 1 and 3,

would comprise a single group with an adjusted offense level of 39.  The application of U.S.S.G.

§ 3D1.4 would then add two levels (instead of four) to the offense level of the highest group—

here 40—creating an offense level of 42.  *Compare with* PSR ¶¶ 139-141.   After acceptance of

responsibility, the final offense level would be 39 which, when combined with Mr. Meier's

criminal history category of II, would yield an advisory range of 292-365 months.

Similarly, were the Court to find that the § 2G2.1 cross-reference applied with respect to

Counts 2 and 4, but not to Counts 5 and 6, there would be three groups[3] which would mean that

three levels (instead of four) would be added pursuant to U.S.S.G. § 3D1.4.  *Compare with* PSR

¶¶ 139-141.   After the deduction for acceptance of responsibility, this would leave a total

offense level of 40 which, when combined with Mr. Meier's criminal history category of II,

would yield an advisory range of 324-405 months.[4]

### **Additional Guideline Considerations**

But even if the Court finds, as Probation did, that the weight of the evidence supports the

application of the cross-reference to § 2G2.1 with respect to Counts 2, 4, 5, and 6 (PSR ¶¶ 104-

138), there are additional issues presented by Counts 5 and 6 that implicate the applicability of

---

[3] Group 1: Counts 1, 3, 5, and 6, with an offense level of 39; Group 2: Count 2 with an offense level of 40; Group 3: Count 4 with an offense level of 40.

[4] If the Court declined to apply the § 2G2.1 cross-reference only to Count 5, the guideline range found by Probation would not change based on the application of § 3D1.4, despite there being four, not five, groups.

5

the cross-reference and grouping under § 3D1.4, and suggest that a lower advisory guideline range would apply in this case.

### *Count 5*

With respect to Count 5, U.S.S.G. § 2G2.2(c) specifically provides that the cross-reference provision only applies, "if the resulting offense level is greater than that determined above". *See* § 2G2.2(c)(1). Here, using the cross-reference provision of § 2G2.1 yields an adjusted offense level of 38. PSR ¶ 129. Because this number is *lower* than the offense level that would apply using § 2G2.2 (i.e. an adjusted offense level of 39; PSR ¶ 103), the higher guideline controls. Thus, because Count 5 should be calculated using § 2G2.2, it would group with Counts 1 and 3, pursuant to § 3D1.2(d). *See also n*.4 *supra*.

### *Count 6*

With respect to Count 6, Probation found that the § 2G2.1 cross reference applied and, in so doing, also added a 2-level enhancement based on the victim's age pursuant to U.S.S.G. § 2G2.1(b)(1)(B), concluding that the victim, W.R., was 13 years old when the video was made. PSR ¶ 131. It is true that the video file at issue was entitled "SkypeHD-William 13yo—USA-2020-04-08". PSR ¶ 61. And because counsel received redacted discovery, she does not know W.R.'s precise birth date. But, from the materials that were provided, her understanding is that W.R. was born in 2005 and turned 18 in 2023.

Underscoring the general problem with relying on the titles or the captions of videos as being definitive proof of the actual truth of the statements made therein—W.R., born in 2005, could not have been 13 in a video made in 2020 (if, indeed, that is when the video was made). And while, without knowing his exact birthdate, it is impossible to know if W.R. could have

6

theoretically attained his 16th birthday by March 27, 2021 (the date the post was made), there is
at least a question as to his age on the relevant dates based on the factual record to which counsel
currently has access.

If the Court ultimately determines that there is insufficient proof of age in order to
support the application of the § 2G2.1(b)(1)(B) enhancement and declines to do so, this would
mean that the adjusted offense level for Count 6 would be 38, not 40. *Compare with* PSR ¶ 138.
As with Count 5, because this number is *lower* than the offense level that would apply using
§ 2G2.2 (i.e. an adjusted offense level of 39; PSR ¶ 103), the higher guideline controls. Thus,
the guidelines for Count 6 would be calculated using § 2G2.2, and Count 6 would group with
Counts 1, 3, and 5.

For these additional reasons, even if the Court determines that it would otherwise apply
the § 2G2.1 cross-reference to Counts 5 and 6, these counts should nonetheless group with
Counts 1 and 3 pursuant to § 3D1.2(d), and three levels (for three groups) should be added to the
highest adjusted offense level of 40 (for Groups 2 and 3) pursuant to § 3D1.4. *Compare with*
PSR ¶¶ 139-141 (adding four levels, for five groups). After acceptance of responsibility, this
would leave a total offense level of 40 which, when combined with a criminal history category of
II, would yield an advisory guideline range of 324-405 months.

### Objections to Conditions of Supervised Release

Mr. Meier does not object to the condition that he participate in sex offender treatment
generally.[5] But he does object to both the imposition of polygraph testing and to visual response

---

[5] While Mr. Meier has no opposition to the Court ordering him to comply with a mental health
treatment condition, he believes that it may benefit him if his mental health and sex offender
treatments were offered together, instead of being siloed into separate conditions of his

7

testing.

A district court has discretion in imposing special conditions of supervised release. In exercising this discretion, however, a court is bound by both statutory and constitutional concerns. The imposition of conditions of supervised release is governed by 18 U.S.C. § 3583(d). That Section provides that the Court may order a special condition of supervised release, provided such condition:

    (1)     is reasonably related to the factors set forth in section 3553(a)(1), (a)(2)(B), (a)(2)(C), and (a)(2)(D);

    (2)     involves *no greater deprivation of liberty than is reasonably necessary* for the purposes set forth in section 3553(a)(2)(B), (a)(2)(C), and (a)(2)(D); and

    (3)     is consistent with any pertinent policy statements issued by the Sentencing Commission pursuant to 28 U.S.C. § 994(a).

18 U.S.C. § 3583(d) (emphasis added). Interpreting this Section, the Tenth Circuit has required "conditions of supervised release to be linked to the offense and be no broader than necessary to rehabilitate the defendant and protect the public." *See United States v. Smith*, 606 F.3d 1270, 1282 (10th Cir. 2010). Any restriction affecting a defendant's liberty must be especially "fine-tuned to achieve the goals set forth in section 3553(a)(2)(B), (C), and (D)." *United States v. Edgin*, 92 F.3d 1044, 1049 (10th Cir. 1996).

Importantly, it is the district court and not a probation officer that must engage in the Section 3583(d) analysis. It is true that probation officers are granted broad authority to "advise and supervise probationers." *United States v. Mike*, 632 F.3d 686, 695 (10th Cir. 2011) (citing *United States v. Pruden*, 398 F.3d 241, 250 (3rd Cir. 2005)). But, there are limits to this

---

supervision. He, appropriately, believes that his treatment needs in both areas are intertwined and overlapping.

8

authority. For example, "Article III prohibits a judge from delegating the duty of imposing the defendant's punishment to the probation officer." *Mike*, 632 F.3d at 695. As the Tenth Circuit has explained:

> In determining whether a particular delegation violates this restriction, courts distinguish between those delegations that merely task the probation officer with performing ministerial acts or support services related to the punishment imposed and those that allow the officer to decide the nature or extent of the defendant's punishment. Delegations that do the former are permissible, while those that do the latter are not.

*Id.* (internal citations omitted).

Allowing a probation officer, or a third-party treatment agency, to impose a condition that affects a significant liberty interest is "tantamount to allowing him to decide the nature or extent of the defendant's punishment." *Id.* at 696. The Tenth Circuit has recognized several specific conditions that affect a significant liberty interest. These include requiring participation in residential treatment, requiring penile plethysmographic testing, polygraph testing and the forced administration of psychotropic medication. *Id.*; *see also United States v. Fivaz*, 521 Fed. Appx. 696, 701-02 (10th Cir. April 15, 2013) (unpublished); *United States v. Von Behren,* 822 F.3d 1139 (10th Cir. 2016).

Constitutional issues also arise with respect to conditions of supervised release. These include First Amendment violations and Fifth Amendment violations. The Fifth Amendment provides, in relevant part, that no person "shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property without due process of law." U.S. Const. amend. V. The Supreme Court held that the general obligation of a probationer to appear and answer questions truthfully does not convert voluntary statements into compelled ones. *Minnesota v. Murphy,* 465 U.S. 420 (1984). But, while a state may require a probationer to

9

appear and discuss matters that affect his probationary status without giving rise to a self-executing privilege:

> The result may be different if the questions put to the probationer, however relevant to his probationary status call for answers that would incriminate him in a pending or later criminal prosecution. There is thus a substantial basis in our cases for concluding that if the state, either expressly or by implication, asserts that invocation of the privilege would lead to revocation of probation, it would have created the classic penalty situation, the failure to assert the privilege would be excused, and the probationer's answers would be deemed compelled and inadmissible in a criminal prosecution.

*Id.* at 435. Conditions that require a probationer to "choose between making incriminating statements and jeopardizing his conditional liberty by remaining silent" are impermissible. *Id.* at 436.

In *United States v. Von Behren,* the Tenth Circuit addressed the question of whether polygraph testing poses a risk of compelled self-incrimination where an invocation of privilege *might* lead to the revocation of Supervised Release. The Court held that "a witness is compelled under the Fifth Amendment *as soon as the government threatens him* with a substantial penalty—it makes no difference whether he proceeds with answering or stands on his right." *Von Behren,* 822 F.3d 1139, 1150 (10th Cir. 2016). In other words, a condition of Supervised Release requiring polygraph testing without the grant of immunity will necessarily violate the Fifth Amendment. If there is no immunity grant, and the defendant, based on his Fifth Amendment privilege, refuses to provide information – be it to a treatment provider, a polygraph examiner, a plethysmographic (or visual response) technician, or to his probation officer – he cannot be sanctioned because of this refusal. *See Murphy*, 465 U.S. at 438. ("Our decisions have made clear that the State could not constitutionally carry out a threat to revoke probation for a legitimate exercise of the Fifth Amendment privilege."). This is true despite any legitimate

10

therapeutic or rehabilitative purpose the disclosure might serve: "The irreconcilable

constitutional problem . . . is that even though the disclosures sought here may serve a valid

rehabilitative purpose, they also may be starkly incriminating, and there is no disputing that the

government may seek to use such disclosures for prosecutorial purposes." *United States v.*

*Antelope*, 395 F.3d 1128, 1137 (9th Cir. 2005).

Finally, due process requires that conditions of supervised release be sufficiently clear to

inform a released prisoner of what conduct will result in his return to prison. *See United States v.*

*Simmons*, 343 F.3d 72, 81 (10th Cir. 2003). Conditions of supervised release may be infirm if

they are overly vague or unclear. *Mike*, 632 F.3d at 694. As a result, the scope of all supervised

release conditions needs to be clearly defined. *Id*.

### Polygraphs and Visual Response Testing

Courts have paid particular attention to areas of sex offender treatment that implicate

significant liberty interests, specifically polygraph testing and plethysmograph testing. For

example, in order for the Court to impose plethysmograph testing, there must be a strong nexus

to the defendant's history and characteristics before it can be imposed. *United States v. Bennett*,

823 F.3d 1316 (10th Cir. 2016), citing *United States v. Dougan*, 684 F.3d 1030, 1034 (10th Cir.

2012).

Polygraph testing to ensure compliance with terms of supervision involves a greater

deprivation of liberty than necessary, and is not reasonably related to Mr. Meier's conduct or to

his history and characteristics. Polygraph testing for the sole purpose of ensuring "compliance

with requirements of supervision," is not recommended in non-sex offense cases, and cannot

therefore be necessary to ensure compliance with supervision generally. Nothing about Mr.

11

Meier specifically suggests a propensity to lie or to lie about his compliance with treatment. Moreover, as even Probation acknowledges (PSR at R-6), the reliability of polygraphs, for any purpose, has frequently and deservedly come under scrutiny. *See, e.g., United States v. Scheffer*, 523 U.S. 303, 309-310 (1998); *United States v. Begay*, 631 F.3d 1168 (10th Cir. 2011). And there is real concern for the potential for a polygraph condition to result in the violation of Mr. Meier's Fifth Amendment Right against compelled self-incrimination. *See Von Behren,* 822 F.3d at 1150. Given all of the forgoing, the Court should decline—or should carefully limit— this requested condition.

Imposing a visual response condition of supervised release implicates a significant liberty interest, and the Court should not do so absent a strong need for this type of "treatment". As an initial matter, Probation offers limited insight into the exact nature of the "visual response testing" that it requests. Without further information, the Court cannot possibly determine the liberty interests at stake, or whether the condition is reasonably related to the 18 U.S.C. § 3553(a) factors as they apply to Mr. Meier. That being said, this test certainly involves a mental intrusion, through "probing of [Mr. Meier's] most innermost thoughts. Such an intrusion is unwarranted absent a specific finding of necessity." *United States v. Weber,* 451 F.3d 552, 562 (9th Cir. 2006). Additionally, these types of tests, like the Abel Assessment or penile plethysmograph, are not scientifically validated and are widely regarded as junk science. *See, e.g.,* The Sex Offender Test, *The Atlantic,* available at https://www.theatlantic.com/politics/archive/2015/07/the-sex-offender-test/397850 (psychology professor Robert Enright notes, for example, that "there are just not enough studies to give me confidence that the scale has strong and enduring psychometric properties for use in predicting a

particular person's sexual interest."). Moreover, general sexual interest does not necessarily, or even often, correlate with offense conduct. In other words, the fact that a test may determine sexual interest, does not make it more likely that Mr. Meier will re-offend, and the Court should therefore decline to authorize an intrusion of this magnitude here.

For the foregoing reasons, these two conditions should either not be imposed at all, or should be modified to conform with the statutory and constitutional mandates governing conditions of Supervised Release.

**Objection to the JVTA Special Assessments**

The Probation Office recommended that the Court impose $30,000 in special assessments pursuant to the JVTA in this case. PSR ¶ 199. Mr. Meier requests that the Court make a finding that he is indigent such that he is relieved of this obligation. *See* PSR, Justification at R6-R7.

Mr. Meier is not a wealthy man. Prior to his arrest he was earning $27.44/hour. PSR ¶ 177. He has a bank account with less than $11,000 in it, and he has saved approximately $65,000 for his retirement over the entirety of his working life. PSR ¶ 182. That is the extent of his liquid assets. Mr. Meier does own a modest home which has appreciated in value since he purchased it. But, as the Court knows all too well, the ability of individuals on the sex offender registry to find appropriate housing is staggeringly difficult, and Mr. Meier is very much hoping to be able to use his relatively modest savings to ensure that he is able to keep his house while he serves this sentence. PSR ¶ 163.

Mr. Meier will serve a prison sentence measured in decades. When he gets out, a man who has done physical labor his entire life, will be in his 60s. Even setting aside how difficult it is for people on the registry to obtain employment, Mr. Meier's ability to perform warehouse

13

work is likely to be greatly diminished by that time, and his ability to support himself is likely to be tenuous at best.  Mr. Meier understands that he is responsible for any requested restitution. He understands that he will face an AVAA assessment.  But, looking at the full financial picture here, the Court can, and should, relieve him of the $30,000 JVTA assessment.

### Objections That Do Not Impact the Guideline Range

Mr. Meier makes the following further objections and clarifications to the draft Presentence Report, none of which impact the calculation of the advisory guideline sentencing range:

- **Paragraph 4**:  Mr. Meier notes that he was never served with any disciplinary paperwork by the Washington County Jail in connection with any of these infractions.  He has been rehired into the inmate worker program at Washington County twice—first in January of 2024 and then again in August of 2024.  He currently serves as a laundry porter.

- **Additional Information; PSR ¶¶ 11-85**:  Mr. Meier does not dispute the general accuracy of the information provided by the government in this section, but he adamantly denies ever blackmailing or trying to extort anyone (*see, e.g.*, PSR ¶35), although he is aware that "cappers" do engage in this behavior on occasion.  Mr. Meier also notes that many of the statements he made in his private messages on the charged website, while accurately reproduced by the government at length in this section, were made in the vein of puffery, braggadocio, and/or exaggeration and so as to enhance his own status with other users, rather than being statements of literal truth.  Finally, while it is true that Mr. Meier made one post (which he later deleted) on "The Resistance" website (PSR ¶ 68), he notes that his involvement with that site was otherwise extremely limited and did not include posting.

- **Paragraph 148**:  Mr. Meier clarifies that he was not arrested in connection with this traffic

14

offense but was rather simply given a citation.

- **Paragraphs 165-166**:  Mr. Meier reports that he also has a history of sleep apnea and was working with Rocky Mountain Sleep Diagnostics in Brighton to obtain appropriate care for this condition prior to his arrest in this case.

- **Paragraph 172**:  Mr. Meier clarifies that he was unable, not unwilling, to participate in treatment while in the CDOC.  Given the scarcity of those services, people who are serving determinate (as opposed to indeterminate) sentences are generally not able to access treatment.

- **Paragraph 180**:  Mr. Meier worked at Nature Composites after (not before) working at Anderson Carpets in Torrington.

- **Justification at R-5, ¶2**:  Mr. Meier clarifies that he was mocked for his *perceived* sexuality; he does not identify as being gay.  Additionally, even when not incarcerated, he has had several periods over the last fifteen years where he was able to abstain from engaging in the conduct at issue in this case. *See also* PSR ¶¶ 76, 81.

　　　　WHEREFORE Mr. Meier respectfully objects as detailed above to the Presentence Investigation Report.

Respectfully submitted,

VIRGINIA L. GRADY
Federal Public Defender

s/ *Stephanie Snyder*
STEPHANIE SNYDER
Assistant Federal Public Defender
633 17th Street, Suite 1000
Denver, CO  80202
Telephone: (303) 294-7002
FAX: (303) 294-1192
Stephanie_Snyder@fd.org
Attorney for Christopher Meier

15

## **CERTIFICATE OF SERVICE**

I hereby certify that on October 23, 2024, I electronically filed the foregoing *Response/Objections to Presentence Report* with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following e-mail addresses:

Alecia Riewerts, Assistant United States Attorney
Email:  Alecia.Riewerts@usdoj.gov

Kyle P. Reynolds, Trial Attorney
Email:  Kyle.Reynolds@usdoj.gov

I hereby certify that I have mailed or served the document or paper to the following non-CM/ECF participant in the manner (mail, hand-delivery, etc.) indicated by the non-participant's name:

Christopher Meier (via hand-delivery)

s/ *Stephanie Snyder*
STEPHANIE SNYDER
Assistant Federal Public Defender
633 17th Street, Suite 1000
Denver, CO  80202
Telephone: (303) 294-7002
FAX: (303) 294-1192
Stephanie_Snyder@fd.org
Attorney for Christopher Meier

16

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No. 23-cr-00419-RMR

UNITED STATES OF AMERICA,

      Plaintiff,

v.

1.  CHRISTOPHER CARL MEIER,

      Defendant.

---

## UNITED STATES' RESPONSE AND OBJECTIONS
## TO PRESENTENCE INVESTIGATION REPORT

---

The United States of America, by and through Acting United States Attorney Matthew T. Kirsch and Assistant United States Attorney Alecia L. Riewerts respectfully responds to the Presentence Investigation Report ("PSR") [ECF #30] as follows:

Objections Impacting the Guideline Calculation

*The USSG § 2G2.1 Cross-Reference Applies to Count 3*

The government agrees with Probation's assessment that Count 1 groups with, at a minimum, Count 3 of the Indictment. However, the government's position is that each of the remaining counts of the Indictment should be calculated utilizing the USSG § 2G2.1 cross-reference. Because Probation agrees that the cross-reference applies to Counts 2, 4, 5, and 6 of the Indictment, the government focuses its argument on the

1

appropriate guideline calculation for Count 3.  The basis for Count 3 of the Indictment is content associated with the defendant's "Productions Index."  PSR at ¶¶34-38.[1]

While the guideline for a violation of 18 U.S.C. § 2252A(a)(2) is USSG § 2G2.2, "[i]f the offense involved causing, transporting, permitting, or offering or seeking by notice or advertisement, a minor to engage in sexually explicit conduct for the purpose of producing a visual depiction of such conduct or for the purpose of transmitting a live visual depiction of such conduct," USSG § 2G2.1 is to be applied "if the resulting offense level is greater than that determined" under USSG § 2G2.2.  USSG § 2G2.2(c)(1).  The government respectfully disagrees with Probation's assertion that there is "a lack of evidence that the defendant produced the images/videos" related to Count 3.  PSR at ¶92, FN2.  The PSR provides ample support for the application of the cross-reference to USSG § 2G2.1 by a preponderance standard in relation to Count 3 of the Indictment as further described below.

The defendant's "profile page included a banner that read '[Defendant's username] Productions' in stylized font"—the defendant made his status on the website in question absolutely clear.  PSR at ¶30.  The defendant held himself out as a "capper," which as explained in detail in the PSR is "a person who takes screen captures of videos depicting minors engaging in sexual activity and creates or preserves those screen captures for later distribution."  *Id.*at ¶32.  The PSR further describes that "[c]appers frequently entice these minors to engage in sexual activity for this purpose,"

---

[1] The real name of the website at issue, the defendant's username on that website, and certain other details are omitted from this filing to protect ongoing investigations.

2

for example by "impersonat[ing] a minor of the same or similar age as the intended
victim." *Id.* It is common for a capper, when attempting to induce boys "to perform
sexually on web camera cappers often pretend to be a young girl approximately the
same age as the boy victim." *Id.* This way, "the boy victim thinks that he is having a
sexual interaction with a girl his own age." *Id.*

The PSR goes on to describe how the website contained a forum called
"Webcam" with a subforum titled "Index of Capper." *Id.* at ¶34. The index included a
link for "[Defendant's username] Productions' Index." *Id.* At this link, there was a post
made by the defendant that "included a list of videos posted and purportedly produced"
by the defendant. *Id.* There were several names, preview images and download links
available associated with this post for "several dozen videos. *Id.* The preview images
for each of the boys described in the post consisted of "'contact sheets'"—*i.e.*, a 6x6
display of images that generally include screenshots taken from a longer video—and
they depict young boys masturbating, displaying their naked genitals, and in one case,
engaging in oral sex with one another." *Id.* Importantly, the defendant also included
information related to each of the victims he used to produce child pornography in the
links, to include "a boy's name, an age designation such as '12yo,' a geographical
location, a date, and often a sexually explicit description." *Id.* Many of the videos
contained further indicia that the defendant had created them, including the
"'[Defendant's username] Productions' logo and imagery…" *Id.* at ¶36.

The victim interviews summarized in the PSR likewise support the inference that
the defendant was the producer of the content underlying Count 3. Several of the

3

victims told law enforcement that they met a "girl" online who directed them to disrobe

and/or masturbate on webcam, but she either never appeared on camera or never

spoke. *See id.* at ¶¶35-36, 48, 53, 67-68. Not only are these victim accounts consistent

with one another, they are also consistent with the defendant's online suggestions that

he enticed minor boys to perform sexually using images or video of a "girl." *See, e.g.,*

*id.* ¶¶40, 42, 45, 64, 73.

The defendant's *modus operandi* was consistent throughout his sexual

exploitation of the minor victims he met online; this, combined with numerous other

factors set forth in the PSR—including the fact that all the videos were categorized as

the defendant's "*productions*" in his capacity as a "capper," the level of detail that he

includes in the file names of his posts pertaining to each victim associated with Count 3

of the Indictment, his online admissions that he produced the content, the victims'

statements about how the videos were created, the consistency between the victim

statements and the defendant's online admissions, and the defendant's personal

branding on the video content itself—provides more than proof by a preponderance

standard that he preyed upon these victims online and used them for the purpose of

producing child pornography.

*The Guideline Calculation for Count 3*

Altogether, there were 35 minor victims whose images were available through

them "[Defendant's username] Productions" index the defendant created. *Id.* While a

"pseudo-count" could be calculated for each of the minor victims depicted in videos

4

pertaining to Count 3 of the Indictment, the government focuses on seven victims
whose interviews are included in paragraphs 35 and 36 of the PSR:

- Victim A:  The defendant posted a contact sheet for a video entitled
"[CFP]Omegle - [Victim A] 14yo – USA - 2015.04.13.mp4," which depicted a
teenage boy naked and masturbating. The "CFP" referenced in the title refers to
"[Defendant's username] Productions."  Victim A was identified and told law
enforcement that when he was 14 years old that he regularly visited the video-
chatting website Omegle.  He reported that someone with a black screen asked
him to disrobe and masturbate on video.  Notably, the defendant provided advice
to others about how to produce sexually explicit videos depicting children; he
indicated that he had used Omegle, stating that "Omegle caps are quickest, but
provide very poor video resolution.  PSR at ¶73.  The government's position is
that the adjusted offense level for Victim A is 40, as the base offense level is 32
and the following enhancements apply:  +2 levels because the minor had not
attained the age of sixteen years pursuant to USSG § 2G2.1(b)(1)(B), +2 levels
for sexual act/contact pursuant to USSG § 2G2.1(b)(2)(A), +2 levels for
knowingly engaging in distribution of the content pursuant to USSG §
2G2.1(b)(3), and +2 levels for use of a computer/concealment of identity
pursuant to USSG § 2G2.1(b)(6).

- Victim B:    The defendant posted a contact sheet for a video entitled
"[CFP]SkypeHD - [Victim B] 12yo – USA - 2016.06.13.mp4," which depicts a
teenage boy naked and masturbating.  This victim was identified and told law

enforcement that when he was approximately 12 or 13 years old, he used Skype to communicate with someone he thought was a female.  The female only communicated with him via chat box.  The "female" directed him to send nude images over Skype and to participate in a video call.  The defendant also indicated when giving advice to other users on how to produce sexually explicit contact that he had utilized Skype to produce child pornography, sharing "[b]est to bring the boys to skype though if you wanna cap HIGH RES caps, otherwise they just don't look so good."  PSR at ¶73.  The government's position is that the adjusted offense level for Victim B is 40, as the base offense level is 32 and the following enhancements apply:  +2 levels because the minor had not attained the age of sixteen years pursuant to USSG § 2G2.1(b)(1)(B), +2 levels for sexual act/contact pursuant to USSG § 2G2.1(b)(2)(A), +2 levels for knowingly engaging in distribution of the content pursuant to USSG § 2G2.1(b)(3), and +2 levels for use of a computer/concealment of identity pursuant to USSG § 2G2.1(b)(6).

• Victim C:  The defendant posted a contact sheet depicting Victim C for a video entitled "[CFP]SkypeHD - [Victim C] 15yo – USA - 2020-08-23.mp4," depicting a teenage boy who was depicted naked and masturbating.  This victim was also identified; he stated that he would have been 16 on the date listed in the file name.   He told law enforcement that he chatted over different applications with teenage girls and he sent them multiple images and videos of himself nude or engaging in sex acts.  He reported that one particular "girl" never showed herself on camera and repeatedly made excuses as to why she would

6

not.  The government's position is that the adjusted offense level for Victim C is 38, as the base offense level is 32 and the following enhancements apply:  +2 levels for sexual act/contact pursuant to USSG § 2G2.1(b)(2)(A), +2 levels for knowingly engaging in distribution of the content pursuant to USSG § 2G2.1(b)(3), and +2 levels for use of a computer/concealment of identity pursuant to USSG § 2G2.1(b)(6).

- Victim D:  The defendant posted a contact sheet for a video entitled "[CFP]SkypeHD - [Victim D] jerks and cums in shower 13yo - USA - 2016.06.16.mp4," depicting a teenage boy naked and masturbating in the shower and bathtub.  A separate contact sheet related to this victim with a similar title depicts a teenage boy naked and masturbating as well.  Victim D was identified and interviewed.  He stated that he was 15 years old on the dates listed in the file names.  He said that he sent nude videos and pictures of himself online to individuals he believed were females.  The government's position is that the adjusted offense level for Victim D is 40, as the base offense level is 32 and the following enhancements apply:  +2 levels because the minor had not attained the age of sixteen years pursuant to USSG § 2G2.1(b)(1)(B), +2 levels for sexual act/contact pursuant to USSG § 2G2.1(b)(2)(A), +2 levels for knowingly engaging in distribution of the content pursuant to USSG § 2G2.1(b)(3), and +2 levels for use of a computer/concealment of identity pursuant to USSG § 2G2.1(b)(6).

- Victim E:  The defendant posted a contact sheet for a video entitled "[CFP]Skype HD - [Victim E] 15yo – USA - 2020-01-21.mp4," which depicted a

7

teenage boy naked and masturbating.  Victim E was identified and interviewed;
he indicated that he would have been 14 on the date listed in the file name.  He
likewise described meeting a girl, who directed him to download Skype and
disrobe in front of the camera.  The "girl" never appeared live on camera and only
communicated through the Skype chat function.  He stated that he first started
communicating with this individual when he was 13 years old.  The government's
position is that the adjusted offense level for Victim E is 40, as the base offense
level is 32 and the following enhancements apply:  +2 levels because the minor
had not attained the age of sixteen years pursuant to USSG § 2G2.1(b)(1)(B), +2
levels for sexual act/contact pursuant to USSG § 2G2.1(b)(2)(A), +2 levels for
knowingly engaging in distribution of the content pursuant to USSG §
2G2.1(b)(3), and +2 levels for use of a computer/concealment of identity
pursuant to USSG § 2G2.1(b)(6).

- Victim F:  A contact sheet depicting Victim F was posted by the defendant
in conjunction with the "[Defendant's username] Productions" index post.  He told
law enforcement that he was 14 and 15 years old when the images he was
shown were created.  He stated that he did not know that he was being recorded
or that the videos were on the Internet.  The government's position is that the
adjusted offense level for Victim F is 40, as the base offense level is 32 and the
following enhancements apply:  +2 levels because the minor had not attained the
age of sixteen years pursuant to USSG § 2G2.1(b)(1)(B), +2 levels for sexual
act/contact pursuant to USSG § 2G2.1(b)(2)(A), +2 levels for knowingly engaging

8

in distribution of the content pursuant to USSG § 2G2.1(b)(3), and +2 levels for use of a computer/concealment of identity pursuant to USSG § 2G2.1(b)(6).

- Victim G:  A contact sheet depicting Victim G was posted by the defendant in conjunction with the "[Defendant's username] Productions" index post.  He was identified by law enforcement and able to identify himself in images distributed by the defendant.  He told law enforcement that he chatted with strangers on the video-chatting application Omegle, but that he didn't recall any further details about the interactions.  The government's position is that the adjusted offense level for Victim G  is 38, as the base offense level is 32 and the following enhancements apply:  +2 levels for sexual act/contact pursuant to USSG § 2G2.1(b)(2)(A), +2 levels for knowingly engaging in distribution of the content pursuant to USSG § 2G2.1(b)(3), and +2 levels for use of a computer/concealment of identity pursuant to USSG § 2G2.1(b)(6).

*The Adjusted Offense Level for Count 3*

Pursuant to USSG § 2G2.1(d)(1), "[i]f the offense involved the exploitation of more than one minor, Chapter Three, Part D (Multiple Counts) shall be applied as if the exploitation of each minor had been contained in a separate count of conviction." Therefore, the government's calculation as to the Adjusted Offense Level for Count 3 is 40 and as to the minimum number of Units associated with Count 3 of the Indictment is 7 based on the guidance provided in USSG § 3D1.4.

| Victim | Adjusted Offense Level | Units |
|---|---|---|
| A | 40 | 1 |

9

| | | |
|---|---|---|
| B | 40 | 1 |
| C | 38 | 1 |
| D | 40 | 1 |
| E | 40 | 1 |
| F | 40 | 1 |
| G | 38 | 1 |

*Total Offense Level for the Indictment*

The government's position is that the following Adjusted Offense Levels and number of Units apply when calculating the multiple count adjustment:

| Count | Adjusted Offense Level | Units |
|---|---|---|
| Count 1 | (Groups as set forth above) | |
| Count 2 | 40 | 1 |
| Count 3 | 40 | 7 |
| Count 4 | 40 | 1 |
| Count 5 | 38 | 1 |
| Count 6 | 40 | 1 |

The greatest of the Adjusted Offense Levels above is 40. Pursuant to USSG § 3D1.4, there is a five-level increase pursuant to the number of Units assigned by the amount indicated on the table and the Combined Adjusted Offense Level is 45. With acceptance of responsibility, the defendant's Total Offense Level is 42. Since the defendant's criminal history score is three, the defendant's criminal history category is II,

10

resulting in a total guideline imprisonment range of 360 months imprisonment to life imprisonment.

*The Life Guideline*

The government agrees with Probation's assessment that the minimum term of imprisonment for each count contained in the Indictment is 15 years and the maximum term is 40 years.  PSR at ¶188.  However, the government disagrees with Probation as to the total guideline imprisonment range for a life sentence.  PSR at ¶190, PSR, Exhibit A ("Sent. Rec.") [ECF #30-1] at 2.  While the guideline range is capped at 480 months for one count of conviction, the government's position is that a life guideline in this case is the maximum number of years to which the defendant can be sentenced if he is sentenced on all six counts consecutively.  USSG § 5G1.1(a) (if "the statutorily authorized maximum sentence is less than the minimum of the applicable guideline range, the statutorily authorized maximum sentence shall be the guideline sentence").  The guideline of life in this case is therefore 40 years (480 months) for each of the six counts of conviction, totaling 240 years or (2,880 months).

<u>Objections Not Impacting the Guideline Calculation</u>

It does not appear that the special assessment under the Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018 ("AVAA") was assessed per count in the Sentencing Recommendation.  Sent. Rec. at 2.  It is the government's position that the defendant is subject to the AVAA special assessment for each of his six counts of conviction.  The AVAA requires a special assessment of "not more than $35,000 on any person convicted of any other offense for trafficking in child pornography," specifically

excluding offenses referenced in 18 U.S.C. § 2259A(a)(1) involving the possession of child pornography.  18 U.S.C. § 2259A(a)(1) and (2).  The language in the AVAA aligns with 18 U.S.C. § 3013, which states that special assessment shall be assessed "on any person convicted of an offense" for which Probation recommended the special assessment apply to each count.  18 U.S.C. § 3013(a), Sent. Rec. at 2.

Dated this 24th day of October, 2024.

Respectfully submitted,

MATTHEW T. KIRSCH
Acting United States Attorney

By:   *s/ Alecia L. Riewerts*
ALECIA L. RIEWERTS
Assistant United States Attorney
United States Attorney's Office
1801 California St., Suite 1600
Denver, Colorado 80202
Telephone: (303) 454-0100
Facsimile: (303) 454-0401
Email: Alecia.Riewerts@usdoj.gov
Attorney for Government

## CERTIFICATE OF SERVICE

      I hereby certify that on this 24th day of October, 2024, I electronically filed the foregoing **UNITED STATES' RESPONSE AND OBJECTIONS TO PRESENTENCE INVESTIGATION REPORT** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following email address:

      Stephanie Snyder
      Email: Stephanie_Snyder@fd.org

      By:    *s/ Alecia L. Riewerts*
      ALECIA L. RIEWERTS
      Assistant United States Attorney
      United States Attorney's Office
      1801 California St., Suite 1600
      Denver, Colorado 80202
      Telephone: (303) 454-0100
      Facsimile: (303) 454-0401
      Email: Alecia.Riewerts@usdoj.gov
      Attorney for Government

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

CASE NO.     23-cr-00419-RMR

UNITED STATES OF AMERICA,

      Plaintiff,

v.

CHRISTOPHER CARL MEIER,

      Defendant.

---

## MOTION FOR VARIANT SENTENCE OF 240 MONTHS[1]

---

      Chris Meier has been isolated, alone in his own world, for most of his life.  When he was a toddler, he stopped speaking for several years.[2]  His mother describes how he would moan and rock whenever there was any change in his routine, and every time he was in a new place.  A daycare asked her to unenroll him because he would spend all day rocking and crying, staring at the door.  Mr. Meier was never assessed for, or diagnosed with, an autism spectrum or other disorder, and he started speaking again at around the age of 4.  But his struggles didn't disappear.

      The neighborhood kids teased him.  The kids on the bus teased him.  He couldn't read people or social situations.  Jokes escaped him.  His younger sister had to explain what things

---

[1] The parties disagree as to the appropriate guideline calculation in this case.  If the Court ultimately declines to apply the § 2G2.1 cross-reference to any of the counts of conviction, Mr. Meier's requested sentence would fall within the advisory range of 210-262 months.  Should the Court apply the § 2G2.1 cross-reference to some, or all, of the counts, his requested sentence would represent a variance.

[2] The information in this section is generated largely from social history interviews with Mr. Meier's family that were conducted by Office of the Federal Public Defender clinical social worker, Sarah Champ, LCSW.

meant to him.  His mother had him join the school basketball team, but no one would pass him the ball.  Other kids wouldn't talk to him at the church youth group that his parents made him attend, anyone who did became a target of ridicule themselves.

The bullying at the Christian school where his parents had enrolled him in the fourth grade was relentless and deeply cruel, culminating in the sexual assault described in the Presentence Report, when he was in the seventh grade.[3]  Bespectacled, with bad acne, Mr. Meier was utterly miserable.  His sister recalls that he started wearing a big orange coat, wanting both to make himself look bigger and to have a place to hide, but it only made him stand out more.  One year, the only kid, other than his sister, who came to his birthday party, was also one of his tormentors.



His parents, deeply religious (as is Mr. Meier), finally took him out of the school.  His mother homeschooled him, using a Bible-based curriculum, for a year.

---

[3] PSR ¶ 159.

2

High school, where he was able to more easily disappear into the crowd, was a relief. Mr. Meier grew to be 6'3, and the other kids largely stopped singling him out. He filled his days with video games, alone in his room. Around this time, a few of the neighborhood boys who used to mock him, introduced him to an (adult) porn movie. One of the boys was old enough to get these types of tapes and soon, they were watching them all the time, all of the boys sitting around and masturbating together. His mother had an idea of what they might be doing and worried about whether she should forbid it. But it was the first time in his life that Mr. Meier had ever spent time with other kids, or that he seemed to have friends. So, she let it go.

Mr. Meier graduated from high school and reluctantly went to college—totally unsure of where he belonged or what he should do with himself. It took him six years to finally finish. He lived at home with his parents, unable to deal with the idea of living on his own and of more change, until he was 29. He bought his house, but didn't move in for a year after purchasing it. He wouldn't (or couldn't) leave until he had fixed it up so that it looked identical to his parents' home—the same kitchen setup, the same carpet, the same shower curtain in the bathroom. His family has never met a girlfriend. He's never had an adult relationship. His sister has met one friend of his, but they stopped coming around years ago. Chris Meier has lived his life largely alone.

To be sure, what he did online was awful, egregious, and extensive. The profundity of his loneliness doesn't excuse what he did to finally feel valued, albeit by a group of individuals who share his disordered attractions and addiction. Mr. Meier feels like the assault froze something inside of him. He feels like he is stuck at the age of 14, the only time when he briefly had "friends" in real life. He knows what he does is wrong, and he detests it. He has spent hours praying for

3

God to help him overcome his struggle with this sickness, his addiction, desperately wanting to change. He has gone to church counseling. He became the accountability partner of his pastor. He admitted his struggles freely to the police. And he wanted no part of contesting his guilt in this case—pleading guilty to everything, without a single concession from the government, knowing that he would spend decades in jail, but not wanting to put anyone—the victims, the government, his family—through a trial. Mr. Meier hates the harm he knows he has caused. He tried in good faith to do treatment in his state case. He wants to do all the treatment he can, both in and out of the Bureau of Prisons. He does not want to live like this.

Cases like this one are hard. But Chris Meier has value, and not just in some dark corner of the internet. His life has meaning. He is redeemable. For him, twenty years in prison, followed by ten years of supervised release, would be a sufficient, but not greater than necessary, sentence. It would account for the scope of the indictment and punish him, substantially but appropriately, for the harm his actions caused. It would protect the community, keeping Mr. Meier in custody until he is 60 years old and then under the Court's close supervision for a decade beyond that. It would not create unwarranted sentencing disparities as between individuals who have been convicted of analogous offenses. And it would give Mr. Meier a reason to hope for a bit of a life outside of prison walls, a reason to keep doing the hard work of unpacking how he became this way and figuring out how to finally overcome it.

**<u>Argument</u>**

**I.     This Court should vary downward because the applicable guideline provisions are flawed and not empirically based.**

This Court can – and should – consider when a guideline isn't based on empirical data or when it fails to properly capture distinctions in culpability. This is particularly true when a

4

guideline reflects "unsound judgment", and thus does not adequately capture the statutory

sentencing considerations of 18 U.S.C. § 3553(a).  *United States v. Rita,* 551 U.S. 338, 357 (2007);

*see also Kimbrough v. United States,* 552 U.S. 85, 101-102 (2007).  A review of the Sentencing

Commission's reports to Congress over the past few decades as well as Congressional intent in

implementing child pornography guidelines demonstrates that the guidelines for these offenses

reflect precisely that type of "unsound judgment."[4]  Congress has repeatedly raised the penalties

for this category of offenses despite recommendations by the Sentencing Commission to the

contrary.[5]

        In February 2013, the Sentencing Commission released a report to Congress on the child

pornography guidelines for non-production offenders. *Id.*  The Commission explained that it

compiled the report in large part due to the increasing rate of below guideline sentences for

offenders sentenced under USSG § 2G2.2, and pursuant to its statutory duty to "consider whether

the guidelines are in need of revision in light of feedback from judges as reflected in their

sentencing decisions."  *Id.*  at 6.   The report found that "as a result of recent changes in the

computer and Internet technologies that typical nonproduction offenders use, the existing

---

[4] *See, e.g.,* Troy Stabenow, *Deconstructing the Myth of Careful Study: A Primer on the Flawed Progression of the Child Pornography Guidelines* (Jan. 2009) (available online at https://www.ussc.gov/sites/default/files/pdf/training/annual-national-training-seminar/2016/report_stabenow.pdf).

[5] *2012 Report to Congress: Federal Child Pornography Offenses*, United States Sentencing Commission, December 2012 (hereafter "2012 Child Pornography Report") (available online at https://www.ussc.gov/sites/default/files/pdf/news/congressional-testimony-and-reports/sex-offense-topics/201212-federal-child-pornography-offenses/Full_Report_to_Congress.pdf).

sentencing scheme in non-production cases no longer adequately distinguishes among offenders

based on their degrees of culpability." *Id.* at ii.

An update to that report, released by the Sentencing Commission in October 2021,

emphasized that in the eight years since the release of the 2012 Report, nothing had changed:

> "[t]he [child pornography] guideline is both overinclusive and underinclusive. Thus, it no longer effectively differentiates among offenders in terms of the seriousness of the offense or culpability of the offender."[6]

And even in a case such as this one, where Probation found that the cross-reference to

U.S.S.G. § 2G2.1 was appropriate at least as to some of the counts, the problems with the over-

inflation of the guideline ranges persists.  For example, under the § 2G2.2 guidelines, Mr. Meier

receives enhancements for using a computer (two levels), and for an offense involving more than

600 images (five levels), despite these enhancements applying in essentially every single case.

Likewise, under the § 2G2.1 guideline, Probation assessed enhancements for the involvement of a

child who had attained the age of 12 but who had not yet attained the age of 16 (two levels), and

for the use of a computer (two additional levels)—enhancements that, on their face, apply in the

overwhelming majority of these types of cases.

Mr. Meier is going to get a lengthy punishment regardless of whether the Court adopts

Probation's guideline calculation in part or in full.  *See generally* Response/Objections to

Presentence Report, ECF No. 31 at pgs. 1-7 (setting out a number of alternatives to the 360-480

guideline range calculated in the PSR: 1) 210-262 months under § 2G2.2; or 2) 292-365 months if

---

[6] *Federal Sentencing of Child Pornography: Non-Production Sentences,* UNITED STATES
SENTENCING COMMISSION, June 2021, at 69 (hereafter "2021 Child Pornography Report")
(available online at https://www.ussc.gov/sites/default/files/pdf/research-and-
publications/research-publications/2021/20210629_Non-Production-CP.pdf).

one count were subject to the § 2G2.1 cross-reference; or 3) 324-405 months were the § 2G2.1 cross-reference applied to two counts).  Here, the Court should consider imposing a sentence that would fall within the advisory guideline range should some, or all, of these almost universally applied enhancements be disregarded.

**A. Several § 2G2.2 enhancements are illogical, as they have become inherent to the vast majority of federal child pornography offenses.**

At least two of the enhancements that increase Mr. Meier's sentencing guideline range under § 2G2.2 purport to indicate aggravating factors but have become inherent to the crimes being punished themselves. Those enhancements include the use of a computer (applied in 96.3% of sentences nationwide in 2019), and possessing more than 600 images (applied in 77.2 % of sentences nationwide in 2019).[7] Put another way, the Guidelines' promulgated enhancements may have been intended to target more culpable offenders, but in practice, these "enhancements" merely increase the average sentence across all defendants – rendering them essentially meaningless as a method of measuring culpability.

### *Use of a Computer (§ 2G2.2(b)(6))*

Congress directed the Sentencing Commission to amend § 2G2.2 in 1996, adding a 2-level increase for using a computer to carry out a child pornography offense, to address the increasing prevalence of computer usage.[8]  By their 2021 Report, the Commission's data showed this increase applies in more than 95% of cases.[9]  The Commission voiced concern that these numbers meant

---

[7] *Id.* at 19.

[8] U.S.S.G. Sentencing Guideline Amendment 537.

[9] 2021 Child Pornography Report at 4.

that the increase is no longer tied to increased culpability, but now has become over-inclusive and meaningless—effectively increasing the base offense level in nearly every case.

As the Commission itself has opined, this is one of several enhancements in § 2G2.2 that has not kept pace with technological advancements.[10]   Congress has failed to amend the Guideline to address these concerns – despite repeated requests by the Commission to do so – likely due to the political unpopularity of any appearance of leniency for sex offenders; this Court, unbound by such political concerns, should disregard this enhancement altogether.

### *600+ images enhancement (§ 2G2.2(b)(7))*

Mr. Meier receives a 5-level enhancement for having more than 600 images – an arbitrary number with no basis in research or logic.  Indeed, because the "series" in which images are often disseminated on the internet come in dozens or hundreds of images or videos per series, the "typical" child porn case now involves well over 600 images.  Because possession of many images is incredibly common in child pornography cases, it should not aggravate the sentence given to any particular defendant.

The Sentencing Commission has acknowledged that "technological changes have resulted in exponential increases in the volume and ready accessibility of child pornography," and that, as a result, the current enhancement for the number of images "does not adequately distinguish among offenders regarding their culpability for their collecting behaviors".[11]   Because this purported enhancement is now inherent to most child pornography crimes, it should not be used to enhance Mr. Meier's sentence here.

---

[10] *Id.* at 68.

[11] 2012 Pornography Offenses Report at 322-23.

**B. Nor, under § 2G2.1, does it make sense to enhance sentences for nearly universally applicable conduct.**

The generally harsher production guideline, §2G2.1, suffers from many of these same problems. The Commission also published an extensive study in 2021 of child pornography production offenders, which Mr. Meier has attached in full as *Exhibit A* for the Court's reference. *See Exhibit A,* UNITED STATES SENTENCING COMMISSION, *Federal Sentencing of Child Pornography: Production Offenses*, October 2021. And, as with § 2G2.2, if nearly half of the cases sentenced under §2G2.1 are enhanced because they involved a computer, it becomes a meaningless measuring stick for enhancing any one individual's sentence or culpability. *See Exhibit A* at p.20. The same is true of the enhancements for the offense involving individuals who have not yet turned 16 years old—something that applies in over 90% of cases under this guideline. *Id*. If the presence of a minor in a child pornography case is assured, it cannot, by definition, also be an aggravating factor. These enhancements do not result in more harsh punishment for more dangerous offenders; they simply result in an increase in the base offense level for all offenders.

**C. Mr. Meier should be sentenced without consideration of these enhancements.**

This Court should exercise its discretion and decline to impose sentence based on guideline enhancements that are not based on empirical evidence or that apply nearly universally. Without the enhancements for use of a computer, the involvement of a minor who had not attained the age of 16, or the number of images, Mr. Meier's total offense level would be four to seven levels lower.

Thus, even starting from the PSR's final offense level of 41 (using the § 2G2.1 cross-reference for four counts),[12] this would mean that the Court should consider varying down to the

---

[12] PSR at ¶ 146.

9

ranges suggested for an offense level of 34 (168-210 months; 7 levels lower,) or to the ranges suggested for an offense level of 37 (235-293 months; 4 levels lower). Mr. Meier's requested sentence of 240 months falls well within these adjusted ranges.

**II.     A sentence of 240 months is appropriate for Mr. Meier and his conduct, and comports with the sentences imposed in analogous cases nationwide.**

The parsimony principal of § 3553 requires the Court to impose a sentence that is "sufficient, but not greater than necessary." Here, that is a sentence of 240 months in prison, followed by 10 years of supervised release.

There are, to be sure, aggravating aspects of this case. Among them is Mr. Meier's prior conviction. As he candidly told the agents, he has been dealing with this unhealthy and all-consuming addiction throughout his life. He knows that isolation is a trigger. When he lived with his parents while on parole in Wyoming, he was able to keep himself distracted enough to do reasonably well. He would stay at work as late as he could, he would stay up talking to his parents, he would walk endless laps around the park, all so that he wouldn't be alone and inside. But when he returned to Colorado, and the pandemic shut down everything, and he would come home from work to find his sister's ex-husband asleep in the recliner in the living room, Mr. Meier retreated to his room. Relapse followed.

Jail is, in some ways, a relief. No computers. No images. No daily struggle with his intense self-loathing. Mr. Meier knows that he needs treatment. And he wants help. He has not shied away from looking at himself, his triggers, the damage he has caused. It spills out of him, in rapid and lengthy torrents, when talking about what he has done. He has insight, including into just how much further he has to go.

10

Twenty years is a long time.  It is the length of an entire military or police career.  It is longer than the maximum possible sentence for sexually abusing a minor under 18 U.S.C. § 2243, or for carjacking a person with the intent to cause their death or other serious bodily harm under 18 U.S.C. § 2119(1), or for committing voluntary manslaughter under 18 U.S.C. § 1112.  It is longer than Chief Justice John Roberts has been on the Supreme Court.  Mr. Meier knows he deserves a substantial sentence, and he is asking for one.  Given the context of the sentences often imposed in like cases, his request is also a relatively modest and reasonable one.

One of the statutory factors that the Court must consider is whether the sentence it imposes here will create disparity between others who are similarly situated.  A 240-month sentence would not do so.  For example, in Fiscal Year 2023, the average sentence imposed in a child pornography trafficking case, as this one is, when a person had a prior sexual abuse or child pornography conviction subjecting them to a 15-year mandatory minimum penalty (as Mr. Meier does) was **236 months**.  *See Exhibit B*, UNITED STATES SENTENCING COMMISSION, *Quick Facts, Child Pornography Offenses FY23*.  And the average sentence for a <u>production</u> offender, sentenced under § 2G2.1 in fiscal year 2019, the vast majority of whom were subject to a 15-year mandatory minimum, was **275 months**.  *See Exhibit* A at p.9; *see also Exhibit C*, UNITED STATES SENTENCING COMMISSION, *Quick Facts, Sexual Abuse Offenses FY23,* noting that in 2023, the average sentence for an individual convicted (<u>as Mr. Meier was not</u>) of child pornography production, and who also had an applicable mandatory statutory minimum penalty, was **304 months**.  Interestingly, the average federal sentence imposed for the hands-on offense of non-statutory rape was only **212 months**.  *Id.*

11

Variances are also extremely common in these types of cases—57% of § 2G2.2 defendants received a downward variance in 2023 (*see Exhibit B*), and 45% of individuals convicted of a sexual abuse offense (including production defendants sentenced under § 2G2.1) received a downward variance in 2023 (*see Exhibit C*).

Nor does the "dark web" angle to this case suggest that a higher sentence would be appropriate or warranted. Indeed, Jonathan Johnson, who not only operated a 27,000 member Tor site but who also produced child pornography, was sentenced to 21 years in prison in 2015 for these activities. *See Exhibit D*, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, "*'Operation Roundtable' ringleader sentenced to 21 years after ICE investigation*", February 12, 2015. Similarly, Eric Marques, who was described as being "one of the largest facilitators of child pornography in the world", because he hosted several hundred Tor sites, with millions of CSAM images on them, received 27 years in prison for his crimes. *See Exhibit E*, U.S. Attorney's Office, District of Maryland, "*Dark Web Child Pornography Facilitator Sentenced to 27 Years in Federal Prison for Conspiracy to Advertise Child Pornography*", September 15, 2021.

And if dark web administrators, the people actually running these websites, have received sentences that are only marginally longer than the one Mr. Meier now seeks, the users and content-generators and distributors on those sites have, over the last several years, typically received even less prison time than Mr. Meier is requesting from the Court. Kory Schulein, for example, received 151 months from a judge in Illinois after posting 13,733 messages—many of them with links to CSAM materials—on exactly these sorts of Tor sites. *See Exhibit F*. Eric Johansson received 150 months from a judge in North Carolina for extensively posting and distributing CSAM on a dark web chat room. *See Exhibit G*. Another "herculean" distributor of CSAM on the dark web

12

received 12 years for his activities.  *See Exhibit H.*  Those men, as described by the United States Department of Justice, did exactly what Mr. Meier has been convicted of doing, and received far less time than he is requesting.

   And even if the Court looks more at cases where there is "dark web" production, Mr. Meier's requested sentence would not be disparate.  For example, a Texas man who both administered a Tor CSAM site and *directed* the hands-on abuse of a 3-year-old by a foreign national via webcam, received 15 years in prison for his crimes.  *See Exhibit I.*  And a man who not only "engaged in sexually explicit communications with persons believed to be minors and encouraged those apparent minors to create sexually explicit images of themselves", but who also then *sold* those images on the dark web, recently received just under 22 years from an Oklahoma judge.  *See Exhibit J.*  These comparisons are, admittedly, somewhat imperfect because every case is individuated by its facts and the circumstances of the defendant.  But, taken collectively, these case comparisons speak to the larger point: while a substantial sentence is both needed and warranted here, that sentence need not exceed twenty years.[13]

   While Mr. Meier's online activities were admittedly extensive, he did not, and has never, committed any type of "contact" or hands-on offense.  His crimes involved neither force nor incapacitation.  He was not in a position of trust with respect any of the minor victims—he was not their parent or other family member, nor was he a teacher or a coach.  Nothing he did involved infants or toddlers or children under the age of 12.  No sadomasochism enhancements apply.  That is not to say that what Mr. Meier did was not heinous—of course it was and is.  But if the average

---

[13] Even in what has been perhaps the most-publicized sexual abuse case in the last decade, Ghislaine Maxwell received a 240-month sentence, after trial, for her extensive misconduct which spanned over a decade and involved dozens and dozens of victims.  *See Exhibit K.*

13

parent who assaults their own child on camera receives a sentence of 340 months, and the average hands-on offender receives a sentence of 307 months, and the average person who incapacitated their victims in some way receives 313 months, Mr. Meier's punishment should be calibrated accordingly. *See Exhibit A* at p.7.

Finally, while twenty years in prison is an enormous punishment for anyone, it is particularly so for those convicted of child pornography offenses. As a man who has struggled to negotiate social situations throughout his life, Mr. Meier will enter prison as a pariah even in that limited social setting; he will be incredibly vulnerable to violence, manipulation, and domination by others. Twenty years of imprisonment will be a harsh and life-altering punishment for this man. Under all of the circumstances presented here, it is enough.

### III.   Designation Request

Mr. Meier respectfully requests that the Court recommend that he be designated to serve his sentence of imprisonment at Englewood FCI in Englewood, Colorado, a Bureau of Prisons ("BOP") facility that is somewhat less likely to be populated by violent offenders and gang members who may target him for his offenses of conviction.

Understanding that the BOP has ultimate discretion over both his designation and his security-level classification,[14] Mr. Meier urges this Court to consider this recommendation for two distinct reasons. First, Englewood FCI has a Non-Residential Sex Offender Treatment Program, in which "[p]articipants learn basic skills and concepts to help them understand their past offenses

---

[14] Counsel believes, based on the BOP's Inmate Security and Classification Guide that Mr. Meier is likely to be eligible for placement in a low-security facility.

and to reduce risk of future offending."[15]   In this program, Mr. Meier can receive the treatment

that he both wants and needs while in a setting with similarly-situated offenders, making targeted

violence less likely.   Second, Englewood FCI is the closest BOP facility both to Mr. Meier's

parents (based in Wyoming) and his sister (based in Denver).  Proximity to his family will provide

him with much-needed support during what is certain to be an incredibly difficult transition to a

very long period of incarceration.

### <u>Conclusion</u>

Christopher Meier knows that he engaged in reprehensible conduct.   He fully

acknowledges that a lengthy period of imprisonment is both necessary and appropriate for his

crimes.  But, because a sentence in excess of twenty years would be greater than what is necessary

to fully and fairly punish his conduct, Mr. Meier respectfully requests that this Court impose a

sentence of 240 months of imprisonment, with ten years of supervised release to follow.

Respectfully submitted,

VIRGINIA L. GRADY
Federal Public Defender

s/ Stephanie Snyder
STEPHANIE SNYDER
Assistant Federal Public Defender
633 17th Street, Suite 1000
Denver, CO  80202
Telephone: (303) 294-7002
FAX: (303) 294-1192
Stephanie_Snyder@fd.org
Attorney for Christopher Meier

---

[15] See https://www.bop.gov/inmates/custody_and_care/sex_offenders.jsp.

## CERTIFICATE OF SERVICE

I hereby certify that on October 30, 2024, I electronically filed the foregoing *Motion for Variant Sentence of 240 Months* with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following e-mail addresses:

Alecia Riewerts, Assistant United States Attorney
Email:  Alecia.Riewerts@usdoj.gov

Kyle P. Reynolds, Trial Attorney
Email:  Kyle.Reynolds@usdoj.gov

I hereby certify that I have mailed or served the document or paper to the following non-CM/ECF participant in the manner (mail, hand-delivery, etc.) indicated by the non-participant's name:

Christopher Meier (via hand-delivery)

s/ *Stephanie Snyder*
STEPHANIE SNYDER
Assistant Federal Public Defender
633 17th Street, Suite 1000
Denver, CO  80202
Telephone: (303) 294-7002
FAX: (303) 294-1192
Stephanie_Snyder@fd.org
Attorney for Christopher Meier

16





United States Sentencing Commission
October 2021

# FEDERAL SENTENCING OF
# CHILD PORNOGRAPHY
## PRODUCTION OFFENSES





# Federal Sentencing of Child Pornography: Production Offenses

CHARLES R. BREYER

Acting Chair

PATRICIA K. CUSHWA

*Ex Officio*

JONATHAN J. WROBLEWSKI

*Ex Officio*

KENNETH P. COHEN

Staff Director

**OCTOBER 2021**

*United States Sentencing Commission*



Federal Sentencing of Child Pornography: Production Offenses

# **Table of Contents**



**1**   **Introduction & Key Findings**

**12**   **Chapter One: Sentencing Framework**

**16**   **Chapter Two: Data Overview**

**26**   **Chapter Three: Proximity, Participation, and Propensity**

**44**   **Chapter Four: Sentencing Outcomes**

**54**   **Conclusion**

**58**   **Appendix**

**60**   **Endnotes**

*United States Sentencing Commission*



This report focuses on offenders sentenced under the production of child pornography guideline. A companion report, *Federal Sentencing of Child Pornography: Non-Production Offenses* (June 2021), analyzes offenders sentenced under the non-production of child pornography guideline.

# Introduction

**This publication updates and expands upon the United States Sentencing Commission's 2012 *Report to the Congress: Federal Child Pornography Offenses* (the "2012 *Child Pornography Report*") and builds upon the Commission's recent report on non-production child pornography offenses.**

This publication is the second report of a two-part series that updates and expands upon the United States Sentencing Commission's 2012 *Report to the Congress: Federal Child Pornography Offenses* (the "2012 *Child Pornography Report*").[1] In the 2012 *Child Pornography Report*, the Commission analyzed offenders sentenced under the federal child pornography sentencing guidelines and their corresponding statutes to assess how these offenders were prosecuted, sentenced, and supervised following their reentry into the community. This report focuses on offenders sentenced for child pornography production offenses under §2G2.1 of the *Guidelines Manual* (Sexually Exploiting a Minor by Production of Sexually Explicit Visual or Printed Material; Custodian Permitting Minor to Engage in Sexually Explicit Conduct; Advertisement for Minors to Engage in Production).[2]

The issues the Commission discussed in the 2012 *Child Pornography Report* persist today: the continued growth in the number of child pornography production cases, the volume and accessibility of child pornography images due to advancements in technology, and the resulting lengthy sentences for child pornography production offenders. Notably, in 2020 alone, the Cyber Tipline of the National Center for Missing and Exploited Children received 21.7 million reports of child sexual abuse imagery, online child exploitation and enticement, child sexual molestation, and child sex trafficking.[3]

Child pornography production offenses cause substantial and indelible harm to victims.[4] Offenders who produce child pornography use a variety of tactics to manipulate minors, and most offenses involve sexual contact with the victim. The typical production offender maintains a position of trust over the victim and has physical access to the child during the production of child pornography. However, a growing proportion of production offenders exploit victims remotely through the use of the internet and mobile devices.

This update to the 2012 *Child Pornography Report* is intended to provide stakeholders with current information on child pornography production offenses, offenders, and sentencing outcomes. This report provides the Commission's most in-depth study of child pornography production offenses to date through an analysis of three primary factors that the Commission has identified as relevant to sentencing child pornography production offenders:

(1) **Proximity**: the physical proximity and relationship between offenders and victims, methods of communication used to induce victims' participation in the offense, and whether offenders and victims lived in the same household;

(2) **Participation**: the offender's level of involvement with victims during the production offense, such as the method used to produce the child pornography, whether the offender engaged in sexual contact with victims, or whether the offender manipulated victims through incapacitation, coercion, enticement, or misrepresentation; and

(3) **Propensity**: the offender's level of engagement in child pornography or exploitive conduct in addition to the production offense, such as whether the offender distributed or collected child pornography in addition to the production offense or engaged in unrelated exploitation or physical sexual abuse of a child.

The Commission's analysis of these three factors focuses, in part, on the advancement of technology since the *2012 Child Pornography Report*. Emerging technology continues to create greater opportunity for child pornography production offenders to access and exploit minor victims. The expansion of mobile and digital technology has facilitated the production of child pornography, including victim-produced content. As computers and mobile devices offer video capabilities and live streaming functions, some offenders produce child pornography from remote locations apart from the victim. Focusing on data related to child pornography production offenders' proximity to the victim, participation in production, and propensity to engage in other abusive behaviors, this report provides insight into how offenders exploit victims and technology to produce child pornography and the factors courts consider in fashioning sentences for these offenses.



## PROTECT Act of 2003

Congress increased the mandatory minimum term of imprisonment from 10 to 15 years for production of child pornography offenses under 18 U.S.C. § 2251. As a result, the Commission increased the base offense level at §2G2.1 from 27 to 32.



## 2012 *Child Pornography Report*

The 2012 *Child Pornography Report* analyzed offenders sentenced under the federal child pornography sentencing guidelines and their corresponding statutes to assess how these offenders were prosecuted, sentenced, and supervised following their reentry into the community.



## *Federal Sentencing of Child Pornography: Non-Production Offenses*

The non-production report provides data from fiscal year 2019 regarding the content of the offender's child pornography collection and nature of the offender's collecting behavior; the offender's degree of involvement with other offenders, particularly in an internet community devoted to child pornography and child sexual exploitation; and the offender's engagement in sexually abusive or exploitative conduct in addition to the child pornography offense.



## This Report

This report focuses on offenders sentenced for child pornography production offenses under §2G2.1 of the *Guidelines Manual* (Sexually Exploiting a Minor by Production of Sexually Explicit Visual or Printed Material; Custodian Permitting Minor to Engage in Sexually Explicit Conduct; Advertisement for Minors to Engage in Production).

# Key Findings



**1** **Although child pornography production cases comprise a small percentage of the overall federal caseload, the expansion of digital and mobile technology has contributed to a 422 percent increase in the number of production offenders sentenced over a 15-year period, from 98 offenders in fiscal year 2005 to 512 offenders in fiscal year 2019.**



**2** **Child pornography production offenders generally received lengthy sentences. In fiscal year 2019, production offenders received an average sentence of almost 23 years (275 months), ranging from one year to life imprisonment. Furthermore, over three-quarters (78.0%) were convicted under a statute carrying at least a 15-year mandatory minimum penalty. A majority of child pornography production offenders, however, received a variance below the applicable guideline range (57.2% of the 512 cases).**

4       *United States Sentencing Commission*



**3** A majority (56.6%) of child pornography production cases sentenced in fiscal year 2019 involved a single victim.  However, a substantial minority of cases (41.0%) involved more than one minor victim, ranging from two to 440 victims.



**4** The typical production offender maintains a position of trust over the victim and has physical access to the child during the production of child pornography.  Of the 512 child pornography production offenders sentenced in fiscal year 2019, 60.3 percent were related to or otherwise maintained a position of trust over the minor victim, whether through familial relationships or by virtue of the offender's role as a teacher or a coach, for example.



**5** **Due to technological advancements and the changing nature of production offenses, an increasing proportion of production offenders exploited victims remotely through use of the internet or mobile devices.  For example, over one-third (35.4%) of production offenders sentenced in fiscal year 2019 were internet strangers who met their victims through an online platform, more than double the proportion of offenders sentenced in fiscal year 2010 who met their victims online (14.3%).[5]**



**6** **Child pornography production offenders who were in closer proximity to their victims—those who communicated with them in person—victimized younger children compared to production offenders who communicated remotely.**

- *Among offenders who communicated with their victims in person, the youngest victim in the vast majority of cases was age 12 or younger (83.5%), which included infants or toddlers in nearly one-third of the cases (30.3%).*

- *Conversely, the youngest victim for nearly two-thirds (61.7%) of remote child pornography production offenders' victims were teenagers, who were more likely to have access to the internet, cell phones, or social media.*

Case 1:23-cr-00049-RMR    Document 52-1    filed 02/10/2024    USDC Colorado    pg

6      *United States Sentencing Commission*



**7** The vast majority of fiscal year 2019 child pornography production offenders (80.9%) were sentenced for an offense that involved sexual contact of a minor.



**8** Of the 512 child pornography production offenders sentenced in fiscal year 2019, 40 percent incapacitated, coerced, or enticed a victim, or misrepresented their identity to a victim to facilitate the offense.



**9** **Although the average sentence imposed was lengthy for child pornography production** offenders (275 months), courts imposed longer sentences (averaging over 300 months) on offenders who:

- *victimized infants or toddlers (average sentences of 364 months and 330 months, respectively);*

- *were parents of victims (340 months, on average);*

- *engaged in or facilitated the sexual contact of a minor during the offense (307 months, on average); or*

- *incapacitated victims (313 months, on average).*

*United States Sentencing Commission*

# Methodology

Figure 1.
District Court Documents Received by the Commission



**Charging Document**

**Statement of Reasons**

**Plea Agreement**

**Judgment and Commitment Order**

**Presentence Investigation Report**

To fulfill its statutory responsibilities, the Commission collects and analyzes data on federal sentences for every federal felony and Class A misdemeanor offense sentenced each year.[6]  Sentencing courts are statutorily required to submit five sentencing documents to the Commission within 30 days of entry of judgment in a criminal case: (1) the charging document, (2) the plea agreement, (3) the Presentence Report, (4) the Judgment and Commitment order, and (5) the Statement of Reasons form.  The Commission extracts and codes data from these documents for input into various databases.  For each case in its Offender Datafile, the Commission routinely collects sentencing data, offender demographics, statutory information, the complete range of court guideline application decisions, and departure and variance information.  This report uses data from the Commission's fiscal years 2005–2019 Offender Datafiles to provide information on child pornography production offenses.

Figure 2.
Federal Offenders Sentenced in Fiscal Year 2019



**FEDERAL OFFENDERS SENTENCED IN FY 2019**
**70,537**

**CHILD PORNOGRAPHY PRODUCTION OFFENDERS**
**512**



The Commission also undertook an extensive special coding project to collect and analyze data on child pornography production offenses and offender characteristics beyond the information regularly collected in the Offender Datafiles and reported in the Commission's annual *Sourcebook of Federal Sentencing Statistics*.  For this special coding project, the Commission analyzed cases in which offenders were sentenced under §2G2.1 in fiscal year 2019 under a *Guidelines Manual* effective November 1, 2004 or later, which totaled 512 cases for which there was sufficient sentencing documentation submitted to the Commission.  The resulting data provides a more complete picture of the offense conduct and offender characteristics.

The special coding project examined (1) the physical *proximity* and relationship between offenders and victims; (2) the offender's *participation* or involvement with minor victims during the production offense; and (3) the offender's *propensity* to engage in child pornography activity or child sexual abuse outside of the instant production offense.  These topics and additional information regarding the methodology are discussed in this report.

# Sentencing Framework

## Chapter

# 1

*United States Sentencing Commission*

# Statutory Scheme

| Production of Child Pornography under 18 U.S.C. § 2251 | | |
| --- | --- | --- |
| No prior sex offense conviction | Prior sex offense conviction | Two or more prior sex offense convictions |
| 15 to 30 years | 25 to 50 years | 35 years to life |

Congress has long expressed its concern for child pornography offenses, most recently in the Prosecutorial Remedies and Other Tools to end the Exploitation of Children Today ("PROTECT") Act of 2003, which established the existing statutory penalties for child pornography offenses.[7] This chapter summarizes the statutory and guideline sentencing scheme for child pornography production offenses.

Federal statutes prohibit a variety of acts related to the production, advertisement, distribution, transportation, importation, receipt, solicitation, and possession of child pornography in chapter 110 of title 18 of the United States Code.[8] Child pornography production offenses carry a mandatory minimum term of 15 years of imprisonment and a maximum term of 30 years.[9] If a child pornography production offender has a prior federal or state conviction for one qualifying sex offense, the penalty range increases to a mandatory minimum term of 25 years of imprisonment and a maximum term of 50 years.[10] Offenders convicted of production of child pornography with more than one prior federal or state conviction for a qualifying sex offense are subject to a statutory imprisonment range of 35 years to life.[11]

The PROTECT Act also created a mandatory minimum term of supervised release of five years and increased the maximum statutory term of supervised release from three years to a lifetime term of supervised release for all child pornography offenders.[12]

# Sentencing Guidelines

The sentencing guidelines for child pornography production offenses are found in Chapter Two, Part G, Subpart 2 (Sexual Exploitation of a Minor) of the *Guidelines Manual*. Section 2G2.1 provides a base offense level of 32 and contains six enhancements based on aggravating circumstances related to: (1) the age of the victim(s) involved;[13] (2) whether the offense involved the commission of a sexual act or sexual contact;[14] (3) whether the defendant knowingly engaged in distribution of child pornography;[15] (4) whether the offense involved material that portrayed sadistic or masochistic conduct, depictions of violence, or an infant or toddler;[16] (5) whether the defendant was a parent, relative, or legal guardian of the minor involved in the offense, or the minor was otherwise in the custody, care, or supervisory control of the defendant;[17] and (6) whether the offense involved the knowing misrepresentation of a participant's identity or use of a computer to persuade or entice a minor to participate in sexually explicit conduct.[18]

Section 2G2.1 also provides that "[i]f the offense involved the exploitation of more than one minor," the court should apply the guidelines' multiple count rules in §§3D1.1 through 3D1.5 "as if the exploitation of each minor had been contained in a separate count of conviction," even if the indictment only contained a single production count.[19]  Thus, in a production case involving multiple victims, an offender's offense level could be increased to account for harm to additional victims, even if the offender is convicted only of a single count of production.[20]



Chapter Two, Part G, Subpart 2
of the *Guidelines Manual*
(Sexual Exploitation of a Minor)

### *Specific Offense Characteristics*

## §2G2.1(b)(1)
*Victim under age of 12 or under age of 16*

### 2- or 4-level increase

## §2G2.1(b)(2)
*Commission of a sex act or sexual contact*

### 2- or 4-level increase

## §2G2.1(b)(3)
*Distribution of child pornography*

### 2-level increase

## §2G2.1(b)(4)
*Sadistic or masochistic conduct
or an infant or toddler*

### 4-level increase

## §2G2.1(b)(5)
*Parent, Relative, Guardian, or Custody
of a Minor*

### 2-level increase

## §2G2.1(b)(6)
*Misrepresentation or Use of a Computer*

### 2-level increase

While most child pornography production offenders are referenced to §2G2.1 because of their statute of conviction, some are sentenced under §2G2.1 as a result of a cross reference from another guideline. For example, under §2G2.2, the non-production child pornography guideline, a defendant who produced (or attempted to produce) child pornography but who was convicted solely of a non-production offense (such as possession, receipt, or distribution) should be sentenced under §2G2.1 rather than under §2G2.2 if the former guideline yields a higher sentencing range than the latter guideline.[21]  In some cases, the statutory maximum punishment may be lower than the otherwise applicable guideline range, and thus, the statutory maximum becomes the guideline sentence.[22]

In addition to the §2G2.1 enhancements and recidivist statutory enhancements, the guidelines also provide for enhanced penalties for certain repeat sex offenders. The guideline at §4B1.5 (Repeat and Dangerous Sex Offender Against Minors) contains two enhancements for defendants convicted of producing child pornography who have at least one prior conviction for a specified sex offense or who "engaged in a pattern of activity involving prohibited sexual conduct."[23]  Section 4B1.5(a) applies if an offender has one or more prior convictions for a specified sex offense. If so, the child pornography production offender's minimum offense level becomes 34 for one conviction and 37 for two or more convictions. The offender's minimum Criminal History Category is V.[24]  If §4B1.5(a) does not apply, but the offender engaged in conduct constituting a "pattern of activity," §4B1.5(b) provides a 5-level enhancement to the offense level determined at §2G2.1.[25]

As noted above, the PROTECT Act increased the statutory maximum term of supervised release to lifetime supervision for all child pornography offenders. The supervised release guidelines recommend a lifetime term of supervised release for all child pornography offenders.[26]

Case 1:23-cr-00419-RMR   Document 52-1   filed 02/10/25   USDC Colorado   pg 97 of 229

# Data Overview

## Chapter

# 2

# Introduction

**This chapter provides data analyses of offenders sentenced under the child pornography production guideline at §2G2.1, focusing on offender and offense characteristics.**

*The analyses in this section include data from fiscal years 2005 to 2019 for offenders sentenced under a* Guidelines Manual *effective November 1, 2004 or later and for which the Commission had complete guideline application information. The Commission used fiscal year 2005 as the earliest point of analysis to evaluate a 15-year period after the PROTECT Act and its impact on statutory penalties and the guidelines.*

Figure 3.
Most Serious Offense of Conviction
for §2G2.1 Offenders
*Fiscal Year 2019*[27]



Figure 4.
Mandatory Minimum Sentences
for §2G2.1 Offenders
*Fiscal Year 2019*



**Fiscal Year 2019 Snapshot**

Child pornography production offenders represented a small percentage of the overall federal caseload in fiscal year 2019. Of the 70,537 federal offenders sentenced in fiscal year 2019 with complete case documentation sent to the Commission, 0.7 percent (512 offenders) were sentenced under §2G2.1 as their primary guideline.[28] Of the 512 offenders sentenced under §2G2.1 in fiscal year 2019, 77.2 percent were convicted of a child pornography production offense. The remaining offenders were convicted of another offense but were sentenced under §2G2.1 as the primary guideline via a cross reference

because the offense involved production conduct: 12.5 percent were convicted of a non-production child pornography offense (possession, receipt, or distribution); 8.8 percent were convicted of travel or enticement of a minor offense; and 1.2 percent were convicted of an offense related to child prostitution (Figure 3).[29]

Of the 512 child pornography production offenders sentenced in fiscal year 2019, 72.3 percent were convicted of an offense carrying a 15-year mandatory minimum penalty (Figure 4). An additional 5.7 percent faced a mandatory minimum penalty greater than 15 years because they were convicted of a child pornography

Figure 5. Trend in Number of Child Pornography Cases
*Fiscal Years 2005 – 2019*



production offense and had one or more prior convictions for a qualifying sex offense. Eighteen percent (18.0%) were convicted of a crime that carries either a five or ten-year mandatory minimum sentence. Notably, the remaining 4.1 percent of offenders were not convicted of an offense that carries a mandatory minimum penalty (*e.g.*, possession of child pornography), but the court applied a cross-reference to §2G2.1 because the offense involved production of child pornography.

### Trends from Fiscal Years 2005 – 2019

The number of federal child pornography production offenses has increased over time. In large part, this increase can be attributed to technological advancements that provide offenders easier access to victims as well as the prevalence of smartphones with built-in cameras and expansive storage.[30]

As depicted in Figure 5, the number of child pornography production offenders sentenced under §2G2.1 has increased steadily from 98 offenders in fiscal year 2005 to its peak in fiscal year 2019 with 512 offenders, which represents a 422 percent increase over 15 years. Conversely, the number of non-production offenders sentenced under §2G2.2 has steadily decreased between 2012 and 2019.[31] As a result of these opposing trends, the overall number of child pornography offenses (production and non-production offenses combined) has remained relatively static since its high in 2012.

## Offender Demographics
## §2G2.1 Offenders Compared To All Other Offenders
### *Fiscal Year 2019*

 **75.2%**

### White
Most child pornography production offenders were White (75.2%). This contrasts with all other federal offenders, who were 19.9 percent White.

 **95.5%**

### U.S. Citizen
Nearly all child pornography production offenders were U.S. citizens. Other federal offenders were 56.3 percent U.S. citizens.

 **94.3%**

### Male
The overwhelming majority were male (94.3%). This contrasts with all other federal offenders, who were 87.8 percent male.

**38**

### Average Age
The average age was 38 years old, while the average age of all other federal offenders was 37 years old.

**48.4%**

### College Educated
Nearly half of child pornography production offenders attended college, compared with just over one-fifth of all other offenders.

## Criminal History Category

**CHC I**



**70.3%**
**44.2%**

More than 70 percent of child pornography production offenders were assigned to CHC I, the lowest category.

By contrast, fewer than half (44.2%) of all other federal offenders were assigned to CHC I.



II — 8.6% / 14.7%
III — 8.6% / 16.6%
IV — 2.5% / 9.7%
V — 5.5% / 5.8%
VI — 4.5% / 9.1%

## Offender and Offense Characteristics

Child pornography production offenders sentenced under §2G2.1 differ from the general federal offender population with respect to demographic factors and criminal history. Child pornography production offenders tend to be racially homogenous, have higher levels of education, and have limited or no prior criminal histories. Most fiscal year 2019 child pornography production offenders were White (75.2%) and nearly all were U.S. citizens (95.5%) and male (94.3%). This contrasts with all other federal offenders who were 19.9 percent White, 56.3 percent U.S. citizens, and 87.8 percent male.

The average age of child pornography production offenders sentenced in fiscal year 2019 was 38 years old, only one year older than the average age of all other federal offenders sentenced in fiscal year 2019. Child pornography production offenders generally attained a higher degree of education than all other offenders, with just under half (48.4%) of production offenders having attended college compared to approximately one-fifth (21.1%) of all other offenders.

Finally, child pornography production offenders have less extensive criminal histories compared to other federal offenders. In fiscal year 2019, 70.3 percent of child pornography production offenders were assigned to Criminal History Category I (the lowest category, requiring no more than one criminal history point). By contrast, 44.2 percent of all other federal offenders were assigned to Criminal History Category I. To add further context, a majority (60.7%) of child pornography production offenders had zero criminal history points compared to one-third (33.4%) of all other offenders sentenced in fiscal year 2019.

## Chapter Four Enhancements for Repeat and Dangerous Sex Offenders

Despite having less extensive criminal records than other federal offenders, the application of sentencing enhancements under §4B1.5 (Repeat and Dangerous Sex Offender Against Minors) for child pornography production offenders has more than doubled since fiscal year 2010. This increase is driven almost entirely by the application of enhanced sentences for an offender's pattern of activity under §4B1.5(b) (which does not require a prior conviction to apply).[32] More than half (51.6%) of the child pornography production offenders sentenced in fiscal year 2019 received enhanced sentences under §4B1.5(b) for engaging in a pattern of activity involving prohibited sexual conduct, compared to less than one-quarter (22.9%) of child pornography production offenders sentenced in fiscal year 2010.[33] In fiscal year 2019, 5.1 percent of child pornography production offenders received enhanced sentences under §4B1.5(a) for a prior sex offense conviction, which is comparable to the 4.2 percent of offenders who received this enhancement in fiscal year 2010 (Figure 6).

Figure 6. Application of §4B1.5 for §2G2.1 Offenders
*Fiscal Year 2019*



No Enhancement 43.4%

§4B1.5(b) 51.6%

§4B1.5(a) 5.1%

The application of the repeat and dangerous sex offender enhancement under §4B1.5 has more than doubled since fiscal year 2010.



**Specific Offense Characteristics Applied to §2G2.1 Offenders**
*Fiscal Year 2010 and Fiscal Year 2019*

# Sentencing Characteristics

**Specific Offense Characteristics Applied to §2G2.1 Offenders**

Reflecting the changing nature of child pornography production offenses, the frequency with which the §2G2.1 specific offense characteristics apply today differs from the application rates a decade earlier. Two of the six enhancements under §2G2.1(b)—the age of the minor victim and commission of a sex act or sexual contact—continue to apply in the majority of child pornography production cases.[34] However, because the crime now is committed more often over the internet, fewer offenders received an enhancement for being a caregiver of the minor victim in the offense in fiscal year 2019 (47.5%) compared to fiscal year 2010 (62.0%). Far more offenders in fiscal year 2019 received the enhancement for misrepresentation of their identity or use of a computer to persuade a minor victim compared to offenders sentenced in fiscal year 2010 (45.7% and 19.5%, respectively). Additionally, one-third (33.0%) of production offenders sentenced in fiscal year 2019 received an enhancement for knowingly distributing child pornography, compared to roughly one-quarter (24.5%) of production offenders sentenced in fiscal year 2010.

**Sentence Length**

In fiscal year 2019, all child pornography production offenders were sentenced to a term of imprisonment. Sentences ranged from one year to life, with an average sentence of 275 months.[35] More than three-quarters (78.0%) of fiscal year 2019 child pornography production offenders were convicted under a statute that carries at least a 15-year mandatory minimum penalty.

Figure 7. Average Guideline Minimum and Average Sentence for §2G2.1 Offenders
*Fiscal Years 2005 – 2019*



## Trends in Average Guideline Minimum and Average Sentence Imposed from Fiscal Years 2005 – 2019[36]

Since the passage of the PROTECT Act, the bottom of the average §2G2.1 guideline range—that is, the average guideline minimum—for child pornography production offenses has increased.  At the same time, the average sentence imposed has remained relatively stable, which has created an increasing divide between the average guideline minimum and average sentence imposed.  Courts continue to impose lengthy sentences, but also increasingly apply downward variances in response to the higher guideline ranges that apply to the typical child pornography production offender.

The average guideline minimum for child pornography production offenders has increased steadily over time, from an average of 273 months in fiscal year 2005 to an average of 332 months in fiscal year 2019 (Figure 7).  During that same time, the average sentence has decreased slightly from an average sentence of 281 months in fiscal year 2005 to an average sentence of 275 months in fiscal year 2019.  Although the difference between the average guideline minimum and average sentence imposed has widened over time, the long-term trend shows that courts consistently sentence child pornography production offenders to lengthy sentences, ranging from an average of 258 months to 288 months over the 15-year period.

# Sentences Imposed Relative to the Guideline Range

## Fiscal Year 2019 Snapshot

Despite the lengthy average sentence (275 months), most child pornography production offenders sentenced under §2G2.1 were sentenced below the guideline range in fiscal year 2019.  Less than one-third (30.7%) of child pornography production offenders sentenced under §2G2.1 received a sentence within the guideline range in fiscal year 2019 (Figure 8).

The majority of child pornography production offenders sentenced under §2G2.1 (57.2%) received a variance below the guideline range under 18 U.S.C. § 3553(a).[37]  More than one-third (36.1%) of offenders received a non-government sponsored variance below the guideline range, compared to roughly one-fifth (21.1%) that were government-sponsored.  Relatively few child pornography production offenders (1.2%) received a variance above the guideline range.

Of the 512 child pornography production offenders sentenced in fiscal year 2019, 10.6 percent received a departure below the guideline range that was either a government-sponsored departure (5.9%),[38] substantial assistance departure (3.1%),[39] or court-sponsored downward departure (1.6%).  Few offenders (0.4%) received a departure above the applicable guideline range.

## Trends from Fiscal Years 2005 – 2019

The percentage of child pornography production offenders sentenced below the guideline range has changed over time (Figure 9, next page).  The rate of within-range sentences for offenders sentenced under §2G2.1 has decreased steadily since fiscal year 2005, from 83.3 percent to 30.7 percent in fiscal year 2019.  This change is driven largely by an increase in the rate of downward variances during that time, from 16.7 percent in fiscal year 2005 to a peak of 57.2 percent in fiscal year 2019.  The rate of substantial assistance departures, other downward departures, and upward departures or variances has remained relatively steady over time.

Figure 8. Sentence Imposed Relative to the Guideline Range for §2G2.1 Offenders *Fiscal Year 2019*



Figure 9. Sentence Imposed Relative to the Guideline Range for §2G2.1 Offenders
*Fiscal Years 2005 – 2019*



# Proximity, Propensity, and Participation

**Chapter**

# 3

# Introduction

This chapter examines child pornography production offender behavior and offense characteristics.  The Commission coded information from the 512 child pornography production cases sentenced in fiscal year 2019 to analyze victim characteristics and three factors relevant to sentencing child pornography production offenders: (1) proximity, a measure of the offender's physical location and relationship with the victim; (2) participation, a measure of the offender's interaction with the victim(s); and (3) propensity, a measure of the offender's tendency to engage in child pornography conduct or exploitation outside of the instant production offense.  Using charging documents, plea agreements, and presentence reports, the Commission also coded information about victim characteristics that inform the discussion of these three factors.



### Proximity

Following an overview of victim characteristics, this section of the report discusses five factors related to the child pornography production offender's **proximity** to the victim: the offender's physical location and personal relationship with the victim, how the offender communicated with the victim, whether the offender traveled to meet the victim, and the association between physical proximity and age of victims.



### Participation

The second section of this chapter examines fiscal year 2019 child pornography production offenders' **participation** in the offense to gain a broader understanding of how offenders interacted with victims during the production offense.



### Propensity

The third section analyzes the child pornography production offenders' **propensity** to engage in child pornography conduct or sexual exploitation outside of the production offense to provide additional insight into the different types of production offenders.

Figure 10. Number of Victims in Child Pornography Production Offenses
*Fiscal Year 2019*



## Number of Victims

The number of child pornography production victims involved in a single offense in fiscal year 2019 ranged from one to 440.[40] A majority (56.6%; n=290) of child pornography production cases involved a single victim. However, a substantial minority (41.0%; n=210) had more than one minor victim (Figure 10).

28    *United States Sentencing Commission*

Figure 11. Age of Youngest Victim in Child Pornography Production Offenses
*Fiscal Year 2019*



## Age of Victims

In fiscal year 2019 child pornography production cases, the average age of the youngest minor victim was ten years old. In over 60 percent (61.3%) of production cases, the youngest victim was age 12 or younger, with 16.8 percent of cases involving an infant or toddler (Figure 11).[41] In 38.7 percent of the child pornography production cases, the youngest victim was a teenager (13 to 17 years old).

## Gender of Victims

Female victims were more prevalent than male victims in child pornography production offenses (Figure 12). In fiscal year 2019, three-quarters of the child pornography production cases involved only female victims (75.6%); approximately 17 percent (17.3%) involved male victims only; and the remaining 7.1 percent of the offenses involved both male and female victims.

Figure 12. Gender of Victims in Child Pornography Production Offenses
*Fiscal Year 2019*





# Proximity

Child pornography production offenders' offense conduct and the degree of harm to the victim varies based on the offender's physical proximity and personal relationship with the victim. A majority of child pornography production offenders maintained a position of trust over their victims, whether through familial relationships or by virtue of the offender's role as a teacher or a coach, for example. However, given advancements in technology and social media use by both offenders and minors, close physical proximity is no longer necessary for offenders to produce child pornography. An increasing number of offenders exploited victims remotely through the internet or the use of mobile technology to produce child pornography. Nevertheless, offenders who appeared to have the closest proximity and

communicated with their victims in person generally committed the production offense with the youngest victims. And offenders in close physical proximity to the victim(s) also had sexual contact with the victim(s) in most cases.

This section of the report discusses five factors related to the child pornography production offender's proximity to the victim: (1) the offender's physical location during the offense; (2) the offender's personal relationship with the victim (*e.g.*, parent, relative, family friend, internet stranger); (3) the means by which the offender communicated with the victim for the purposes of producing child pornography; (4) whether the offender traveled to meet a victim; and (5) the association between physical proximity and the age of the victims.

**Physical Proximity**

Approximately 60 percent (n=311) of the 512 offenders in fiscal year 2019 produced child pornography in the same location as the victim, and nearly 40 percent (n=201) of the offenders committed the offense from a remote location.

Figure 13. Offender's Physical Location During the Offense
*Fiscal Year 2019*



30    *United States Sentencing Commission*

Table 1. Relationships of §2G2.1
Offenders to Victim
*Fiscal Year 2019*

| Relationship to the Victim | All Cases | |
|---|---|---|
| | *N* | *%* |
| **Total §2G2.1 Offenders** | 512 | 100.0% |
| *Relative / Position of Trust* | *307* | *60.3%* |
| *Parent* | *93* | *18.2%* |
| *Stepparent/Legal Guardian* | *33* | *6.4%* |
| *Other Relative* | *64* | *12.5%* |
| *Parent's Intimate Partner* | *40* | *7.8%* |
| *Family Friend* | *87* | *17.0%* |
| *Teacher, Coach, etc.* | *37* | *7.2%* |
| *Internet Stranger* | *181* | *35.4%* |
| *Other Stranger* | *39* | *7.6%* |
| *Unknown* | *23* | *4.5%* |

**Relationship of the Offender to the Victim**

As reflected in Table 1, a majority (60.3%) of child pornography production offenders were related to or otherwise maintained a position of trust over a minor victim, as a family member or other close relationship.  Nevertheless, due to technological advancements and the changing nature of production offenses, the largest individual category of child pornography production offenders were internet strangers who met their victims through an online or remote platform (35.4%).  Comparatively, only 14.3 percent of offenders in fiscal year 2010 were internet strangers who met their victims online.[42]

An offender with multiple victims may fall into more than one category (*e.g.*, an offender is the parent of one victim and the teacher of another victim).  Therefore, the cumulative number in Table 1 exceeds the 512 offenders.

Biological parents (18.2%) and stepparents or legal guardians (6.4%) of a minor victim make up roughly a quarter of child pornography production offenders sentenced in fiscal year 2019.  Approximately 20 percent of child pornography production offenders were



Figure 14. Offender Lived with Victim
*Fiscal Year 2019*

either non-parental relatives (12.5%) or a minor victim's parent's intimate partner (7.8%).  Just under one-quarter of the offenders were either a family friend of a victim (17.0%) or maintained another position of trust, for example, as a teacher or coach (7.2%).

Although a majority of child pornography production offenders maintained some position of trust over their victim(s), most (61.9%) did not live in the same household with their minor victim(s) (Figure 14).  Nearly one-third (32.2%) of child pornography production offenders lived in the same household with a victim full-time, while 5.9 percent of offenders lived with a victim at least part-time.

**Methods of Communication with the Victim to Facilitate Offense**

Child pornography production offenders communicated with victims through various methods to induce them to participate in the offense.  Furthermore, some offenders who had more than one victim used multiple methods (*e.g.*, an offender communicated with one victim in person and contacted another victim remotely, or an offender communicated with one victim in person and surreptitiously recorded a separate victim) (see Figure 15, next page).  Approximately half of fiscal year 2019 child pornography production offenders

Figure 15. Methods of Communication with Minor Victims
*Fiscal Year 2019*



communicated with a victim in person (50.4%) and slightly less than half (44.0%) of the offenders communicated with a victim remotely (*e.g.*, via computer or interactive mobile device) to effectuate the offense. Notably, 19.3 percent of offenders surreptitiously recorded a victim to produce child pornography, and thus did not communicate with that victim either in person or remotely.

The type of remote methods child pornography production offenders used to communicate with victims also varied (Table 2). Slightly more than one quarter (26.6%) of child pornography production offenders used interpersonal communication methods, such as text, email, or instant messaging, to persuade a victim to participate in the child pornography production offense. Approximately one-third (32.8%) of offenders used one or more online or virtual means of communication to contact a victim, including social media platforms (24.8%), live streaming (10.0%), online video games (2.3%), and other websites (2.0%).

Table 2. Methods §2G2.1 Offenders Used to Communicate with Victims
*Fiscal Year 2019*

| Methods of Communication | N | % |
|---|---|---|
| **Total §2G2.1 Offenders** | **512** | **100%** |
| *In Person* | *258* | *50.4%* |
| *Phone Call* | *13* | *2.5%* |
| *Text/Email/IM* | *136* | *26.6%* |
| *Social Media Platform* | *127* | *24.8%* |
| *Video Game* | *12* | *2.3%* |
| *Website* | *10* | *2.0%* |
| *Live Streaming* | *51* | *10.0%* |
| *No Contact/Surreptitious Production* | *99* | *19.3%* |

*United States Sentencing Commission*

Figure 16. Travel with Intent to Engage in Sexual
Contact with a Victim
*Fiscal Year 2019*



### Travel to Meet a Victim

Of the 512 child pornography production offenders, 11.9 percent (n=61) traveled to meet a victim of the offense, most commonly after contacting the victim remotely (*e.g.*, after chatting on the internet) (Figure 16).  In a few instances, the offender initially contacted the victim in person, for example, at a family function, and then traveled to meet the victim of the offense at a later date.  Most of the 61 offenders (80.3%; n=49) who traveled to meet a victim had sexual contact with the minor.

Figure 17.  Age of Victim by Method of §2G2.1 Offender Contact (Remote or In Person)
*Fiscal Year 2019*



## Proximity of Offender and Age of the Victims

Child pornography production offenders who had closer proximity to their victims—those who communicated with them in person—victimized younger children compared to production offenders who communicated remotely (Figure 17).  Among offenders who initiated communication with their victims in person, the youngest victims for nearly one-third (30.3%) of offenders were infants or toddlers, and slightly more than half (53.2%) were prepubescent (age 4 to 12).[43]  Teenagers were the youngest victims in 16.5 percent of the cases in which offenders initially communicated with victims in person.

Conversely, the youngest victims for nearly two-thirds (61.7%) of offenders who communicated with victims remotely were teenagers, who were more likely to have access to the internet, cell phones, or social media.  The youngest victims for more than one-third of offenders who communicated with victims remotely were prepubescent (36.5%).[44]

34        *United States Sentencing Commission*

# Participation

This section of the report examines fiscal year 2019 child pornography production offender participation in the offense to gain a broader understanding of how offenders interacted with victims during the production offense. The Commission analyzed four measures of participation: (1) the method of production used by the offender; (2) whether the offender committed the offense with a co-participant; (3) any sexual contact with the victim during production; and (4) any incapacitation, coercion, enticement, or misrepresentation used against the victim.

Child pornography production offenders exploit technology to gain access to potential victims to produce child pornography. Today, offenders predominantly use easily accessible technologies such as cell phones and web cameras to produce child pornography. Some victims self-produce images or videos. In such instances, some offenders use coercive tactics to effectuate the offense by harassing or threatening victims. Other offenders misrepresent their identity or engage in online dialogue to entice victims.

## Method of Production

Nearly half (47.1%) of all production offenders sentenced in fiscal year 2019 used a smartphone or tablet to create a child pornography image or video, highlighting the ease with which offenders can create new content using readily available technology (Table 3). A substantial minority of offenders (36.5%) had victims create content at their request. In 11.9 percent of the cases in fiscal year 2019, the offenders used a live-streaming platform or web camera to produce child pornography. Because some offenders produced child pornography in more than one way, the percentages in Table 3 exceed 100.

Table 3. Method of Production Used by §2G2.1 Offenders
*Fiscal Year 2019*

| Method of Production | N | % |
|---|---|---|
| **Total §2G2.1 Offenders** | **512** | **100.0%** |
| *Smartphone or Tablet* | *241* | *47.1%* |
| *Victim Produced* | *187* | *36.5%* |
| *Other Camera* | *66* | *12.9%* |
| *Live Stream or Webcam* | *61* | *11.9%* |
| *Other* | *11* | *2.2%* |
| *Unknown Method or Attempted Production* | *55* | *10.7%* |

Case Case 1:23-cr-00449-RMR DocDocument 52-3-1 filFiled 02/10/2624 USPageeColo1 of 472 pg
117 of 229



Figure 18. Co-Participants for §2G2.1 Offenders
*Fiscal Year 2019*



## Offender and Co-Participant Conduct

In fiscal year 2019, most child pornography production offenders (83.8%) committed the offense alone, but 16.2 percent of offenders committed the offense with an adult co-participant (Figure 18).  Nearly as many offenders committed the offense with an adult co-participant in the same location (7.4%) as remotely (8.6%).  Although there were relatively few female child pornography production offenders (5.7%; n=29), female production offenders were far more likely to commit the offense with a co-participant compared to male production offenders (75.9% of female offenders compared to only 12.6% of male offenders).

## Sexual Contact During the Offense

The Commission found that the majority of child pornography production cases (80.9%) in fiscal year 2019 involved sexual contact. Most commonly, child pornography production offenses in fiscal year 2019 involved the offender sexually contacting a victim (51.2%; n=262) (Table 4).  In an additional 4.5 percent of the cases, an adult co-participant sexually contacted the victim.  A quarter of child pornography production offenses (25.2%; n=129) involved the victim(s) engaging in sexual contact alone or with another victim.

Table 4. Sexual Contact During Production Offense
*Fiscal Year 2019*

| Sexual Contact During Production | N | % |
|---|---|---|
| Total §2G2.1 Offenders | 512 | 100.0% |
| Offenses Involving Sexual Contact | 414 | 80.9% |
| *Offender sexually contacted a victim* | *262* | *51.2%* |
| *Co-participant sexually contacted a victim* | *23* | *4.5%* |
| *Victim(s) engaged in sexual contact* | *129* | *25.2%* |
| No sexual contact of a victim | 98 | 19.1% |

Case 1:23-cr-00419-RMR   Document 53-1   filed 02/10/25   USDC Colorado   pg
118 of 229

Figure 19. Sexual Contact and Offender Present
§2G2.1 Offenders - *Fiscal Year 2019*



■ Offender sexually contacted victim                    ■ Co-participant sexually contacted victim
■ Victim sexually contacted himself/herself or another victim          ■ No sexual contact

## Proximity and Sexual Contact

This section of the report examines the rate and type of sexual contact when an offender committed the offense in the same location as the victim and when the offender committed the offense remotely. As discussed previously, in fiscal year 2019, of the 512 offenders, approximately 60 percent (n=311) produced child pornography in the same location as the victim, and nearly 40 percent (n=201) of the offenders committed the offense from a remote location.[45]

### Offender Present in the Same Location

When the offender committed the offense in the same location as the victim, the offense involved sexual contact in the vast majority of cases (89.1% of the 311 cases). Most commonly, the offender sexually contacted the victim (84.2%). Less frequently, when the offender was in the same location as the victim, a co-participant sexually contacted the victim (2.3%), or a victim engaged in sexual contact alone or with another victim (2.6%). Finally, there was no sexual contact in 10.9 percent of cases when the offender committed the offense in the same location as the victim.

### Offender in Remote Location

When the offender committed the production offense from a remote location (*e.g.*, via the internet or video chat), most cases also involved physical sexual contact, albeit less frequently than when the offender was present (68.2% of 201 cases) (Figure 19). Furthermore, the nature of the sexual contact differed. In 60.2 percent of the 201 cases where the offender committed the offense remotely, the victim engaged in sexual contact alone or with another victim. In 8.0 percent of the cases when the offender committed the offense from a remote location, a co-participant sexually contacted the victim. Finally, in nearly one-third of the 201 cases when the offender was not present, there was no sexual contact (31.8%).

Figure 20. Incapacitation, Coercion, Enticement, or Misreprentation by §2G2.1 Offenders
*Fiscal Year 2019*



## Incapacitation, Coercion, Misrepresentation, and Enticement

The Commission identified aggravating means offenders used to manipulate a victim to participate in the production of child pornography. Forty percent of the 512 child pornography production offenders sentenced in fiscal year 2019 incapacitated, coerced, or enticed a minor victim, or misrepresented their identity to facilitate the child pornography production offense. This section of the report analyzes the various aggravating means offenders used to induce victims to participate in producing child pornography.

## Incapacitation

Among child pornography production offenders sentenced in fiscal year 2019, roughly five percent (4.5%) used drugs or alcohol to render the minor victim unconscious, docile, or cooperative prior to the production conduct (Figure 21).

Figure 21. Incapacitation of a Minor Victim by §2G2.1 Offenders
*Fiscal Year 2019*



*United States Sentencing Commission*

Figure 22. Coercion Used by §2G2.1 Offenders
*Fiscal Year 2019*



| | |
|---|---|
| Violence Used | 3.5% |
| Violence Threatened | 6.8% |
| Sextortion | 8.4% |
| Bullying | 1.6% |
| Other Pressure | 7.8% |

## Coercion

The Commission also examined whether the offender used any coercion—violence, threats, bullying, or other pressure—to induce the minor victim to participate in the child pornography offense.  In fiscal year 2019, one-in-five (20.1%; n=103) child pornography production offenders coerced a minor victim in some fashion to participate in the offense (Figure 22).  Of the offenders who engaged in coercive behaviors, roughly two-thirds used only one coercive approach (64.1%; n=66); more than one-third (35.9%; n=37) used more than one of these coercive tactics against a minor victim.

The most commonly used type of coercion is known as "sextortion."  It involves coercing a minor by using, or threatening to use, images or videos previously obtained to demand that the minor engage in a sexual act with the offender or to demand additional images or videos that are sexual in nature.  Sextortion can take many forms, including making threats to harm family or friends unless the victim complies with demands, hacking to gain access or control of the computer's webcam to obtain images and videos, or leading the victim to believe the perpetrator can be trusted.[46]  In fiscal year 2019, roughly eight percent (8.4%) of offenders engaged in sextortion by threatening to share or actually sharing images of the minor child with their peers, family members, friends, and even their teachers.

Approximately ten percent of child pornography production offenders either used violence (3.5%) or threatened violence (6.8%) against a minor.  Fewer offenders (1.6%) engaged in another form of bullying to coerce a minor victim.[47]  Additionally, 7.8 percent of the offenders used other forms of pressure against a minor victim, such as threatening to take away television privileges, to secure the child's cooperation with the offender's demands.

Case Case 1:23-cr-00049-RMR Document 52-1 Filed 02/10/26 USDC Colorado pg
121 of 229



Figure 23. Offender Misrepresentation of Identity
*Fiscal Year 2019*

## Misrepresentation

The increased use of the internet and remote technologies allows offenders to contact their victims on platforms where they can easily disguise their real identities.  In fiscal year 2019, approximately one-fifth (19.3%) of child pornography production offenders misrepresented their identity in some manner to lure victims into participating in the production offense (Figure 23).  Offenders misrepresented their age (7.2%), gender (2.2%), both their age and gender (4.9%), or another aspect of their identity (5.1%).  Among production offenders who otherwise misrepresented their identity, they represented themselves as talent scouts, photographers, modeling agents, or employers. Most child pornography production offenders who misrepresented their identity initially met their victim remotely (*e.g.*, via the internet).

## Enticement

Child pornography production offenders used various forms of enticement to induce victims to participate in the offense.  Of the 512 child pornography production offenders sentenced in fiscal year 2019, 15.4 percent offered minor victims enticements in the form of drugs, alcohol, gifts, or other incentives to encourage them to participate in the production of child pornography (Figure 24). Gifts or incentives (11.9%) were the most common enticements and included items such as smartphones, phone cards, and in-app purchases in an online game—items which helped facilitate both the offender's communication with the minor victim and the production of child pornography.  Fewer offenders used drugs or alcohol (2.5%) or both gifts and drugs and alcohol (1.0%) as an enticement.

Figure 24. Enticement Used by §2G2.1 Offenders
*Fiscal Year 2019*



40      *United States Sentencing Commission*



# Propensity

The Commission analyzed the child pornography production offenders' propensity to engage in child pornography conduct or sexual exploitation outside of the production offense to provide additional insight into the different types of production offenders.[48]  In this section of the report, the Commission examines four measures of an offender's propensity: (1) whether an offender shared self-produced child pornography, or possessed or distributed additional child pornography that the offender did not produce; (2) whether an offender was a member of an online community devoted to child pornography or sexual exploitation; (3) whether an offender had any previous contact sex offenses (any illegal sexually abusive conduct involving actual or attempted sexual contact with a victim); and (4) whether an offender had a history of non-contact sex offenses (such as soliciting a minor online).

## Propensity to Engage in Child Pornography or Exploitive Conduct

Most child pornography production offenders not only produced child pornography, but also engaged in additional child pornography conduct or sexual exploitation.  Two-thirds (68.4%) of production offenders sentenced in fiscal year 2019 either distributed the pornography they produced, possessed or distributed child pornography that they did not produce, or otherwise participated in an online community devoted to child pornography or sexual exploitation. Some offenders engaged in more than one additional child pornography behavior (*e.g.*, an offender distributed child pornography and separately participated in a community devoted to sexual exploitation), therefore, the sub-categories of offenders in Figure 25 discussed below exceed 68.4 percent.

Figure 25. Engagement in Additional Child Pornography Conduct or Sexual Exploitation by §2G2.1 Offenders
*Fiscal Year 2019*



Case Case 1:23-cr-00419-RMR Document 53-1 Filed 02/10/24 USDC Colorado pg
123 of 229

Slightly more than 30 percent (31.6%) of offenders distributed the videos or images they produced, most commonly using direct personal communication methods, such as instant messaging or texting. Additionally, more than half (54.7%) of production offenders possessed child pornography that they did not produce, and almost one-quarter (22.9%) distributed child pornography that they did not produce. More than one-third (36.3%) of child pornography production offenders were members of online child pornography communities specifically dedicated to discussing child exploitative content or abuse.

**Propensity to Engage in Child Sexual Abuse**

The Commission also examined whether the offenders committed contact or non-contact sex offenses in addition to the production offense as a measure of the child pornography offenders' propensity to sexually abuse victims. The Commission analyzed presentence reports and plea agreements to determine whether the instant offense involved sexually abusive conduct (in addition to the production offense), whether pretrial release was revoked for a sex offense or subsequent child pornography offense, and whether there was a criminal history of arrests or convictions for prior sexually abusive conduct or allegations of such conduct. Additionally, the Commission reviewed the Personal History section of the presentence reports, which often described other allegations or admissions by the offender of engaging in aggravating sexual conduct.

First, the Commission analyzed the rate at which offenders committed a contact sex offense. In nearly 40 percent (37.5%) of child pornography production cases sentenced in fiscal year 2019, the offender had engaged in a contact sex offense against a minor (Table 5). More than one-in-ten (10.9%) had a prior conviction for a contact sex offense against a child. Similar proportions of fiscal year 2019 child pornography production offenders were arrested for (11.5%), admitted to (10.0%), or were alleged (11.7%) to have committed a contact sex offense against a minor.[49] Relatively few child pornography production offenders (1.0%) had a prior conviction for a contact sex offense against an adult.

Table 5. Sexual Conduct by §2G2.1 Offenders
*Fiscal Year 2019*

| Sexual Conduct | N = 512 | % of 512 |
|---|---|---|
| **Contact Sex Offenses Against a Minor** | 192 | 37.5% |
| *Conviction* | *56* | *10.9%* |
| *Arrest* | *59* | *11.5%* |
| *Admission* | *51* | *10.0%* |
| *Allegation* | *60* | *11.7%* |
| *Revocation* | *1* | *0.2%* |
| **Non-Contact Sex Offense Conviction** | 22 | 4.3% |
| **Prior Non-Production Child Pornography Conviction** | 25 | 4.9% |
| **Conviction for Contact Sex Offense Against an Adult** | 5 | 1.0% |

*United States Sentencing Commission*

Table 6. Non-Contact Sexual Conduct by §2G2.1 Offenders

| Sexual Conduct | N = 512 | % of 512 |
|---|---|---|
| Non-Contact Sex Offenses Against a Minor | 235 | 45.9% |
| Solicitation of a Minor for Images | 88 | 17.2% |
| Solicitation of a Minor for Sex | 72 | 14.1% |
| Sent Pornography to Minors | 164 | 32.0% |
| Other Non-Contact Sex Offenses | 53 | 10.4% |

Next, the Commission analyzed whether the child pornography production offenders had prior convictions for non-contact sex offenses. Of the 512 child pornography production offenders sentenced in fiscal year 2019, nearly five percent (4.9%) had a prior conviction for a non-production child pornography offense (possession, receipt, or distribution). Roughly four percent (4.3%) of child pornography production offenders had a prior conviction for a non-contact sex offense, such as indecent exposure (Table 5, previous page).

Finally, the Commission analyzed the sentencing documents to identify whether the child pornography production offenders engaged in other sexually abusive or exploitative conduct, irrespective of an arrest or prosecution. Nearly half (45.9%) of all child pornography production offenders sentenced in fiscal year 2019 engaged in sexually abusive or exploitative conduct in addition to the production offense (Table 6). Approximately one-third (32.0%) of child pornography production offenders sent pornography to a minor, 17.2 percent solicited a minor for pornographic images (unrelated to the production offense), and 14.1 percent solicited a minor for sexual contact.[50] Approximately ten percent (10.4%) of child pornography production offenders sentenced in fiscal year 2019 also committed some other non-contact sex offense, such as indecent exposure.

Case No. 1:23-cr-00419-RMR   Document 52-1   Filed 02/10/2524   USDC Colorado   pg

# Sentencing Outcomes

## Chapter



44     United States Sentencing Commission

# Sentencing Outcomes

| Child pornography production offenders received lengthy sentences in fiscal year 2019, 275 months on average.  The Commission found that proximity, participation, and propensity of child pornography production offenders appear to be key factors that impact sentencing outcomes. | Longer sentences were imposed for offenses involving younger victims, a familial or close relationship between the offender and victim, any sexual contact of a minor prior to or during the instant offense, and the incapacitation or coercion of a minor victim by the offender. |
| --- | --- |

## Proximity and Sentencing Outcomes

The potential for physical harm to a child is greater when the offender is present in the same location as the victim. Accordingly, in fiscal year 2019, courts sentenced offenders who were present with the minor victim during production to longer sentences than offenders who committed the offense remotely.  Child pornography production offenders in the same location as the victim were sentenced to an average of 302 months, compared to an average of 234 months for remote offenders, a difference of more than five years.

Table 7. Offender Location and Sentence Length
*Fiscal Year 2019*

| Offender Presence | N | Mean Sentence |
| --- | --- | --- |
| Total §2G2.1 Offenders | 512 | 275 |
| Offender Was Present | 311 | 302 |
| Offender Was Not Present | 201 | 234 |

Case 1:23-cv-00449-RMR   Document 53-1   filed 02/10/22   USDC Colorado   pg 127 of 229

## Offender and Victim Relationship and Sentence Length

The proximity, or closeness of the relationship between an offender and the victim, also appears to affect sentencing outcomes.  Child pornography production offenders who had closer relationships to their victim(s) received longer average sentences compared to those offenders with more distant relationships (Table 8).  Section 2G2.1 provides a 2-level enhancement for offenders who were parents, relatives, legal guardians, or otherwise maintained custody or care of their victim(s).[51]

When analyzing the relationship between the offender and victim, the Commission found that courts imposed the longest sentences, on average, for child pornography production offenders who were parents of the victim(s) (340 months) followed by offenders who were some other relative of the victim(s) (304 months).  Similarly, child pornography production offenders who maintained a position of trust over the minor victims, such as a coach or teacher, received longer average sentences (274 months) than offenders who met their victim(s) online (249 months).

Table 8. Select Offender and Victim Relationships and Sentence Length
*Fiscal Year 2019*

| Relationship to Victim | N | Mean Sentence |
|---|---|---|
| Total §2G2.1 Offenders | 512 | 275 |
| Parent | 93 | 340 |
| Other Relative | 60 | 304 |
| Teacher, Coach, etc. | 37 | 274 |
| Internet Stranger | 181 | 249 |

*United States Sentencing Commission*

## Age of Victim and Sentence Length

The proximity of an offender to their victim(s) is also closely associated with having younger victims involved in the production offense.[52]  Section 2G2.1 provides enhancements of 2- or 4-levels based on the age of the victim. Accordingly, offenses that involved the youngest victims received longer sentences compared to those offenses involving older minor victims.

When analyzing the age of the victims, offenders whose youngest production victim was an infant had the highest average sentence among fiscal year 2019 production offenders (364 months) (Table 9).  On average, offenders who victimized an infant received sentences that were more than a decade longer than production offenders whose youngest victim was a teenager (364 months and 232 months, respectively).  Additionally, offenders whose youngest victim was a toddler or prepubescent also received longer average sentences (330 months and 292 months, respectively) than offenders whose youngest victim was a teenager (232 months).

Table 9.  Age of the Youngest Production Victim and Sentence Length
*Fiscal Year 2019*

| Age of Youngest Victim | N | Mean Sentence |
|---|---|---|
| Total §2G2.1 Offenders | 512 | 275 |
| Infant | 26 | 364 |
| Toddler | 58 | 330 |
| Prepubescent | 223 | 292 |
| Teenager | 194 | 232 |

# Participation and Sentencing Outcomes

Courts appear to consider an offender's level of participation with a minor victim during the offense when imposing sentences.  Among fiscal year 2019 child pornography production offenders, courts imposed longer sentences on offenders who had a higher degree of participation with a minor victim, either through sexual contact or the use of coercive tactics to manipulate the victim.

## Sexual Contact During Production

Section 2G2.1 provides an enhancement of 2- or 4-levels if the production offense involved sexual contact or the commission of a sex act.[53]  Consistent with the enhancement, courts imposed longer average sentences when an offender or adult co-participant physically sexually contacted a minor victim (307 months) compared to offenses that did not involve sexual contact (221 months) (Table 10).  Courts also appear to consider sexual conduct between or among minor victims that does not include the offender or a co-participant when imposing sentences.  Offenders who committed child pornography production offenses that involved the victim(s) engaging in sexual contact alone or with another victim were sentenced to 244 months on average, almost two years longer than the average sentences for offenses that did not include sexual contact during production (221 months).

Table 10. Sexual Contact During Production and Sentence Length
*Fiscal Year 2019*

| Level of Contact | N | Mean Sentence |
|---|---|---|
| Total §2G2.1 Offenders | 512 | 275 |
| Offender or co-participant sexually contacted a victim | 285 | 307 |
| Victim(s) engaged in sexual contact | 129 | 244 |
| No sexual contact | 98 | 221 |

*United States Sentencing Commission*

## Incapacitation, Coercion, Enticement, or Misrepresentation

Section 2G2.1 provides a 2-level enhancement if an offender misrepresents their identity to commit the offense.[54]  Offenders who misrepresented themselves to a minor victim received longer average sentences (288 months) compared to offenders who did not use any aggravating form of manipulation or coercion (266 months) (Table 11).

The Commission also examined how courts sentenced offenders who engaged in coercive or manipulative conduct not specifically accounted for in §2G2.1 to secure a minor victim's participation to produce child pornography.  Child pornography production offenders who incapacitated or coerced victims received longer average sentences, compared to offenders who used other means of enticement or did not engage in those behaviors (Table 11).  Child pornography production offenders

who incapacitated a minor victim using drugs or alcohol received an average sentence of 313 months.  Offenders who used coercive tactics such as violence, sextortion, threats, or bullying were sentenced to an average of 291 months, which is more than two years longer than the average sentence for offenders who did not engage in these behaviors (266 months).

Courts also appear to consider whether offenders used other enticements, such as gifts, when imposing sentences on child pornography production offenders.  Offenders who provided these enticements were sentenced to an average of 277 months, which is 11 months longer than offenders who did not use any misrepresentation or coercion to commit the child pornography production offense.

Table 11. Incapacitation, Coercion, Misrepresentation, or Enticement and Sentence Length
 *Fiscal Year 2019*

| Type of Inducement | N | Mean Sentence |
|---|---|---|
| Total §2G2.1 Offenders | 512 | 275 |
| Incapacitation | 23 | 313 |
| Coercion | 103 | 291 |
| Misrepresentation | 99 | 288 |
| Enticement | 79 | 277 |
| None | 307 | 266 |

# Propensity and Sentence Length

Courts imposed longer sentences on production offenders who engaged in child pornography conduct outside of the instant offense or had any other physical sexual contact with a minor victim. Courts also imposed longer sentences on offenders who had a history of sexual misconduct, including those with a history of non-contact sex offenses and contact sex offenses against adults.

## Child Pornography Conduct Outside of the Production Offense

In fiscal year 2019, production offenders who engaged in child pornography conduct outside of their production offense received longer average sentences than those offenders who did not (Table 12). Offenders who shared images they produced, possessed or shared images produced by others, or participated in an online community devoted to child pornography or exploitation were sentenced to 289 months, on average, which was nearly four years longer than the 245-month average sentence for those offenders who did not engage in additional child pornography conduct.

Table 12. Propensity to Engage in Child Pornography Conduct or Sexual Exploitation and Sentence Length
*Fiscal Year 2019*

| Level of Contact | N | Mean Sentence |
|---|---|---|
| Total §2G2.1 Offenders | 512 | 275 |
| Offender Engaged in Non-Production Child Pornography Conduct or Sexual Exploitation | 350 | 289 |
| Offender Did Not Engage in Other Child Pornography Conduct or Sexual Exploitation | 162 | 245 |

**Propensity to Engage in Sexual Abuse Outside of the Production Offense**

As discussed previously, §4B1.5 (Repeat and Dangerous Sex Offender Against Minors) contains two enhancements for offenders who commit sex crimes.  The first provision under §4B1.5(a) applies if the offender committed the instant offense of conviction after sustaining at least one qualifying sex offense conviction.[55] In fiscal year 2019, 26 child pornography production offenders received the sentencing enhancement under §4B1.5(a) and their average sentence was 387 months, more than 15 years longer than production offenders who did not receive the enhancement (204 months) (Table 13).  Section 4B1.5(b) provides a 5-level enhancement for behavior that constitutes a pattern of activity involving prohibited sexual conduct.[56]  More than half of the production offenders (51.6%) received the pattern of activity enhancement under §4B1.5(b).  The production offenders who received the pattern of activity enhancement were sentenced to an average of 324 months, ten years longer than the average sentence for offenders who did not receive an enhancement under §4B1.5 (204 months).

Table 13. Repeat and Dangerous Sex Offender Enhancement and Sentence Length
*Fiscal Year 2019*

| Chapter Four Enhancement | N | Mean Sentence |
|---|---|---|
| §4B1.5(a) | 26 | 387 |
| §4B1.5(b) | 264 | 324 |
| No Enhancement | 222 | 204 |

Irrespective of a §4B1.5 enhancement, courts appear to account for the presence of a prior sex offense when sentencing child pornography production offenders.  Among child pornography production offenders sentenced in fiscal year 2019, those with a prior contact sex offense against a minor or an adult received markedly longer average sentences (334 months and 330 months, respectively) than those offenders with no history of such conduct (267 months) (Table 14).  Offenders with prior convictions for non-production child pornography offenses received comparable sentences (331 months) to those offenders who committed a prior contact sex offense.

Table 14. Prior Sex Offense Conviction and Sentence Length
*Fiscal Year 2019*

| Type of Prior Sexual Offense Conviction | N | Mean Sentence |
|---|---|---|
| Total §2G2.1 Offenders | 512 | 275 |
| Contact Sex Offense Against a Minor | 56 | 334 |
| Non-Production Child Pornography Offense | 25 | 331 |
| Contact Sex Offense Against an Adult | 5 | 330 |
| Non-Contact Sex Offense | 22 | 255 |
| No Prior Sex Offense Conviction | 424 | 267 |

# Conclusion

## Conclusion

Child pornography production offenses are serious crimes that memorialize the sexual abuse and exploitation of children. Offenders who produce child pornography use a wide variety of technology and coercive tactics to manipulate children for the purpose of committing these serious offenses. The typical child pornography production offense takes one of two forms. Most commonly, the offender maintains a position of trust over the victim and has physical access to the child during the production of child pornography, which frequently culminates in the offender having sexual contact with the victim during the offense. Alternatively, a growing proportion of offenders are strangers who initially contact victims remotely through the internet or other mobile technology to produce child pornography. This report provides insight into how offenders commit child pornography production offenses and highlights the dangers that children face, whether offenders rely upon their proximity, coercive tactics, or online platforms to communicate with victims.

Although most child pornography production offenders receive sentences below their applicable guideline ranges, the serious nature of these offenses generally leads to lengthy sentences. The average production offender was sentenced to 275 months in fiscal year 2019. However, sentence lengths vary, at least in part, based on the presence of aggravating factors related to the offenders' proximity to the victim, participation in the offense, and propensity to engage in exploitive behavior. Longer sentences, on average in excess of 300 months, were imposed for offenses involving infants or toddlers, a familial or close relationship between the offender and victim, any sexual contact of a minor prior to or during the instant offense, and any incapacitation of a minor victim to effectuate the offense.



## For More Information

Visit the Commission's website for additional resources on the child pornography guidelines.

*www.ussc.gov*

## Related Reports



**History of the Child Pornography Guidelines**

**2009**



**Report to the Congress: Federal Child Pornography Offenses**

**2012**



**Mandatory Minimum Penalties for Federal Sex Offenses**

**2019**



**Federal Sentencing of Child Pornography: Non-Production Offenses**

**2021**

56    *United States Sentencing Commission*



# Appendix

# Appendix A

Appendix A provides the geographic distribution of child pornography production cases.  Tables A-1 and A-2 show the district courts with the highest number of production cases, by highest raw number of cases and by highest percentage of the total caseload, respectively.  Figure A-1 is a map showing the child pornography production caseload by district in fiscal year 2019.

Of the 512 cases in fiscal year 2019, the five districts with the highest number of child pornography production cases were as follows: 19 cases from the District of Minnesota, 17 cases from the Southern District of Indiana, 17 cases from the Western District of Missouri, 16 cases from the District of Maryland, and 16 cases from the Eastern District of Michigan.

The five districts where child pornography production cases made up the highest percentage of their overall federal caseload were the District of Minnesota (5.1%), the Southern District of Indiana (3.6%), the Central District of Illinois (3.6%), the Middle District of Pennsylvania (3.4%), and the Southern District of Illinois (3.2%).

Table A-1. Top 5 Districts by Number of Cases

| District | # |
|---|---|
| Minnesota | 19 |
| Southern Indiana | 17 |
| Western Missouri | 17 |
| Maryland | 16 |
| Eastern Michigan | 16 |

Table A-2. Top 5 Districts by Percentage of Caseload

| District | % |
|---|---|
| Minnesota | 5.1% |
| Southern Indiana | 3.6% |
| Central Illinois | 3.6% |
| Middle Pennsylvania | 3.4% |
| Southern Illinois | 3.2% |

Figure A-1. §2G2.1 Offenders in Each District
*Fiscal Year 2019*



SOURCE: U.S. Sentencing Commission, 2019 Datafile, USSCFY19.

60    *United States Sentencing Commission*

## Endnotes

1        U.S. Sᴇɴᴛ'ɢ Cᴏᴍᴍ'ɴ, Rᴇᴘᴏʀᴛ ᴛᴏ ᴛʜᴇ Cᴏɴɢʀᴇss:  Fᴇᴅᴇʀᴀʟ Cʜɪʟᴅ Pᴏʀɴᴏɢʀᴀᴘʜʏ Oғғᴇɴsᴇs (2012), https://www.ussc.gov/sites/default/files/pdf/news/congressional-testimony-and-reports/sex-offense-topics/201212-federal-child-pornography-offenses/Full_Report_to_Congress.pdf [hereinafter 2012 Cʜɪʟᴅ Pᴏʀɴᴏɢʀᴀᴘʜʏ Rᴇᴘᴏʀᴛ].

2        For a review of non-production child pornography offenses, see U.S. Sᴇɴᴛ'ɢ Cᴏᴍᴍ'ɴ, Fᴇᴅᴇʀᴀʟ Sᴇɴᴛᴇɴᴄɪɴɢ ᴏғ Cʜɪʟᴅ Pᴏʀɴᴏɢʀᴀᴘʜʏ:  Nᴏɴ-Pʀᴏᴅᴜᴄᴛɪᴏɴ Oғғᴇɴsᴇs (2021), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2021/20210629_Non-Production-CP.pdf [ʜᴇʀᴇɪɴᴀғᴛᴇʀ Nᴏɴ-Pʀᴏᴅᴜᴄᴛɪᴏɴ Oғғᴇɴsᴇs Rᴇᴘᴏʀᴛ].

3        *Key Facts*, Nᴀᴛ'ʟ Cᴛʀ. ғᴏʀ Mɪssɪɴɢ ᴀɴᴅ Eхᴘʟᴏɪᴛᴇᴅ Cʜɪʟᴅ., (Mᴀʀ. 2, 2021), https://www.missingkids.org/ourwork/ncmecdata.

4        2012 Cʜɪʟᴅ Pᴏʀɴᴏɢʀᴀᴘʜʏ Rᴇᴘᴏʀᴛ, *supra* note 1, at 107–08.

5        *Id.* at 267.

6        As authorized by Congress, the Commission's numerous research responsibilities include: (1) the establishment of a research and development program to serve as a clearinghouse and information center for the collection, preparation, and dissemination of information on federal sentencing practices, (2) the publication of data concerning the sentencing process, (3) the systematic collection and dissemination of information concerning sentences actually imposed and the relationship of such sentences to the factors set forth in section 3553(a) of title 18, and (4) the systematic collection and dissemination of information regarding the effectiveness of sentences imposed.  28 U.S.C. § 995(a)(12)–(16).

7        Pub. L. No. 108–21, 117 Stat. 650.

8        18 U.S.C. §§ 2251, 2252, 2252A, 2260.

9        18 U.S.C. § 2251(e).

10        The qualifying sex offenses include prior federal convictions under title 18, section 1591, chapter 71, chapter 109A, or chapter 117, or under section 920 of title 10 (article 120 of the Uniform Code of Military Justice), or state convictions relating to aggravated sexual abuse, sexual abuse, or abusive sexual conduct involving a minor or ward, or the production, possession, receipt, mailing, sale, distribution, shipment, or transportation of child pornography, or sex trafficking of children.  18 U.S.C. § 2251(e).

11        *Id.*

12        Pub. L. No. 108–21, § 101, 117 Stat. 650.

13        A 4-level enhancement applies if the offense involved a minor who had not attained the age of 12. U.S. Sᴇɴᴛ'ɢ Cᴏᴍᴍ'ɴ, Gᴜɪᴅᴇʟɪɴᴇs Mᴀɴᴜᴀʟ, §2G2.1(b)(1)(A) (Nᴏᴠ. 2018) [hereinafter USSG].  A 2-level enhancement applies if the offense involved a minor who had attained the age of 12 years but not attained the age of 16 years.  USSG §2G2.1(b)(1)(B).

14        A 2-level enhancement applies if the offense involved the commission of a sexual act or sexual contact.  USSG §2G2.1(b)(2)(A).  A 4-level enhancement applies if the offense involved the commission of a sexual act and conduct described in 18 U.S.C. § 2241(a) or (b).  USSG §2G2.1(b)(2)(B).

15        A 2-level enhancement applies if the defendant knowingly engaged in distribution of child pornography.  USSG §2G2.1(b)(3).

16      A 4-level enhancement applies if the offense involved material that portrays sadistic or masochistic conduct or other depictions of violence, or an infant or toddler.  USSG §2G2.1(b)(4).

17      A 2-level enhancement applies if the defendant was a parent, relative, or legal guardian of the minor involved in the offense, or if the minor was otherwise in the custody, care, or supervisory control of the defendant.  USSG §2G2.1(b)(5).

18      A 2-level enhancement applies if, for the purpose of producing sexually explicit material or for the purpose of transmitting such material live, the offense involved (A) the knowing misrepresentation of a participant's identity to persuade, induce, entice, coerce, or facilitate the travel of, a minor to engage in sexually explicit conduct; or (B) the use of a computer or an interactive computer service to (i) persuade, induce, entice, coerce, or facilitate the travel of, a minor to engage in sexually explicit conduct, or to otherwise solicit participation by a minor in such conduct; or (ii) solicit participation with a minor in sexually explicit conduct.  USSG §2G2.1(b)(6).

19      USSG §2G2.1(d)(1).  *See also* USSG §§3D1.1 (Procedure for Determining Offense Level on Multiple Counts), 3D1.2 (Groups of Closely Related Counts), 3D1.3 (Offense Level Applicable to Each Group of Closely Related Counts), 3D1.4 (Determining the Combined Offense Level), and 3D1.5 (Determining the Total Punishment).

20      *See, e.g.*, United States v. Peck, 496 F.3d 885, 890 (8th Cir. 2007) (noting that the defendant, who was convicted of a single count of production of child pornography, received a 3-level increase in his offense level under §2G2.1(d)(1) because of relevant conduct involving multiple victims).

21      USSG §2G2.2(c).

22      USSG §5G1.1(a).

23      USSG §4B1.5(a), (b).

24      If an offender's final offense level or criminal history category resulting from a guidelines determination before application of §4B1.5(a) exceeds those in §4B1.5(a), then no additional enhancement would apply.

25      For purposes of §4B1.5, "prohibited sexual conduct" means any of the following: (i) any offense described in 18 U.S.C. § 2426(b)(1)(A) or (B); (ii) the production of child pornography; or (iii) trafficking in child pornography only if, prior to the commission of the instant offense of conviction, the defendant sustained a felony conviction for that trafficking in child pornography.  "Prohibited sexual conduct" does not include receipt or possession of child pornography.  The defendant engaged in a "pattern of activity" involving prohibited sexual conduct if on at least two separate occasions, the defendant engaged in prohibited sexual conduct with a minor.  An occasion of prohibited sexual conduct may be considered for purposes of §4B1.5(b) without regard to whether the occasion (i) occurred during the course of the instant offense; or (ii) resulted in a conviction for the conduct that occurred on that occasion.  USSG §4B1.5, comment. (n.4).

26      *See* USSG §§5D1.1(a)(1) (Imposition of a Term of Supervised Release) & 5D1.2(b) (Term of Supervised Release) (policy statement "recommend[ing]" the "statutory maximum term of supervised release" for all offenders convicted of "a sex offense," including a child pornography offense).

27      Two offenders in this analysis account for only 0.3% of production offenders and therefore are not visible in this graphic.  One offender was convicted under 18 U.S.C. § 2244 (Abusive Sexual Contact) and one offender was convicted under 18 U.S.C. § 1470 (Transfer of Obscene Material to Minors).  Both offenders engaged in production conduct that was relevant conduct to their instant offense.

28      Appendix A provides the geographic distribution of child pornography production cases sentenced in fiscal year 2019.

*United States Sentencing Commission*

29    In fiscal year 2019, 61 offenders were sentenced under §2G2.1 via cross reference from §2G2.2 (Trafficking in Material Involving the Sexual Exploitation of a Minor; Receiving, Transporting, Shipping, Soliciting, or Advertising Material Involving the Sexual Exploitation of a Minor; Possessing Material Involving the Sexual Exploitation of a Minor with Intent to Traffic; Possessing Material Involving the Sexual Exploitation of a Minor), 28 offenders were cross-referenced from §2G1.3 (Promoting a Commercial Sex Act or Prohibited Sexual Conduct with a Minor; Transportation of Minors to Engage in a Commercial Sex Act or Prohibited Sexual Conduct; Travel to Engage in Commercial Sex Act or Prohibited Sexual Conduct with a Minor; Sex Trafficking of Children; Use of Interstate Facilities to Transport Information about a Minor), one offender was cross-referenced from §2G3.1 (Importing, Mailing, or Transporting Obscene Matter; Transferring Obscene Matter to a Minor; Misleading Domain Names), and one offender was cross-referenced from §2X2.1 (Aiding and Abetting).

30    2012 Child Pornography Report, *supra* note 1, at 41-42.

31    Non-Production Offenses Report, *supra* note 2, at 17.

32    2012 Child Pornography Report, *supra* note 1, at 260.

33    *Id.*

34    *Id.* at 260–62.

35    Cases with sentences of 470 months or greater (including life) were included in the sentence average computations as 470 months.  The information presented in this analysis includes conditions of confinement as described in §5C1.1.

36    *See id.*

37    Variance cases are those in which the sentence was outside the guideline range and where the court did not cite any reason for departure from the *Guidelines Manual* for the sentence.

38    "Government sponsored" departures include cases in which a reason for the sentence indicated that the prosecution initiated, proposed, or stipulated to a sentence outside of the guideline range, either pursuant to a plea agreement or as part of a non-plea negotiation with the defendant.  Substantial assistance motions filed by the prosecution are categorized separately.

39    There are two types of "substantial assistance" motions filed by the prosecution—the first seeks a downward departure below the applicable guideline range, and the second seeks a downward departure below a statutory mandatory minimum sentence.  *Compare* USSG §5K1.1, *with* 18 U.S.C. § 3553(e).

40    In three child pornography production cases, there was no production victim.  In two cases the offenders acted as accessories in a production offense and one case involved attempted production with no identifiable victim.

41    For this report, the Commission relied on information from the Centers for Disease Control and Prevention and the National Library of Medicine of the National Institutes of Health to categorize toddlers as age one to three.  *See* Ctrs. for Disease Control & Prevention, Positive Parenting Tips for Healthy Child Development Toddlers (1–2 Years of Age) (2021), https://www.cdc.gov/ncbddd/childdevelopment/positiveparenting/pdfs/toddlers-1-2-w-npa.pdf; Ctrs. for Disease Control & Prevention, Positive Parenting Tips for Healthy Child Development Toddlers (2–3 Years of Age) (2021), https://www.cdc.gov/ncbddd/childdevelopment/positiveparenting/pdfs/Toddlers-2-3-w-NPA.pdf; U.S. Nat'l Libr. of Med., *Toddler Development*, MedlinePlus (Aug. 2, 2021),  https://medlineplus.gov/toddlerdevelopment.html.

42    2012 Child Pornography Report, *supra* note 1, at 267.

43    The infants and toddlers in this category were in the presence of a co-participant who facilitated the

remote production.

44      The age of the youngest victim is unknown in two offenses where the offender communicated with the victims in person.

45      *See supra* Figure 13.

46      U.S. Dep't of Just., Sextortion: Recognize, Prevent, Protect (2019), https://www.justice.gov/file/1317551/download.

47      For the purposes of this report, the other forms of bullying are non-violent or non-sexual threats or pressure.

48      2012 Child Pornography Report, *supra* note 1, at 264.

49      Some offenders had more than one type of prior contact sex offense against a minor. Therefore, the percentages exceed 37.5%.

50      The pornography sent to a minor included pornography depicting the offender, other adult pornography, or child pornography.

51      USSG §2G2.1(b)(5).

52      *See supra* Figure 17.

53      USSG §2G2.1(b)(2).

54      USSG §2G2.1(b)(6).

55      USSG §4B1.5(a).

56      USSG §4B1.5(b).



**United States Sentencing Commission**

www.ussc.gov

THURGOOD MARSHALL FEDERAL JUDICIARY BUILDING
ONE COLUMBUS CIRCLE N.E.
SUITE 2-500, SOUTH LOBBY
WASHINGTON, DC 20002-8002

*This document was produced and published at U.S. taxpayer expense.*



https://www.ussc.gov/research/quick-facts



# **Quick**Facts



DEFENDANT'S EXHIBIT
B
USA v. Meier
23-cr-00419-RMR

## Child Pornography Offenses

### Population Snapshot

**64,124 cases** *were reported in FY23;* **1,408** *involved child pornography.[1]*

**Child pornography offenses have increased 2.9% since FY19.**

### Number of Child Pornography Offenses



### Length of Mandatory Minimums for Child Pornography Offenses



15 Years (7.1%)
Ten Years (11.2%)
None (32.6%)
Fiscal Year 2023
Five Years (49.0%)

### Individual and Offense Characteristics[2]

- 47.3% of individuals sentenced for child pornography were sentenced for trafficking child pornography; 43.9% for possessing child pornography; and 8.8% for receiving child pornography.
- 98.8% were men.
- 77.1% were White, 12.8% were Hispanic, 5.8% were Black, and 4.3% were Other races.
- Their average age was 41 years.
- 96.2% were United States citizens.
- 71.2% had little or no prior criminal history (Criminal History Category I);
  - 9.0% were CHC II;
  - 13.7% were CHC III;
  - 3.2% were CHC IV;
  - 1.6% were CHC V;
  - 1.2% were CHC VI.
- The top five districts for individuals sentenced for child pornography were:
  - Eastern District of Virginia (55);
  - Southern District of Texas (52);
  - Middle District of Florida (50);
  - Southern District of Florida (48);
  - Western District of Texas (44, tie);
  - Eastern District of Missouri (44, tie).

### Punishment

- 99.0% of individual sentenced for child pornography were sentenced to prison; their average sentence was 114 months.
- The average sentence for individuals convicted of *trafficking child pornography* was 148 months:[3]
  - 87.3% of these individuals were convicted of an offense carrying a five-year mandatory minimum penalty; their average sentence was 135 months.
  - 12.7% had a prior sexual abuse or child pornography conviction and were subject to a 15-year mandatory minimum penalty; their average sentence was 236 months.

*This document was produced and published at U.S. taxpayer expense.*



# QuickFacts
## Child Pornography Offenses

**Sentences Relative to the Guideline Range**



**Fiscal Year 2023**

Under the Guidelines Manual (39.9%)

Variances (60.1%)



| | |
|---|---|
| Within Range | 33.7% |
| Other Downward Departure | 3.4% |
| Substantial Assistance | 2.3% |
| Upward Departure | 0.3% |

## Punishment (continued)

The average sentence for individuals convicted of ***possessing child pornography*** was 79 months:[4]

- 74.4% of these individuals were not convicted of an offense carrying a mandatory minimum penalty; their average sentence was 62 months.
- 25.6% had a prior sexual abuse or child pornography conviction and were subject to a ten-year mandatory minimum penalty; their average sentence was 129 months.

The average sentence for individuals convicted of ***receiving child pornography*** was 101 months:

- 87.5% of these individuals were convicted of an offense carrying a five-year mandatory minimum penalty; their average sentence was 87 months.
- 12.5% had a prior sexual abuse or child pornography conviction and were subject to a 15-year mandatory minimum penalty; their average sentence was 195 months.

## Sentences Relative to the Guideline Range

39.9% of individuals sentenced for child pornography were sentenced under the *Guidelines Manual*. Of all individuals sentenced for child pornography:

- 33.7% were sentenced within the guideline range.
- 3.4% received some other downward departure.
  - *Their average sentence reduction was 35.8%.*
- 2.3% received a substantial assistance departure.
  - *Their average sentence reduction was 37.6%.*
- 0.3% received an upward departure.
  - *Their average sentence increase was 25.8%.*

60.1% received a variance. Of those individuals:

- 57.1% received a downward variance.
  - *Their average sentence reduction was 38.8%.*
- 3.0% received an upward variance.
  - *Their average sentence increase was 36.2%.*

**Sentences Relative to the Guideline Range**



— Within Range — Substantial Assistance --- Other Downward Departure — Variances

**Average Guideline Minimum and Average Sentence (months)**



— Guideline Minimum — Sentence

---

[1] Individuals sentenced for child pornography are those convicted of Trafficking in Material Involving the Sexual Exploitation of a Minor; Receiving, Transporting, Shipping, or Advertising Material Involving the Sexual Exploitation of a Minor; Possessing Material Involving the Sexual Exploitation of a Minor with Intent to Traffic; Possessing Material Involving the Sexual Exploitation of a Minor (§2G2.2). It does not include cases where individuals are convicted of Production of Child Pornography (§2G2.1).

[2] Cases with incomplete sentencing information were excluded from the analysis. Cases that do not meet logical criteria were also excluded.

[3] Individuals convicted of Trafficking in Material Involving the Sexual Exploitation of a Minor and Receiving, Transporting, Shipping, or Advertising Material Involving the Sexual Exploitation of a Minor are subject to a five-year mandatory minimum penalty, or 15 years with a prior conviction for sexual abuse or child pornography.

[4] Individuals convicted of Possessing Material Involving the Sexual Exploitation of a Minor (§2G2.2) are subject to a ten-year mandatory minimum penalty with a prior conviction for sexual abuse or child pornography.

SOURCE: United States Sentencing Commission, FY 2019 through FY 2023 Datafiles, USSCFY19-USSCFY23.

https://www.ussc.gov/research/quick-facts



# QuickFacts



**DEFENDANT'S EXHIBIT**
C
USA v. Meier
23-cr-00419-RMR

## Sexual Abuse Offenses

**Population Snapshot**

**64,124 cases** *were reported in FY23;*
**1,395** *involved sexual abuse.[1]*

**Sexual abuse offenses have increased 19.7% since FY19.**

**Number of Sexual Abuse Offenses**



| | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 |
|---|---|---|---|---|---|
| | 1,165 | 880 | 1,061 | 1,499 | 1,395 |

**Primary Sentencing Guideline for Sexual Abuse Offenses**



Fiscal Year 2023

- Statutory Rape (3.1%)
- Abusive Sexual Contact (3.3%)
- Rape (9.5%)
- Travel for Prohibited Sexual Conduct (29.8%)
- Production of Child Pornography * (50.9%)
- Other (3.3%)

### Individual and Offense Characteristics[2]

93.8% of individuals sentenced for sexual abuse were men.

55.4% were White, 16.0% were Black, 14.0% were Hispanic, 12.3% were Native American, and 2.2% were Other races.

- 72.7% of individuals in cases involving production of child pornography were White.[3]
- 50.0% of individuals in cases involving travel for prohibited sexual contact were White and 27.9% were Black.
- 64.9% of individuals in cases involving criminal sexual abuse (rape) were Native American.[4]
- 65.2% of individuals in cases involving abusive sexual contact were Native American.
- 90.7% of individuals in cases involving statutory rape were Native American.

Their average age was 38 years.

96.2% were United States citizens.

68.5% had little or no prior criminal history (Criminal History Category I);

- 8.6% were CHC II;
- 9.3% were CHC III;
- 4.6% were CHC IV;
- 6.1% were CHC V;
- 2.9% were CHC VI.

11.1% of individuals sentenced for sexual abuse were convicted at trial, compared to 2.7% of all other federally sentenced individuals.

The top five districts for individuals sentenced for sexual abuse were:

- Middle District of Florida (45);
- District of South Dakota (42);
- Eastern District of Virginia (39);
- Northern District of Texas (37);
- Eastern District of Michigan (36, tie);
- Western District of Missouri (36, tie);
- District of Utah (36, tie).

### Punishment

99.5% of individual sentenced for sexual abuse were sentenced to prison; their average sentence was 213 months.

The average sentence for individuals convicted of production of child pornography was 272 months:

- 79.9% of these individuals were convicted of an offense carrying a mandatory minimum penalty; their average sentence was 304 months. The average sentence without a mandatory minimum was 146 months.

*This document was produced and published at U.S. taxpayer expense.*



## Sexual Abuse Offenses

### Sentences Relative to the Guideline Range



### Punishment (continued)

The average sentence for individuals convicted of travel to engage in prohibited sexual conduct with a minor was 155 months:

- 74.5% of these individuals were convicted of an offense carrying a mandatory minimum penalty; their average sentence was 182 months. The average sentence without a mandatory minimum was 76 months.

The average sentence for individuals convicted of criminal sexual abuse (rape) was 212 months:

- 27.7% of these individuals were convicted of an offense carrying a mandatory minimum penalty; their average sentence was 360 months. The average sentence without a mandatory minimum was 156 months.

The average sentence for individuals convicted of abusive sexual contact was 37 months.

The average sentence for individuals convicted of statutory rape was 48 months.

### Sentences Relative to the Guideline Range

50.3% of individuals sentenced for sexual abuse were sentenced under the *Guidelines Manual*.

- 38.6% were sentenced within the guideline range.
- 5.4% received some other downward departure.
    - Their average sentence reduction was 40.1%.
- 5.1% received a substantial assistance departure.
    - Their average sentence reduction was 46.4%.
- 1.2% received an upward departure.
    - Their average sentence increase was 40.7%.

49.7% of individuals sentenced for sexual abuse received a variance:

- 45.2% received a downward variance.
    - Their average sentence reduction was 34.0%.
- 4.6% received an upward variance.
    - Their average sentence increase was 33.7%.

### Sentences Relative to the Guideline Range





### Average Guideline Minimum and Average Sentence (months)



SOURCE: United States Sentencing Commission, FY 2019 through FY 2023 Datafiles, USSCFY19–USSCFY23.

1   Individuals sentenced for sexual abuse are those convicted of Criminal Sexual Abuse – Rape (§2A3.1), Statutory Rape (§2A3.2), Criminal Sexual Abuse of a Ward (§2A3.3), Abusive Sexual Contact (§2A3.4), Promoting a Commercial Sex Act (§2G1.1), Travel to Engage in Prohibited Sexual Conduct with a Minor (§2G1.3), Production of Child Pornography (§2G2.1), or Child Exploitation Enterprises (§2G2.6).

2 Cases with incomplete sentencing information were excluded from the analysis.

3 Production of Child Pornography does not include cases where individuals were convicted of Trafficking in Material Involving the Sexual Exploitation of a Minor; Receiving, Transporting, Shipping, or Advertising Material Involving the Sexual Exploitation of a Minor; Possessing Material Involving the Sexual Exploitation of a Minor with Intent to Traffic; Possessing Material Involving the Sexual Exploitation of a Minor (§2G2.2).

4 Under the Major Crimes Act (18 U.S.C. § 1153), the federal government has jurisdiction over sexual assault crimes committed by Native Americans in Indian Country.



DEFENDANT'S EXHIBIT
D
USA v. Meier
23-cr-00419-RMR

 An official website of the United States government

**Official websites use .gov**
A **.gov** website belongs to an official government organization in the United States.



**Secure .gov websites use HTTPS**
A **lock** (🔒) or **https://** means you've safely connected to the .gov website. Share sensitive information only on official, secure websites.

🌐 En Español  📱 Contact Us  🔗 Quick Links


**U.S. Immigration and Customs Enforcement**

Search [          ]

Call 1-866-DHS-2-ICE     Report Crime

ICE     NEWSROOM

FEBRUARY 12, 2015 • NEW ORLEANS, LA • CHILD EXPLOITATION

# 'Operation Roundtable' ringleader sentenced to 21 years after ICE investigation

*Jonathan Johnson operated 27,000-member child exploitation network, largest in ICE history*



NEW ORLEANS — An Abita Springs man who pleaded guilty last year to operating a worldwide child pornography network that was the largest ever discovered in the history of U.S. Immigration and Customs Enforcement (ICE) was sentenced Thursday to 21 years in federal prison for operating a child exploitation enterprise. The sentencing follows an investigation by ICE's Homeland Security Investigations (HSI), the U.S. Postal Inspection Service and multiple U.S. Attorneys across the country.

According to court documents, Jonathan Johnson, 28, admitted in his guilty plea that he created multiple fake female personas on popular social networks and used them to target children for exploitation by coercing them into producing sexually explicit material. Johnson also coached other child predators in his inner circle how to do the same. Two underground websites administered by Johnson operated as a hidden service board on the Tor network that operated from about June 2012 until Johnson's arrest in June 2013, at which time the site contained more than 2,000 videos and had more than 27,000 members worldwide. Tor is an Internet network that enables online anonymity by directing Internet traffic through thousands of relays to conceal a user's location.

The two websites operated by Johnson shared webcam-captured videos of mostly juvenile boys enticed by the operators of the site to produce sexually explicit material. So far, investigators have identified more than 250 minor victims in 39 states and five foreign countries. All victims have been contacted by law enforcement and U.S. victims have been offered support services from HSI victim assistance specialists.

Dubbed "Operation Roundtable," the case against Johnson has thus far resulted in ten additional individuals being criminally charged by the U.S. Attorney's Office in New Orleans. To date, all ten defendants have pleaded guilty to crimes involving the sexual exploitation of children.

"As the ringleader of a pack of sadistic child predators, this defendant is responsible for the sexual exploitation of hundreds of young victims, whose documented abuse was subsequently distributed to thousands of perverted criminals," said Raymond R. Parmer Jr., special agent in charge of HSI New Orleans. "There is simply no room in our society for such monsters, and I applaud the HSI special agents who put him in handcuffs and the federal prosecutors who put him behind bars. In this case, justice has been served."

Case No. 2:23-cv-00409-MMR Document 53-4 filed 02/10/26 USDC ECOno. pg
Case 2:23-00-0419-MR Document 53-3 filed 10/26/24 Page 304 o
155 of 229
10/30/24, 1:18 PM                    'Operation Roundtable' ringleader sentenced to 21 years after ICE investigation | ICE

In addition to his prison term, U.S. District Judge Nannette Jolivette Brown ordered
Johnson to serve an additional ten years of supervised release upon his release from
custody and he will be required to register as a sex offender.

"Today's sentencing represents a significant step in our continued efforts to dismantle a
criminal enterprise that is responsible for the sexual victimization of our nation's young
people," said United States Attorney for the Eastern District of Louisiana Kenneth A.
Polite. "Once again, I commend HSI and the Postal Service for being dedicated partners in
Operation Roundtable. Together, we are committed to utilizing our collective resources to
bring justice to both the victims and the perpetrators of these crimes."

"Postal Inspectors have fought the scourge of child pornography since the 1900s, and we
will never hesitate to pursue those who use the mail to exploit children," said Acting
Inspector in Charge Daniel Brubaker. "We investigate a wide variety of crimes in our
mission to protect the integrity of the U.S. Mail, but sexual exploitation of children is
particularly heinous. When these predators use a combination of mail and the Internet to
exploit our children we will ensure no aspect of their crimes escape justice."

This investigation was conducted under HSI's Operation Predator, an international
initiative to protect children from sexual predators. Since the launch of Operation
Predator in 2003, HSI has arrested more than 12,000 individuals for crimes against
children, including the production and distribution of online child pornography, traveling
overseas for sex with minors, and sex trafficking of children. In fiscal year 2014, more
than 2,000 individuals were arrested by HSI special agents under this initiative.

HSI encourages the public to report suspected child predators and any suspicious activity
through its toll-free Tip Line at 1-866-DHS-2-ICE or by completing its online tip form.
Both are staffed around the clock by investigators. Suspected child sexual exploitation or
missing children may be reported to the National Center for Missing & Exploited Children,
an Operation Predator partner, via its toll-free 24-hour hotline, 1-800-THE-LOST.

For additional information about wanted suspected child predators, download HSI's
Operation Predator smartphone app or visit the online suspect alerts page.

HSI is a founding member and current chair of the Virtual Global Taskforce, an
international alliance of law enforcement agencies and private industry sector partners
working together to prevent and deter online child sexual abuse.

Updated: 04/21/2015

## MEDIA INQUIRIES

For media inquiries about this release, call (504) 310-8887.

For media inquiries about ICE activities, operations, or policies, contact the ICE Office of Public Affairs at (202) 732-4242.

**About Us**

**Immigration Enforcement**

**Combating Transnational Crime**

**Newsroom**

    





### ICE Contact Center

Report suspicious activity: 1-866-DHS-2-ICE

 ICE.gov

**An official website of the U.S. Department of Homeland Security**

**National Terrorism Advisory System**

About ICE

Archive

The White House

Accessibility

No FEAR Act Data

DHS Components

FOIA Requests

Site Links

USA.gov

Privacy Policy

Performance Reports

DHS.gov

Inspector General

Case No. 1:23-cr-00419-RMR Document 53-5 filed 02/10/25 USDC Colorado pg 157 of 229

10/30/24, 1:27 PM          District of Maryland | Dark Web Child Pornography Facilitator Sentenced to 27 Years in Federal Prison for Conspiracy to Advertise…





DEFENDANT'S
EXHIBIT
E
USA v. Meier
23-cr-00419-RMR

**PRESS RELEASE**

# Dark Web Child Pornography Facilitator Sentenced to 27 Years in Federal Prison for Conspiracy to Advertise Child Pornography

Wednesday, September 15, 2021

**For Immediate Release**

U.S. Attorney's Office, District of Maryland

## Millions of Images of Child Exploitation Material Found and Removed from Hosting Service

***Greenbelt***, Maryland – U.S. District Judge Theodore D. Chuang today sentenced Eric Eoin Marques, age 36, of Dublin, Ireland, to 27 years in federal prison, followed lifetime supervised release, for conspiracy to advertise child pornography on the dark web. Marques, a dual national citizen of the United States and Ireland, pleaded guilty to that charge on February 6, 2020, after he was extradited by Irish authorities. Marques arrived in the United States on March 23, 2019, to face federal criminal charges filed in Maryland on August 8, 2013.

According to his plea agreement, between July 24, 2008 and July 29, 2013, Marques conspired to advertise child pornography by operating a free, anonymous web hosting service (AHS) located on the "dark web", an area of the Internet that is only accessible by means of special software, allowing users and website operators to remain anonymous or untraceable. The defendant's hosting service hosted websites that allowed users to view and share images

documenting the sexual abuse of children, including the abuse of prepubescent minors, violent sexual abuse, and bestiality. The investigation revealed that the hosting service contained over 200 child exploitation websites that housed millions of images of child exploitation material. Over 1.97 million of these images and/or videos involved victims that were not previously known by law enforcement. Many of these images involved sadistic abuse of infants and toddlers to include bondage, bestiality and humiliation to include urination, defecation and vomit.

The sentence was announced by Acting United States Attorney for the District of Maryland Jonathan F. Lenzner; Assistant Attorney General Kenneth A. Polite, Jr. of the Justice Department's Criminal Division; and Assistant Director Calvin Shivers of the FBI's Criminal Investigative Division.

"Eric Marques was one of the largest facilitators of child pornography in the world," said Acting United States Attorney for the District of Maryland Jonathan F. Lenzner. "This is an egregious case where one individual facilitated the abuse of more than a million new child victims and attempted to keep the abuse hidden on the dark web. We are grateful to our law enforcement partners here and abroad for helping us to bring Eric Marques to justice. We will continue to do everything we can to find and prosecute those who use the anonymity of the Internet to perpetuate the cruel and heartless business of the sexual abuse of children for personal gain, in order to keep our children safe."

"The defendant's web service anonymously hosted hundreds of insidious criminal communities dedicated to the sexual exploitation of children, which openly and notoriously spread millions of images of child sexual abuse across the globe," said Assistant Attorney General Kenneth A. Polite Jr. of the Justice Department's Criminal Division. "This complex, global investigation, lengthy and successful extradition, and substantial jail sentence are proof of the Department's steadfast and unwavering commitment to identifying and bringing to justice criminals who hide behind anonymous networks to abuse and exploit the world's children."

"Today's sentencing of Eric Marques sends a clear message to perpetrators of this egregious crime that no matter where you are in the world, law enforcement will hold you accountable and bring you to justice," said FBI Assistant Director Calvin Shivers. "The FBI combats crimes against children and stands up for vulnerable children across the globe."

During 2012 and 2013, FBI special agents and employees using computers in Maryland downloaded more than one million files from that website. As part of the investigation, those files were reviewed and nearly all of the files depict children who are engaging in sexually explicit conduct with adults or other children, posed nude and/or in such a manner as to expose their genitals, in various state of undress, or depict child erotica. A substantial majority of the images downloaded by the FBI depict prepubescent minor children who are fully or partially nude or engaged in sexually explicit conduct.

10/30/24, 1:27 PM                District of Maryland | Dark Web Child Pornography Facilitator Sentenced to 27 Years in Federal Prison for Conspiracy to Advertise...

Case No. 1:23-cv-00449-TMR Document 52-33-5 filed 02/10/25 USDC Colorado   pg 159 of 229

Marques admitted in his guilty plea that this offense also involved the distribution of child pornography, which involved minors who were less than twelve years old, to include infants and toddlers, and sadistic or masochistic material or depictions of violence. Marques further admits that he willfully obstructed or impeded the administration of justice with respect to the investigation into this offense.

The Marques prosecution was a part of a path-marking global investigation that targeted thousands of users of more than 200 websites operating on the Tor network and dedicated to the trade of child pornography. The Criminal Division's Child Exploitation and Obscenity Section (CEOS), FBI, and Europol conceived of and executed a globally coordinated criminal investigation of then-unparalleled scope, which pooled resources of over a dozen countries who deployed over 70 law enforcement agents to Europol, which served as the hub for operational support, facilities and information sharing. Through this investigation, more than 200 child sexual exploitation websites were taken offline (along with hundreds of other sites sponsoring or facilitating criminal activity); the activities of tens of thousands of online child pornographers were disrupted; over four million images and videos of child sexual abuse were seized (including more than 100 previously unknown series of child abuse images and new images from more than 50 existing series); and dozens of offenders were identified and prosecuted throughout the world.

This case was brought as part of Project Safe Childhood, a nationwide initiative launched in May 2006 by the Department of Justice to combat the growing epidemic of child sexual exploitation and abuse. Led by the United States Attorney's Offices and the Criminal Division's Child Exploitation and Obscenity Section, Project Safe Childhood marshals federal, state, and local resources to locate, apprehend, and prosecute individuals who sexually exploit children, and to identify and rescue victims. For more information about Project Safe Childhood, please visit www.justice.gov/psc. For more information about Internet safety education, please visit www.justice.gov/psc and click on the "Resources" tab on the left of the page.

United States Attorney Jonathan F. Lenzner and Assistant Attorney General Kenneth A. Polite, Jr. commended the FBI's Violent Crime Section, Child Exploitation Operational Unit and Violent Crimes Against Children International Task Force with significant assistance from the Legal Attaché London Office, Irish law enforcement authorities, An Garda Síochána and EUROPOL. The Department of Justice's Office of International Affairs provided significant assistance in bringing Marques to the United States and procuring foreign evidence during the investigation.

Mr. Lenzner and Mr. Polite thanked Assistant U.S. Attorney Thomas M. Sullivan, and Deputy Chief Keith A. Becker and Trial Attorney Ralph Paradiso of the Justice Department's Criminal Division's Child Exploitation and Obscenity Section, who prosecuted the federal case.

For more information on the Maryland U.S. Attorney's Office, its priorities, and resources available to help the community, please visit www.justice.gov/usao-md/project-safe-childhood

Case No. 1:23-cr-00404-JMR Document 52-33-5 filed 02/10/26/24 USDC Colorado    pg
160 of 229

and https://www.justice.gov/usao-md/community-outreach.

# # #

**Contact**

Marcia Murphy

(410) 209-4854

*Updated September 16, 2021*

**Topic**

| **PROJECT SAFE CHILDHOOD**

**Component**

USAO - Maryland

# Related Content

**PRESS RELEASE**

**Baltimore Man Sentenced to Federal Prison for Soliciting Sexually Explicit Images of Children**

**Baltimore**, Maryland – U.S. District Court Judge Matthew J. Maddox sentenced Eugene Edward Golden, age 38, of Baltimore, Maryland, to 45 years in federal prison and lifetime supervised release...

October 24, 2024





DEFENDANT'S
EXHIBIT
F
USA v. Meier
23-cr-00419-RMR

**PRESS RELEASE**

# Man Sentenced to 151 Months in Prison for Knowingly Receiving Child Sexual Abuse Material Through Dark Web Sites

Wednesday, September 1, 2021

**For Immediate Release**

Office of Public Affairs

An Illinois man was sentenced today in the Southern District of Illinois to 151 months, or 12 and a half years, in prison for knowingly receiving child sexual abuse material over the internet.

According to court documents and statements made in connection with the sentencing, Kory R. Schulein, 37, of Sparta, pleaded guilty to knowingly receiving child pornography over the internet. According to court documents, Schulein first came to the attention to law enforcement in 2018 during an FBI investigation of child pornography on the dark web. Agents were able to track his internet protocol address and executed a federal search warrant at his home. Schulein served as a moderator of a dark web site dedicated to child exploitation and had been an active participant on other sites. Schulein had posted 13,733 messages, many of which included links to child exploitation images and videos. Schulein also collected and stored over 9,000 images and videos of child sexual abuse material on an encrypted hard driveThe FBI's Springfield Field Office investigated the case, with valuable assistance provided by the U.S. Marshals Service.

Trial Attorneys Jessica Urban and Alicia A. Bove of the Criminal Division's Child Exploitation and Obscenity Section (CEOS) and Assistant U.S. Attorney Nathan D. Stump of the U.S. Attorney's Office of the Southern District of Illinois prosecuted the case.

Case No. 2:23-cr-00404-JMR Document 53-6 filed 02/10/25 USDC Colorado pg 162 of 229

10/30/24, 1:32 PM                    Office of Public Affairs | Man Sentenced to 151 Months in Prison for Knowingly Receiving Child Sexual Abuse Material Through D…

This case was brought as part of Project Safe Childhood, a nationwide initiative to combat the growing epidemic of child sexual exploitation and abuse, launched in May 2006 by the Department of Justice. Led by U.S. Attorneys' Offices and CEOS, Project Safe Childhood marshals federal, state, and local resources to better locate, apprehend and prosecute individuals who exploit children via the internet, as well as to identify and rescue victims. For more information about Project Safe Childhood, please visit www.justice.gov/psc.

*Updated September 1, 2021*

## Topic

> **PROJECT SAFE CHILDHOOD**

## Components

Criminal Division  |  Criminal - Child Exploitation and Obscenity Section  |  Federal Bureau of Investigation (FBI)  |  USAO - Illinois, Southern

Press Release Number: 21-825

# Related Content

**PRESS RELEASE**

## Indiana Man Sentenced for Sexually Exploiting Children

An Indiana man was sentenced today to 17 and a half years in prison for possessing and creating images of child sexual abuse.

September 6, 2024




DEFENDANT'S EXHIBIT
G
USA v. Meier
23-cr-00419-RMR

**PRESS RELEASE**

# Morrisville Man Sentenced to 150 Months in Prison and 20 Years Supervised Release for Posting Child Pornography on Dark Web Chat Room

Friday, July 29, 2022

**For Immediate Release**

U.S. Attorney's Office, Eastern District of North Carolina

WILMINGTON, N.C. – Eric Werner Johansson, 59, a Morrisville resident was sentenced today to 150 months in prison and 20 years of supervised release for sharing child pornography on dark web chat rooms.  On March 8, 2022, the defendant pled guilty to transportation and possession of child pornography.

According to court documents and other information presented in court, agents with the Department of Homeland Security discovered a chat room on the dark web dedicated to child pornography.  Using an explicit username, Johansson was observed in the chat room uploading links that connected to images of child pornography.  In addition, Johansson was discussing his sexual arousal of such materials and fantasizing about sexually abusing children.

The investigation revealed that Homeland Security agents as well as Wake County Sheriff's Office deputies and the State Bureau of Investigation executed a search warrant at Johansson's residence on November 4, 2020.  He admitted to viewing child sexual abuse material for a period of ten years.  He admitted he had posted links to child pornography and had discussed

10/30/24, 1:35 PM
Eastern District of North Carolina | Morrisville Man Sentenced to 150 Months in Prison and 20 Years Supervised Release for Posti…

Case No. 5:23-cv-00419-M-RJ    Document 52-33-7    filed 02/10/25    Page 2 of 20    pg 164 of 229

his fantasies about sexually abusing children. Johansson further admitted being sexually aroused by child pornography.

A forensic examination of his digital devices revealed over 1,400 images and 30 videos of child sexual abuse material. These images and files included depictions of infants and toddlers being sexually abused and sadistic and masochistic conduct.

Michael Easley, U.S. Attorney for the Eastern District of North Carolina made the announcement after the sentencing hearing was concluded. Chief U.S. District Judge Richard E. Myers II presided over the case. The Department of Homeland Security, Wake County Sheriff's Office and the State Bureau of Investigation investigated the case and Assistant U.S. Attorney Charity Wilson prosecuted the case.

This case was brought as part of Project Safe Childhood, a nationwide initiative to combat the growing epidemic of child sexual exploitation and abuse, launched in May 2006 by the Department of Justice. Led by U.S. Attorneys' Offices and the Child Exploitation and Obscenity Section (CEOS), Project Safe Childhood marshals federal, state and local resources to better locate, apprehend and prosecute individuals who exploit children via the internet, as well as to identify and rescue victims. For more information about Project Safe Childhood, please visit www.justice.gov/psc.

Related court documents and information can be found on the website of the U.S. District Court for the Eastern District of North Carolina or on PACER by searching for Case No. 5:21-cr-00389-M-1.

###

*Updated July 29, 2022*

## Topic

**PROJECT SAFE CHILDHOOD**

## Component

USAO - North Carolina, Eastern

Case No. 2:23-cr-00419-RMR Document 33-8 filed 02/10/26 USDC Colorado pg 165 of 229

10/30/24, 1:37 PM                Eastern District of Washington | Wenatchee Man Sentenced to 12 Years in Federal Prison for Distributing Child Pornography on th…



DEFENDANT'S
EXHIBIT
H

USA v. Meier
23-cr-00419-RMR


**PRESS RELEASE**

# Wenatchee Man Sentenced to 12 Years in Federal Prison for Distributing Child Pornography on the "Dark Web"

Friday, October 13, 2023

**For Immediate Release**

U.S. Attorney's Office, Eastern District of Washington

Spokane, Washington – On October 11, 2023, U.S. District Judge Thomas O. Rice sentenced Michael Luis Ibarra, 36, of Wenatchee, Washington, to 12 years in federal prison for distributing images of child pornography on the "Dark Web." Judge Rice also ordered Ibarra to serve the remainder of his life on federal supervision after he is released from prison. Ibarra was also ordered to pay a total of $114,000 in restitution to 38 individual victims of his conduct.

In January of 2021, Ibarra was identified as a user of a website on the "Dark Web" dedicated to the distribution of child pornography. Ibarra was commended at one point by website administrators for distributing a "herculean" quantity of child pornography. Ibarra communicated with undercover federal agents in chat rooms and shared with them child pornography on several occasions.

Ibarra's electronic devices were seized at his home in Wenatchee and searched by the Federal Bureau of Investigation. Agents found more than fifteen thousand child pornography files, with more than five thousand files depicting the sexual abuse of infants and toddlers.

Case No. 2:23-cv-00049-JMR Document 52-3-8 filed 02/10/26 USPageode pg
166 of 229
10/30/24, 1:37 PM        Eastern District of Washington | Wenatchee Man Sentenced to 12 Years in Federal Prison for Distributing Child Pornography on th…

"The FBI and the United States Attorney's Office stand ready to respond with thorough investigations, vigorous prosecutions, and significant sentences for anyone who abuses children," said Vanessa R. Waldref, United States Attorney for the Eastern District. "No sentence can give these children back their innocence; however, our community is safer with Mr. Ibarra behind bars. Today's sentence sends a clear message to those who seek to victimize children, whether behind closed doors, through the dark web, or computer screens: the U.S. Attorney's Office and our partners will continue to work tirelessly to seek justice, and the consequences of exploiting children will be severe."

"Mr. Ibarra may have believed the Dark Web afforded him a level of protection from law enforcement" said Richard A. Collodi, Special Agent in Charge of the FBI's Seattle field office. "Thanks to the dedication of our investigators, we were able to bring his reprehensible activities to an end. The FBI and our partners will continue the work of protecting the most vulnerable of our citizens."

This case was brought as part of Project Safe Childhood, a nationwide initiative launched in May 2006 by the U.S. Department of Justice to combat the growing epidemic of child sexual exploitation and abuse. Led by the U.S. Attorneys' Offices and the Criminal Division's Child Exploitation and Obscenity Section, Project Safe Childhood marshals federal, state, and local resources to better locate, apprehend, and prosecute individuals, who sexually exploit children, as well as to identify and rescue victims. For more information about Project Safe Childhood, please visit http://www.justice.gov/psc.

This case was investigated by the Federal Bureau of Investigation. The case was prosecuted by Michael J. Ellis, Assistant U.S. Attorney for the Eastern District of Washington, and Kyle P. Reynolds, Trial Attorney for the Child Exploitation and Obscenity Section of the United States Department of Justice Criminal Division.

2:21-CR-00173-TOR

**Contact**

Richard Barker

First Assistant United States Attorney and Public Affairs Officer

509-353-2767 or USAWAE.Media@usdoj.gov

*Updated October 16, 2023*





**PRESS RELEASE**

# Texas Man Sentenced to 15 Years in Prison for Advertising Child Pornography

Monday, November 6, 2023

**For Immediate Release**

U.S. Attorney's Office, District of Massachusetts

BOSTON – A Texas man was sentenced today in federal court in Boston for advertising child sexual abuse material on the dark web.

Neal Staton Grubert, 35, of Bertram, Texas, was sentenced by U.S. District Court Judge Nathanial M. Gorton to 15 years in prison followed by five years of supervised release. On July 12, 2023, Grubert pleaded guilty to one count of advertising child pornography.

In May 2020, Swedish law enforcement authorities determined that a Swedish citizen was producing images and videos of himself sexually abusing his three-year-old niece and distributing them on various dark websites. The investigation identified Grubert as an administrator of one of the websites. Following the Swedish individual's arrest, a forensic examination of their phone revealed several images and videos depicting the sexual exploitation of children, including images and videos in which Grubert's face could be seen watching the exploitation as it happened via webcam while logged onto this dark website. Specifically, Grubert was masturbating while directing the Swedish individual how to molest his niece. A subsequent undercover investigation located images and a video uploaded and published by Grubert in his role as an administrator on the dark website.

The other individual pleaded guilty to charges in Sweden and was sentenced to seven years in prison.

Acting United States Attorney Joshua S. Levy and Michael J. Krol, Special Agent in Charge of Homeland Security Investigations in New England made the announcement today. Valuable assistance in the investigation was provided by the Swedish Police Authority; Swedish National Operations Department; Swedish National IT Crime Centre; Swedish Prosecution Authority; Swedish National Public Prosecution Department; and Swedish National Unit against Organized Crime. Assistant U.S. Attorneys Luke A. Goldworm and Benjamin Tolkoff of the Major Crimes Unit prosecuted the case.

This case was brought as part of Project Safe Childhood, a nationwide initiative to combat the growing epidemic of child sexual exploitation and abuse, launched in May 2006 by the Department of Justice. Led by the U.S. Attorneys' Offices and the DOJ's Child Exploitation and Obscenity Section, Project Safe Childhood marshals federal, state, and local resources to locate, apprehend, and prosecute individuals who exploit children, as well as identify and rescue victims. For more information about Project Safe Childhood, please visit https://www.justice.gov/psc.

*Updated November 6, 2023*

**Topic**

**PROJECT SAFE CHILDHOOD**

**Component**

USAO - Massachusetts

# Related Content

**PRESS RELEASE**





DEFENDANT'S EXHIBIT
J
USA v. Meier
23-cr-00419-RMR

**PRESS RELEASE**

# Man Sentenced for Advertising and Distributing Child Sexual Abuse Material on Dark Web

Tuesday, November 7, 2023

**For Immediate Release**

Office of Public Affairs

An Oklahoma man was sentenced yesterday to 21 years and 10 months in prison for advertising and distributing child sexual abuse material.

According to court documents, Austen Peppers, 36, of Lawton, sold and offered to sell images of minors being sexually abused. Peppers conducted the transactions on the dark web with cryptocurrency, and used platforms and applications that he believed were secure and protected him from law enforcement scrutiny. Peppers also engaged in sexually explicit communications with persons believed to be minors and encouraged those apparent minors to create sexually explicit images of themselves. Peppers amassed thousands of images and videos of children being sexually abused.

Peppers was also ordered to pay a special assessment of $11,200 and restitution totaling $57,000 to his victims.

Acting Assistant Attorney General Nicole M. Argentieri of the Justice Department's Criminal Division, U.S. Attorney Phillip A. Talbert for the Eastern District of California, and Special Agent in Charge Tatum King of Homeland Security Investigations (HSI) San Francisco made the announcement.

Case No. 2:23-cr-00091-RFB-RRR   Document 233-10   Filed 02/10/25   USDC Colorado   pg 170 of 229

10/30/24, 1:45 PM          Office of Public Affairs | Man Sentenced for Advertising and Distributing Child Sexual Abuse Material on Dark Web | United States ...

HSI Fresno, Chicago, and Oklahoma, and the Royal Canadian Mounted Police investigated the case, with assistance from the Oklahoma Highway Patrol Tactical Team.

Trial Attorney James E. Burke IV of the Criminal Division's Child Exploitation and Obscenity Section (CEOS) and Assistant U.S. Attorney David Gappa for the Eastern District of California prosecuted the case.

This case was brought as part of Project Safe Childhood, a nationwide initiative to combat the epidemic of child sexual exploitation and abuse launched in May 2006 by the Justice Department. Led by U.S. Attorneys' Offices and CEOS, Project Safe Childhood marshals federal, state, and local resources to better locate, apprehend, and prosecute individuals who exploit children via the internet, as well as to identify and rescue victims. For more information about Project Safe Childhood, please visit www.justice.gov/psc.

*Updated November 7, 2023*

**Topic**

| **PROJECT SAFE CHILDHOOD**

**Components**

Criminal Division   |   Criminal - Child Exploitation and Obscenity Section   |   USAO - California, Eastern

Press Release Number: 23-1242

# Related Content

**PRESS RELEASE**

## Indiana Man Sentenced for Sexually Exploiting Children





DEFENDANT'S
EXHIBIT
K
USA v. Meier
23-cr-00419-RMR

**PRESS RELEASE**

# Ghislaine Maxwell Sentenced To 20 Years In Prison For Conspiring With Jeffrey Epstein To Sexually Abuse Minors

Tuesday, June 28, 2022

**For Immediate Release**

U.S. Attorney's Office, Southern District of New York

Damian Williams, the United States Attorney for the Southern District of New York, announced that GHISLANE MAXWELL was sentenced today in Manhattan federal court by United States Circuit Judge Alison J. Nathan to 240 months in prison for her role in a scheme to sexual exploit and abuse multiple minor girls with Jeffrey Epstein over the course of a decade. MAXWELL was previously found guilty on December 29, 2021, following a one-month jury trial, of conspiracy to entice minors to travel to engage in illegal sex acts, conspiracy to transport minors to participate in illegal sex acts, transporting a minor to participate in illegal sex acts, sex trafficking conspiracy, and sex trafficking of a minor.

U.S. Attorney Damian Williams said: "Today's sentence holds Ghislaine Maxwell accountable for perpetrating heinous crimes against children. This sentence sends a strong message that no one is above the law and it is never too late for justice. We again express our gratitude to Epstein and Maxwell's victims for their courage in coming forward, in testifying at trial, and in sharing their stories as part of today's sentencing."

According to the allegations in the Indictment, court documents, and evidence presented at trial:

From at least 1994, up to and including in or about 2004, GHISLAINE MAXWELL assisted, facilitated, and participated in Jeffrey Epstein's abuse of minor girls by, among other things, helping Epstein to recruit, groom, and ultimately abuse victims known to MAXWELL and Epstein to be under the age of 18.  The victims were as young as 14 years old when they were groomed and abused by MAXWELL and Epstein, both of whom knew that their victims were in fact minors.  As a part and in furtherance of their scheme to abuse minor victims, MAXWELL and Epstein enticed and caused minor victims to travel to Epstein's residences in different states, which MAXWELL knew and intended would result in their grooming for and subjection to sexual abuse.

MAXWELL enticed and groomed minor girls to be abused in multiple ways.  For example, MAXWELL attempted to befriend certain victims by asking them about their lives, their schools, and their families, and taking them to the movies or on shopping trips.  MAXWELL also acclimated victims to Epstein's conduct simply by being present for victim interactions with Epstein, which put victims at ease by providing the assurance and comfort of an adult woman who seemingly approved of Epstein's behavior.  Additionally, Epstein offered to help some victims by paying for travel and/or educational opportunities, and MAXWELL encouraged certain victims to accept Epstein's assistance.  As a result, victims were made to feel indebted and believed that MAXWELL and Epstein were trying to help them.  MAXWELL also normalized and facilitated sexual abuse for a victim by discussing sexual topics, undressing in front of the victim, being present when the victim was undressed, and encouraging the victim to massage Epstein.

As MAXWELL and Epstein intended, these grooming behaviors left minor victims vulnerable and susceptible to sexual abuse by Epstein.  MAXWELL was then present for certain sexual encounters between minor victims and Epstein, such as interactions where a minor victim was undressed, and ultimately was present for sex acts perpetrated by Epstein on minor victims.  That abuse included sexualized massages during which a minor victim was fully or partially nude, as well as group sexualized massages of Epstein involving a minor victim where MAXWELL was present.  In some instances, MAXWELL participated in the sexual abuse of minor victims.

Ultimately minor victims were subjected to sexual abuse that included, among other things, the touching of a victim's breasts or genitals, placing a sex toy such as a vibrator on a victim's genitals, directing a victim to touch Epstein while he masturbated, and directing a victim to touch Epstein's genitals.  MAXWELL and Epstein's victims were groomed or abused at Epstein's residences in New York, Florida, and New Mexico, as well as MAXWELL's residence in London, England.

Case Nase:1:226-cr-09004-BRRR Document5233-11filed 12/102/250/24 USDPage3of3 pg 173 of 229

10/30/24, 1:53 PM          Southern District of New York | Ghislaine Maxwell Sentenced To 20 Years In Prison For Conspiring With Jeffrey Epstein To Sexuall…

In the earlier phase of the conspiracy, from at least approximately 1994 through approximately 2001, MAXWELL and Epstein identified vulnerable girls, typically from single-mother households and difficult financial circumstances.  This earlier phase required the defendant and Epstein to identify one girl at a time to target for grooming and abuse.  In the later phase, from approximately 2001 until at least approximately 2004, MAXWELL and Epstein enticed and recruited, and caused to be enticed and recruited, minor girls to visit Epstein's Palm Beach Residence to engage in sex acts with Epstein, after which Epstein, MAXWELL, or another employee of Epstein's would give the victims hundreds of dollars in cash. MAXWELL and Epstein encouraged one or more of those victims to travel with Epstein with the intention that the victim engage in sex acts with Epstein.  Moreover, and in order to maintain and increase his supply of victims, MAXWELL and Epstein also paid certain victims to recruit additional girls to be similarly abused by Epstein.  In this way, MAXWELL and Epstein created a network of underage victims for Epstein to sexually exploit.

*          *          *

In addition to the prison sentence, MAXWELL, 60, was sentenced to five years of supervised release and ordered to pay a $750,00 fine.

Mr. Williams praised the outstanding work of the Federal Bureau of Investigation.

This case is being handled by the Office's Public Corruption Unit.  Assistant U.S. Attorneys Maurene Comey, Alison Moe, Lara Pomerantz, and Andrew Rohrbach are in charge of the prosecution.

### Contact

Nicholas Biase
Victoria Bosah
(212) 637-2600

*Updated June 28, 2022*

### Component

[USAO - New York, Southern](#)

Press Release Number: 22-206

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Criminal Case No. 23-cr-00419-RMR

UNITED STATES OF AMERICA,

       Plaintiff,

v.

1.     CHRISTOPHER CARL MEIER,

       Defendant.

---

## GOVERNMENT'S SENTENCING STATEMENT

---

The United States of America ("the government"), by and through Matthew T. Kirsch, Acting United States Attorney for the District of Colorado, Alecia L. Riewerts, Assistant United States Attorney, and Kyle Reynolds, Acting Deputy Chief of the Department of Justice's Child Exploitation and Obscenity Section, hereby submits this Sentencing Statement.

The defendant is a registered sex offender who, by his own admission, is "addicted" to child pornography and has been viewing it for approximately 25 years. He was not deterred when federal law enforcement searched his home for child pornography offenses in 2006. Nor was he deterred when local authorities searched his home and arrested him in 2012, which led to his 2013 conviction for sexual exploitation of children and his requirement to register as a sex offender. Nor was he deterred when the FBI executed yet a third search warrant at his home in 2021. After all this, he still continued to access child pornography websites online.

In fact, after his first encounter with law enforcement, the defendant's criminal sexual activity toward children *escalated*. Passively consuming child pornography was no longer

enough for him.  He began posing as a young girl to talk to minor boys online and encouraging and enticing them to disrobe and masturbate for the camera.  Once they did so, he would create videos of the boys without their knowledge and advertise and distribute them on websites dedicated to the sexual exploitation of children.  The presentence report ("PSR") refers to *more than sixty* minor victims of the defendant's conduct.

The defendant is a sexual predator, a recidivist, and a clear danger to children.  He had every opportunity to cease his sexually exploitative conduct and simply did not.  The government therefore recommends that the Court sentence him to 40 years in prison, which is a fair and just sentence given the egregious facts, the sheer number of victims, the advisory sentencing guidelines, and the other factors set forth in 18 U.S.C. § 3553(a).

## I.     THE UNITED STATES SENTENCING GUIDELINES

The United States Sentencing Guidelines are advisory, but they remain "the starting point and the initial benchmark" in sentencing.  *Gall v. United States,* 552 U.S. 38, 49-50 (2007).  The guidelines must be properly calculated and considered, but ultimately the Court must craft a sentence that sufficiently accounts for the sentencing factors and objectives outlined in 18 U.S.C. § 3553(a).  *Id*. at 49-50.  "A sentence is substantively reasonable when the length of the sentence reflects the gravity of the crime and the § 3553(a) factors as applied to the case." *United States v. Martinez-Barragan*, 545 F.3d 894, 905 (10th Cir. 2008).

The draft PSR [ECF #37] filed on October 9, 2024, calculates the defendant's final offense level at 41, accounting for his acceptance of responsibility.  The government agrees with portions of the PSR's analysis but objects to other portions, and it has filed objections [ECF #32] establishing that the defendant's final offense level should be 42, which combined with a

Criminal History Category of II leads to a guidelines range of 360 months to the statutory

maximum sentence of 240 years, equivalent to 2,880 months.

Because the guidelines are advisory and only one factor to be considered by the Court in

determining a sentence under 18 U.S.C. § 3553(a), the government will frame its argument

within the factors set forth in 18 U.S.C. § 3553(a) and proceed through those factors in the order

in which they appear in the statute.

## II.    DISCUSSION OF THE 18 U.S.C § 3553(a) FACTORS

### A. *Nature and Circumstances of the Offense*

The facts of the defendant's crime of conviction are well documented in the PSR.  The

defendant pleaded guilty to multiple counts involving the distribution of child pornography.  PSR

at ¶¶ 1-2.

But this defendant is no mere distributor.  Instead, as the unobjected-to facts in the PSR

make clear, the images and videos he shared over the website at issue—referred to here as

"Website A"—consisted of branded content the defendant produced himself.  He did so by

targeting minor boys online, enticing them to perform sexually, recording them as they did so,

and then sharing the resulting videos with like-minded pedophiles on Website A.  The defendant

was so notorious and prolific that his online activity attracted the attention of four different law

enforcement agencies in three separate countries.  PSR at ¶ 29.

Specifically, Website A was website dedicated to child pornography and the sexual

exploitation of minor boys.  PSR at ¶ 26.  The defendant was active on the website for more than

18 months, and during this time he made more than 600 posts and received several "awards."  *Id.*

at ¶¶ 26, 30-31.  On Website A, he used a particular username that identified him to other users

and which he used to brand his content.  *See, e.g., id.* at ¶¶ 34-37.

3

The defendant held himself out on Website A as a "capper," which refers to someone who takes videos or screen captures—sometimes called "caps"—of minors engaging in sex acts on web camera.  PSR at ¶ 32.  He maintained a "productions index" within a Website A subforum dedicated to cappers.  *Id.* at ¶¶ 27, 34.  This "productions index" consisted of a post on Website that included numerous depictions of boys between the ages of approximately 12 and 15 disrobing and masturbating in front of a camera.  *Id.* at ¶¶ 34-35.  Each depiction consisted of a collage of screenshots from a video, and each included a title that included a boy's name, a location like "USA" or "CANADA," a date, and often a sexually explicit description such as "12yo shows dick in bath," "13yo cums 2x," or "15yo poses, anal fun, cums."  *Id.* ¶ 34.  (The abbreviation "yo" stands for "years old.")

One set of images in the defendant's "production index" depicts two boys, identified as being 14 and 12 years old, engaging in oral and anal sex with one another.  PSR at ¶¶ 34-35.  All told, this "production index" post appears to include depictions of at least *thirty-five* minor boys who showed their genitals and/or masturbated on camera.  *Id.* at ¶ 36.  This includes nine boys who were identified by the FBI, as well as eight additional boys who were preliminarily identified.  *Id.* at ¶¶ 34-36.

The defendant made other posts on Website A as well.  As detailed in the PSR, the FBI captured at least six other posts he made on Website A that included images or videos of minor boys masturbating.  PSR at ¶¶ 40-66.  In these posts, the defendant often included nauseatingly specific descriptions of the depicted conduct.  For example, he described one 12-year-old child as "hot and horny" and "too young to cum," but whose genitals "are begging for a thorough sucking and licking."  *Id.* at ¶ 41.  In a comment to this post, the defendant admitted that his session with the boy lasted approximately two and a half hours, and that he had been interacting

4

with the minor for more than a year before he went through puberty.  *Id.* at ¶ 42.  These other posts that the defendant made on Website A depicted at least eight identified or preliminarily identified minor boys, not including the 35 minor boys depicted in the "production index" post. *Id.* at ¶¶ 48, 65, 67.

Some of the defendant's posts constituted entries in perverse "competitions" with other members of Website A about the sexual abuse of children.  *See, e.g.,* PSR ¶¶ 40, 45, 55, 60.  In these posts, the defendant distributed and advertised child pornography he previously produced in order to gain favor and appreciation from other like-minded pedophiles.  *Id.*  The defendant specifically stated in one such instance, "I'm trying to get more votes from the pedos…"  *Id.* at ¶ 42.  Other Website A users responded to the defendant's posts to thank and praise him and comment on the videos he posted.  *See, e.g., id.* at ¶¶ 41-42, 46-47, 51-52, 57, 62-63.

In these posts, the defendant encouraged his audience of Website A users to masturbate to the minor boys in the videos he posted.  *See, e.g.,* PSR at ¶¶ 46, 61.  He and other users discussed and praised the minor boys' sexual attractiveness and performance in explicit detail. *See, e.g., id.* at ¶¶ 41-42, 45, 47, 58.  These comments—made both by the defendant and the audience to which he catered—made clear that they viewed these boys as mere sexual objects to be ogled and masturbated to and not vulnerable minor victims of sexual exploitation and gross invasions of privacy.

All of the defendant's conduct made clear that he was the original producer of the content that he posted on Website A.  For example, as noted above, he expressly held himself out as a capper who maintained an index of his "productions."  PSR at ¶¶ 32, 34.  He also made detailed statements about his interactions with the victims.  He said, for example, that one of his videos omitted certain scenes depicting the victim getting distracted and nervous, and these are details

5

only the producer of the video would know.  *Id.* at ¶ 42.  He also implied that he interacted with this same victim over the course of several years and observed his sexual development, and specifically his ability to ejaculate.  *Id.*  He also sent another user a detailed transcript between him and a 13-year-old boy in which he asked the boy to be his "slave," he instructed the boy to "slap ur ass" and to "cum," and that he might ask the boy to "use a hairbrush in your ass like a dildo…"  *Id.* at ¶ 73.  He told another user that he has "been directing boys in solo action and duo hardcore action since 2012."  *Id.*

The defendant also spoke in detail in his private messages about being a capper and the process of capping.  For example, he stated that he has been capping since 2007, that he worked with another person to recruit and target boys in three specific foreign countries, that he capped one particular boy 43 times over a two-year period, that he capped eight separate boys in one particular day, that capping is a difficult and "time consuming" process that takes "hours," that certain online platforms are better for capping than others, that only about 10% of his efforts result in successful caps.  PSR at ¶ 73.  He also provided detailed instructions to other users about best practices for targeting children online and producing child pornography of them.  *Id.*

In addition, the defendant made statements disclosing his *modus operandi* of enticing young boys to perform sexually on camera.  As noted in the PSR, cappers who target boys often pose as girls the same age as their victims, in the hopes that their victims will be more likely to engage in sexual conduct if they think they are interacting with a girl their own age.  PSR at ¶ 33. The defendant made numerous statements on Website A admitting that he used a "girl" to induce his victims to engage in sexual conduct.  For example, he mentioned that one victim viewed "my girl stripping for him," another wanted to spend time with "my girl," another ejaculated only after the defendant used "my girl," yet another victim wanted to "cum for a girl," and even yet

6

another had "cam sex with my girl." *Id.* at ¶¶ 40, 42, 45, 58.  The defendant, of course, is a

childless middle-aged male sex offender, so these statements make no sense in any context other

than a disclosure of his capping methods.  He also told another user in a private message that he

uses a "bait girl" in his capping.  *Id.* at ¶ 73.

The defendant's online admissions are corroborated by the statements of several of his

victims.  A number of the defendant's victims told law enforcement that they chatted over

various platforms with a "girl" who directed them to disrobe and/or send nude images, and this

"girl" either never spoke or never appeared on camera.  *See, e.g.,* PSR at ¶¶ 35, 48, 68.  Other

victims also confirmed more generally that they engaged in sexual interactions with girls online.

*Id.* at 35, 36, 53, 67, 68.  These victims, of course, would have no reason to know about the

admissions the defendant made on Website A regarding his capping methods.  And none of them

reported having an online sexual interaction with an adult man.

In addition, the defendant went to great lengths to brand his videos and market them as

his own produced content.  For example, his username appears frequently in his videos, either in

full or in abbreviated form, and he included a personalized banner in his posts.  *See, e.g.,* PSR at

¶¶ 35, 37, 40-41, 45-46, 50-51, 55-58, 60-62, 64.  This username was personal to the defendant,

and he has been using it since he was a child.  *Id.* at ¶ 77.  Some of his videos also included a

stylized logo that appeared to be a play on his username.  *Id.* at ¶¶ 36, 58, 64.

The defendant's sexually predatory conduct was not limited to Website A, either.  He

engaged in essentially the same conduct on at least three other websites dedicated to child

exploitation—that is, he screen-captured boys masturbating on camera and then uploaded them

to a child pornography website—and FBI identified or preliminarily identified approximately 23

additional child victims whose content appeared on websites other than Website A.  PSR at ¶ 68.

All told, the PSR alone refers to more than 65 separate victims of the defendant, and whose depictions he advertised or distributed over Website A and other websites. This excludes numerous as-of-yet unidentified victims, including victims in foreign countries and victims whose videos the defendant did not share with others. *See, e.g.,* PSR at ¶¶ 59, 69, 73. As the Supreme Court first noted approximately 40 years ago, the abuse and memorialization of the abuse "are a permanent record of the children's participation." *New York v. Ferber*, 458 U.S. 747, 759 (1982). The harm that the defendant inflicted on his victims will likely be lifelong. And by distributing the videos memorializing his abuse, he has inflicted an entirely different kind of harm on them. The internet is forever. His victims necessarily know that their videos will be in the hands of pedophiles and circulating on the internet for their whole lives.

Also, these figures necessarily understate the number of minors the defendant *tried* to target online. As noted above, he stated that only about 10% of his efforts resulted in successful caps. PSR at ¶ 73. By his own math, the defendant must have targeted more at least 650 minors online to achieve the caps depicting 65 minors that are referred to in the PSR.

The defendant's conduct with regard to these victims was outrageous on its own, but it was all the worse because he uploaded videos of the victims to a community dedicated to child pornography and child exploitation. The U.S. Sentencing Commission has specifically identified this as an aggravating factor not currently accounted for in the Sentencing Guidelines for child pornography trafficking.[1] The Commission concluded that the existence of such communities "increases the likelihood that *other* community members may engage in sex offending to create

---

[1]   United States Sentencing Commission, *2012 Report to the Congress: Federal Child Pornography Offenses*, at xvii-xviii (December 2012) ("2012 Report"), available at https://www.ussc.gov/sites/default/files/pdf/news/congressional-testimony-and-reports/sex-offense-topics/201212-federal-child-pornography-offenses/Full_Report_to_Congress.pdf.

new child pornography images for trading online." 2012 Report at 94. The Commission found

that such communities are also dangerous because they normalize the sexual exploitation of

children, help offenders look at their deviant sexual desires in a positive light, and may lead

offenders to progressing from viewing CSAM to committing other sex offenses. *Id.* at 97.

Another aggravating factor is the defendant's level of sophistication—not just in

exploiting minors online, but in avoiding detection by law enforcement. The defendant was so

knowledgeable about law enforcement methods and matters that he invoked by name a particular

anti-child-exploitation task force operated by a foreign government. PSR at ¶ 73. In an effort to

evade law enforcement, he used sophisticated anonymizing tools—such as the dark web and

virtual private networks—to obscure his true identity while committing crimes online. *See, e.g.,*

*id.* at ¶¶ 19-26, 68, 72, 74. He also used encryption software on his devices. In fact, expert

forensic examiners from the FBI and the Department of Justice were unable to decrypt and

access almost all of the digital devices seized from his home during a search warrant in 2021. *Id.*

at ¶ 74. The FBI still does not know what is on these devices. And not only did the defendant

use these technological methods to avoid law enforcement detection, but he also specifically

counseled other criminals on Website A to do the same. *See, e.g., id.* at ¶ 72.

The defendant also used online tradecraft to evade detection and arrest. By his own

admission, he would delay distributing videos he created because then the victim would look

different and be harder to identify. PSR ¶ 73. This tactic was successful, as the victims were in

fact more difficult to identify and had less recollection of their interactions of the defendant. *Id.*

at ¶ 70. In addition, the defendant left few online remnants of his online interactions with his

victims. By the time the FBI identified the victims and served process on social-media

companies, the evidence was no longer available, and the FBI was not able to identify what

online accounts he used to target and exploit children. *Id.* ¶ 80. This, combined with the defendant's successful use of encryption software on the devices in his home, is the reason for the absence of charges under 18 U.S.C. § 2251(a) in the indictment.

Finally, the defendant did not stop his criminal conduct even after the FBI executed a search warrant at his home and seized his devices. As noted further below, this was the *third time* law enforcement searched his home for evidence of child-exploitation crimes. Approximately six to seven months after the FBI searched his home, the defendant was back on a child pornography website, telling a confederate that law enforcement had searched his home. PSR ¶ 78. The FBI also obtained evidence that after the 2021 search warrant at his home, the defendant began accessing at least one child pornography website from an internet account belonging to the Jefferson County Public Library system. *Id.* at ¶ 79. (The defendant's place of employment in this time period was located in Jefferson County. *Id.* at ¶ 177.)

Overall, the defendant's criminal conduct is shocking. He specifically targeted dozens of child victims over the course of many years, he created video evidence of them at their most vulnerable and exposed moments, and he gleefully shared that content with other pedophiles on multiple websites. This offense conduct fully supports a sentence of 40 years in prison.

### B. History and Characteristics of the Defendant

The defendant's history and characteristics likewise warrant a substantial sentence. He is, by his own admission, "addicted" to child pornography. PSR at ¶¶ 17, 76, 81, 149. He stated on numerous occasions that he first started viewing child pornography approximately 25 years ago and he was "hooked ever since." *Id.* at ¶¶ 17, 72, 81. He told the FBI that he has tried to stop his behavior, but he cannot be fixed. *Id.* at ¶ 81. He stated online that he knew his actions were wrong and he asked God for assistance, without success. *Id.* at ¶ 73. He stated "I have

always had constant battles within myself over this. It gets exhausting so I stopped fighting and gave in for now. I came to acceptance, knowing that I cannot help what I like." *Id.*

True to his own admissions, the defendant's criminal conduct appears to be the product of a deep and uncontrollable sexual attraction to children—particularly boys who are in early puberty. He stated online that his preferred age of boys is 11 through 16, with a particular preference for 12-15 year olds. PSR at ¶ 73. He expressly describes himself as a hebephile, which is a scientific term for sexual attraction to minors in early puberty or early adolescence. *Id.* And needless to say, he described his sexual desires online in great detail. For example, he told one user of Website A that "We seem to have similar taste in boys age and body types (i like 11y-16y as long as they CUM!, must have cum, LOL). What ages do you like?"

There is also little in the defendant's background that would explain—much less justify—his destructive, decades-long criminal behavior. He appears to have had a good relationship with his family, including during his childhood. PSR at ¶¶ 155-58. There is no question that the defendant has suffered hardship, including severe bullying and a sexual assault as an adolescent. *Id.* at ¶¶ 159-60. As awful as these incidents were, however, it is a sad truth that many other people undergo similar or more traumatic abuse, and yet they do not go on to sexually exploit dozens of minors online and then upload videos of that exploitation to child pornography websites. In addition, many victims of sexual exploitation naturally feel deep sympathy and empathy for others in the same position; for the defendant, it appears to have had the opposite effect.

It is also clear that the defendant is intelligent and resourceful. He has a bachelor's degree in computer information systems, and he was a reliable employee at his places of employment. PSR ¶¶ 176-81. Unfortunately, the defendant chose to devote his talents to

malevolent ends.  After all, he targeted dozens of children online, persuaded them to disrobe and

masturbate, recorded, edited, and branded the fruits of his labor, posted them on online

communities dedicated to child sexual exploitation, and used sophisticated technological

methods to evade serious punishment for two-and-a-half decades.

### C. *A sentence that reflects the seriousness of the offense, promotes respect for the law, provides just punishment, affords adequate deterrence to criminal conduct, and protects the public from further crimes of the defendant*

The offense of production of child pornography is one of the most serious that this office

prosecutes and warrants the most serious of sentences.  Federal District Judge John R. Adams, in

*United States v. Cunningham*, 680 F. Supp. 2d 844, 847 (N.D. Ohio 2010), used a quote

attributed to Nelson Mandela: "There can be no keener revelation of a society's soul than the

way in which it treats its children."  He continued: "Given the recent statistics surrounding child

pornography, we are living in a country that is losing its soul."  *Id.*

The criminal conduct at issue is the sexual exploitation and abuse of dozens of minor

boys.  Deterrence and protection of the public are critical.  A sentence of 40 years will afford

such deterrence, particularly as to this defendant, as he cannot reoffend while incarcerated.

Additionally, a sentence of 480 months would deter the defendant and others from future

criminal behavior.  As for other offenders who might consider engaging in similar behavior,

"[g]eneral deterrence is crucial in the child pornography context."  *United States v. Bistline*, 665

F.3d 758, 767 (6th Cir. 2012).

There is a manifest risk that the defendant will reoffend without a substantial sentence.

As noted above, he admitted that he is "addicted" to child pornography and has tried to stop his

criminal behavior, but he cannot.

The defendant specifically needs to be deterred and incapacitated because his criminal

activity escalated throughout his life, and there is no reason to believe that he will stop upon his

release from federal prison. As noted above, he repeatedly stated that he first became involved with child pornography when he was 15, approximately 25 years ago. This would have been approximately in the late 1990s. And his first encounter with law enforcement for child pornography crimes was in 2006, when agents from Homeland Security Investigations executed a search warrant at his home and seized his devices. PSR at ¶ 13. The defendant was ultimately charged in Colorado state court, but the charges were dropped. *Id.* at ¶ 14.

But even after this, the defendant's conduct escalated to exploiting children in real time. He also stated on Website A on more than one occasion that he began capping minors in 2007, *after* the 2006 search warrant at his home. PSR ¶ 73.

The defendant's next encounter with law enforcement was more serious. In 2012, the Adams County Sheriff's office executed a search warrant at his home to search for child pornography offenses. PSR at ¶ 17. This time, the defendant was convicted of sexual exploitation of a child in Colorado state court, which required him to register as a sex offender. *Id.* at ¶¶ 18, 149.

But a criminal conviction and sex-offender registration did not dissuade the defendant from continuing his criminal activity. Indeed, this conduct persisted for an additional decade, during which time he began accessing child-exploitation communities on the dark web and cultivating his heavily branded and curated online reputation as a capper.

In fact, the defendant was still on parole from this conviction at the time he began accessing Website A in September 2019. PSR at ¶¶ 30, 149. This is not factored into his Criminal History Category due to recent changes to Section 4A1.1(e) of the Sentencing Guidelines. *Id.* at ¶ 151.

13

The defendant could have stopped his conduct at any time. He could have stopped in 2006, after the first search warrant at his home. But he did not. He could have stopped in 2013, after his conviction and his sex offender registration. But he did not. And he could have stopped in 2021, when the FBI executed a search warrant at his home. But again, he did not. In fact, he did not stop until he was arrested and detained on the current charges. There is every reason to believe that the defendant cannot and will not stop engaging in this criminal conduct.

And his claims that he will stop his conduct should fall on deaf ears. After all, that is what he said in an "autobiography" discovered in his home, which appears to have been written around the time of his 2013 conviction. There, he expressed optimism that his involvement with child pornography was over. PSR ¶ 76. But it was not—it persisted for another ten years. Based on all the available evidence in the record, the defendant's involvement with child pornography and minors is likely to continue after he is released from federal prison.

The risk of recidivism is one factor to be taken into account with regard to protecting the public from the defendant's further crimes. The difficulty in assessing recidivism is critical to consider in regard to protecting the public from further crimes of the defendant under 18 U.S.C. § 3553(a). Unfortunately, valid risk assessment instruments to predict sexual recidivism by child pornography offenders currently do not exist.[2] Many of these risk assessments provide a series

---

[2] On the issue of recidivism and child pornography offenses, Dr. Gene Abel testified before the Sentencing Commission at a public hearing on February 15, 2012, addressing federal child pornography offenses. Dr. Abel is a well-known psychiatrist and widely respected leader in the field of diagnosing and treating sexual problems. He is considered by many to be the leading psychophysiology researcher in studies of sexual behavior problems in the United States. Dr. Abel was also presented with a series of questions by the Sentencing Commission. One of the questions he was asked was "[a]re there valid risk assessment instruments to predict sexual recidivism by child pornography offenders." His response: "We don't have that—I don't have that, at present." The transcript can be found online at https://www.ussc.gov/sites/default/files/Transcript_4.pdf, p. 107. The government's understanding is that this statement still reflects the current state of affairs.

14

of questions to determine whether a defendant is likely to recidivate. But those assessments are

not necessary here, where the defendant has *already* demonstrated his willingness to recidivate,

even after a conviction, sex offender registration, jail time, and numerous encounters with law

enforcement.

## III.   CONCLUSION

The defendant has participated in one of the most vile and heinous crimes in our

society—that which exploits our society's children. The defendant engaged in the repeated

sexual exploitation of dozens of children and posted the videos online. A sentence of 40 years of

imprisonment fairly reflects the factors to be considered under 18 U.S.C. § 3553(a), including the

nature and circumstances of the offense, the history and characteristics of the defendant, the need

for the sentence to reflect the seriousness of the offense, promote respect for the law, afford

adequate deterrence to criminal conduct, and protect the public from future crimes of the

defendant.


Respectfully submitted,


MATTHEW T. KIRSCH                          STEVEN J. GROCKI
Acting United States Attorney              Chief

By:  *s/ Alecia L. Riewerts*          By:  *s/ Kyle P. Reynolds*
Alecia L. Riewerts                         Kyle P. Reynolds
Assistant U.S. Attorney                    Acting Deputy Chief
U.S. Attorney's Office                     U.S. Dept. of Justice, Criminal Division
1801 California Street, Suite 1600         Child Exploitation and Obscenity Section
Denver, CO 80202                           1301 New York Avenue, NW
Telephone: 303-454-0100                    Washington, DC 20005
E-mail: Alecia.Riewerts@usdoj.gov          Telephone: 202-616-2842
Attorney for Government                    E-mail: Kyle.Reynolds@usdoj.gov
                                           Attorney for Government

15

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 30th day of October, 2024, I electronically filed the foregoing **SENTENCING STATEMENT** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

**Stephanie Maureen Snyder**
**Email:  Stephanie_Snyder@fd.org**


By:  <u>*s/ Kyle P. Reynolds*</u>
　　　Kyle P. Reynolds
　　　Acting Deputy Chief
　　　U.S. Dept. of Justice, Criminal Division
　　　Child Exploitation and Obscenity Section

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No. 23-cr-00419-RMR

UNITED STATES OF AMERICA,

      Plaintiff,

v.

1.  CHRISTOPHER CARL MEIER,

      Defendant.

---

**UNITED STATES' RESPONSE TO DEFENDANT'S OBJECTIONS
TO PRESENTENCE INVESTIGATION REPORT [ECF #31]**

---

      The United States of America, by and through Acting United States Attorney Matthew T. Kirsch, Assistant United States Attorney Alecia L. Riewerts, and Acting Deputy Chief of the Department of Justice's Child Exploitation and Obscenity Section Kyle Reynolds, respectfully responds to the defendant's objections to the Presentence Investigation Report [ECF #31 ("Objections")] as follows:

<u>Response to Objections Impacting the Guideline Calculation</u>

*The USSG § 2G2.1 Cross-Reference Applies to All Counts Other than Count One*

      Section 2G2.2 of the guidelines typically applies to offenses involving the distribution of child pornography.  That section contains a cross-reference, however, which generally provides that if the defendant produced the child pornography he distributed, his guidelines should be calculated under Section 2G2.1 and not 2G2.2. *See* U.S.S.G. § 2G2.2(c)(1).

1

The draft Presentence Investigation Report ("PSR") [ECF #30] correctly determines that the § 2G2.2(c)(1) cross-reference applies to Counts 2, 4, 5, and 6.[1] PSR ¶¶ 104, 113, 122, 130.  In its objections to the draft PSR, the United States has already explained why the cross-reference should apply to Count 3 as well.  [ECF #32.]

The defendant's objection that the cross-reference should not apply to any count in the Indictment should be overruled.  He concedes, as he must, that his own statements provide "circumstantial evidence tending to show that he was involved in the production of some videos at various points in time."  Objections at 4.  But he claims that his statements are mere exaggeration and not evidence of production.

This argument fails, principally because it disregards numerous factors in the draft PSR that lend reliability, credibility, and corroboration to the defendant's online admissions that he produced the child pornography that he shared over Website A.

*First,* the defendant's admissions that he produced the content on Website A were extensive.  They were not stray, coy, cryptic, or infrequent comments.  He straightforwardly held himself out to be a "capper" who maintained a "productions index" of the material that he produced.  PSR at ¶¶ 32, 34.  This "index" formed the basis for Count 3 of the Indictment.  *Id.* ¶ 38.  The defendant also repeatedly admitted on Website A that he produced the content that he posted, both in public and private messages.  *See, e.g., id.* at ¶¶ 41-42, 45, 58, 61, 64, 73.

With regard to the specific posts underlying counts 2, 4, 5, and 6 of the Indictment, the defendant stated in each one that he was offering "original content," and

---

[1] The Probation Office has since filed a final PSR and addendum.  [ECF #35.]

2

the file title for each offered video included an abbreviation for his username's "productions," a boy's name and age, a specific date, and a country. PSR at ¶¶ 40-41, 45-46, 50-51, 60, 64. Each file title also contained the name of an online video-chatting platform that presumably corresponds to where the defendant encountered the child victim. *Id.* Each victim underlying Counts 2, 4, 5, and 6 of the Indictment actually lived in the United States, as their file titles indicated. *Id.* at ¶¶ 43, 48, 53, 65; *compare id.* at ¶¶ 34-35 (video titles referring to other countries). For the victims underlying Counts 5 and 6, the boy's name in the file title that the defendant distributed was the real name of the victim, and for the victim underlying count 2, the first initial in the defendant's file title was the real first initial of the victim. *Id.* at ¶¶ 40, 43, 51, 53, 64-65.

The defendant made other comments in each of these posts indicating that he produced the videos available through them. For example, in three of these four posts, he referred directly to using his "girl" to entice the child victims to disrobe, masturbate, and ejaculate. *See, e.g.,* PSR at ¶ 40, 42, 45, 64. As further described below, this refers to the defendant streaming a video of a girl the same age as his victim in order to induce the victim to disrobe and masturbate. *Id.* at ¶ 33. In the remaining post, he referred to "how much countless time went into this work," which is consistent with his other statements that capping minors is time-consuming. *Id.* at ¶¶ 52, 73. He also described one of his videos as a "cap entry" provided by a "capper." *Id.* at ¶¶ 60-61.

The defendant also provided details about off-screen interactions with one of the victims that only the producer of the video would know. He said, for example, that the video omitted certain scenes depicting the victim getting distracted and nervous. *Id.* at

¶ 42.  He also implied that he interacted with this same victim over the course of several years and observed his sexual development, and specifically his ability to ejaculate.  *Id.*

Contrary to the defendant's arguments, these statements cannot plausibly be interpreted as the defendant simply posting videos that some other person created.  Instead, he plainly held himself out as the creator of this "original content."

*Second*, the defendant's admissions contained significant details about his methods of targeting minors, tricking them into performing sexually on webcam, and editing the results.  He specifically admitted that he used a "girl" to induce his victims to engage in sexual conduct.  He mentioned that one victim viewed "my girl stripping for him," another wanted to spend time with "my girl," another ejaculated only after the defendant used "my girl," yet another victim wanted to "cum for a girl," and even yet another had "cam sex with my girl."  *Id.* at ¶¶ 40, 42, 45, 58.  He also refers to "girls" employed by other cappers.  *Id.* at ¶ 73.

Once again, the defendant's efforts to explain these statements away fall flat.  He asserts that sentencing enhancements should not rest on words such as "I" or "my," when talking about his girl.  Objections at 4.  But this argument misreads and minimizes the defendant's own words.  As set forth above, the defendant announced online that he used a "girl" to entice minor boys to masturbate and ejaculate.  These statements are direct confessions to conduct that satisfies the sentencing enhancement, and they cannot be wished away by simply dismissing them, as the defendant does.  *Id.*  Also, no girls appear in <u>any</u> of the videos the defendant shared over Website A.  It is therefore unclear what else the defendant's repeated references to his "girl" could possibly mean.

4

Many of the defendant's other statements also contain minute details about his conduct that cannot be so casually waved away as "puffery."  For example:

- He previously targeted boys in three specific countries in Eastern Europe, and he focused on boys in one particular country "from 2012 to 2018" until he was prevented from doing so by specific political events.  *Id.* at ¶ 73.  He has 230 videos of them "that will never see the light of day…"  *Id.*

- He capped one boy over a 2-year period and has "43 vids/cams of him."  *Id.*

- He mentioned on one occasion that he has "capped since 2007" and on another occasion that he has "been capping since 2007, and ben directing boys in solo action and duo hardcore action since 2012."  *Id.*  The FBI recovered at least one of the defendant's branded videos that depicted "duo hardcore action"—*i.e.*, two boys engaging in oral and anal sex.  *Id.* at ¶ 35.

The defendant also made statements online that focused on the drudgery and labor of being a capper, which is inconsistent with attempts to impress other pedophiles on Website A.  For example, he complained about the "hours" needed "to search, befriend, groom, the capping itself, editing, and encoding."  PSR at ¶ 73.  He also lamented his low success rate in targeting minors and the fact that many of them changed their minds before agreeing to masturbate on camera.  *Id.*  He also grumbled about sharing his caps with other users who did not share back to his satisfaction.  *Id.*

These statements contain the kind of detail known only to someone actively engaged in capping with children.  They are plainly not the sort of statements of someone peddling idle falsehoods to impress people on the internet.

5

*Third*, the defendant's admissions were internally consistent.  At all times, he represented himself to be a "capper" who targeted boys in a very specific age range. *See, e.g.,* PSR at ¶ 73.  Throughout his extensive admissions on Website A, he never deviated from this self-description.  If the defendant were right—*i.e.*, if he was just making stuff up to impress other pedophiles—there would have been no reason to hew so closely to such a narrow sexual interest and self-description.

There are, sadly, many ways to produce child pornography.  Many offenders do so by sexually assaulting children on camera.  Other offenders take surreptitious videos of children in private while they are bathing, using the bathroom, or otherwise disrobing.

There are even many ways to "cap" minors online.  Some offenders—commonly referred to as "sextortionists"—will blackmail minors into creating sexualized images of themselves or performing sexually on webcam.  Other cappers will use their own identity and images when targeting, grooming, and exploiting children online.  They thus have no need for a "bait girl" or similar misrepresentation.  *See* PSR at ¶ 73.

But the defendant never claimed on Website A to have produced child pornography in any of these other ways, even though doing so almost certainly would have "enhance[d] his own status with other users of this website…"  Objections at 3.  He always described himself as a capper who targeted boys between 11 and 16.

The defendant maintained this consistency even in private, one-to-one messages with other users, where he would have had much less incentive to exaggerate or fabricate details than in his public posts.  *See, e.g.,* PSR at ¶ 73.

6

*Fourth*, the defendant's admissions were corroborated by the accounts of several of his victims. A number of the defendant's victims told law enforcement that they chatted over various platforms with a "girl" who directed them to disrobe and/or send nude images, and this "girl" either never spoke or never appeared on camera. *See, e.g.,* PSR at ¶¶ 35, 48, 68. Other victims also confirmed more generally that they engaged in sexual interactions with girls online. *Id.* at ¶¶ 35, 36, 53, 67, 68. None of them reported having an online sexual interaction with an adult man. And these victims, of course, would have no reason to know about the admissions the defendant made on Website A regarding his methods of producing child pornography.

*Fifth*, the defendant went to great lengths to personalize and brand the content he shared over Website A and to market them as his own produced content. For example, his username appears frequently in his videos, either in full or in abbreviated form, and he included a personalized banner in his posts. *See, e.g.,* PSR at ¶¶ 35, 37, 40-41, 45-46, 50-51, 55-58, 60-62, 64. This username was personal to the defendant, and he has been using it since he was a child. *Id.* at ¶ 77. Some of his videos also included a stylized logo that appeared to be a play on his username. *Id.* at ¶¶ 36, 58, 64. These acts are, of course, efforts to claim credit and ownership.

*Sixth*, the record is entirely bereft of <u>anyone else</u> claiming credit for producing the videos that the defendant shared over Website A. This is notable because Website A had hundreds of thousands of users and a subforum exclusively dedicated to cappers. If the defendant was fraudulently passing off another capper's work as his own, it stands to reason that one of these hundreds of thousands of users would have said something.

7

*Finally*, the defendant made numerous other statements about himself and his past on Website A that were entirely true.  For example, he told other users about his birthday, the birthdays of other people in his family, his job and paycheck, an injury he sustained, his prior criminal history and incarceration, and his requirement to register as a sex offender.  PSR at ¶ 72.  All of these statements corresponded exactly with the defendant's own life, and he displayed no tendency to exaggerate or embellish details.  He also said more than once online that he discovered child pornography when he was around 15 years old, or in the late 90s when he was starting high school.  PSR at ¶ 73.  This is exactly what he told law enforcement back in 2013.  *Id.* at ¶ 149.

These factors provide more than enough to establish that the defendant was the original producer of the content he shared over Website A.  Guidelines enhancements, of course, need to be proven only by a preponderance of the evidence.  *See United States v. Montano*, 109 F.4th 1275, 1280 (10th Cir. 2024).  And the guidelines commentary makes clear that the cross-reference in Section 2G2.2(c)(1) should be "construed broadly…"  U.S.S.G. § 2G2.2, App. Note 7(A).

The defendant's arguments to the contrary are unavailing.  In an effort to escape the plain consequences of his own statements, he reads them in a tortured and unreasonable manner to mean something different than what they mean on their face.  He also broadly minimizes his own statements in nearly 70 paragraphs of the draft PSR as "puffery" or "exaggeration," *id.* at 3, but he does not identify a single statement that is false or overstated.  This objection should be overruled.

8

*The Guideline Calculation for Count 5*

Count 5 of the Indictment charges the defendant with making a post on Website A on January 1, 2021.  PSR at ¶ 8 & n.1.  The draft PSR correctly determines that the adjusted offense level for this count is 38.  PSR at ¶ 129.  In reaching this calculation, the draft PSR applies the cross-reference in U.S.S.G. § 2G2.2(c)(1).  *Id.* at ¶¶ 122.

In his Objections, the defendant argues that the guidelines for Count 5 should be calculated under U.S.S.G. § 2G2.2 and not 2G2.1 because the former leads to a higher offense level.  He is right that 2G2.2(c)(1) provides for a cross-reference to 2G2.1 only when "the resulting offense level is great than that determined" under 2G2.2.

But he is not right that calculating the offense level for Count 5 under 2G2.2 would lead to a higher offense level than calculating it under 2G2.1.  The defendant claims that the adjusted offense level for Count 5 would be 39 if calculated under 2G2.2, and in support, he cites to paragraph 103 of the draft PSR.  Objections at 6.  But paragraph 103 of the draft PSR is not based on the single post on Website A that gave rise to Count 5 of the Indictment.  Instead, it includes the guidelines calculation for Count 1, which is the <u>entire conspiracy underlying Website A</u>.  PSR at ¶¶ 1, 7-10, 38.

One critical distinction is that paragraph 103 of the draft PSR provides for a five-level enhancement under U.S.S.G. § 2G2.2(b)(7)(D) because the offense involved 600 or more images.  It reached this calculating by accounting for <u>all</u> the defendant's conduct on Website A.  PSR ¶ 103.

Count 5, in contrast, is limited to the one post the defendant made on Website A on January 1, 2021.  As described in the draft PSR, that post included four images of

9

minors, plus one video.  PSR ¶¶ 50-54.  This results in a total of 79 images for Count 5.

*See* U.S.S.G. § 2G2.2, App. Note 6(B)(ii).

The accurate guidelines analysis for Count 5 under § 2G2.2 thus looks like this:

| Guideline | Offense Level |
|---|---|
| Base Offense Level (U.S.S.G. § 2G2.2(a)(2)); | 22 |
| Enhancement for distributing in exchange for non-pecuniary consideration (*id.* § 2G2.2(b)(3)(B)); | +5 |
| Enhancement for pattern of activity involving the sexual abuse or exploitation of a minor (*id.* § 2G2.2(b)(5)); | +5 |
| Enhancement for use of a computer or interactive computer service for receipt of child pornography (*id.* § 2G2.2(b)(6)); | +2 |
| Enhancement for an offense involving at least 10 but fewer than 150 images (*id.* § 2G2.2(b)(7)(A)); | +2 |
| **TOTAL:** | **36** |

Accordingly, calculating Count 5 under Section 2G2.2 leads to a lower offense

level than calculating it under 2G2.1.  The cross-reference in Section 2G2.2(c)(1)

applies, and the defendant's objection should be overruled.

*The Guideline Calculation for Count 6*

The draft PSR correctly determines that the adjusted offense level for Count 6 is

40.  PSR at ¶ 138.  This includes a two-level enhancement under U.S.S.G.

§ 2G2.1(b)(1)(B) because the offense involved a minor who had attained the age of 12

years old but had not attained the age of 16 years.  *Id.* at ¶ 121.

The Objections raise the possibility that the victim underlying Count 6 may have

been 16 years old and not 15 at the time of the relevant criminal conduct.  Objections at

6.  The United States, however, has since provided the defendant and the Probation

Office with information establishing that the victim underlying Count 6 was 15 years old

on March 27, 2021, which is the date on which the defendant posted relevant video to

Website A.  This victim also would have been 14 years old on April 4, 2020, which is the

date listed in the video title that the defendant posted to Website A, and which

presumably corresponds with the date on which the defendant created the video.

The victim was under the age of 16 on both dates.  The two-level enhancement

under U.S.S.G. 2G2.1(b)(1)(B) was therefore appropriate.

<u>Response to Objections to Conditions of Supervised Release</u>

The defendant's objections to the special conditions of supervised release should

be overruled.  "District courts have broad discretion to impose conditions of supervised

release," as long as those supervised release conditions are consistent with the

statutory requirements of 18 U.S.C. § 3583(d) and "comport with the relevant

constitutional provisions."  *United States v. Mike*, 632 F.3d 686, 692 (10th Cir. 2011)

(citation omitted).  A supervised release condition "must satisfy both § 3583(d)(1)

(requiring reasonable relationship to the [enumerated] § 3553 factors) and § 3583(d)(2)

(involve no greater deprivation of liberty than necessary)"; however, each condition

"does not need to be reasonably related to *all* of the [enumerated] factors in § 3553."

*United States v. Hahn*, 551 F.3d 977, 983 (10th Cir. 2008) (citation omitted) (emphasis

added).  Further, the conditions must be "consistent with any pertinent policy statements

issued by the Sentencing Commission. 18 U.S.C. § 3583(d)(3).  As the supervised

release conditions recommended by U.S. Probation meet both statutory and

constitutional requirements and do not conflict with any pertinent policy statements, the government respectfully requests that they be imposed.

The draft PSR recommends sex-offender treatment, which "may include polygraph and visual response testing as part of the required participation."   PSR, Sentencing Recommendation, Special Condition 2.  This is a standard condition for sex offenders in this district.  (Neither the Probation Office nor the United States are recommending penile plethysmograph testing, so it is not addressed herein.)

The defendant objects to these conditions on the grounds that they implicate constitutional and liberty interests.  Objections at 7-13.  He argues that the polygraph and visual-response testing conditions should either not be imposed at all, or should be modified to conform with statutory and constitutional mandates.  *Id.* at 13.

As an initial matter, the defendant has not provided anything to suggest that the imposition of these conditions *would* infringe on anyone's constitutional rights; he just suggests that they *could*.  The United States does not anticipate any such violations.

In general, imposition of polygraph testing as a special condition of supervised release has been upheld in the Tenth Circuit.  *United States v. Begay*, 631 F.3d 1168, 1175-76 (10th Cir. 2011).  There is particular reason for this condition here, as the defendant previously entered into a conspiracy to distribute child pornography while still on parole for a previous child pornography offense.  PSR at ¶¶ 30, 149, 151.  In addition, under Tenth Circuit law, government may not threaten a defendant with a substantial penalty for refusing to answer a question during a polygraph.  *United States v. Von Behren*, 822 F.3d 1139, 1150-51 (10th Cir. 2016).

12

Visual response testing, otherwise known as a visual reaction time test, is a physically non-invasive test that gauges an individual's sexual interests. The nature of the defendant's offenses justifies such testing. *See United States v. Traufield,* 768 Fed.Appx. 802, 810 (10th Cir. 2019) (unpublished). As does the defendant's repeated admissions that he is sexually interested in boys between the ages of 11 and 16 (particularly aged 12-15), that he is "addicted" to child pornography, that his attempts to seek therapy have failed, that he cannot be fixed, and that he has "stopped fighting" his sexual urges toward children. PSR at ¶¶ 17, 73, 76, 81, 149.

In *Mike*, one of the conditions of supervised release was that the defendant "immediately undergo a psychosexual evaluation upon release and begin participating in sex offender treatment, consistent with the recommendations of the psychosexual evaluation, and furthermore, the defendant shall submit to clinical polygraph testing and any other specific sex offender testing, as directed by the probation officer." 632 F.3d at 690. The defendant's objections should be overruled.

### Response to Objection to the JVTA Special Assessments

Under 18 U.S.C. § 3014(a)(3), the court "shall" assess a special assessment of $5,000 per count for a person convicted of distributing distribution of child pornography. The statutory word "shall," of course, carries a "mandatory intent." *Jewell v. United States*, 749 F.3d 1295, 1298 (10th Cir. 2014). The assessments under this provision fund programs relating to human trafficking and child protection. 18 U.S.C. § 3014(3).

13

The only exception to this assessment is for defendants who are "indigent."   18
U.S.C. § 3014(a).  The defendant bears the burden of proving indigency.  *See, e.g.,*
*United States v. Janatsch*, 722 F. Appx. 806, 811 (10th Cir. 2018) (unpublished).

The defendant has not met his burden, principally because he is not indigent.  He
has a positive net worth of nearly $290,000.  PSR at ¶ 183.  This includes
approximately $12,000 in savings and checking accounts, $58,000 in retirement savings
accounts, and a house worth $375,000, subject to a mortgage of $90,000.  *Id.*  He has a
college degree in computer information systems and a history of stable and satisfactory
employment, all of which indicate that he has future earning power.  *Id.* at ¶¶ 176-81.

The defendant is much better off than other individuals who were properly found
not to be indigent within the meaning of § 3014.  In *United States v. Wesely*, the Eighth
Circuit reversed a finding of indigency for a defendant with a net worth of $120,000,
$90,000 of which was in illiquid home equity, and a restitution judgment of $48,000.  96
F.4th 1045, 1048 (8th Cir. 2024).  The court found that a positive net worth of $70,000,
most of which is tied up in home equity, is "hardly a fortune" but "does not make
someone indigent either."  *Id.*; *see also United States v. Graves*, 908 F.3d 137, 139,
143-44 (5th Cir. 2018) (affirming finding of non-indigency for defendant with $245 in
monthly discretionary income, given that he had a GED and some college, had
vocational skills and a long history of employment, and was able bodied).

The defendant's arguments to the contrary are unavailing.  He points to the
difficulties that sex offenders often face when seeking employment.  Objections at 13.  A
large portion of the individuals subject to § 3014, however, will be required to register as

14

sex offenders, and courts have held that sex-offender status neither renders a defendant indigent nor "shield[s] him from paying the assessment." *United States v. Rosario*, 7 F.4th 65, 73 (2d Cir. 2021) (quoting *United States v. Shepherd*, 922 F.3d 753, 760 (6th Cir. 2019)).  He also claims that he "is very much hoping to use his relatively modest savings to ensure that he is able to keep his house" while incarcerated.  Objections at 13.  But his desire to use his assets for a purpose other than the mandatory statutory assessment hardly makes him "indigent."  This objection should be overruled.

<u>Response to Objections Not Impacting the Guideline Calculation</u>

The United States takes no position on these objections.

Dated this 6th day of November, 2024.

Respectfully submitted,

| | |
|---|---|
| MATTHEW T. KIRSCH<br>Acting United States Attorney | STEVEN J. GROCKI<br>Chief |
| By: *s/ Alecia L. Riewerts*<br>Alecia L. Riewerts<br>Assistant U.S. Attorney<br>U.S. Attorney's Office<br>1801 California Street<br>Suite 1600<br>Denver, CO 80202<br>Telephone: 303-454-0100<br>Alecia.Riewerts@usdoj.gov<br>Attorney for Government | By: *s/ Kyle P. Reynolds*<br>Kyle P. Reynolds<br>Acting Deputy Chief<br>U.S. Dept. of Justice, Criminal Division<br>Child Exploitation and Obscenity Section<br>1301 New York Avenue, NW<br>Washington, DC 20005<br>Telephone: 202-616-2842<br>Kyle.Reynolds@usdoj.gov<br>Attorney for Government |

**CERTIFICATE OF SERVICE**

     I hereby certify that on this 6th day of November, 2024, I electronically filed the foregoing **UNITED STATES' RESPONSE TO DEFENDANT'S OBJECTIONS TO PRESENTENCE INVESTIGATION REPORT** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following email address:

Stephanie Snyder
Email: Stephanie_Snyder@fd.org

              By:    *s/ Kyle P. Reynolds*
                      Kyle P. Reynolds
                      Acting Deputy Chief
                      U.S. Dept. of Justice, Criminal Division
                      Child Exploitation and Obscenity Section

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Criminal Case No. 23-cr-00419-RMR

UNITED STATES OF AMERICA,

     Plaintiff,

v.

1.  CHRISTOPHER CARL MEIER,

     Defendant.

---

**GOVERNMENT'S RESPONSE TO DEFENDANT'S
MOTION FOR VARIANT SENTENCE OF 240 MONTHS**

---

The United States of America ("the government"), by and through Matthew T.
Kirsch, Acting United States Attorney for the District of Colorado, and Alecia L.
Riewerts, Assistant United States Attorney, hereby responds to the defendant's Motion
for Variant Sentence of 240 Months [ECF #33] ("Def. Sent. Mot."). Numerous
arguments made by the defendant were addressed in the government's Sentencing
Statement [ECF #34]; however, the government responds herein to the defendant's
arguments related to the sentencing guidelines and unwarranted sentencing disparities.
The defendant asks this Court to sentence the defendant to 240 months imprisonment.
Such a sentence does not appropriately reflect the gravity of the offense conduct.

## I. THE DEFENDANT'S HISTORY AND CHARACTERISTICS

The government acknowledges that the defendant is a victim of childhood
bullying and sexual assault. Clearly, no child should have to suffer abuse of any kind. It
must be acknowledged, however, that countless humans cope with childhood abuse

1

without going on to engage in the sexual exploitation of minors and the distribution of child pornography.  During his offense conduct, the defendant showed absolutely no compassion, empathy, or consideration for the negative long-term consequences for the victims depicted in the child sexual abuse imagery he produced and distributed.

## II.  THE SENTENCING GUIDELINES

The Tenth Circuit has explained that "[t]he purpose of the sentencing guidelines is to eliminate disparities among sentences nationwide."  *United States v. Franklin*, 785 F.3d 1365, 1371 (10th Cir. 2015) (citations and quotations omitted) (upholding a sentence of 100 years, within the advisory sentencing guideline range of life imprisonment, where the defendant was convicted at trial of advertisement, distribution, receipt, and possession of child pornography); *see also United States v. Garza*, 1 F.3d 1098, 1100 (10th Cir. 1993) ("Congress chose to avoid unwarranted disparities through a guideline system which considered various facts concerning the offense and the offender.").  It's the government's position that a sentence within the advisory sentencing guideline range, when it's not unreasonable, minimizes these disparities.

The defendant argues that the sentencing guidelines for child pornography offenses are not entitled to deference by this Court.  The defendant primarily focuses his arguments on attacks commonly made with regard to § 2G2.2 of the child pornography guidelines.  As described in the "United States' Response and Objections to Presentence Investigation Report" [ECF #32], it is the government's position that this case is governed by USSG § 2G2.1.  The Tenth Circuit, among others, has affirmed sentences as presumptively reasonable that fall within § 2G2.1's recommended guideline range.  *United States v. Grigsby*, 749 F.3d 908 (10th Cir. 2014); *see also*

*United States v. Pappas*, 715 F.3d 225 (8th Cir. 2013); *United States v. Schuster*, 706

F.3d 800, 808 (7th Cir. 2013) (deference to Congress is appropriate because of its

study of the child pornography problem).  In *Grigsby*, the Tenth Circuit cited the 2012

Sentencing Commission Report referenced in the defendant's motion and below, stating

"sentencing in federal production cases has been less controversial."  749 F.3d at 911.

Turning, however, to the defendant's arguments with regard to § 2G2.2, the

Supreme Court's decision in *Kimbrough v. United States*, 552 U.S. 85 (2007), does not

require district courts to evaluate the history and development of a particular guideline

before sentencing within, or outside, the range it produces.  Should a full understanding

of the evolution of USSG § 2G2.2 be deemed relevant, the 2009 Sentencing

Commission Report provides an account of changes predating the report.  *2009 U.S.*

*Sentencing Commission Report: History of the Child Pornography Guidelines* ("2009

Sent. Comm. Rep.").[1]

As detailed in the 2009 Sentencing Commission Report, the government asserts

that the current version of USSG § 2G2.2 is a product and reflection of the Sentencing

Commission's institutional role and empirical study.  *See also United States v.*

*Cunningham*, 680 F.Supp.2d 844, 849-51 (N.D. Ohio 2010).  As stated in the 2009

report, "in amending the child pornography guidelines over the years, the Commission

has reviewed sentencing data, considered public comment on proposed amendments,

conducted public hearings on proposed amendments, studied relevant literature, and

considered pertinent legislative history."  2009 Sentencing Commission Report at 7.

---

1 Available at http://www.ussc.gov/sites/default/files/pdf/research-and-
publications/research-projects-and-surveys/sex-
offenses/20091030_History_Child_Pornography_Guidelines.pdf.

Congressional involvement in the formation and development of § 2G2.2 does not render the guideline less worthy of consideration, as the Sentencing Reform Act expressly contemplated such participation by Congress. *Id.* at 5-6.

A well-reasoned rejoinder to many of the arguments raised by the defendant regarding the USSG § 2G2.2 guidelines can be found in the letter "Response to 'A Reluctant Rebellion'" ("Reluctant Rebellion Response Letter") which was written by Alexandra Gelber, who is currently the Deputy Chief for Policy and Legislation of the Child Exploitation and Obscenity Section.[2]  The letter, which takes up in part arguments put forth by Mr. Troy Stabenow referenced in the defendant's motion for a downward variance, addresses aspects of the guideline enhancements that are far from novel, arguing that "it is completely logical in child exploitation cases that a defendant who had a larger collection, who had pictures of younger children, or who had violent pictures has committed a more serious crime than someone who does not."  Reluctant Rebellion Response Letter at 12.  The letter also describes how the Sentencing Commission anticipated that some enhancements would apply in "nearly every case" and therefore "established a lower base offense level to account for this." *Id.*  The Sentencing Commission thereby "negated any impact that would be caused by the frequent application of those enhancements." *Id.* at 13.  The government therefore urges the Court to recognize the egregious crimes that the defendant has committed and reject the defendant's argument that the sentencing enhancements are invalid.

---

2 The letter can be found online at
http://www.ussc.gov/sites/default/files/pdf/training/annual-national-training-
seminar/2010/009c_Reluctant_Rebellion_Response.pdf.

A.      Computer Use Enhancement

The defendant seeks a downward variance because the enhancement applied to more than 95% of child pornography offenders.  Def. Sent. Mot. at 7-8.  There is significant irony to the defendant's claim.  The penalty was enacted to curb the explosion of child pornography on the Internet.  Indeed, there is no other area of criminal law where, when severe crime becomes more common, the penalties are reduced.  This argument also ignores the purpose of the enhancement.

Due to the wide dissemination and instantaneous transmission, computer-assisted trafficking of child pornography is extremely difficult for law enforcement officials to eradicate.  *United States v. Lebovitz*, 401 F.3d 1263, 1271 (11th Cir. 2005) (quoting H.R.Rep. No. 104-90, at 3-4 (1995), as reprinted in 1995 U.S.C.C.A.N. 759, 760-61).  Thus, the enhancement for use of a computer aims at punishing a distinct harm beyond the possession of child pornography.  *United States v. Tenuto*, 593 F.3d 695, 698-99 (7th Cir. 2010).

As the Second Circuit observed in *United States v. Reingold*, "the use of a computer is not essential to the act of distributing child pornography.  A person can traffic in child pornography without using a computer much like one could commit a robbery without the use of a gun."  731 F.3d 204, 226 (2d Cir. 2013); *see also United States v. Kiefer*, 760 F.3d 926, 931 (9th Cir. 2014) (finding no double counting for the inclusion of this enhancement).  Similarly, a person can possess child pornography without a computer.  If the defendant had possessed printed material, the seizure of those items would put them out of circulation permanently.  Now, however, the government can access numerous child pornography images online during the course

5

of an investigation, yet those images still exist in cyberspace.  The images will continue to be circulated, and the harm to the victims will never end.

To properly calculate the guidelines and arrive at a just sentence for the defendant, the Court should not vary downward based on this sentencing enhancement, as a computer clearly was used to commit this offense.  While this enhancement may apply to a large number of cases, there is simply no reason to not apply this enhancement and/or mitigate the defendant's sentence on this ground should the Court determine that the § 2G2.2 guidelines are applicable.

B.      600 Images or More Enhancement

The defendant further suggests that since "possession of many images is incredibly common in child pornography cases," that the five-level enhancement in USSG §2G2.2(b)(7)(D) over-represents the seriousness of this crime.  Def. Sent. Mot. at 8.  The government strongly disagrees.

Section 2G2.2(b) provides for graduated enhancements based on the presence of a number of aggravating factors, including the number of images a defendant possesses.  This section of the advisory sentencing guidelines calls for a two-level enhancement if a defendant possesses more than ten but less than 150 images, a three-level enhancement for possessing between 150 and 300 images, a four-level enhancement for possessing between 300 and 600 images, and a five-level enhancement for 600 or more images.  Thus, the guidelines consider defendants who possess more images to be more culpable than those who possess fewer images.  That is only logical.  The guidelines, however, essentially cap a defendant's culpability at 600 images.

Under the guidelines, a defendant who possesses 600 images of child pornography winds up with the same adjusted offense level as a defendant who possessed thousands of images. The Sentencing Commission recognizes that the guidelines may under-represent the number of victims depicted. USSG §2G2.2, Application Note 4(b)(i). In such a case, an upward departure may be warranted. *Id*.

It may be true that almost every child pornography defendant who comes before the Court possesses more than 600 images. Ordinarily, only the most prolific possessors (i.e., the most serious offenders) are prosecuted federally. That aside, this is not a case in which the defendant stands convicted of possession of child pornography—he engaged in far more egregious conduct, which the defendant does not dispute. The government strongly encourages the Court to reject defendant's argument that this enhancement should be disregarded should the Court decide to follow the 2G2.2 guidelines.

The Sentencing Commission has had the opportunity to study and reflect further on the child pornography guidelines over the last decade. *See* Sentencing Commission's Report to Congress: Federal Child Pornography Offenses[3] ("2012 Report"); *see also* Federal Sentencing of Child Pornography:  Non-Production Offenses[4] ("2021 Report"). The 2012 Report, which examined federal sentencing policy in child pornography cases, focused primarily on non-production offenses under USSG § 2G2.2. The 2012 Report, at its outset and throughout, confirms the extreme and

---

3 Available at http://www.ussc.gov/news/congressional-testimony-and-reports/sex-offense-topics/report-congress-federal-child-pornography-offenses.

4 Available at https://www.ussc.gov/research/research-reports/federal-sentencing-child-pornography-non-production-offenses.

multifaceted damage caused by child pornography. The emphasis at the outset of the 2012 Report on the terrible impact of child pornography brings into clearer focus what the courts have known for some time; that child pornography has a highly destructive impact on the most vulnerable segment of society which lasts forever. The 2012 Report recommends that sentencing be focused on "content, community, and conduct." 2021 Report at 3. The 2021 Report "provides updated data from fiscal year 2019 regarding content, community, and conduct." *Id.* While the 2021 Report reflects that some of the sentencing enhancements are no longer are helpful in distinguishing among offenders, the Sentencing Commission noted additional factors for a Court to consider at sentencing, which it found to be helpful in determining the level of danger a particular offender poses to the community: (1) the content of the offender's child pornography collection and nature of the offender's collecting behavior; (2) the offender's degree of involvement with other offenders, particularly in an Internet community devoted to child pornography and child sexual exploitation; and (3) the offender's engagement in sexually abusive or exploitative conduct in addition to the child pornography offense. *Id.*

The 2021 Report explored whether participation in an online community or "aggravating conduct" (to include noncontact sex offenses, specifically any illegal sexually abusive conduct not involving actual or attempted physical contact with a victim, such as soliciting a minor online and prior non-production child pornography offenses); it found that "[c]onsistent with the Commission's recommendations in the 2012 Child Pornography Report, participation in a child pornography community and engaging in aggravating conduct did impact the sentence length for non-production child pornography offenders." 2021 Report at 39, 45. The 2021 Report determined that

"[o]ffenders who participated in a child pornography community (without aggravating
conduct) had slightly higher sentences" than offenders who had not participated in a
child pornography community. *Id.* at 45. Significantly, "[o]ffenders who engaged in
aggravating conduct received a substantially lower rate of downward variances (43.3%
of cases), with a much higher rate of (44.3%) receiving a sentence within the guideline
range compared to offenders without aggravating conduct." *Id.* at 45. The 2021 Report
went on to pronounce "[i]ndeed, these offenders, who are arguably the most culpable
among non-production child pornography offenders, received within-guideline range
sentences at a rate that approaches the rate of within-guideline range sentences for the
overall federal offender population in fiscal year 2019 (51.4%)." *Id.*

     The defendant's conduct, even under the criteria suggested by the Sentencing
Commission in the 2012 and 2021 Reports, emphasizes the heinous nature of the
defendant's conduct. The defendant engaged in an online community, specifically a
high degree of involvement with other offenders on Website A, and also engaged in
"aggravating conduct," specifically the sexual exploitation of dozens of minors, as
extensively documented in the final Presentence Investigation Report [ECF #35] and
the government's sentencing documents filed in this case. Further distinguishing the
defendant, he also has a prior non-production child pornography conviction.

     In the nearly ten years since the 2012 Report, Congress has not acted and
therefore the current sentencing guidelines can and should be this Court's guide. On
balance, if the Court is inclined to jettison those sentencing enhancements the
Sentencing Commission has criticized as being ubiquitous, it should consider the
factors the Sentencing Commission says should be taken into account, but are not.

Regardless, the factors delineated in 18 U.S.C. § 3553(a), as described in detail in the government's Sentencing Statement, support a sentence of 40 years imprisonment.

### III. UNWARRANTED SENTENCING DISPARITIES

The defendant asks this Court to sentence the defendant to 240 months imprisonment based in part on the sentences in cases involving other dark web administrators, users, content-generators, and distributors prosecuted nationwide. Def. Sent. Mot. at 10-14. The Tenth Circuit cautions against comparisons between individual cases because "[n]o two cases are identical, and comparison of an individual sentence with a few counsel-selected cases involving other defendants sentenced by other judges is almost always useless." *Franklin*, 785 F.3d at 1372 (citations and quotations omitted). However, given that the defendant has referenced numerous cases in his sentencing motion, the government wishes to bring additional examples of sentences imposed in cases to the Court's attention.

*United States v. Minh Thong*, 14-cr-00027-REB, is a case prosecuted in this district involving a defendant who accessed minors through video chat websites online and utilized videos depicting a minor female to entice minor males to engage in sexually explicit conduct, which he then recorded and collected. Plea Agreement [ECF #61] at 16-23. The computer forensic review revealed that defendant Thong had approximately 100-120 victims. *Id.* at 21. Nine victims of defendant Thong's conduct were able to be identified; they ranged in age from 12-16 years old at the times the videos were created. *Id.* The defendant was sentenced to 292 months imprisonment and 15 years of supervised release. Judgment [ECF #92] at 2-3. Defendant Thong is distinguishable from defendant Meier in that there was no evidence that defendant Thong distributed

the child pornography that he created nor did he have a prior child pornography conviction. *Id.* at 23, 25.

A comparable case in terms of being a member of an online community dedicated to the sexual exploitation of minors is *United States v. Arin Caleb Ellis.*[5] Defendant Ellis was a member of several online groups dedicated to the online sexual exploitation of children and trafficking in child pornography imagery. Defendant Ellis conspired with others to create sexually explicit content depicting minor victims; the online offenders strategized with one another to improve their criminal tradecraft. Defendant Ellis also posed as a minor child while engaging online with minors. The content he produced was shared with other members of the online groups. Defendant Ellis potentially targeted thousands of minors. He was sentenced to 35 years imprisonment and lifetime supervised release.

The defendant is similarly situated to the defendant in *United States v. James Patrick Burns,* who created sexually explicit conduct with more than 100 minors and distributed that content to other offenders on the dark web.[6] To be clear, defendant Burns went to trial and his conduct involved threatening minors to produce child pornography, which distinguishes his offense conduct from defendant Meier's. Defendant Burns was sentenced to 65 years imprisonment and lifetime supervised release. Notably, defendant Burns was also a registered sex offender when he engaged in this conduct.

---

5 Available at https://www.justice.gov/usao-mdfl/pr/jacksonville-medical-records-technician-sentenced-35-years-sexually-exploiting.

6 Available at https://www.justice.gov/usao-nv/pr/registered-sex-offender-sentenced-sextorting-numerous-minors.

## IV. CONCLUSION

The government's recommended sentence of 40 years imprisonment is appropriate.  The defendant engaged in the distribution of child pornography to numerous members of online communities dedicated to trafficking in child pornography.  The child pornography the defendant distributed depicted dozens of minor boys he himself had sexually exploited.  Not only does the production and distribution of child pornography devastate individual children, participating in an online community of this nature undermines all of society by perversely validating, both for this defendant and the individuals with whom he communicated online, the sexual exploitation of children.  As acknowledged by the defendant, this conduct is reprehensible.  Def. Sent. Mot. at 15.

A guideline sentence of 40 years imprisonment fairly reflects the factors to be considered under 18 U.S.C. § 3553(a), including the nature and circumstances of the offense, the history and characteristics of the defendant, the need for the sentence to reflect the seriousness of the offense, promote respect for the law, afford adequate deterrence to criminal conduct, protect the public from future crimes of the defendant, and avoid unwarranted sentencing disparities.

Respectfully submitted,

MATTHEW T. KIRSCH
Acting United States Attorney

By:    *s/ Alecia L. Riewerts*
ALECIA L. RIEWERTS
Assistant U.S. Attorney
U.S. Attorney's Office
1801 California Street, Suite 1600
Denver, CO 80202
Telephone: 303-454-0100
E-mail: Alecia.Riewerts@usdoj.gov
Attorney for Government

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 7th day of November, 2024, I electronically filed the foregoing **GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION FOR VARIANT SENTENCE OF 240 MONTHS** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following email address:

Stephanie Snyder
Email: Stephanie_Snyder@fd.org


<u>s/ Alecia L. Riewerts</u>
ALECIA L. RIEWERTS
Assistant U.S. Attorney
U.S. Attorney's Office
1801 California Street, Suite 1600
Denver, CO 80202
Telephone: 303-454-0100
E-mail: Alecia.Riewerts@usdoj.gov
Attorney for Government

13

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Regina M. Rodriguez**

Criminal Action No.: 23-cr-00419-RMR          Date: November 13, 2024

Courtroom Deputy: Kally Myhaver          Court Reporter: Sadie Herbert

Probation Officer: Michelle Sinaka

---

_Parties:_                                             _Counsel:_

UNITED STATES OF AMERICA,                  Alecia Lynne Riewerts
                                                       Kyle Patrick Reynolds

    Plaintiff,

v.

1. CHRISTOPHER CARL MEIER,                  Stephanie Maureen Snyder

    Defendant.

---

## COURTROOM MINUTES

---

**SENTENCING**

**3:06 p.m.          Court in session.**

Court calls case. Appearances of counsel.  Defendant present in custody.

Defendant sworn.

Statement by the Court regarding defendant's offense level, criminal history level, and sentencing guidelines range.

Discussion and argument regarding objections to the presentence report, pending motions, and sentencing recommendation.

**ORDERED:**  Government's Motion for Decrease for Acceptance of Responsibility [ECF No. 38] is GRANTED.

Court states its findings of fact and conclusions of law.

**ORDERED:**  Defendant's Motion for Variant Sentence [ECF No. 33] is DENIED.

**ORDERED:**  Defendant shall be imprisoned for 420 months as to Counts 1 through 6 of the Indictment to be served concurrently. Upon release from imprisonment, defendant shall be placed on a lifetime period of supervised release.

**ORDERED:**  Conditions of Supervised Release, as stated on record.

**ORDERED:**  Defendant shall pay a $600.00 Special Assessment fee and a $12,000.00 AVAA assessment to be paid immediately.  No fine is imposed.

**ORDERED:**  Defendant shall forfeit any interest in property, as stated on record, to the United States.

**ORDERED:**  Defendant is remanded to the custody of the U.S. Marshal.

Defendant advised of right to appeal.

The Court recommends that the director of the Bureau of Prisons place the Defendant in a facility that is appropriate to his security designation and is located within the District of Colorado, specifically, FCI Englewood.

**5:00 p.m.      Court in recess.**

Hearing concluded.
Total time in court:    1:54

2

AO 245B (CO Rev. 11/20)    Judgment in a Criminal Case

# UNITED STATES DISTRICT COURT

### District of Colorado

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | **JUDGMENT IN A CRIMINAL CASE** |
| **v.** | ) | |
| | ) | |
| CHRISTOPHER CARL MEIER | ) | Case Number:    23-cr-00419-RMR-01 |
| | ) | |
| | ) | USM Number:    81940-510 |
| | ) | |
| | ) | Stephanie Maureen Snyder |
| | ) | Defendant's Attorney |

## THE DEFENDANT:

☒ pleaded guilty to count(s)    1, 2, 3, 4, 5, and 6 of the Indictment.

☐ pleaded nolo contendere to count(s)
which was accepted by the court.

☐ was found guilty on count(s)
after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. § 2252A(a)(2) and (b)(1) | Conspiracy to Distribute Child Pornography | 4/30/2021 | 1 |
| 18 U.S.C. § 2252A(a)(2) and (b)(1) | Distribution of Child Pornography | 5/3/2020 | 2 |
| 18 U.S.C. § 2252A(a)(2) and (b)(1) | Distribution of Child Pornography | 5/23/2020 | 3 |
| 18 U.S.C. § 2252A(a)(2) and (b)(1) | Distribution of Child Pornography | 10/8/2020 | 4 |
| 18 U.S.C. § 2252A(a)(2) and (b)(1) | Distribution of Child Pornography | 1/1/2021 | 5 |
| 18 U.S.C. § 2252A(a)(2) and (b)(1) | Distribution of Child Pornography | 3/27/2021 | 6 |

The defendant is sentenced as provided in pages 2 through    7    of this judgment.  The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s)

☐ Count(s) _____ ☐ is ☐ are dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

November 13, 2024
Date of Imposition of Judgment

Signature of Judge

Regina M. Rodriguez, United States District Judge
Name and Title of Judge

November 25, 2024
Date

AO 245B (CO Rev. 11/20) Judgment in Criminal Case

DEFENDANT:        CHRISTOPHER CARL MEIER
CASE NUMBER:    23-cr-00419-RMR-01

# IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of: **four hundred twenty (420)** months as to counts 1, 2, 3, 4, 5, and 6; to be served concurrently.

☒    The court makes the following recommendations to the Bureau of Prisons:
The Court recommends that, based upon the Bureau of Prisons' analysis as to the defendant's security, rehabilitation, and mental health needs, and if it is a fit, that the defendant be designated to a facility within Colorado.

☒    The defendant is remanded to the custody of the United States Marshal.

☐    The defendant shall surrender to the United States Marshal for this district:

☐    at _____    ☐    a.m.    ☐    p.m.    on    _____ .

☐    as notified by the United States Marshal.

☐    The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

☐    before 2 p.m. on _____ .

☐    as notified by the United States Marshal.

☐    as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows:

Defendant delivered on _____    to    _____

at _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

AO 245B (CO Rev. 11/20) Judgment in Criminal Case

| | | | Judgment — Page | 3 | of | 7 |

DEFENDANT:        CHRISTOPHER CARL MEIER
CASE NUMBER:    23-cr-00419-RMR-01

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of: **life** as to counts 1, 2, 3, 4, 5, and 6; to be served concurrently.

## MANDATORY CONDITIONS

1. You must not commit another federal, state or local crime.
2. You must not unlawfully possess a controlled substance.
3. You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and a maximum of 20 tests per year of supervision thereafter.
   ☐ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*
4. ☐ You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*
5. ☒ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
6. ☒ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq*.) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7. ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

AO 245B (CO Rev. 11/20) Judgment in Criminal Case

Judgment — Page ___4___ of ___7___

DEFENDANT: CHRISTOPHER CARL MEIER
CASE NUMBER: 23-cr-00419-RMR-01

## STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1. You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2. After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3. You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4. You must answer truthfully the questions asked by your probation officer.
5. You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6. You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7. You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8. You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9. If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12. If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may, after obtaining Court approval, notify the person about the risk or require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.
13. You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature _____ Date _____

AO 245B (CO Rev. 11/20) Judgment in Criminal Case

|  | Judgment — Page 5 of 7 |
| --- | --- |

DEFENDANT: CHRISTOPHER CARL MEIER
CASE NUMBER: 23-cr-00419-RMR-01

## SPECIAL CONDITIONS OF SUPERVISION

1. You must participate in a program of mental health treatment approved by the probation officer and follow the rules and regulations of such program. The probation officer, in consultation with the treatment provider, will supervise your participation in the program as to modality, duration, and intensity. You must pay for the cost of treatment based on your ability to pay.

2. You must participate in a sex-offense specific evaluation and/or treatment program approved by the probation officer. This may include polygraph and visual response testing as part of the required participation. The probation officer, in consultation with the treatment provider, will supervise your participation in and compliance with the treatment program. You must comply with all rules and regulations of the treatment program that are specified by the treatment agency and the probation officer. You must pay for the cost of treatment based on your ability to pay.

3. Your use of computers and Internet capable devices will be limited to those you request to use and which the probation officer authorizes. The probation officer may not prohibit lawful Internet use except to impose restrictions on the types of computers or Internet capable devices that you may use, to provide necessary restrictions to facilitate correctional treatment and rehabilitation, and to protect the public from any further crimes. Authorization for use of any computer or Internet capable device shall be based on the ability of the computer device to be effectively monitored by monitoring software utilized by the Probation Office. You must disclose any username or identification(s) and password(s) for all computers or Internet capable devices to the probation officer.

4. You must allow the probation officer to install software/hardware designed to monitor activities on any computer or Internet capable device you are authorized by the probation officer to use. This monitoring may record any and all activity on the device, including the capture of keystrokes, application information, Internet use history, email correspondence, and chat conversations. You must not attempt to remove, tamper with, reverse engineer, or in any way circumvent the software/hardware.

5. You must submit your person, and any property, house, residence, vehicle, papers, computer, Internet capable device, other electronic communications or data storage devices or media, and effects to search at any time, with or without a warrant, by any law enforcement or probation officer with reasonable suspicion concerning a violation of a condition of supervised release or unlawful conduct and by any probation officer in the lawful discharge of the officer's supervision functions.

6. You must not incur new credit charges or open additional lines of credit without the approval of the probation officer, unless you are in compliance with the periodic payment obligations imposed pursuant to the Court's judgment and sentence.

7. You must provide the probation officer access to any requested financial information and authorize the release of any financial information until all financial obligations imposed by the court are paid in full.

8. You must apply any monies received from income tax refunds, lottery winnings, inheritances, judgments, and any anticipated or unexpected financial gains to the outstanding court-ordered financial obligation in this case.

9. If the judgment imposes a financial penalty/restitution, you must pay the financial penalty/restitution in accordance with the Schedule of Payments sheet of this judgment. You must also notify the court of any changes in economic circumstances that might affect your ability to pay the financial penalty/restitution.

10. If you have an outstanding financial obligation, the probation office may share any financial or employment documentation relevant to you with the Asset Recovery Division of the United States Attorney's Office to assist in the collection of the obligation.

AO 245B (CO Rev. 11/20) Judgment in Criminal Case

Judgment — Page 6 of 7

DEFENDANT: CHRISTOPHER CARL MEIER
CASE NUMBER: 23-cr-00419-RMR-01

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on the following page.

| | Assessment | Restitution | Fine | AVAA Assessment* | JVTA Assessment** |
|---|---|---|---|---|---|
| **TOTALS** | $ 600.00 | $ 0.00 | $ 0.00 | $ 12,000.00 | $ 0.00 |

☐ The determination of restitution is deferred until _____. An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| **Name of Payee** | **Total Loss\*\*\*** | **Restitution Ordered** | **Priority or Percentage** |
|---|---|---|---|
| | | | |

| **TOTALS** | $ _____ | $ _____ | |
|---|---|---|---|

☐ Restitution amount ordered pursuant to plea agreement $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on the following page may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

    ☐ the interest requirement is waived for the   ☐ fine   ☐ restitution.

    ☐ the interest requirement for the   ☐ fine   ☐ restitution is modified as follows:

\* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Publ. L. No. 115-299.
\*\* Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
\*\*\* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

AO 245B (CO Rev. 11/20) Judgment in Criminal Case

Judgment — Page ___7___ of ___7___

DEFENDANT: CHRISTOPHER CARL MEIER
CASE NUMBER: 23-cr-00419-RMR-01

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

A ☐ Lump sum payment of $ _____ due immediately, balance due

    ☐ not later than _____ , or
    ☐ in accordance with ☐ C, ☐ D, ☐ E, or ☐ F below; or

B ☒ Payment to begin immediately (may be combined with ☐ C, ☐ D, or ☒ F below); or

C ☐ Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of
    _____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after the date of this judgment; or

D ☐ Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of
    _____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after release from imprisonment to a
    term of supervision; or

E ☐ Payment during the term of supervised release will commence within _____ *(e.g., 30 or 60 days)* after release from
    imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F ☒ Special instructions regarding the payment of criminal monetary penalties:

    The special assessments and AVAA assessments are due immediately. Any unpaid monetary obligations upon release from
    incarceration shall be paid in monthly installment payments during the term of supervised release. The monthly installment
    payment will be calculated as at least 10 percent of the defendant's gross monthly income.

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐ Joint and Several

| Case Number<br>Defendant and Co-Defendant Names<br>*(including defendant number)* | Total Amount | Joint and Several Amount | Corresponding Payee, if<br>appropriate |
|---|---|---|---|
| | | | |

☐ The defendant shall pay the cost of prosecution.

☐ The defendant shall pay the following court cost(s):

☒ The defendant shall forfeit the defendant's interest in the following property to the United States:
Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, and the defendant's admission to the Forfeiture Allegation contained in the Indictment, the defendant must forfeit to the United States any and all property, real or personal, derived from proceeds from the instant offense.

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

CASE NO. 23-cr-00419-RMR-1

UNITED STATES OF AMERICA,

        Plaintiff,

v.

CHRISTOPHER CARL MEIER,

        Defendant.

---

## DEFENDANT'S NOTICE OF APPEAL

---

        Mr. Christopher Carl Meier, through appointed counsel, Stephanie Snyder and the Office of the Federal Public Defender, files this notice of appeal to the Tenth Circuit Court of Appeals and appeals the Judgment and Commitment Order (Doc. 42) that was entered on November 25, 2024.

                              Respectfully submitted,

                              VIRGINIA L. GRADY
                              Federal Public Defender


                              */s/ Stephanie Snyder*
                              STEPHANIE SNYDER
                              Assistant Federal Public Defender
                              633 17th Street, Suite 1000
                              Denver, CO 80202
                              Telephone: (303) 294-7002
                              FAX: (303) 294-1192
                              Email: Stephanie_Snyder@fd.org
                              Attorney for Christopher Carl Meier

## CERTIFICATE OF SERVICE

I hereby certify that on December 3, 2024, I filed the foregoing *Notice of Appeal* with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following email address and all parties of record:

Alecia L. Riewerts, Assistant United States Attorney
Email:  Alecia.Riewerts@usdoj.gov

Kyle P. Reynolds, Acting Deputy Chief, Child Exploitation and Obscenity Section.
Email: Kyle.Reynolds@usdoj.gov

I hereby certify that I have mailed or served the document or paper to the following participant in the manner (mail, hand-delivery, etc.) indicated next to the participant's name:

Christopher Carl Meier (*held on file*)

*/s/ Stephanie Snyder*
STEPHANIE SNYDER
Assistant Federal Public Defender
633 17th Street, Suite 1000
Denver, CO 80202
Telephone: (303) 294-7002
FAX: (303) 294-1192
Email: Stephanie_Snyder@fd.org
Attorney for Christopher Carl Meier

2